FILED

MAY 21 2019

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

JUDGE LIOI
MAG. JUDGE BURKE

KELLIE REHANNA,
Legal name Tony Fisher,
Plaintiff,

)  CASE No.
)  4:19 CV 01169
)
)

vs.

)  Civil Action
)

1. Federal Burea of Prisons
320 1st Street N.W.
Washington, DC 20534;

)  - Jury Trial Demanded -
)
)

2. Federal Bureau of Prisons,
Acting Director,
Hugh Horowitz;

)
)
)

3. Federal Bureau of Prisons,
Chief Medical Director,
Dr. Jeffery Allen;

)
)
)

4. Federal Burea of Prisons,
Assistant Director of Health
Services, Dr. Deborah Schultz,
Ph.D;

)
)
)

)

5. B.O.P. Regional Director, )
 J. Ray Ormond; )
6. B.O.P. Regional Medical Director, )
 Dr. John Manenti, D.O.; )
7. B.O.P. Transgender Executive )
 Committee Member, )
 Dr. Elizabetha Stahl; )
8. B.O.P. Female Offender Branch )
 Director, Alix McClearen; )
9. United States Surgeon General, )
 Jerome Adams, )
 200 Independence Ave. S.W. )
 Humphrey Bldg., Suite 701H )
 Washington, DC 20201; )
10. UNITED STATES PUBLIC HEALTH )
 SERVICES; )
11. United States Assistant Secretary )
 For Health, Adm. Brett Giroir; )
12. Elkton Federal Correctional )
 Institution ("Elkton") )
 8730 Scroggs Road )
 P.O. Box 10 )
 Lisbon, Ohio 44432; )
13. Elkton Warden, )
 Mark Williams; )
)

Elkton Employees; )

14. Chief Psychologist and
P.R.E.A. Coordinator, )
Dr. Paul Clifford; )

15. Psychologist and S.O.M.P.
Coordinator, Dr. Marissa Szumigale; )

16. R.D.A.P. Coordinator, )
Dr. Joshua Payne; )

17. Clinical Director, )
Dr. J. Dunlop; )

18. Assigned Health Care Provider, )
Dr. Kathy McNutt; )

19. Assigned Health Care Provider, )
Debra Giannone; )

20. Captain, Steven Grimm; )

21. Unit Counselor, C. Marshall; )

22. Unit Manager, D. Johnson, )

* All in their Official
capacities.

Defendants.

Plaintiff Kellie Rehanna, legal name Tony Fisher ("Plaintiff" or "Ms. Rehanna")[1], brings this action to obtain redress for the deprivation of her federal constitutional rights, as hereinafter alleged.

## Introduction

1.) Plaintiff is currently a prisoner serving her sentence at the Elkton Federal Correctional Facility ("Elkton") operated by the Federal Bureau of Prisons ("BOP").

2.) Throughout her incarceration she has suffered from Gender Identity Disorder, now known as Gender Dysphoria ("GD"), a serious

---

[1]  Although Plaintiff was born a biological male, she identifies as female, goes by "Kellie", and intends at a future time to change her legal name to "Kellie Rehanna". Accordingly, throughout this pleading, she will be referred to by the feminine pronoun and salutation except that Plaintiff has not changed pronouns in quoted statements from BOP documents

medical condition characterized by (1) a strong cross-gender identification, which is the desire to be, or the insistence that one is of the other gender, and (2) a persistent discomfort about one's assigned sex or a sense of inappropriateness in the gender of that sex.

3.) GD causes significant distress or impairment of social, occupational, and other areas of important functioning.

4.) GD is a readily diagnosable and treatable serious mental illness with an established course of treatment, consisting primarily of three components. This course of treatment is commonly referred to as "triadic therapy" and includes: (1) hormones of the desired gender; (2) the "real life" experience, i.e. living full-time in the new gender, and (3) surgery to change the sex characteristics of the person suffering from GD.

5.) Individuals suffering from GD who do not receive appropriate medical treatment are at risk of serious medical harm

including depression, anxiety, self-mutilation
and suicide.

6.) Beginning almost four (4) years ago, in
approximately October 2015, Ms. Rehanna
has sought treatment for her GD. Despite the
B.O.P's diagnosis and agreement to treat
Ms. Rehanna's GD, and Defendants knowledge
that Ms. Rehanna has intended to cause
serious harm to herself on multiple
occasions due to her fully untreated
condition, Defendants have refused, and
continue to refuse, to provide complete
and appropriate medical care to Plaintiff.

7.) As a direct result of Defendants intentional
delay, refusal and deliberate indifference
to her serious GD condition, Ms. Rehanna
has intended, threatened and experienced
severally strong urges to remove her penis
and testicles; and at multiple times has
thoughts of suicide due to the severe
mental anguish. Nevertheless, Defendants
continue to refuse to provide necessary
medical care to Ms. Rehanna, including,

but not limited to, Refusing to provide her with specific and adequate psychological treatment, appropriate hormone therapy by trained professionals with experience in the treatment of GD; appropriate grooming essentials, clothing and electrolysis for females; proper Restroom facilities with privacy stall doors; and sex reassignment surgery for treatment cure and completion as elected by Plaintiff.

