# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| TONY FISHER, | ) | CASE NO. 4:19-cv-1169 |
| aka KELLIE REHANNA | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| FEDERAL BUREAU OF PRISONS, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Tony Fisher ("Fisher"),[1] an inmate incarcerated at Federal Correctional Institution Elkton ("FCI-Elkton"), brought this action alleging that FCI-Elkton, the Federal Bureau of Prisons ("BOP"), the United States Public Health Service ("USPHS"), seven BOP employees, ten FCI-Elkton employees, the United States Surgeon General, and the Assistant Secretary for Health (collectively, "defendants") violated her Eighth Amendment rights. (Doc. No. 1, complaint ["Compl."].)

Now pending before the Court is defendants' motion to dismiss for lack of jurisdiction and for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1) and (6). (Doc. No. 21 ["Mot."].) Fisher opposed the motion,  (Doc. No. 29, opposition ["Opp'n"]), and defendants filed a reply, (Doc. No. 30, reply ["Reply"]). For the reasons detailed below, defendants' motion to dismiss is GRANTED in part and DENIED in part.

---

[1] Fisher is anatomically male and was assigned the male sex at birth, but identifies as a woman and goes by the name Kellie Rehanna. (Compl. at 4 fn.1.)  Both parties refer to Fisher with feminine pronouns in their briefs. Accordingly, the Court will refer to Fisher using female pronouns. *See Murray v. United States Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at *1 n.1 (6th Cir. Jan. 28, 1997) (adopting a biologically male plaintiff's usage of "the feminine pronoun to refer to herself").

## I. BACKGROUND

Though born a male, Fisher believed she was "assigned the wrong gender[]" throughout most of her life. (Compl. ¶ 63.) For a variety of reasons, however, Fisher did not present as a female publicly prior to her incarceration in 2013. (*Id.* ¶¶ 67–68.) While attending therapy in prison, Fisher realized that she was suffering from untreated Gender Dysphoria ("GD"). (*Id.* ¶ 68.) Fisher was formally diagnosed with GD by the FCI-Elkton medical staff on July 7, 2015, and began hormone treatment for her condition shortly thereafter. (*Id.* at ¶¶ 57, 71.) GD "refers to discomfort or distress that is caused by [a] discrepancy between a person's gender identity[] and that person's sex assigned at birth."[2] (*Id.* at ¶ 49.) "[P]eople with GD who do not receive appropriate medical treatment are at risk of genital self-harm (a form of surgical self-treatment of auto-castration or auto-penectomy that can lead to serious, even life threatening, injuries, depression[,] and suicide attempts)." (*Id.* at ¶ 45.) GD "can be in large part alleviated through [individualized] treatment[.]" (*Id.* at ¶¶ 49–50.) Treatment options include changes in gender expression and role, hormone therapy, sex reassignment surgery ("SRS")[3], and/or psychotherapy. (*Id.* ¶ 51.)

Since her diagnosis, Fisher has "made a plethora of requests, communications[,] and complaints to BOP officials at multiple levels," asking for a variety of treatments and accommodations related to her GD. (*Id.* ¶ 77.) Some of these requests include: electrolysis hair

---

[2] "GD is a recognized diagnosable and treatable medical condition listed in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders[.]" (Compl. at ¶ 42.) The World Health Organization "recognizes the discordance between anatomical sex and gender as a disorder … but uses the [term] transsexualism." (*Id.*)

[3] The Court uses the term "SRS", as opposed to gender confirmation surgery, as it is the label used by the parties. *See Campbell v. Kallas*, 936 F.3d 536, 550 n.1 (7th Cir. 2019) (recognizing that the term "sexual reassignment surgery" is now commonly referred to as gender confirmation surgery).

2

removal (*id.* ¶ 84); access to the same clothing and grooming products as female inmates (including "the same bras, panties, hairstyles, and makeup items permitted in … female [prison] facilities") (*id.* ¶ 85); being placed on female hormones (*id.* ¶ 78); SRS (*id.* ¶ 77); treatment from outside medical professionals who specialize in GD (*id.* ¶ 69(j)–(k)); installation of full restroom stall doors on certain of FCI-Elkton's restrooms (*id.* ¶ 87); and a "pat search[]" exception whereby pat searches are performed by female officers (*id.* ¶ 88). After reviewing the nearly 400 pages of exhibits appended to her complaint, it is clear that the BOP and FCI-Elkton granted some of Fisher's requests, but denied others.

The BOP has promulgated various policies, manuals, and rules related to the treatment and clinical care of inmates with GD, including the Transgender Offender Manual. (*Id.* ¶¶ 55, 60, 81.) *See also* Federal Bureau of Prisons, *Transgender Offender Manual* (May 11, 2018), bop.gov/policy/progstat/5200-04-cn-1.pdf. The Transgender Offender Manual details BOP policy concerning staff training and responsibilities, initial designations and intake screening, housing and programming assignments, documentation and sentry assignments, hormone and necessary medical treatment, institution psychology services, pronouns and names, pat searches and exceptions, visual searches and exceptions, clothing and commissary items, and transgender inmates' reentry needs. *Id.*

BOP has also established the Transgender Clinical Care Team ("TCCT"), which is "[a] multidisciplinary group of BOP personnel with [transgender] subject matter expertise" that "provides assistance to institution staff and develops clinical treatment recommendations for the BOP [transgender] population." Federal Bureau of Prisons, *Medical Management of Transgender Inmates*, at 1 (Dec. 2016), https://www.bop.gov/resources/pdfs/trans_guide_dec_2016.pdf. And

3

the Transgender Executive Council, which is "[a] group of BOP management personnel who mitigate executive level non-clinical issues[,] … [and] provides oversight to the BOP TCCT." *Id.*

Throughout her complaint, Fisher cites to various publications by the World Professional Association for Transgender Health ("WPATH"). WPATH is "an international multi-disciplinary professional association … [that] promulgates standards of care for [individuals who suffer from] gender identity disorders, which set forth the clinical protocols for treating persons with GD." (Compl. ¶ 43.) Several BOP policies and procedures related to the care of inmates with GD make reference to WPATH and the WPATH Standards of Care ("WPATH SOC").[4]

Nevertheless, Fisher claims that BOP policies "exclude [her] from fulfilling complete and necessary treatment for [GD]." (Compl. ¶ 62.) Thus, Fisher filed this action alleging that BOP's policies, and denials of certain of her GD-related requests, constitute deliberate indifference to serious medical needs in violation of the Eighth Amendment. (*Id.*)

Even though Fisher's complaint, with exhibits, is over 400 pages in length, the precise nature of Fisher's claims and requested relief is unclear. It appears as though Fisher seeks declaratory and injunctive relief (*id*. at 50–54) on the basis that defendants' following actions violated the Eighth Amendment: (1) denial of her request for a GD specialist's second opinion (*id*. at ¶¶ 7, 69); (2) denial of her request to stock the prison commissary with female clothing and female grooming products (*id*. at ¶¶ 7, 69, 85, 86); (3) refusal to install stall doors on bathrooms in the FCI-Elton recreation room (*id*. at ¶¶ 7, 87); (4) denial of her request for a bed reassignment