8.) In support of their refusal to provide necessary medical care for Plaintiff, BOP officials and staff have referred to BOP policies which prevents prisoners with Gender Dysphoria from receiving individualized medical assessments and treatment for this serious medical condition by claiming it is an "elective procedure". (see, e.g. Patient Care Policy)

9.) Ms. Rehanna by this action challenges Defendants refusal to provide adequate medical care as an unconstitutional deprivation in violation of the Eighth Amendment of the United States Constitution.

10.) Ms. Rehanna challenges the constitutionality of BOP's policies both on its face and as applied to her as a violation of the Eighth Amendment of the United States Constitution.

11.) Ms. Rehanna seeks declaratory and injunctive Relief, including but not limited to, appropriate treatment and counseling by competent professionals experienced in treating persons with Gender Dysphoria, to continue throughout her incarceration,

## Jurisdiction

12.) Jurisdiction of this Court is invoked pursuant to 28 USC § 1331 in that it is a civil action arising under the Constitution and Laws of the United States and is premised upon the acts or omissions of Defendants acting under color of Federal law.

13.) Jurisdiction in this Court is proper for the Plaintiff's claim for declaratory and injunctive Relief against Defendants in their official capacities pursuant to 5 USC § 702.

14.) This Court is Authorized to grant declaratory And injunctive Relief under 28 USC § 2201 and 2202.

15.) Venue in the Northern District of Ohio is proper pursuant to 28 USC § 1391 (c) and (e).

16.) All Defendants are agencies, officers, or employees of the United States of America, or were At the time of the incidents at issue.

## PARTIES

17.) Plaintiff Kellie Rehanna, At all times material to this action, has been a federal prisoner in the custody and control of the Federal Bureau of Prisons. She is currently housed at the Elkton Federal Correctional Facility in Lisbon, Ohio.

18.) Defendant Federal Burea of Prisons ("BOP") is the United States Agency that currently and at all times relevant to this Complaint, has custody and control of Plaintiff.

19.) Defendant, Hugh Horowitz, was at all times material hereto, the duly appointed Director, employed by the BOP, acting within the course and scope of his duties. Defendant Horowitz is sued in his official capacity.

20.) Defendant, Dr. Jeffery Allen, was at all times material hereto, employed by the BOP as the Chief Medical Director, and was acting within the course and scope of his duties. Defendant Allen is sued in his official capacity.

21.) Defendant, Dr. Deborah Schultz, was at all times material hereto, the Assistant Director of Health Services Division, either under contract to provide medical services to BOP prisoners, or employed directly by the BOP to provide medical care to prisoners in the BOP (including Plaintiff).

22.) Defendant, J. Ray Ormond, was at all times material hereto, the duly appointed Regional Director, employed by the BOP and acting within the course and scope of his duties.

23.) Defendant, Dr. John Manenti, was at all times material hereto, the duly appointed Regional Medical Director, employed by the BOP, acting within the course and scope of his duties and sued in his official capacity.

24.) Defendant, Dr. Elizabeth Stahl, was at all times material hereto, a member of the Transgender Executive Committee of the BOP, acting within the course and scope of her duties.

25.) Defendant, Alix McClearen, was at all times material hereto, the Director of the Female Offender Branch of the BOP, acting within the course and scope of her duties.

26. Defendant, Jerome Adams, at all times material hereto, duly appointed Surgeon General of the United States of America for the United States Department of Health and Human Services, acting within the course and scope of his duties, and sued in his official capacity.

27.) Defendant, United States Public Health Services, at all times material hereto, is a corporation, and upon information and belief, pursuant to contractual agreements with a Department of the Military and the BOP provides staff for comprehensive medical and/or mental health services for prisoners (including Plaintiff at Elkton).

28.) Defendant, Adm. Brett Giroir, was at all times material hereto, and upon information and belief, the duly appointed United States Secretary for Health for the United States Public Health Services.

29.) Defendant, Elkton Federal Correctional Institution ("Elkton"), is an institutional division of the BOP for housing federal prisoners, and where Plaintiff's custody, control and care is provided.

30.) Defendant, Mark Williams, at all times material hereto, is the Elkton Warden. Defendant Williams was employed by the BOP, and was acting

within the course and scope of his duties
as Warden, and as the agent, servant,
and employee (including successor in office)
for the BOP; and is sued in his official
capacity.

31.) Defendant, Dr. Paul Clifford, was at all
times material hereto, Chief Psychologist
and P.R.E.A. Coordinator, either under
contract or employed by Elkton and the
BOP as the agent, servant and employee to
provide medical/mental health services
to prisoners (including Plaintiff), and
was acting within the scope and course
of his duties as Chief Psychologist at
Elkton. Defendant Clifford is sued in
his official capacity.

32.) Defendant, Dr. Marissa Szumigale, was
at all times material hereto, a staff
psychologist and S.O.M.P. Coordinator
at Elkton, either under contract or employed
by Elkton and the BOP.

33.) Defendant, Dr. Joshua Payne, was at all times material hereto, the staff R.D.A.P. Coordinator at Elkton, either under contract or employed by Elkton and the BOP.

34.) Defendant, Dr. J. Dunlop, was at all times material hereto, Chief Clinical Director at Elkton, either under contract or employed by Elkton and the BOP as the agent and servant to provide medical services to prisoners (including Plaintiff), and was acting within the course and scope of his duties as Chief Clinical Director at Elkton. Defendant Dunlop is sued in his official capacity.