---

[4] Fisher claims that "the ["WPATH SOC"] were officially adopted and incorporated into BOP program statement policies[,]" in a memo dated May 31, 2011. (Compl. ¶ 55.) But Fisher included this memorandum in the record, and it includes no such adoption or incorporation of the WPATH SOC. (Doc. No. 1-7, Corrected Exhibit B Administrative Remedies ["Admin. Rec."] at 345–46.) At most, the memorandum references the WPATH SOC by stating "[c]urrent, accepted standards of care will be used as a reference for developing the treatment plan." (*Id.*) Rather, the purpose of the memorandum was to instruct BOP personnel that "inmates in the custody of the [BOP] with a possible diagnosis of [GD] will receive a current individualized assessment and evaluation." (*Id.*)

4

(*id*. at ¶ 89); (5) denial of her request for an exemption from pat searches conducted by male guards (*id*. at ¶ 88); (6) FCI-Elkton's failure to comply with the Prison Rape Elimination Act ("PREA") (*id*. at ¶¶ 69, 87); and (7) denial of her request for SRS (*id*. at ¶¶ 7, 69), including BOP's alleged blanket ban on SRS (*id*. at ¶¶ 8, 10, 100, 111). The Court will address each of these claims below.

## II. STANDARDS OF REVIEW

### A. Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing authorities). In other words, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 556 n.3 (criticizing the *Twombly* dissent's assertion that the pleading standard of Rule 8 "does not require, or even invite, the pleading of facts"). This requirement applies to all plaintiffs, including those proceeding *pro se. See Kennedy v. First NLC Servs., LLC*, No. 08-12504, 2009 WL 482715, at *1 (E.D. Mich. Feb. 25, 2009) ("The requirements of Rule 8(a), of course, are applicable to *pro se* plaintiffs…").

In deciding a motion to dismiss under Rule 12(b)(6), the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in the light most favorable to the plaintiff. *Erickson v. Pardus,* 551 U.S. 89, 93–94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (citations omitted). Complaints filed by a *pro se* plaintiff must be liberally construed and "'however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]'" *Id.* (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)).

5

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

In deciding a motion to dismiss under Rule 12, the Court generally may not consider matters outside of the pleadings without converting the motion into a motion for summary judgment under Rule 56. As the Sixth Circuit has held, however, there are a number of exceptions to this rule. Indeed, it is well settled that a district court, in ruling on a Rule 12 dispositive motion, "may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted); *see Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (citations omitted).

Here, Fisher has appended various documents to support her position. (*See* Doc. No. 1-4, Exhibit C Medical Records/Documentation ["Med. Rec."]; Doc. No. 1-5, Exhibit D Psychology Records/Documentation ["Psych. Rec."]; Doc. No. 1-6, Exhibit E Misc. Supporting Documents ["Misc. Docs."]; Doc. No. 1-7, Corrected Exhibit B Administrative Remedies ["Admin. Rec."].) The Court will consider Fisher's supporting documents in ruling on the motion to dismiss.

### B.  Eighth Amendment Claims

Fisher's claims are all based upon allegations that defendants violated the Eighth Amendment. To show that "conditions of confinement constitute 'cruel and unusual punishment'

6

prohibited by the Eighth Amendment," a plaintiff must satisfy a two-step framework, which includes an objective and subjective component. *Reilly v. Vadlamudi*, 680 F.3d 617, 623–24 (6th Cir. 2012) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991); *Blackmore v. Kalamazoo Cty.,* 390 F.3d 890, 895 (6th Cir. 2004)). First, the objective component requires the plaintiff to show that the alleged deprivation was "sufficiently serious[.]" *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). To show that the denial of medical care has violated the Eighth Amendment, the plaintiff must "establish the existence of a sufficiently serious medical need." *Reilly*, 680 F.3d at 623–24 (internal quotation omitted). "Routine discomforts of prison life do not suffice." *Parker v. Bowen*, No. 4:18cv1744, 2018 WL 6267182, at *2 (N.D. Ohio Nov. 30, 2018) (citing *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)).

Second, the subjective component requires the plaintiff to demonstrate that the defendants were deliberately indifferent to the prisoner's needs. *Wilson,* 501 U.S. at 297–302. The deliberate indifference standard is very high. To demonstrate deliberate indifference, "a plaintiff must show that the official: (1) subjectively knew of a risk to the inmate's health [or safety], (2) drew the inference that a substantial risk of harm to the inmate existed, and (3) consciously disregarded that risk." *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010); *see also Cardinal v. Metrish,* 564 F.3d 794, 802 (6th Cir. 2009). A prison official acts with deliberate indifference "when 'he acts with criminal recklessness,' a state of mind that requires that the official act with conscious disregard of a substantial risk of serious harm." *Spisak v. Wilkinson*, 1:01 CV 136, 2001 WL 36178103, at *3 (N.D. Ohio Apr. 27, 2001) (quoting *Estelle*, 429 U.S. at 106). As such, to allege a cognizable Eighth Amendment violation, Fisher was required to plead facts showing that there was a sufficiently serious medical need for her requested treatments, that the defendants were

*7*

subjectively aware of facts from which the inference could be drawn that failure to provide the requested treatment posed a substantial risk of serious harm, and that defendants, in fact, drew that inference but disregarded the risk anyway. *Finley v. Huss*, 723 F. App'x 294, 298 (6th Cir. 2018).

## III. LAW AND ANALYSIS

### A. All Defendants, Other than BOP and FCI-Elkton, are Dismissed from this Action

Fisher asserts claims against numerous BOP officials, FCI-Elkton employees, as well as other federal government employees, "all in their official capacities." (Compl. at 3.) "[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent…." *Monell v. N.Y. City Dep't of Soc. Servs.,* 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *see also Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S. Ct. 1052, 1053, 10 L. Ed. 2d 191 (1963) ("The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter."). Therefore, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) (citation omitted).

For that reason, in *Baar v. Jefferson Cty. Bd. of Educ*., 476 F. App'x 621, 634 (6th Cir. 2012), the Sixth Circuit held that "the district court [properly] dismissed the official-capacity claims against the individual [d]efendants as duplicative of the claim against [the government entity]" when the government entity "received notice of th[e] suit against its employees and itself, and responded" because "any judgment against the individual defendants in their official capacities would be a judgment against [the government entity.]" *See also Bickerstaff v. Cuyahoga Cty.,* No. 1:18-CV-01142, 2019 WL 7500494, at *7 (N.D. Ohio Aug. 12, 2019), *report and recommendation*

*adopted,* No. 1:18cv1142, 2019 WL 5303967 (N.D. Ohio Oct. 21, 2019); *Jennings v. Martin,* No. 3:12 CV 2368, 2013 WL 12123937, at \*4 (N.D. Ohio Apr. 10, 2013), *aff'd sub nom. Wilson v. Martin*, 549 F. App'x 309 (6th Cir. 2013).