35.) Defendant, Dr. Kathy McNutt, was at all times material hereto, a staff Assigned Health Care Provider at Elkton, either under contract or employed by Elkton and the BOP to treat Plaintiff.

36.) Defendant, Debra Giannone, was at all times material hereto, a staff Assigned Health Care Provider at Elkton,

either under contract or employed by Elkton and the BOP.

37.) Defendant, Steven Grimm, was at all times material hereto, Elkton's Captain in charge of the facility, employed by the BOP as agent and servant for the safety and security of the facility, acting in the course and scope of his duties.

38.) Defendant, C. Marshall, was at all times material hereto, employed by Elkton and the BOP as the Counselor for the unit in which Plaintiff resides.

39.) Defendant, D. Johnson, was at all times material hereto, employed by Elkton and the BOP as the Unit Manager for the unit in which Plaintiff resides.

40.) Each and all of the acts of Defendants alleged herein, where done by the Defendants in their official capacities (to include all successors in office),

but under color of law, and pretense of the statutes, regulations, policies, customs, practices and usages of the BOP, and under authority of the Defendants as public officials of the United States of America and the BOP.

## Gender Dysphoria is a Serious Medical Condition That Requires Adequate Medical Treatment

41.) As discussed more fully below, Ms. Rehanna was diagnosed with GD in 2015 by mental health providers contracted or employed by Defendant BOP.

42.) GD is a recognized diagnosable and treatable medical condition listed in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") (5th ed. 2015). Diagnosis is based on the following criteria: (1) a strong cross-gender identification, which is the desire to be, or the insistence that one is, the

other sex; (2) A persistent discomfort with one's assigned sex or an inappropriateness in the gender role of that sex; (3) the disturbance is not concurrent with a physical intersex condition (e.g. a person who is born with ambiguous genitalia); and (4) the disturbance causes significant distress or impairment in social, occupational, or other important areas of functioning. The World Health Organization also recognizes the discordance between anatomical sex and gender as a disorder in its 1990 publication, The International Classification of Disease (known as ICD-10), but uses the nomenclature of transsexualism.

43.) The World Professional Association For Transgender Health (WPATH), formerly known as, The Harry Benjamin International Gender Dysphoria's Association's Standards of Care for Gender Identity Disorder ("Standards of Care") articulate the professional consensus about the psychiatric, psychological, medical, and surgical management of

GD within the United States. WPATH is an international multi-disciplinary professional association with extensive expertise in accepted standards for transgender health. The WPATH promulgates standards of care for gender identity disorders, which set forth the clinical protocals for treating persons with GD.

44.) WPATH has published its 7th version of Standards of Care. "Standards of Care for the Health of Transsexuals and Gender Non-conforming People", within the International Journal of Transgenderism, 13:165-232 (2011). WPATH has also designated a section entitled: XIV Applicability of the Standards of Care to People Living in Institutional Environments, which states:

The SOC [Standards of Care] in their entirety apply to all transsexual, trans-gender and gender non-conforming people, irrespective of their housing situation. People should not be

discriminated against in their access
to appropriate health care based on
where they live, including institutional
environments, such as prisons, or
long-term intermediate health care
facilities. Health care for transsexual,
transgender and gender non- conforming
people living in institutional environments
should mirror that which would be
available to them if they were living
in a non-institutional setting within
the same community.

WPATH Standards of Care at p. 207.

45.) According to the Standards of Care, and
the DSM-IV-TR, people with GD who do
not receive appropriate medical treatment
are at risk of genital self-harm (a form
of surgical self-treatment of auto-castration
or auto-penectomy that can lead to serious,
even life threatening, injuries, depression
and suicide attempts).

46.) The goal of medical treatment for GD according to the Standards of Care are as follows: (1) to alleviate clinically significant distress and impairment of functioning associated with GD; (2) to achieve long-lasting personal comfort with the gendered self in order to maximize overall psychological well-being and self-fulfillment. The Standards of Care provide that there are three medically appropriate treatment options to treat GD: (1) hormones of the desired gender, (2) the "Real life" experience (i.e. cosmetics for grooming and wearing clothing of the preferred gender) as the pre-requisite of surgery, and (3) Surgery to change the sex characteristics of the person suffering from GD. These treatment procedures are frequently referred to as the triadic therapy and are the accepted and appropriate treatment for GD.

47.) Dr. Ettner is one of the authors of WPATH Standards of Care, version 7. Dr. Ettner has been a WPATH member since 1993 and chairs its Committee for Institutionalized persons. Dr. Ettner has

treated approximately 3,000 individuals with gender dysphoria, including evaluating whether gender confirmation surgery is necessary for certain patients. Dr. Ettner is an author or editor of numerous peer-reviewed publications on treatment of gender dysphoria and transgender healthcare. Dr. Ettner is the editor for the textbook, "Principles of Transgender Medicine and Surgery" which was revised in 2017 and is the textbook used in medical schools. Dr. Ettner has concluded that the clinical significance of an individual with GD who has severe and extreme urges of self-surgery castrate are not acts of mutilation or self-harm, but are instead attempts to remove the target organ that produces testosterone, which in such a case is the actual "cure" for Gender Dysphoria of this individual's elective choice.