Here, Fisher seeks declaratory and injunctive relief against the BOP, FCI-Elkton, the United States Public Health Services ("USPHS"), United States Surgeon General Jerome Adams, United States Assistant Secretary for Health Brett Giroir, seven employees of BOP, and ten employees of FCI-Elkton.

A judgment against any of the BOP and FCI-Elkton employees acting in their official capacity would operate as a judgment against the BOP and FCI-Elkton. And because BOP and FCI-Elkton are named defendants, have received notice of the suit, and are participating in the suit, defendants' motion to dismiss is granted related to all BOP and FCI-Elkton employees. Thus, Fisher's claims against the following individuals are dismissed: BOP Acting Director Hugh Horowitz, BOP Chief Medical Director Dr. Jeffrey Allen, BOP Assistant Director of Health Services Dr. Deborah Schultz, BOP Regional Director J. Ray Ormond, BOP Regional Medical Director Dr. John Manenti, BOP Transgender Executive Committee Member Dr. Elizabetha Stahl, BOP Female Offender Branch Director Alix McClearen, FCI-Elkton Warden Mark Williams, FCI-Elkton Chief Psychologist and PREA Coordinator Dr. Paul Clifford, Assigned Healthcare Provider Dr. Kathy McNutt, Assigned Healthcare Provider Debra Giannone, Psychologist and SOMP Coordinator Dr. Marissa Szumigale, Clinical Director Dr. J. Dunlop, RDAP Coordinator Dr. Joshua Payne, Captain Steven Grimm, Unit Manager D. Johnson, and Unit Counselor C. Marshall.

Finally, Fisher neither makes any allegations against nor mentions in the complaint the USPHS, United States Surgeon General Dr. Jerome Adams, or United States Assistant Secretary for Health Dr. Brett Giroir. Therefore, the motion to dismiss is granted as to these defendants. The

Court will proceed to address Fisher's claims as they apply to the remaining two defendant: the BOP and FCI-Elkton.

### B.  Defendants' Motion to Dismiss for Lack of Jurisdiction is Denied

Defendants argue that "[p]laintiff's claims for monetary damages against the BOP … should be dismissed" for lack of jurisdiction because "the United States has not waived its sovereign immunity for Eighth Amendment claims for money damages…." (Mot. at 680.) But Fisher's complaint does not seek monetary damages. And Fisher clarified, in her opposition brief, that she "did not seek relief of monetary damages." (Opp'n at 728.) Accordingly, defendants' motion to dismiss for lack of jurisdiction is denied. The Court will now analyze defendants' motion to dismiss under Rule 12(b)(6).

### C.  Fisher's Prayers for Relief as to the Following Claims are Dismissed Because they Fail to State a Claim Upon Which Relief can be Granted

#### 1.  Fisher's request for a second opinion from a GD specialist

Fisher has failed to assert a plausible claim that defendants violated the Eighth Amendment by denying her request for a GD specialist's second opinion. To adequately claim that denying an inmate's request for a medical specialist violated the Eighth Amendment, a plaintiff must allege that the decision was not based on "a medical judgment." *Rhinehart v. Scutt*, 894 F.3d 721, 751 (6th Cir. 2018) (concluding that so long as the prison physician "made a medical judgment in declining to refer" an inmate for a particular procedure, the inmate could not "establish the subjective component" of an Eighth Amendment claim); *Richmond v. Huq,* 885 F.3d 928, 941 (6th Cir. 2018) (concluding that "[i]t would be improper for this court to overturn [physicians'] medical judgment" that a burn specialist was not medically necessary to treat an inmate's burn injury).

Fisher alleges defendants were deliberately indifferent to her medical needs by denying her requests for "a second opinion from a medical professional that specializes in treating transgender females diagnosed with [GD.]" (Admin. Rec. at 333; *see also* Compl. at ¶ 69.) Defendants respond that Fisher "received medical care and is simply challenging its adequacy," which is insufficient to state a claim under the Eighth Amendment. (Mot. at 675.)

The record supports defendants' argument. After appealing FCI-Elkton's denial of her request for a second opinion, Fisher was informed that prison  psychology services staff provided her with "adequate care[]" and that "[a]ll BOP psychologists are generalists who can treat a multitude of disorders and symptoms." (Admin. Rec. at 395.) Fisher's clinical team found "no present clinical indication warranting [her] referral for a second opinion by an outside specialist." (*Id.* at 337.) In addition, the Chief Psychiatrist at FCI-Elkton informed Fisher that he "reviewed [Fisher's] entire file and nothing indicate[d] [she] need[ed] a specialist in GD." (Psych. Rec. at 199.) The Clinical Director at FCI-Elkton told Fisher that FCI-Elkton didn't need an endocrinologist to treat her and noted "if we needed them[,] th[e]n we would call them, but we don't need them." (Med. Rec. at 87; *see also* Admin. Rec. at 409.)  And a psychologist at FCI-Elkton told Fisher that "because [she is] 'not considered to have extenuating circumstances to warrant a specialist' [Fisher would] be cared for with institution medical/psychology services…." (Med. Rec. at 121; s*ee also* Admin. Rec. at 392, 395, 337–38, 402, 410.)

The record is clear, Fisher consulted with numerous physicians and medical professionals who instructed her that, in their professional opinion, she did not require treatment by outside specialists. Because the decision to deny Fisher's request for a GD specialist was based on professional medical judgment, the denial was not constitutionally deficient. *See Rhinehart*, 894 F.3d at 744 (holding that a prisoner's "disagreement with a course of medical treatment does not

rise to the level of a federal constitutional claim under the Eighth Amendment"). Accordingly, Fisher's claim related to defendants' denial of her request for an outside medical opinion is dismissed.

### 2. Fisher's requests for female clothing and grooming products

Fisher has failed to plead sufficient facts to show that defendants violated the Eighth Amendment by denying her request for female clothing and grooming products. The Eighth Amendment protects inmates from "unnecessary and wanton infliction of pain…." *Farmer*, 511 U.S. at 834. But the Eight Amendment "does not mandate that a prisoner be free from discomfort or inconvenience during his or her incarceration." *Parker*, 2018 WL 6267182, at *2 (citing *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam)). Fisher requested that FCI-Elkton provide her with access to, among other things, particular brands and types of underwear and bras, shampoo/conditioners, skin care products, female watches, hair care products, soaps/body washes, deodorant, nail polish, lip gloss, and make-up. (Admin. Rec. at 342–43.)