48.) Further, The Standards of Care are intended to be flexible in order to meet the diverse healthcare needs of transsexual, transgender, and gender non-conforming people. While flexible, they offer standards

For promoting optimal healthcare and guidelines. Gender nonconformity is not the same as Gender Dysphoria. Gender nonconformity refers to the extent to which a person's gender identity, role or expression from cultural norms prescribed for people of a particular sex. (Institute of Medicine, 2011).

49.) Gender Dysphoria refers to discomfort or distress that is caused by discrepancy between a person's gender identity, and that person's sex assigned at birth. Only some gender nonconforming people experience gender dysphoria at "some" point in their lives. Treatment is available to assist people with such distress to explore their gender identity and find a gender role that is comfortable for them. Treatment, however, is individualized, and to each one's election that they may make in the elective choice of how far to treat it. What helps one person alleviate gender dysphoria might be very different from what helps another person. This process may or may not involve a change of gender expression

or body modifications. Medical treatment options include, for example, feminization or masculinization of the body through hormone therapy, and/or surgery, which are effective in alleviating gender dysphoria and are medically necessary for many people. Gender identities and expressions are diverse, and hormones and surgery are just two options of many options available to assist people with achieving comfort with self and identity. (WPATH Standards of Care at p. 167-68).

50.)  Gender Dysphoria can be in large part alleviated through treatment. Hence, while transsexual, transgender, and gender non-conforming people may experience gender dysphoria at some points in their lives, many individuals who receive treatment will find a gender role and expression that is comfortable for them, even if these differ from those associated with their sex assignment at birth, or from prevailing gender norms and expectations. (WPATH Standards of Care at p. 168).

51.) <u>Options For Psychological And Medical Treatments of Gender Dysphoria</u>: For individuals seeking care for Gender Dysphoria, a variety of therapuetic options can be considered. The number and type of interventions Applied and the other in which these take place may differ from person to person (emphasis Applied, Mine). Treatment options include: changes in gender expression And Role (which may involve living part-time or full time in Another gender Role, consistent with one's gender identity); Hormone therapy to feminize or masculinize the body; Surgery to change primary And/or Secondary Sex characteristics (e.g. breasts/chest, external and/or internal genitalia, facial features, body contouring); Psychotherapy (individual, couple, family or group) for purposes such as exploring gender identity, Role, and expression; Addressing the negative impact of gender dysphoria, And stigma on mental health; alleviating internalized transphobia enhancing social and peer support, improving body image; or promoting Resiliance (WPATH Standards of Care p. 171-72).

52.) As such, Plaintiff cannot obtain her own medical services. Therefore, the United States Constitution Requires Defendants to provide her with "Reasonable Adequate medical care". "Adequate" medical services are services at a level Reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards, and, as a level of health services Reasonably designed to meet Routine and emergency medical, dental, psychological, or psychiatric care.

53.) Defendants are Required to follow certain and specific policies and directives for the treatment of offenders with GD. Defendants failed to do so.

54.) According to the Standards of Care, after diagnosis is made by a competent, prudent medical professional (Endocronologist) the therapeutic approach usually and (as the elections Plaintiff has chosen) normally includes the elective choices of the individual, being the administration of hormones of the desired gender,

the "Real life" experience in the desired gender Role, and to Finally "cure" [my] Gender Dysphoria by completing sex Reassignment Surgery. Further, the Standards of Care, cross-sex hormonal therapy, the "Real life" experience, and completion of sex Reassignment Surgery are "medically necessary" For patience suffering from GD. Not only do these improve the quality of life, but they also limit psychiatric co-morbidity (the development of additional mental disorders), which often accompanies lack of treatment. In some, not all, patients using hormonal therapy alone may provide sufficient symptomatic Relief of the obviate need for "cross living" in the desired gender, which is not in Ms. Rehanna's case, providing symptom Relief. The sex Reassignment surgical cure is medically necessary in this particular case.

## DEFENDENTS BOP, INCLUDING BUT NOT LIMITED TO, ELKTON AND STAFF, PROMULGATED AND ENFORCE A POLICY THAT DENIES PRISONERS WITH GENDER DYSPHORIA, INCLUDING MS. REHANNA, INDIVIDUALIZED EVALUATION AND CONSTITUTIONALLY ADEQUATE TREATMENT

55.) In a Memorandum for the Chief Executive Officer of the BOP, dated May 31, 2011, From the Federal Assistant Director of Health Services, Newton E. Kendig, and Assistant BOP Director, Charles E. Samual Jr. (later to become BOP Director), the WPATH Standards of Care were officially adopted and incorporated into BOP program statement policies.

56.) Defendants are responsible for the promulgation and administration of BOP Program Statement policies.

57.) Ms. Rehanna was diagnosed with Gender Dysphoria by Staff Psychologist, Jessica Virzi, at Elkton on July 7, 2015.

58.) Defendants agreed to treat Plaintiff's GD in a consent form (attached Exhibit A), signed by both the BOP, through authorized clinician and medical officer Kathy McNutt, and Ms. Rehanna dated October 2, 2015.

59.) Among the understandings of the consent agreement is that Plaintiff's medicines and dose would be based on by "experienced" practitioners, and that Plaintiff should stop taking estrogen two weeks before any surgery (indicating the ultimate completion of treatment by surgery).

60.) BOP's Program Statements for Health Services Administration, Patient Care, Psychology, Treatment and Care of Inmates with Mental Illness, and Transgender Offender Manual, governs the structure and outlines the detailed policies regarding prisoner health care within the BOP, including the policy regarding Gender Dysphoria treatment.