As an initial matter, "[c]osmetic products are not among the minimal civilized measures of life's necessities," so failure to make them available for purchase in a prison commissary is not a violation of Fisher's Eighth Amendment rights. *Murray*, 1997 WL 34677 at *2. And "[a]s a general matter, there is no constitutional right of access to a jail or prison commissary." *Vick v. Core Civic*, 329 F. Supp. 3d 426, 451 (M.D. Tenn. 2018) (holding that a "conditions of confinement claim premised on the lack of access to the prison commissary fails to state an Eighth Amendment claim upon which relief can be granted"); *see also Turbeville v. Ray*, No. 3:18-CV-215-TAV-DCP, 2018 WL 3574935, at *4 (E.D. Tenn. July 25, 2018) (holding that a "conditions of confinement claim premised on the lack of access to a prison commissary fails to state a claim upon which relief may be granted" when the plaintiff did "not allege that the denial of access to a commissary was in

retaliation for the exercise of a constitutionally protected right"); *Newell v. Ruth*, No. 1:11-CV-86, 2014 WL 4411045, at *9 (E.D. Tenn. Sept. 8, 2014) ("[C]ommissary access is a privilege, not a right…."); *Adams v. Hardin Cty. Det. Ctr.,* No. 3:16-CV-P29-CRS, 2016 WL 2858911, at *3 (W.D. Ky. May 16, 2016) ("[Inmates] have no federal constitutional right to purchase items (food or non-food) from a commissary at all."); *Wolfe v. Alexander*, No. 3:11-cv-0751, 2014 WL 4897733, at *8 (M.D. Tenn. Sept. 30, 2014) (same).

This is particularly true when, as here, the denial is based on security concerns. (*See* Compl. ¶ 86.) Prison administrators are afforded "'wide-ranging deference' … when making safety and security assessments.'" *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1277 (11th Cir. 2020) (quoting *Kosilek v. Spencer*, 774 F.3d 63, 68 (1st Cir. 2014)). Prison officials do not violate the Eighth Amendment by denying inmates with GD unfettered access to all their desired "social-transitioning requests[.]" *Id.* (holding that prison officials' decision to deny an inmate's request to "dress and groom herself as a woman" does not violate the Eighth Amendment when the inmate was provided alternative GD treatments that did not present "significant security concerns in an all-male prison").

Nevertheless, the record indicates that FCI-Elkton provided some, but not all, of Fisher's requested items. She was provided with sports bras (Admin. Rec. at 356), female "panties," and "commissary items like soaps, etc." (Psych. Rec. at 206). While Fisher may not believe such provisions are adequate, the Constitution does not require "prison officials to provide every convicted inmate—at taxpayer expense—with any treatment that is 'psychologically pleasing.'" *Keohane*, 952 F.3d at 1278.

Fisher is not entitled to unlimited access to the female items of her choosing. "[R]outine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only

those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson*, 503 U.S. at 9, (internal quotation marks and citations omitted). Moreover, there is nothing in the complaint to indicate that the items Fisher requested, but did not receive, were medically necessary. Nor is there any indication that, even if the requested items were medically necessary, that defendants were deliberately indifferent to a significant medical need. Quite the opposite. FCI-Elkton officials provided Fisher with female undergarments (Pysch. Rec. at 206) and FCI-Elkton staff agreed to "reconsider [Fisher's] request to purchase female grooming and clothing items." (Admin. Rec. at 353). Fisher's claims related to female commissary items do not rise to the level of an Eighth Amendment violation and, therefore, must be dismissed.

### 3. Fisher's generalized security-related grievances

Fisher alleges that unsafe conditions at FCI-Elkton violate the Eighth Amendment and PREA because they put her at risk of attack and sexual assault from other inmates. Though Fisher has not alleged that she has been attacked or harmed by other inmates at FCI-Elkton, under certain circumstances, "the Eighth Amendment protects against future harm to inmates…." *Helling v. McKinney*, 509 U.S. 25, 33, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993). The threat of an attack by other inmates can, in some instances, constitute a sufficiently serious risk of harm and satisfy the objective component of an Eighth Amendment claim, even if the attack has not yet occurred. *Id*. at 33–34 (citing *Rhodes v. Chapman*, 452 U.S. 337, 352, n.17, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)).

But to adequately allege that prison conditions constitute such a substantial risk to an inmate's safety that they implicate the Eighth Amendment, the inmate must "identify [a] specific threat." *Halliburton v. Sunquist*, 59 F. App'x 781, 782–83 (6th Cir. 2003). For example, in *Lewis*

*v. McClennan,* 7 F. App'x 373, 375 (6th Cir. 2001), the Sixth Circuit held that alleging a hypothetical risk that white inmates would attack an African-American inmate, absent "any specific facts which would show that he was in danger of being assaulted by the other inmates" was inadequate to state an Eighth Amendment claim. *See also Miller v. Stevenson*, No. 1:18-cv-702, 2018 WL 3722164, at *7 (W.D. Mich. Aug. 6, 2018) (holding that transgender plaintiff's "conclusory assertion that he was 'obviously' at risk of harm because of his feminine appearance" and allegation that his roommate "was masturbating near him and touching his breast [did] not evince a sufficiently serious risk of harm" to state a claim under the Eighth Amendment).

And a plaintiff must allege that the prison official was deliberately indifferent to the inmate's risk of harm from such an attack. *McGhee v. Foltz,* 852 F.2d 876, 880–81 (6th Cir. 1988). Merely alleging that defendants "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent[,]" is insufficient to state an Eighth Amendment claim. *Farmer,* 511 U.S. at 844. Fisher's complaint identifies several of her security-related concerns within FCI-Elkton.

### i)  Bathroom Stall Doors

Fisher has failed to assert a plausible claim that the bathroom setup in the FCI-Elkton recreation room violates the Eighth Amendment. Fisher alleges that the bathroom stalls in the FCI-Elkton recreation room do not have stall doors and the bathroom entrance doors are solid metal and remain unlocked, putting her at risk of sexual assault from other inmates who could walk in and observe her using the restroom. (*See* Compl. at ¶ 87; Opp'n at 727; Admin. Rec. at 316.) Fisher claims prison officials are aware of the danger the bathroom setup poses to her safety and have done nothing to remedy the issue. (*See* Admin. Rec. at 311–12, 314–16, 320.)

15

Defendants claim that the bathroom setup does not constitute an Eighth Amendment violation because Fisher has merely described occasional incidents where "another inmate entered the bathroom while [p]laintiff was using it [and the incidents] were isolated and did not involve intentional or wanton behavior that denies life's necessities." (Mot. at 677.) Moreover, defendants say they were not deliberately indifferent because they posted a sign stating that the bathroom "is to be occupied by one inmate at a time[,]" which shows they were "trying to protect the privacy of inmates." (*Id.* at 677–78.)