61.) The BOP relies on these Program Statement policies to deny all inmates under its care any individualized medical assessment and appropriate care, including "complete" treatment for Gender Dysphoria.

62.) These BOP Program Statement policies exclude Ms. Rehanna from fulfilling complete and necessary treatment for Gender Dysphoria, without regard to her serious, individualized medical needs, without regard to her history of serious risk of suicide and genital self-harm, and without regard to the serious future suicide and genital self-harm risk she poses. Due to Defendants' ongoing deliberate indifference to her serious medical need, Ms. Rehanna continues to suffer severe emotional harm and remains at risk for additional emotional and physical harm.

<u>MS. REHANNA HAS REPEATEDLY COMMUNICATED</u>
<u>TO THE DEFENDANTS THAT SHE HAS GENDER</u>
<u>DYSPHORIA AND HAS FREQUENTLY REQUESTED</u>
<u>APPROPRIATE MEDICAL TREATMENT TO</u>
<u>CURE HER GD BY COMPLETING</u>
<u>SEX REASSIGNMENT SURGERY</u>

63.) Ms. Rehanna was born in Ohio in 1977. Throughout her life, Ms. Rehanna has believed she was assigned the WRONG gender.

64.) In her younger years, Ms. Rehanna felt more comfortable with girls and played games in which she would dress-up as a girl.

65.) During her younger years, Ms. Rehanna became AWARE of her female gender identity, Realized that she was a female inside a male body and at times began privately presenting as female.

66.) Other than her grandmother, Ms. Rehanna was terrified of telling her family and others that she felt "female" because she was afraid that they would Reject her.

67.) Desperately wanting to present as a female publicly, given societal reasons among others, she was unable to do so because of financial restrictions, the social obligations of her conservative church and workplace, and because of family pressure to act "normal".

68.) After becoming incarcerated in 2013, Ms. Rehanna participated in therapy that helped her understand that the source of her self-destructive behavior is the distress and turmoil she has been experiencing her whole life because of her untreated Gender Dysphoria.

69.) During her incarceration, she has repeatedly communicated to the BOP, both verbally and through her actions, that she identifies as a female and has Gender Dysphoria. She has repeatedly made written and verbal requests (as evidenced by attachments hereto) for treatment and accomodations for her condition. Examples of Ms. Rehanna's communications and exhaustion of the Administrative Remedies include, but are not limited to, the following:

A.) By no later than October 2015, Ms. Rehanna Requested that the BOP place her on female hormones to assist with her transition and ultimate surgery.

b.) In December of 2015, Ms. Rehanna Requested female grooming products. With the exception of only allowing such items as shampoo and a sports bra, the BOP denied this Request by claiming "security concerns". (Although the BOP has approved it all in female facilities).

c.) In April of 2016, Ms. Rehanna Requested sex Reassignment surgery. It was Refused by the BOP.

d.) In May and June of 2016, Ms. Rehanna complained of P.R.E.A. harrassment issues, in particular due to Elkton's failure of having appropriate Restroom privacy stall doors in all locations of the facility per policy. The Response indicated her claims were unsubstantiated.

e.) In June of 2016, Ms. Rehanna Requested female undergarments be provided. Elkton and the BOP Refused her Request.

f.) Plaintiff Requested electrolysis hair Removal in October 2016. BOP and Elkton Refused this Request.

g.) In a medical summary, dated 12-8-16, Chief Psychologist Clifford memorialized: "Inmate was reminded that makeup is not on the approved list; was reminded that inmates are prohibited from using substances as makeup."

h.) In November of 2017, Ms. Rehanna had communicated by Email to Psychology and Medical feelings of wanting her penis removed and not wanting to live with it any longer.

i.) In November 2017, Psychology performed a Suicide Risk Assessment, which among other things the following month resulted in Ms. Rehanna being diagnosed with P.T.S.D. As an additional result of prior proven sexual assaults at the BOP.

j.) Ms. Rehanna requested in November 2017 to have a medical Endrocronologist specialist and sex reassignment surgery. The BOP and Elkton responded refusing to provide her this treatment.

k.) In April 2018, Ms. Rehanna requested a Psychologist Specialist for Transgenders, which, again, the BOP refused to provide.

l.) In 2018, Ms. Rehanna's estrogen levels rose to a dangerously high and critical level of 715.1 pg/mL, where normal

levels are 200 pg/mL; Revealing the fact that
Ms. Rehanna **not** Receiving adequate medical
treatment by a professional specialist.

(It is no wonder Elkton staff neglect their duties
when they have, for example, written in their FB
Unit staff conference room the following: "How to
succeed in the BOP. Think of a real job, then take
away Reason, common sense, and accountability.
Never volunteer for anything.")

## DEFENDANTS HAVE BEEN AWARE OF MS. REHANNA'S GENDER DYSPHORIA SINCE AT LEAST 2015 AND HAVE FAILED AND REFUSED TO ADEQUATELY TREAT HER GD CONDITION

70.)  The BOP Knew that Ms. Rehanna had Gender
Dysphoria as early as July 2015.

71.)  Ms. Rehannas' treating Psychologist at
Elkton formally diagnosed her with Gender
Dysphoria in July 2015, and agreed, and
began hormone treatment for her GD.