While Fisher alleges that defendants knew the underlying facts—that the bathroom setup allowed other inmates to enter the bathroom while she was using it and that an inmate did so enter—Fisher does not claim that defendants actually made the inference that the bathroom setup created a substantial risk of harm to her. Moreover, according to the record, defendants did not believe the setup was dangerous for her. In response to Fisher's administrative remedy appeals about the bathroom setup, prison officials responded that "the [r]ecreation [department toilet] meets the requirements of [BOP] policy" (Admin. Rec. at 314; *see also id.* at 325) and "the physical set-up of the restrooms in the area is not considered to enable abuse" (*id.* at 321).

Fisher has failed to plead facts sufficient to state an Eighth Amendment violation related to the lack of stall doors on certain FCI-Elkton toilets and, thus, her claim that the bathroom setup in the recreation room violated her Eighth Amendment rights is dismissed.

### ii)  Bed Reassignment

Fisher's claim related to her bed reassignment requests is somewhat unclear. It appears that she alleges FCI-Elkton officials have accommodated other inmates' requests for bed reassignments but have denied Fisher's requests, assigning new inmates to the beds that she had requested.

(Compl. at ¶ 89; Psych. Rec. at 157.) To the extent she claims these actions violate the Eighth Amendment, she has failed to assert a plausible claim.

Fisher conceded that she does "not feel to be in imminent danger [in her current bed assignment,] (possibly a little attitude from inmates due to me 'snitching,' but nothing more than some gossip or potential 'set-ups,' light retaliation though nothing physical, or veiled threats) I feel that this potentially is a very serious problem." (Psych. Rec. at 178.) Fisher's allegations are insufficient to state an Eighth Amendment claim, because while she claims to be afraid in prison, she does not claim that she is actually in danger of an attack. (*See Id*. at 167–68; 158.) Under Sixth Circuit precedent*,* Fisher was required to plead facts sufficient to plausibly show that her cube assignment posed a particular threat to her safety. *See Lewis*, 7 F. App'x at 375; *Miller*, 2018 WL 3722164, at *7. She has failed to plead such facts and hypothetical risks are insufficient. *Lewis*, 7 F. App'x at 375.

In addition, Fisher does not allege that FCI-Elkton staff inferred that her cubemates posed a specific risk of harm. In fact, the record indicates that the staff did not think Fisher's cubemates posed a risk to her safety. After complaining about her cubemates, a unit manager told Fisher "that unless [she was] in danger [she] will not be moved because [the unit manager] believes it is just a move request for [Fisher's] convenience." (*Id.* at 158.)

Accordingly, Fisher has failed to plead sufficient facts to establish that FCI-Elkton's failure to accommodate her bed reassignment request constitutes deliberate indifference to a substantial risk of harm and, as such, her bed reassignment claim must be dismissed.

### iii) PREA Claims

Fisher also alleges several PREA violations. In addition to the recreation room bathroom setup, and her denied bed reassignment requests, Fisher alleges that FCI-Elkton male officers'

failure to announce their presence when entering Fisher's housing unit, violates the PREA. (Compl. at ¶¶ 87–89.) Courts within the Sixth Circuit have consistently held that "the PREA does not create a private cause of action which can be brought by an individual plaintiff." *Simmons v. Solozano*, No. 3:14CV-P354-H, 2014 WL 4627278, at *4 (W.D. Ky. Sept. 16, 2014) (citing cases); *see also Peterson v. Burris*, No. 14-cv-13000, 2016 WL 67528, at *2 (E.D. Mich. Jan 6, 2016) ("Numerous [c]ourts that have addressed this issue have determined that the PREA provides no private right of action to individual prisoners.") (citing cases);  *Montgomery v. Harper,* No. 5:14CV-P38-R, 2014 WL 4104163, at *2–3 (W.D. Ky. Aug. 19, 2014). That is because "the PREA itself seeks to compile data and statistics concerning incidences of prison rape and to adopt standards to combat the same, [it] does not confer upon [inmates] any extra rights outside of the normal prison grievance system." *Jones v. Medlin*, No. CV 213-040, 2012 WL 5025309, at *6 (S.D. Ga. Sept. 10, 2012), *report and recommendation adopted,* No. CV 312-040, 2012 WL 4961683 (S.D. Ga. Oct. 16, 2012); *see also Hardney v. Moncus*, No. 2:15-cv-1842 KJM AC P, 2016 WL 7474908, at *3–4 (E.D. Cal. Dec. 28, 2016); *Diamond v. Allen,* No. 7:14-CV-124, 2014 WL 6461730, at *4 (M.D. Ga. Nov. 17, 2014); *Mosley v. Medlin,* No. CV 313-086, 2014 WL 3110027, at *10 (S.D. Ga. July 7, 2014); *Breer v. Medor,* No. 2:12-CV-53, 2013 WL 4456896, at *6 (D. Vt. Aug.16, 2013); *Aitken v. Nobles,* No. 5:13-cv-216-LC-GRJ, 2013 WL 3441116, at *2 (N.D. Fla. July 9, 2013); *Chapman v. Willis,* No. 7:12-CV-00389, 2013 WL 2322947, at *4 (W.D. Va. May 28, 2013); *Holloway v. Dep't of Corr.,* No. 3:11VCV1290(VLB), 2013 WL 628648, at *2 (D. Conn. Feb. 20, 2013); *Ball v. Beckworth,* No. CV 11-0037-H-DWM-RKS, 2011 WL 4375806, at *4 (D. Mont. Aug. 31, 2011); *Chao v. Ballista,* 772 F. Supp. 2d 337, 341 n.2 (D. Mass. 2011); *Woodstock v. Golder,* No. 10-cv-00348-ZLW-KLM, 2011 WL 1060566, at * 9 (D. Colo. Feb. 7, 2011); *LeMasters v. Fabian,* No. 09-702 DSD/AJB, 2009 WL 1405176, at *2 (D. Minn.

May 18, 2009); *Rindahl v. Weber,* No. CIV. 08-4041-RHB, 2008 WL 5448232, at *1 (D. S.D. Dec. 31, 2008); *Bell v. Cty. of L.A.,* No. CV 07-8187-GW(E), 2008 WL 4375768, at *6 (C.D. Cal. Aug. 25, 2008); *Chinnici v. Edwards,* No. 1:07-cv-229, 2008 WL 3851294, at *3 (D. Vt. Aug. 12, 2008).

Because the PREA does not provide Fisher with a private right of action, her claims brought pursuant thereto must be dismissed.

### D.    Fisher's claims related to cross-gender pat searches[5]

Fisher's pat-search-related claims appear to be twofold: (1) FCI-Elkton denied her request for a "pat search exception[,]" that would ensure she was only subject to pat downs "by female officers or staff" and (2) on one occasion an FCI-Elkton staff member allegedly conducted a pat search in a "discriminatory" manner. (Compl. ¶ 88.) The Court will examine each of these claims beginning with the alleged "discriminatory search."