72.) Cross-sex hormone therapy results in development of secondary sex characteristics of the other sex and provides an increase in the overall level of well-being of a person with Gender Dysphoria. For a transgender woman, hormone treatment has physical effects (which Plaintiff has obtained) such as breast growth, thinning of facial hair, redistribution of fat and muscle, and shrinkage of the testicles. The maximum physical effects of hormone therapy will typically be achieved in two to three years.

73.) Surgery — particularly genital surgery — is often the last and the most considered step in the treatment process for Gender Dysphoria. Defendants refuse Plaintiff this step.

74.) Ms. Rehanna has well met all the WPATH Standards of Care criteria to complete and cure her elective and desired gender identity, as her medical records will all confirm. The WPATH criteria for genital reconstruction surgery in male-to-female patients include the following:

A.) Persistent, well documented gender dysphoria.

b.) Capacity to make a fully informed decision and to consent to treatment.

c.) Age of majority in a given country.

d.) If significant medical and mental health concerns are present, they must be well controlled.

e.) 12 continuous months of hormone therapy as appropriate to the patients gender goals; and

f.) 12 continuous months of living in a gender role that is congruent with their gender identity.

75.) Ms. Rehanna has achieved the maximum (in fact well beyond) physical changes associated with hormone treatment. Defendants refuse and have failed to provide appropriate and adequate medical treatment.

76.) Defendants knew Ms. Rehanna had a serious medical condition and was/is at high risk of self-harm, as demonstrated by their/her medical files, requests for treatment, communications, and actions

of self-harm, but they have responded with denials of treatment and deliberate indifference. These records demonstrate Defendants' knowledge and inadequate responses, including but not limited to, Elkton's basic "cut-and-paste" records and reports as evidenced.

77.) Since 2015, Ms. Rehanna has made a plethora of requests, communications and complaints to BOP officials at multiple levels, including Central and Regional Offices, as well as Chief Psychiatrists, Chief Physicians, Warden, and treating medical and psychologists asking for medical treatment, especially surgery, for GD, but Defendants have repeatedly denied her treatment, although Defendants knew that Ms. Rehanna, as a person with GD, had a heightened risk of suicide and genital self-mutilation if left untreated.

78.) Despite the BOP's GD diagnosis and Ms. Rehanna's numerous requests for appropriate GD treatment and surgery,

starting with Requests to be placed on Female hormones in October 2015, the BOP has Refused to provide medical treatment, despite having agreed to do so. This denial exacerbated Ms. Rehanna's GD condition and caused her overall health to further deteriorate.

79. Although Defendants knew that persons with untreated GD have heightened suicide Risk and Risk of further genital self-mutilation, and that Ms. Rehanna had a history of these Risks, Defendants denied Ms. Rehanna adequate medical care to treat her condition.

DEFENDANTS CONTINUE TO DENY MS. REHANNA TREATMENT FOR GD, IGNORING HER SERIOUS MEDICAL NEEDS, BASED ON BOP POLICY, WHILE ELKTON STAFF CONTINUE TO ALSO DISCRIMINATE AGAINST HER AS A RESULT OF HER GD

80.) The WPATH Standards "are intended to be flexible in order to meet the diverse health care needs of transsexual, transgender,

and gender-nonconforming people." They confirm that treatment requires an "individual" approach.

81.) BOP Transgender Offender Manual policy, under Section 7, states: "A transgender or intersex inmate's own views with respect to his/her safety must be given serious consideration".

82.) BOP Treatment and Care of Inmates with Mental Illness policy, under Section 7, states that the C Care Team is to identify concerns such as: "cellmate conflicts", "Bullying or abuse by other inmates", and to "mitigate potential interactions" by utilizing "Positive Reinforcers" for treatment goals, for example listing Social Supports as cellmates and positive staff relationships.

83.) Several treatment options can alleviate a person's GD, which primarily include psychotherapy, hormonal management, and surgical interventions, like genital confirmation surgery or sex reassignment surgery. Aside from these three main

domains, "social transitioning" is another treatment for gender dysphoria.

84.) For the purpose of assisting Ms. Rehanna's social transitioning, she requested in October 2016 for electrolysis hair removal, which the BOP and Elkton refused to provide.

85.) Social transitioning also refers to Ms. Rehanna's request from Elkton for access to Defendant BOP's clothing and grooming standards for female inmates. To be clear, Ms. Rehanna is not requesting permission to wear stiletto heels or costume jewelry while in Defendant's custody. Instead, she's only ever sought to be treated like any other female inmate. This includes the ability to possess and wear the same bras, panties, hairstyles, and makeup items permitted in Defendant's female facilities; and which the BOP already provides in part to other transgender inmates, but Elkton discriminates to provide Plaintiff.

86.) Defendant Elkton denies all of Ms. Rehanna's grooming requests, refusing

them by focusing on the infeasability of transitioning based on security concerns instead of Realizing the appropriate medical necessity for treatment.

87.) Ms. Rehanna grieved the privacy and safety concerns of Elkton's failure to have appropriate restroom stall doors and the discrepancy between 28 C.F.R. § 115.15(d) and BOP Program Statement 5324.12, which the BOP and Elkton Refuse to comply with claiming their policy "only applies to housing units, not recreation, education, religious service buildings, or any other place, contrary to the C.F.R.