In her complaint and accompanying documentation, Fisher describes an incident that occurred on August 24, 2017 in which Dr. Clifford—who is a male and the Chief Psychologist and PREA Coordinator at FCI-Elkton—"forcefully performed a pat search" near "the serving line area of the chow hall" in front of Warden Steven Merlak, Associate Warden Bill Story, Captain Grimm, and several inmates. (Compl. ¶ 88; Admin. Rec. at 455.) Upon being directed to undergo a search, Fisher "requested a female to pat search [her]" to which Dr. Clifford and Captain Grimm replied that Fisher did not have an exemption to pat searches performed by male officers. (Admin. Rec. 455.) After the search, Fisher "showed Dr. Clifford [and others] that [she] was shaking uncontrollably and explained the anxiety" she was experiencing as a result of the search. (*Id.*)

---

[5] The Court uses the term "cross-gender" because Fisher alleges that searches conducted by male officers are inappropriate, in part, because "she has developed breasts from hormone treatment…." (Compl. ¶ 88.)

Captain Grimm told Fisher to "let staff do their jobs, that is all Dr. Clifford was trying to do." (*Id.*) Then Warden Merlak and Associate Warden Bill Story "began laughing out loud" at Fisher. (*Id.*) Fisher does not allege that this search was conducted improperly, that Dr. Clifford conducted the search sadistically, maliciously, or "without penological justification," that the search involved sexual touching or groping, or that the search caused her injury.

As a general rule, routine pat searches do not violate an inmate's constitutional rights. *See e.g., Bishawi v. Ne. Ohio Corr. Ctr.,* 628 F. App'x 339, 345–46 (6th Cir. 2014) (holding that pat-down searches are an inconvenience that are "insufficient to support an Eighth Amendment claim"). This is true even if an officer grabs, *Tuttle v. Carroll Cty. Det. Ctr.*, 55 F. App'x 480, 482 (6th Cir. 2012), or fondles, *Williams v. Keane*, No. 95 CIV. 0379 AJP JGK, 1997 WL 527677, at *9–11 (S.D.N.Y. Aug. 25, 1997), an inmate's genitals, so long as alleged inappropriate touching "occurs as part of an otherwise justified search[.]" *Cherry v. Frank*, No. 03-C-129-C, 2003 WL 23205817, at *12 (W.D. Wis. Dec. 4, 2003), *aff'd,* 125 F. App'x 63, 66 (7th Cir. 2005). To avoid dismissal, an inmate alleging that a pat search violated the Constitution must "allege facts demonstrating that [an officer] acted maliciously or sadistically for the purpose of causing harm." *Tuttle*, 500 F. App'x at 482. Fisher has failed to plead such facts related to the August 24, 2017 search.

Fisher does not allege that Dr. Clifford's search was unjustified or that it was conducted maliciously or sadistically for the purpose of causing harm. She also does not allege that Dr. Clifford touched her genitals or developed breasts. The record shows that, at worst, the search was

forceful, anxiety provoking, and potentially humiliating.[6] But a single inappropriate pat search is not enough to give rise to an Eighth Amendment violation. *Soloman v. Mich. Dep't of Corr.*, 478 F. App'x 318, 320 (6th Cir. 2012) (holding that an officer who "allegedly groped [a plaintiff's] penis, both inside and outside of his pants, while making sexually suggestive comments" did not constitute an Eighth Amendment violation). Even assuming the pat search was inappropriate, "a single, isolated instance of unwarranted groping by [a] defendant [prison official] … does not rise to the level of a constitutional violation." *Kelly v. Moose*, No. 3:12-cv-01339, 2013 WL 141132, at *3 (M.D. Tenn. Jan 10, 2013). Therefore, Fisher's claims related to Dr. Clifford's pat search must be dismissed.

As for Fisher's claim related to Warden Merlak's denial of her requests for a pat search exemption, Fisher has met the minimum pleading standards to survive defendants' motion to dismiss. "The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement." *Olive v. Harrington*, No. 1:15-cv-01276-BAM (PC), 2016 WL 4899177, at *5 (E.D. Cal. Sept. 14, 2016). Pat searches may violate the Eighth Amendment if they are routinely conducted in a manner "devoid of legitimate penological purpose or contrary to evolving standards of decency that mark the progress of a maturing society…." *Id.* "[T]he Eighth Amendment protects inmates from repetitive and harassing searches…." *Id.*

---

[6] Fisher claims that immediately after witnessing the search, the Warden and Associate Warden began "laughing out loud." (Admin. Rec. at 455.) But it is well settled that "harassment and verbal abuse … do not constitute the type of infliction of pain that the Eighth Amendment prohibits." *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004). Mere "shameful and utterly unprofessional behavior" is "insufficient to establish an Eighth Amendment violation." *Id.*

Defendants cite to *Renee v. Neal*, No. 3:18-CV-592-RLM-MGG, 2018 WL 3861610, at *1–2 (N.D. Ind. Aug. 13, 2018) for the proposition that "transgender inmate[s] that identif[y] as … female do[] not have the constitutional right to be exclusively searched by female corrections officers." (Mot. at 676.) Though cross-gender searches, without more, do not violate the Eighth Amendment, "[s]earches by members of the opposite sex have been found in certain circumstances to violate the Constitution." *Banschbach v. Miller*, No. CV 19-00041-H-BMM-JTJ, 2019 WL 8112490, at *2 (D. Mont. Dec. 9. 2019) (citation omitted) *report and recommendation adopted*, No. CV 19-41-H-BMM-JTJ, 2020 WL 999208, at *1 (D. Mont. Mar. 2, 2020). For example, routine cross-gender searches may constitute a constitutional violation if prison officials are aware of the "pain" caused by cross-gender searches on inmates who previously suffered from sexual assaults and officials are deliberately indifferent to the inmate's suffering. *Jordan v. Gardner*, 986 F.2d 1521, 1525–30 (9th Cir. 1993). Fisher claims that the denial of her pat search exception request, without explanation as to why the request was denied, constitutes deliberate indifference to her serious medical condition—post traumatic stress disorder ("PTSD").

Several BOP program statements describe BOP policy regarding pat searches of transgender inmates. (*See* Admin. Rec. at 445.) Program Statement 5521.06 states, in relevant part:

> For purposes of pat searching, inmates will be pat-searched in accordance with the gender of the institution, or housing assignment, in which they are assigned. Transgender inmates may request an exception. The exception must be pre-authorized by the Warden, after consultation with staff from Health Services, Psychology Services, Unit Management, and Correctional Services.

(*Id.* at 452.) Fisher claims she requested an exception because pat searches conducted by male officers cause her "undue extreme stress, anxiety, and panic attacks" because she is a "victim of brutal double sexual assaults" that occurred at different BOP facilities prior to her transfer to FCI-Elkton. (*Id.* 447.) In denying Fisher's exception request, FCI-Elkton staff stated "[p]er policy the

22

warden is the deciding officer for exceptions. You indicate your request has been denied. This has been addressed." (*Id.* at 444.) There is no indication why the warden denied Fisher's request other than, as Fisher claims, "because he can." (*Id.* at 447.)