88.) Ms. Rehanna grieved the discriminatory "pat searches" of her to be performed in an appropriate manner and preferrably by female officers or staff to eliminate "groping" by male officers given she has developed breasts from hormone treatment, and to Relieve her anxiety and distress she suffers due to previous substantiated prison Rapes while in the BOP. The BOP denied her Request, which thereafter Elkton Warden

And staff discriminately pat searched Ms.
Rehanna at lunch while making fun of her.
BOP has policy that includes pat search
exceptions.

89.) Ms. Rehanna has communicated issues
and safety concerns with her cube-mates
to Unit team staff counselor Marshall and
Unit Manager Johnson to no avail, while they
intentionally discriminate with assisting to
rectify her concerns per above mentioned
policy; however, would accomodate others
with bed moves due to Ms. Rehanna's belief
of their bigotry and ignorance of her GD.

90.) Other Federal courts have found similar
policies banning specific treatments for
inmates with gender dysphoria - often
hormone therapy or certain surgical procedures
- to be facially invalid. (See, e.g. Fields
v. Smith, 653 F.3d 550, 556 (7th Cir. 2011);
Soneeya v. Spencer, 851 F.Supp.2d 228, 247
(D. Mass. 2012); Kosilek v. Spencer, 774 F.3d
63, 91 (1st Cir. 2014); Keohane v. Jones,
2018 U.S. Dist. LEXIS 142640; Edmo v. Corizon Inc,
2018 U.S. Dist. LEXIS 211391).

91.) Despite her history of serious self-harm and affirmative diagnosis of GD, a serious medical condition recognized by the medical and psychological communities, Defendants, along with Elkton and staff, have consistently refused to provide - and continue to refuse to provide discriminately - against Ms. Rehanna's medical care to treat her GD.

92.) She is currently housed at Elkton's all male facility, an institution where officials are openly hostile to her because of her gender identity.

93.) As a result of Defendants indifference, Ms. Rehanna continues to suffer emotionally and physically because of her Gender Dysphoria, which all of her requests and communications have fallen on deaf ears.

94.) <u>EXHAUSTION OF ADMINISTRATIVE REMEDIES PURSUANT TO 42 U.S.C. § 1915</u>

Plaintiff has exhausted all administrative Remedies in respect to all claims and allegations herein. Plaintiff has attached hereto true and

correct copies of BOP grievances and appeals, as they relate to such claims and allegations herein as Exhibit _B_. Such grievances and appeals are listed as follows:

A.) 06/09/2016, Grievance/Appeal # 869712-A1
b.) 12/28/2016, Grievance/Appeal # 890832-A1
c.) 03/23/2017 Grievance/Appeal # 901070-A1
d.) 08/02/2017 Grievance/Appeal # 915382-A1
e.) 11/27/2017 Grievance/Appeal # 926832-A1
f.) 11/27/2017 Grievance/Appeal # 926837-A1
g.) 04/04/2018 Grievance/Appeal # 939217-A1
h.) 08/07/2018 Grievance/Appeal # 954868-A1
i.) 08/15/2018 Grievance/Appeal # 952467-R1
j.) 08/22/2018 Grievance/Appeal # 952742-A1

95.) Any further BOP grievance/appeals containing "any" complaint or problem similar to the above listed is considered "grieved" and not allowed any further process, and returned to Plaintiff as such.

## COUNT I: DEFENDANTS FAILURE AND REFUSAL TO PROVIDE CARE AND TREATMENT FOR MS. REHANNAS' GD CONDITION VIOLATES THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION

96.) Plaintiff Rehanna Restates and Realleges paragraphs 1-93 as if fully set forth in this Count I.

97.) Defendants have been deliberately indifferent to Ms. Rehanna's serious medical needs while she is incarcerated under conditions posing a substantial risk of serious harm to her. She has been deprived of the minimal civilized measures of life's necessities as a result of Defendants failing to provide her with appropriate medical care for her Gender Dysphoria.

98.) By their policies, practices, acts and omissions, Defendants violate Ms. Rehanna's Right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution.

99.) As a matter of policy and practice (especially Elkton's failure to provide to all the inmates) Defendants have refused, and continue to refuse, to provide appropriate medical treatment to Ms. Rehanna who has been diagnosed with a serious medical condition which has severe physical and emotional consequences.

100.) To the extent that the failure and refusal of Defendants to provide adequate treatment concerning even all Ms. Rehanna's denied Requests, Rests on BOP Program Statements, then any such policies/policy is unconstitutional on its face and as applied to Ms. Rehanna as set forth more fully below in Counts II and III.

**COUNT II:** DEFENDANTS PROMULGATION AND ENFORCEMENT OF BOP PROGRAM STATEMENTS MENTIONED HEREIN VIOLATES THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION ON ITS FACE

101.) Plaintiff Rehanna Restates and Realleges paragraphs 1-93 as fully set forth herein.

102.) By their policies, practices, acts and omissions, Defendants, including Elkton and staff, violate the Rights of inmates with Gender Dysphoria to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution.

103.) As a matter of policy and practice, Defendants have Refused, and continue to Refuse, to provide appropriate medical treatment to inmates who have been diagnosed with Gender Dysphoria.