Fisher claims that prison officials know she is diagnosed with PTSD after being subjected to several prison rapes. (*Id.* at 445, 447, 452.) Officials are also aware, according to Fisher, that male-conducted searches exacerbate her PTSD symptoms, causing severe anxiety and panic attacks. (*Id.* at 453.) Yet, Fisher claims the warden denied her request for a pat search exception merely "because he can." (*Id.* at 447.) It is unclear if Fisher's request was denied for legitimate penological reasons, such as security or staffing concerns. At the motion to dismiss stage, Fisher's allegations—when taken as true and construed liberally—are sufficient to plausibly allege that defendants acted with deliberate indifference to Fisher's PTSD symptoms. Therefore, defendants' motion to dismiss, as to Fisher's claim related to denial of her pat search exception, is denied.

### E.    Fisher's Requests for Sex Reassignment Surgery

Perhaps the most pervasive grievance in Fisher's complaint is the BOP's denial of her requests for SRS. The Sixth Circuit has recognized GD as a serious medical condition and, as such, "a complete refusal by prison officials to provide [an inmate] with any treatment at all would state an Eighth Amendment claim for deliberate indifference to medical needs." *Murray*, 1997 WL 34677, at *3. But courts distinguish "'between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment,' such that where medical care is merely inadequate, [courts are] 'generally reluctant to second guess medical judgments.'" *Richmond*, 885 F.3d at 939 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). Similarly, "differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough

23

to state a deliberate indifference claim." *Miller*, 2018 WL 3722164, at *5 (citing *Sanderfer v. Nichols*, 62 F.3d 151, 154–55 (6th Cir. 1995)); *see also Lamb v. Norwood*, 899 F.3d 1159, 1163 (10th Cir. 2018) (holding that prison officials "could not have been deliberately indifferent by implementing the course of treatment recommended by a licensed medical doctor" which included providing hormone therapy and psychological counseling but denying SRS).

There is no dispute that Fisher is receiving medical treatment—hormone therapy and psychotherapy—for her GD. (*See* Compl. ¶¶ 58, 71; Mot. at 667.) Therefore, defendants argue that Fisher simply "disputes the type of care" she is receiving and "[a] mere difference of opinion about the medical care provided is insufficient to maintain a viable Eighth Amendment claim." (Mot. at 672 [citing *Dodson v. Wilkinson*, 304 F. App'x 434, 440 (6th Cir. 2008)].) Fisher argues that SRS is medically necessary to treat her GD because she has met all the WPATH SOC[7] requirements for SRS, and because FCI-Elkton medical staff told her SRS was necessary in her particular case. (Compl. at ¶ 62; Opp'n 718–723.) Defendants respond that SRS was not medically necessary to treat Fisher's GD because the BOP Chief Medical Officer conducted "a careful medical review of Fisher's history" and determined that she was ineligible for SRS. (Mot. at 673; *see also id.* at 667; Reply at 736.)

The Sixth Circuit has not yet addressed whether a prison's failure to provide SRS to an inmate diagnosed with GD, when the prison is providing alternative treatment, constitutes a

---

[7] The WPATH SOC recognizes various treatment options for GD including hormone therapy, changes in gender expression to include living full or part time in another gender role, or surgery to change sex characteristics. (Compl. ¶ 46.) SRS "is often the last … step in the treatment process for [GD]…." (*Id.* ¶ 73.) The WPATH criteria for SRS in male-to-female patients includes: (1) persistent, well documented GD; (2) capacity to make a fully-informed decision and to consent for treatment; (3) age of majority in a given country; (4) if significant medical or mental health concerns are present, they must be well controlled; (5) twelve (12) continuous months of hormone therapy as appropriate to the patient's gender goals; and (6) twelve (12) continuous months of living in a gender role that is congruent with the patient's gender identity. (*Id.* ¶ 74.)

violation of the Eighth Amendment. Other circuit courts that have addressed this issue have held that an inmate states a claim under the Eighth Amendment—at least for purposes of surviving dismissal under Rule 12—when the inmate plausibly alleged that SRS was medically necessary, but prison officials outright refused to consider SRS as a treatment option, *De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013) (holding that plaintiff's Eighth Amendment claim was "sufficiently plausible to survive screening" because plaintiff alleged that prison officials never evaluated whether she was suitable for SRS despite their awareness of "the persistence of her symptoms and the inefficacy of her existing treatment"), or when a plaintiff alleges that prison officials knew SRS may be medically necessary to treat her GD but denied her request for SRS based "solely on the recommendation of a physician's assistant with no experience in transgender medicine[]" or on a "blanket policy against SRS." *Rosati v. Igbinoso*, 791 F.3d 1037, 1039–40 (9th Cir. 2015).

On the other hand, cases involving dueling medical experts will typically not support an Eighth Amendment claim. In *Kosilek*, 774 F.3d at 86, the plaintiff "argue[d] that [SRS was] the only constitutionally sufficient treatment regimen" for her GD and presented testimony from physicians hired by the department of corrections ("DOC") "that SRS was medically necessary." *Id.* (internal quotation omitted) (emphasis omitted). Failure to provide SRS, the experts testified, "would almost certainly lead to a deterioration in [plaintiff's] mental state and a high likelihood of self-harming behaviors." *Id.* Conversely, the DOC, relying on the advice of accredited medical professionals, argued that SRS was "not the only adequate treatment option" and that DOC had provided the plaintiff with adequate alternative treatment. *Id.* When faced with "two alternative treatment plans, which were each developed by different medical experts to mitigate the severity of [plaintiff's] mental distress[,]" the court reasoned that "[t]he choice of a medical option that,

25

although disfavored by some in the field, is presented by competent professionals" did not constitute deliberate indifference. *Id.* at 91–92. *See also Keohane,* 952 F.3d at 1274–75 (holding that when "testifying medical professionals were—and remain—divided over whether social transitioning is medically necessary to [the plaintiff's] gender-dysphoria treatment" "there is simply no legal basis for concluding that the treatment provided" is so inadequate as to constitute a violation of the Eighth Amendment).

This case appears to be one of dueling medical opinions, as shown by the record Fisher submitted. In a note from a psychology appointment, Fisher wrote that she and the psychologist "discussed that this [SRS denial] is definitely a medical concern. We went over the Practice Guideline [Medical Management of Transgender Inmates], and agreed that I do meet the qualifications." (Psych. Rec. at 184.) After another appointment, Fisher reported the same psychologist told her that the "[r]equest for surgery [SRS] was signed because it was found to be medically necessary by medical and psychology services." (*Id*. at 189.) A member of the FCI-Elkton medical staff submitted a second SRS request on Fisher's behalf without Fisher asking her to do so. (Med. Rec. at 83; *see also id*. at 85.) According to Fisher, Warden Merlak informed her that two members of the FCI-Elkton medical staff "compelled [him] to sign" their recommendation for Fisher's SRS to Regional BOP "as they deemed it medically necessary for [Fisher]." (Psych. Rec. at 202; *see also id*. at 207.)