104.) Defendants have long been aware of the consequences of failing to provide medically appropriate treatment for inmates with GD by way of accepted medical literature, advocacy organizations, prisoner grievances and other means, but have failed to make Reasonable corrective action.

105.) Defendants, including Elkton and staff, are ultimately Responsible, under BOP policy, for the physical and psychiatric

106.) By Refusing to provide appropriate medical treatment For GD, Defendants have acted, and continue to act, with discrimination and deliberate indifference to the serious medical needs of, and the substantial risk of serious harm to, prisoners with GD.

## COUNT III: DEFENDANTS PROMULGATION AND ENFORCEMENT OF BOP PROGRAM STATEMENTS MENTIONED HEREIN VIOLATES THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS APPLIED TO PLAINTIFF REHANNA

107.) Plaintiff Rehanna Restates and Realleges paragraphs 1-93 as if fully set forth herein.

108.) The BOP diagnosed Plaintiff with Gender Dysphoria in 2015. At the time of her diagnosis, and at all times thereafter, Defendants were aware of the medically appropriate treatments for Gender Dysphoria.

109.) Despite this Knowledge, as well as having agreed to treat her, BOP has refused, and continues to refuse, to provide

Plaintiff with complete, adequate, or any treatment for her Gender Dysphoria.

110.) Plaintiff has a history of serious suicide risk and other self-harm while in BOP custody, including serious risk and desire to cut off her genitalia. These risks have been diagnosed as being related, both directly and indirectly, to her untreated Gender Dysphoria.

111.) Defendants have applied the Program Statements of the BOP mentioned herein to Plaintiff, and in so doing have refused to allow her any access to appropriate medical or psychological treatment for her Gender Dysphoria.

112.) By their policies, practices, acts and omissions, Defendants violate the rights of Ms. Rehanna to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution.

113.) Defendants have long been aware of the consequences of failing to provide medically appropriate treatment for Ms. Rehanna by way of accepted medical literature, advocacy organizations, her own grievances, and other means, but have failed to take reasonable corrective action.

114.) By refusing to provide Ms. Rehanna complete, full or any medically appropriate treatment for Gender Dysphoria, Defendants have acted, and continue to act, with discrimination and deliberate indifference to the serious medical needs of, and the substantial risk of serious harm to Ms. Rehanna.

** This court is informed that Ms. Rehanna sought the help of another to organize and prepare this Complaint. She is not well versed in the law and, therefore, seeks the assistance of a lawyer to be appointed by this Court for the continued pursuit of this Action.

## Prayer for Relief

Plaintiff has suffered and will continue to suffer immediate and irreperable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants, including Elkton and staff, as alleged herein, unless she is provided with medically appropriate treatment for her Gender Dysphoria. The declaratory and injunctive relief sought by Plaintiff is necessary to prevent continued and further injury.

WHEREFORE, Plaintiff requests that this Court grant the following Relief:

A.) Enjoin Defendants, including Elkton and staff, from continuing to enforce the current BOP policies toward the treatment of incarcerated persons with Gender Dysphoria.

B.) Enjoin Defendant BOP to provide Ms. Rehanna with appropriate GD treatment by medical and mental health professionals with expertise in Gender

Dysphoria, including GD specific psychological treatment, hormone therapy, sex Reassignment surgery — that includes "All" surgical options that Plaintiff elects And desires to be provided her —, And other medical treatments deemed Appropriate by third-party uninterested medical professionals with experience in the treatment of Gender Dysphoria;

C.) Issue a permanent injunction Against Defendants from subjecting Plaintiff to the unconstitutional And illegal policies, Acts, practices And omissions described in this Complaint;

D.) Issue A Judgment Against Defendants declaring that the policies, Acts, practices, And omissions of these Defendants with Regard to prisoners with GD Are unlawful And constitute cruel And unusual punishment in violation of the Eighth Amendment to the United States Constitution;

E.) Order Defendant BOP to promulgate a formal policy stating that prisoners with GD shall have access to medically appropriate treatment by experts, including hormone therapy, "Real life" experience, which includes grooming and female products, transition surgery, Regardless of whether or not they received GD treatment prior to incarceration;

F.) Order Defendant BOP to promulgate a formal policy stating appropriate privacy Restroom stall doors be provided in all Restroom facilities for prisoners with GD; Along with appropriate "pat down" procedures and training for staff without discrimination toward prisoners with Gender Dysphoria;

G.) Order Defendants to take all other actions necessary to provide medically appropriate treatment for prisoners with Gender Dysphoria;

H.) Order Reasonable Attorney fees as well costs of suit to Plaintiff; and

I.) GRANT such other and further Relief
this Court considers just and proper.

## VERIFICATION

Having Read the foregoing Complaint, I
hereby declare and verify under the penalty
of perjury that the foregoing, except as to
the matters alleged on information and belief,
is true and correct;

Executed this 15th day of May , 2019
and placed in the institutional mail system,
First-class postage pre-paid by me.

Respectfully submitted,

*Tony Fisher*

Tony Fisher, Plaintiff
A.K.A. Kellie Rehanna
Elkton F.C.I.
No. 70313-061
P.O. Box 10
Lisbon, Ohio 44432

✱ Attached Exhibits:
A - 5 pgs
B - 160 pgs
C - 81 pgs
D - 117 pgs
E - 10 pgs

To the Clerk;
Please perform the necessary Service of
Process as Required by Federal Civil Rule 4.