But the BOP Chief Medical Officer and TCCT determined that Fisher was ineligible for SRS for three reasons, all of which are pre-requisites for SRS: (1) she had not yet reached the maximum benefit from hormone therapy, (2) her hormone levels were unstable[8], and (3) she was

---

[8] The record appears to support, and Fisher concedes, that at one point her "[e]strogen level ha[d] gone off the chart peeking (sic) at 519.3…." (Admin. Rec. at 400.)

not eligible for transfer to a female prison. (Mot. at 667.) Instead, BOP decided that Fisher should continue hormone therapy and psychotherapy. (Admin. Rec. at 380, 383.) Therefore, this case is distinguishable from *Delonta*, where defendants had not evaluated the plaintiff for SRS, and from *Rosati*, where a single and allegedly unqualified physician's assistant recommended denying SRS. Here, Fisher's own record proves that she has been evaluated for SRS. Though several of Fisher's treating medical professionals apparently thought that SRS was necessary, the BOP's Chief Medical Officer and TCCT determined that it was not.

If Fisher's complaint only alleged disagreements between medical professionals as to the medical necessity of SRS to treat her GD, it would be difficult to find that FCI-Elkton was deliberately indifferent to Fisher's seriously medical need. But Fisher's complaint—when interpreted liberally—claims more than a mere medical disagreement related to her treatment plan. Fisher claims that her SRS requests were denied, not based on medical opinion, but on alleged unofficial BOP blanket policy against providing SRS to inmates with GD. The Sixth Circuit has not determined if a prison's blanket ban against treatments for GD constitutes a violation of the Eighth Amendment. And there is a split among the circuit courts that have considered the issue.

The majority of courts hold that such a blanket policy (or de facto ban), which does not allow for the consideration of an inmate's particular medical needs, could violate the Eighth Amendment. *See Kosilek*, 774 F.3d at 91 (noting that the court's holding did not "create a de facto ban against SRS as a medical treatment for any incarcerated individual" because "any such policy would conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs"); *Fields v. Smith,* 653 F.3d 550, 552, 556 (7th Cir. 2011) (finding a state statute banning the Wisconsin Department of Corrections from providing inmates with SRS unconstitutional because "[t]he statute applies irrespective of an inmate's serious medical need"

27

for such treatment) (internal quotation omitted); *Rosati*, 791 F.3d at 1040 (denying defendants' motion to dismiss when the plaintiff alleged, among other things, that prison officials denied her SRS due to "a blanket policy against SRS"); *Keohane*, 952 F.3d at 1266–67 (concluding that an outright refusal to perform a particular type of medical treatment "is the very definition of 'deliberate indifference'"). But the Fifth Circuit has held that a blanket ban against SRS does not violate the Eighth Amendment because "there is no consensus in the medical community about the necessity and efficacy of sex reassignment surgery as a treatment for gender dysphoria." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019). "We can all agree," the *Gibson* court continued, "that sex reassignment surgery remains an issue of deep division among medical experts." *Id.* at 226. As such, there is no basis "to hold a state official deliberately (and constitutionally) indifferent, for doing nothing more than refusing to provide medical treatment whose necessity and efficacy is hotly debated within the medical community." *Id.* The Sixth Circuit has yet to have occasion to weigh in on this issue.

But at this stage, it is improper for the Court to determine whether BOP does, in fact, have an alleged blanket (or de facto) policy against providing SRS to inmates with GD. Nor is it proper for the Court to determine whether the BOP denied Fisher's SRS requests based on such a policy. At the motion to dismiss stage, the Court only needs to determine whether Fisher has put forth sufficient facts to support a plausible claim that SRS is medically necessary to treat her GD and defendants are deliberately indifferent to that necessity by denying her access to SRS based on BOP's blanket ban policy against SRS. She has met that burden.

Fisher claims that a member of the FCI-Elkton medical staff said her "request for SRS was 'denied by Dr. Shaw [Stahl] at the regional level stating the BOP is not yet doing SRS as they can't find a doctor to perform the surgery or personnel for after care even though SRS is part of the BOP

28

Clinical Guidelines for the treatment of transgender inmates.'" (Med. Rec. at 113–14 (emphasis omitted); *see also* Admin. Rec. at 369, 371, 373.) And Fisher alleges that the Clinical Director at FCI-Elkton told her "nobody in the BOP has gotten SRS and that [Fisher would] be the first." (Med. Rec. at 118.) Fisher's psychologist at FCI-Elkton said, "there are conflicting opinions in the BOP on weather [sic] [SRS] is considered medically necessary or not." (Psych. Rec. at 202.) Moreover, defendants define SRS as an elective procedure, such that it is considered "medically acceptable [but] not always necessary."  (*See* Admin. Rec. at 372, 383; Med. Rec. at 113; Psych. Rec. at 202.) In a note from a clinical encounter with Fisher, a member of the FCI-Elkton medical staff wrote that she had "[d]iscussed [Fisher's] case with Region over last several months as well as Chief Medical Officer who confirmed there are no sex reassignment surgeries being done at this time as it is still considered an 'elective medical procedure,' rather than [a] medical necessity." (Med. Rec. at 117; *see also* Opp'n at 722.)

Fisher has satisfied the 12(b)(6) pleading requirement. Taking her allegations as true, as the Court must, she has plausibly alleged defendants have a blanket policy against providing SRS to inmates with GD, and denied SRS based on that policy, rather than an individualized assessment of her medical needs. Accordingly, Fisher's claim that her request for SRS was denied based on BOP's blanket ban on SRS is sufficient to survive dismissal under Rule 12. In permitting this claim to survive the motion to dismiss, the Court is not indicating that a blanket ban against SRS violates the Eighth Amendment. If there is such a ban, that is a question left for a later time and a more fully developed record.

**IV. CONCLUSION**

For the reasons outlined herein, all individual defendants named in their official capacity and the USPHS are dismissed from this action. The remaining defendants are the BOP and FCI-

29

Elkton. The defendants' motion to dismiss for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) is DENIED. Defendants' motion pursuant to Rule 12(b)(6) is GRANTED in part. All claims for relief related to the following allegations are DISMISSED pursuant to Fed. R. Civ. P. 12(b)(6): (1) defendants' denial of Fisher's request for a specialist second-opinion; (2) defendants' denial of Fisher's request to stock the FCI-Elkton commissary with female clothing and female grooming products; (3) defendants' denial of Fisher's request to install stall doors in the FCI-Elkton recreation room bathroom; (4) defendants' denial of Fisher's request for a bed reassignment; and (5) FCI-Elkton's alleged PREA violations. Defendants' motion is DENIED related to Fisher's pat search exception and SRS-related claims.

**IT IS SO ORDERED**.

Dated: September 3, 2020 _____

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT**
**JUDGE**

30