UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TONY FISHER, aka KELLIE REHANNA, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) ) |
| | ) |
| FEDERAL BUREAU OF PRISONS, *et al.,* | ) ) ) |
| Defendants. | |

CASE NO.: 4:19-CV-1169

JUDGE SARA LIOI

NOTICE OF FILING THE DEPOSITON OF PAUL CLIFFORD, Psy.D.

Plaintiff, Tony Fisher, aka Kellie Rehanna, by and through counsel, hereby notifies this

Court and Defendants that the deposition of Paul Clifford, Psy.D. that was taken on July 29,

2021 (attached hereto) has been filed in this case.

Respectfully submitted,

*/s/Edward A. Icove*
Edward A. Icove (0019646)
Icove Legal Group, Ltd.
Terminal Tower, Ste. 3220
50 Public Square
Phone (216) 802-0000; Fax (216) 802-0002
ed@icovelegal.com
Attorney for Plaintiff Tony Fisher,
aka Kellie Rehanna

## <u>CERTIFICATE OF SERVICE</u>

On August 27, 2021, this document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this through the Court's system.

*/s/ Edward A. Icove*
Edward A. Icove

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION

 3                       - - -

 4   Tony Fisher, aka          )
     Kellie Rehanna,           )
 5                             )
                 Plaintiff,    )
 6                             )
          vs.                  )   Case No. 4:19CV1169
 7                             )   Sara Lioi, J.
     Federal Bureau of         )
 8   Prisons, et al.,          )
                               )
 9               Defendants.   )

10                       - - -

11        Deposition of Paul Clifford, M.D., a witness

12   herein, called on behalf of the plaintiff for oral

13   examination, pursuant to the Federal Rules of Civil

14   Procedure, taken before Karen A. Toth, Notary Public

15   in and for the State of Ohio, via Zoom, on Thursday,

16   July 29, 2021, commencing at 9:41 a.m.

17                       - - -

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2   On behalf of the Plaintiff:

 3          Ed Icove, Esq.
            Icove Legal Group LTD
 4          Terminal Tower
            500 Public Square, Suite 3320
 5          Cleveland, Ohio 44113
            216-802-0000
 6
     On behalf of the Defendants:
 7
            Joshua Gardner, Esq.
 8          Gary Feldon, Esq.
            Joshua Kolsky, Esq.
 9          United States Department of Justice
            Civil Division, Federal Programs Branch
10          1100 L Street NW
            Room 11502
11          Washington, D.C. 20005
            202-305-7583
12

13   Also present:

14          Kellie Rehanna

15                        -  -  -

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX

 2   WITNESS:                CROSS  REDIRECT   RECROSS

 3   Paul Clifford, M.D.

 4        By Mr. Icove             4                 33

 5        By Mr. Gardner                   29

 6                        -  -  -

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           MR. ICOVE:        Josh, could you just

2      stipulate that we can have the court reporter

3      administer the oath?

4           MR. GARDNER:      Of course.

5              PAUL CLIFFORD, M.D.

6  Of lawful age, being first duly sworn, as

7  hereinafter certified, was examined and testified as

8  follows:

9           MR. GARDNER:      And just for the

10      record, Karen, the witness will read and sign.

11              CROSS-EXAMINATION

12  By Mr. Icove:

13  Q    Good morning, Doctor.  My name is Ed Icove and

14      I represent Tony Fisher also known as Kellie

15      Rehanna who I will be referring to as Kellie

16      in her case.  And the case is against the BOP

17      and the Federal Correction Institute Elkton.

18          Your testimony today is the same as if

19      you were in court, except, as you know, there

20      is no judge present.  So your counsel may

21      object to a question, and since there is no

22      judge present an objection will have to be

23      considered, if necessary, by the court at a

24      later time.  You must note that if your

25      counsel does object you still must answer the

```
 1              question to the best of your ability unless he
 2              tells you not to.
 3                      Can you briefly provide me with your
 4              educational background, employment history at
 5              the BOP?
 6    A    Sure.  I've got educational history.  What was
 7         the second part that you wanted?
 8    Q    Oh, I'm sorry.  Educational history or
 9         employment history at the BOP.
10    A    Okay.  I hold a doctoral degree in clinical
11         psychology and I have been working with the
12         Federal Bureau of Prisons at FCI Elkton since
13         approximately June of 1999.  And I initially
14         started as the drug abuse program coordinator
15         in again approximately June 1999, and then I
16         became the chief psychologist in approximately
17         2001.
18    Q    Are you board certified in psychology?
19    A    No.
20    Q    But you do take continuing legal education on
21         a regular basis?
22    A    Yes.  For purposes of clarification that I am
23         licensed, I do hold a license in psychology.
24    Q    In the State of Ohio?
25    A    In Pennsylvania.
```

```
 1   Q      In Pennsylvania.  Okay.
 2   A      Correct.
 3   Q      If I recall correctly Elkton is in the Ohio;
 4          is it not?
 5   A      Yes.  I can provide clarification.
 6   Q      It's not necessary.  I was just curious, sir.
 7   A      Okay.  Yes.  Yes.
 8   Q      What documents did you review in preparation
 9          for today's deposition?
10   A      I reviewed documents that I'm familiar with to
11          include psychology services program statements
12          and associated documents related to program
13          statements as well as an exhibit that was
14          forwarded to me regarding medical management
15          of individuals with transgender status.
16   Q      Did you have an opportunity at all to review
17          Kellie's chart?
18   A      Yes.
19   Q      Did you provide services to Kellie in your
20          position at Elkton?
21   A      Yes.
22   Q      And do you recall the approximate period of
23          time?
24   A      I provided services in varies capacities since
25          I believe 2015 when she arrived at Elkton up
```

```
 1          through the current time.
 2                  Again, I want to clarify that it was in
 3          varying capacities in provisional services.
 4   Q    Could you just briefly explain to us what
 5          capacities those were?
 6   A    Sure.  At times it involved direct patient
 7          care, at other times it involved more
 8          administrative contacts in terms of
 9          facilitating various procedures related to
10          transgender status procedures here at the
11          facility.  And then to include oversight of
12          the psychology department wherein I have
13          varying -- again, have knowledge of the
14          individuals under our care.
15   Q    What was the period of time that you provided
16          direct care for her; if you recall?
17   A     I don't recall.  It varied over the span of
18          six years or so that she has been here and it
19          -- it varied so much that I don't recall the
20          exact time frames.
21   Q     That's fine.  So in summary is it fair to say
22          that you've been involved in the treatment
23          plan, treatment and other decisions related to
24          Kellie's case?
25   A     Yes.
```

8

```
 1   Q     Insofar as your personal interaction with
 2         Kellie is concerned, was she cooperative with
 3         you?
 4   A     Yes.
 5   Q     And insofar as your personal interaction with
 6         Kellie was concerned, did she do everything
 7         that you requested?
 8   A     Yes.  And in terms of a more recent series of
 9         interactions with her in terms of recommending
10         the sex offender treatment program she has
11         conveyed that she is uncertain on that at this
12         time.
13   Q     Okay.  Let's talk about that particular
14         program a little bit later, but I want to ask
15         you a couple other questions first, if I may.
16               Since 2015 is it fair to say that
17         Kellie lived as a woman at Elkton?
18   A     Yes, to the degree that I am aware for at
19         least a certain period of that time.
20   Q     What period of time are you aware that she did
21         live as a woman at Elkton?
22   A     Well, let me explain in terms of my -- my
23         knowledge of that would be through my
24         behavioral observations, essentially my
25         interactions with her, what I observed.  So
```

1     what I've observed for some years, again, in

2     approximation, that in my interactions with

3     her she presented in a female capacity for

4     some years now.

5            And I cannot vouch or verify whether

6     that is the case all the time when someone is

7     not essentially in front of me, but during

8     other portions of the day.

9  Q   That's fine.  Doctor, you can only testify to

10    what you can observe and remember and relate

11    to us today, and you're doing a good job.  So

12    I just wanted to let you know we don't expect

13    you to do anything else except abide by that

14    particular rule.

15 A   Okay.

16 Q   Do you recall in February of 2018 that you

17    signed off on Kellie's request for

18    gender-affirming surgery that was sent to the

19    BOP?

20          MR. GARDNER:     Objection.  Beyond

21    the scope of the 30(b)(6).

22 Q   You can answer, Dr. Clifford.

23          Yeah, one of the things is that your

24    attorney is making objections for the record

25    which may or may not be necessary.  But since

10

```
 1          there is no judge here to rule on that

 2          particular objection you need to answer it

 3          anyway so that we don't have to have you come

 4          back later.

 5   A      Yeah.  I don't recall that.

 6   Q      Do you recall any request that she made for

 7          gender-affirming surgery that was sent to the

 8          BOP at all?

 9   A      Yes.  I am aware of at least one request that

10          was sent from the institution regarding

11          request for gender-affirming surgery.

12   Q      And did that come across your desk?

13   A      I don't recall that it did.

14   Q      Do you remember what year that was?

15   A      No, I do not.

16   Q      Was that her first request, to the best of

17          your recollection?

18   A      The one that I'm recollecting, yes, to the

19          best of my recollection it was the first

20          request.

21   Q      Was it initiated by Kellie?

22   A      In terms of the overall time frame, her as the

23          patient initiated or was in pursuit of that

24          intervention and then that cascaded into the

25          other steps of the request being forwarded
```

```
1          from the institution regarding
2          gender-affirming surgery.
3    Q    Are you aware of any other requests that were
4          made for gender-affirming surgery by Kellie?
5    A    As I mentioned before, I'm aware of at least
6          that one.  And beyond that I -- I'll say no to
7          any further knowledge.
8    Q    Is it your understanding that the BOP
9          considered Kellie's transfer to a female
10         prison if she went to Devens, Massachusetts to
11         complete a sex offender treatment program?
12              MR. GARDNER:      Objection.  Beyond
13         the scope of the 30(b)(6).  You can answer,
14         Dr. Clifford.
15   A    Can you either restate the question, just so I
16         want to be able to understand it to answer it
17         accurately?
18   Q    Certainly.  Is it your understand that the BOP
19         can reconsider Kellie's transfer to a -- is it
20         your understand that the -- strike that.
21              Is it your understand that the BOP
22         would consider Kellie's transfer to a female
23         prison if she went to Devens, Massachusetts to
24         complete sex offender treatment?
25   A    It's my understanding that completion of the
```

```
 1            sex offender treatment program would need to
 2            occur before consideration to a female
 3            facility would be considered.
 4   Q    Is that particular understanding based upon
 5            any documents that you're aware of?
 6   A    No.
 7   Q    And what is it based upon; if you recall?
 8   A    Conversations or direction regarding the
 9            consideration of that request from -- I'm
10            trying to recall the individual.  But someone
11            I believe from central office regarding the
12            need to look at that component before
13            transferred to a -- the female facility could
14            be considered.
15   Q    Is it fair to say that the sex offender
16            treatment could be, for example, done under
17            supervised release?
18   A    The sex offender treatment program in the
19            Bureau of Prisons is a program only offered to
20            incarcerated individuals.  They're -- yeah,
21            that's all on that.
22   Q    Are you aware that it's offered to people
23            while they are on supervised release?
24   A    I'm aware that sex offender treatment
25            programming is available for people on
```

1       supervised release, but in terms of the

2       Federal Bureau of Prisons' sex offender

3       treatment program that we're speaking of, that

4       I believe is only available for individuals

5       who are currently or actively incarcerated.

6   Q    And it was your recommendation that she

7       perform this particular treatment?

8           MR. GARDNER:        Objection.  Beyond

9       the scope of the Rule 30(b)(6).

10  A    Yes.

11  Q    And what was that?  What was your rationale?

12  A    In terms of fully allowing an individual --

13      transgender individual who is seeking

14      gender-affirming surgery, which really is

15      essentially irreversible, the expectation of

16      clinical standards is that the individual live

17      for at least a year fully as a -- in this case

18      a female capacity.  I believe that in -- I

19      concur with the Bureau of Prisons, which is my

20      understanding of the agency's  kind of overall

21      understanding of this is that in order to

22      fulfill that in a clinically relevant manner

23      while incarcerated the individual needs to go

24      to a female facility to fully experience as

25      much as possible what that role is as a female

```
 1            and all the social kind of adjustments and
 2            various other aspects that come with taking on
 3            that role.
 4                     Doing so in a male facility as a male
 5            seeking to be, you know, gender-affirming
 6            surgery to a female, really only approximates
 7            that.  So in an effort to get the individual
 8            to -- this individual to a female facility you
 9            have to look at some things that are specific
10            or unique to managing a correctional
11            environment.
12                     So this individual has a sexually
13            related offense which I believe I concur with
14            the Bureau in that it needs to be looked at
15            and addressed via sex offender treatment
16            program before consideration to a female
17            facility can take place.
18    Q    Thank you.
19                     Do you know the facts surrounding that
20            particular sex offender decision by the
21            criminal court as to what she was convicted
22            of?
23    A     I recall generally that it involved either
24            taking pictures or -- and/or attempting to
25            take pictures of a minor.  And I believe that
```

```
 1          there was some pornographic aspects to that.
 2          Beyond that, I don't recall the exact
 3          specifics.
 4    Q      That's fair.  Is it fair to say that her
 5          particular offense had nothing to do with any
 6          contact with any minor?
 7    A      I apologize if that -- if you heard that.  I
 8          get notifications of email, so I may hear
 9          things that you don't hear.
10    Q      You don't have to apologize to us for
11          anything, Doctor.
12    A      Okay.
13    Q      Go ahead.
14    A      Sure.  Contact offense in the field is defined
15          kind of in the most direct kind of overt
16          manner as literally hands-on contact, but it's
17          also defined in the field as an individual who
18          is basically in the same proximity as the
19          victim versus say someone who views child
20          pornography remotely.
21              So in this case it's considered a
22          contact-related offense.
23    Q      Thank you, Doctor.
24              But it's fair to say that despite that
25          particular definition Kellie didn't actually
```

```
 1            touch any offender -- excuse me, touch any
 2            child in any way?
 3                 MR. GARDNER:      Objection.  Lack of
 4            foundation.
 5   Q    Based upon your knowledge did Kellie actually
 6            physically touch any juvenile?
 7   A    No, not to my knowledge.
 8   Q    Are you aware of any document that requires
 9            Kellie to complete sexual offender treatment
10            in order to be transitioned into a female
11            facility?
12                 MR. GARDNER:      Objection.  Beyond
13            the scope of the 30(b)(6).
14   Q    I'm sorry, Doctor, I didn't hear your answer.
15   A    I want to make sure I'm answering the question
16            appropriately.  Is it -- can I confer with
17            Counsel Gardner?
18   Q    No, unfortunately you're not allowed to confer
19            during the middle of a question.  So why don't
20            we just see if we can work it out between the
21            two of us.
22                 MR. GARDNER:      Just to be clear,
23            Dr. Clifford, I assume you don't need to
24            consult with me with respect to a privilege,
25            because then we absolutely would consult off
```

1           the record.

2    Q    Right.  And I'm not asking you any privileged

3           information and I don't want to hear any

4           privileged information today.

5                MR. GARDNER:      So, Dr. Clifford, if

6           you can answer that sort of question without

7           divulging privilege you should feel free to do

8           so.  If you have a question as to whether you

9           can answer that question and what's

10          privileged, then we absolutely should consult.

11   A    I do believe it falls under the umbrella of a

12          question about privilege.

13   Q    Okay.  Well, let me restate it.

14               Are there any documents that you're

15          aware of in the BOP that require a sexual

16          offender to complete sexual offender treatment

17          in order to be transferred to a female

18          facility?

19               MR. GARDNER:      Beyond the scope of

20          the 30(b)(6).

21   A    No.

22   Q    Would you look at Exhibit 1 just for a minute.

23          And I was specifically looking at page 19, if

24          you would.

25   A    What page did you say, sir?

```
1   Q      Page 19.
2   A      Yes, I have it.
3   Q      Can you just read that over?
4   A      Sure.  Do you mean Section 12?
5   Q      Yeah.  Just to yourself.  I don't need you to
6          read it for the record.
7   A      Yes, I've completed reading.
8   Q      Okay.  I would like to go through those
9          criteria with you just briefly, and then I'm
10         almost done.  I'll have a couple more
11         questions for you.
12              Let's go through each of the criteria,
13         and I would like your knowledge as to whether
14         or not Kellie has completed each of those
15         criteria, and if not why not.
16              MR. GARDNER:     And just for the
17         record, I'll just be making a continuing
18         objection.  This is well beyond the scope of
19         the 30(b)(6) topics for which Dr. Clifford has
20         been designated.
21              MR. ICOVE:     And again for the
22         record, we'll stipulate to that particular
23         objection.
24   Q   You need to go through these with me, if you
25       would.
```

```
1   A     Sure.
2              MR. GARDNER:     I'm sorry, Ed.  What's
3         the question?
4              MR. ICOVE:        The question was I
5         wanted to go through these criteria with him.
6         I'll go through them individually and I wanted
7         to know what Kellie's status was, whether she
8         completed that particular criteria or she
9         didn't complete it or she's in the process of
10        completing it.  So let's start with the first
11        one.
12             MR. GARDNER:     Okay.  And I'll just
13        also lodge a continuing objection to lack of
14        foundation.
15             MR. ICOVE:        That's fine.
16  A     Do you want to read each criterion or would
17        you like me to read it and then comment?
18  Q     You've already read them.  I can.  Has she met
19        the criteria for at least 12 months of
20        successful use of hormonal therapy?
21  A     I do believe she has, insomuch as I'm a mental
22        health professional not an actual provider of
23        the hormonal treatment.
24  Q     Right.  And you can only testify from your
25        particular vantage point; is that fair?
```

1   A      Yes, that's correct.

2   Q      Has she participated in psychotherapy as

3          clinically indicated?

4   A      Yes.

5   Q      And I think we already touched on this one.

6          Is it fair to say that she had a full-time

7          real life experience at Elkton of her

8          preferred gender and consolidation of her

9          gender identify?

10              MR. GARDNER:      Objection.  Misstates

11         the witness's previous testimony.

12  A      I believe to the degree that I'm aware in that

13         she has been able to live a life -- her life

14         experience in her preferred gender at a male

15         facility she has.  And then lastly, in terms

16         of consolidation of gender identity, yes.

17  Q      Thank you.

18  A      Now, I would want to clarify that in my

19         opinion those points are not mutually

20         exclusive.  That consolidation is tied, in my

21         opinion, to some degree to living a full-time

22         real life experience in order for the person

23         to make an informed -- a fully informed

24         decision about that level of consolidation.

25              So again, to the degree that she has

| | | |
|---|---|---|
| 1 | | been able to live in that life experience |
| 2 | | here, yes. |
| 3 | Q | Has she demonstrated a consent to go forward |
| 4 | | with the gender-affirming surgery? |
| 5 | A | She has indicated a verbal indication.  For me |
| 6 | | consent implies certain levels of kind of |
| 7 | | almost really a written level of understanding |
| 8 | | and a full agreement on consent to do that. |
| 9 | | But to put it plainly, yes, she has |
| 10 | | certainly indicated an agreement to have the |
| 11 | | surgery. |
| 12 | Q | Did she indicate at least to you from your |
| 13 | | professional capacity a practical |
| 14 | | understanding of what would be involved in |
| 15 | | gender-affirming surgery? |
| 16 | A | I don't recall exact specific personal |
| 17 | | knowledge of that, although that may have been |
| 18 | | discussed through other contacts that she's |
| 19 | | had with psychology over the six approximate |
| 20 | | years that she's been here. |
| 21 | Q | Is there anything in this particular section, |
| 22 | | 12, that  mentions that an inmate must be |
| 23 | | transferred to a female institution? |
| 24 | A | No. |
| 25 | Q | And is there anything in this particular |

```
 1            section that indicates that an inmate must
 2            complete sexual offender training, or therapy,
 3            excuse me, in order to be transferred to a
 4            female facility?
 5    A     No.
 6    Q     Is there anything in here that says that a
 7            person needed to be transferred to a female
 8            institution to obtain gender-affirming
 9            surgery?
10    A     No.
11    Q     And is there anything in this provision that
12            provides any mention for any inmates to be
13            transferred to a female institution?
14    A     No.
15    Q     Okay.  There is nothing in there at all about
16            that?
17    A      If I can clarify.  There is nothing direct nor
18            overt regarding that.  I mean, as I mentioned
19            before, the full-time real life experience in
20            the preferred gender, that is -- certainly has
21            to be thoughtfully -- how can I say, that
22            there is a lot imbedded within that small
23            statement in terms of ensuring that the
24            person, that the patient really is ultimately
25            given the opportunity to fully experience the
```

```
1           full ramifications of adopting the role
2           ultimately, all the social roles, expectations
3           and other aspects of being the other gender
4           for which they originally were assigned at
5           birth.
6                     So I felt the need to at least kind of
7           explain that capacity of it.
8    Q     No, I appreciate it.
9                     Is there anything listed in these
10          criteria that mentions that a person must
11          complete sexual offender training in order to
12          be transferred to a female institution?
13   A     No.
14   Q     Two more questions.  Does the BOP or the -- or
15          the Federal Correction Institution at Elkton
16          request any gender dysphoria experience,
17          knowledge or otherwise of any clinical or
18          contractor that treats inmates with gender
19          dysphoria at Elkton?
20   A     Yes.  In the same manner that it expects
21          clinicians to provide services consistent with
22          professional standards in the treatment of any
23          condition that clinician may assess or treat.
24          And I can -- I can clarify further that these
25          professional standards that I speak of
```

24

1           essentially -- essentially call for the
2           clinician to utilize their clinical expertise
3           in delivering psychological services.  And the
4           clinical expertise essentially comes down to a
5           composition or combination of the clinician's
6           education, training, experience --
7           professional and supervised experiences,
8           consultation, study, things along those lines.
9           And the program statement, the main program
10          statement for psychology services outlines
11          this overall in the main program statement
12          which is the psychology services manual and
13          program statement.
14   Q      If I understand correctly it's basically up to
15          the clinician to get education regarding
16          gender dysphoria through continuing education?
17   A      That's a component to it.  I think the, you
18          know, clinical expertise or competence to
19          practice in a certain area or with a certain
20          group of individuals or with a certain
21          condition comes down to a combination of those
22          various things that I mentioned before, and
23          then as part of the clinician's training and
24          adherence to ethical standards it's up to that
25          clinician to ensure that they are clinically

1          expert enough or competent enough to practice.

2          So my long way of saying ongoing continuing

3          education may be part of that, depending upon

4          what those other components of a person's

5          credentials essentially are.

6    Q    Is there any explicit mandate to take gender

7          dysphoria education?

8    A    Within the Bureau of Prisons?

9    Q    Yes, I'm sorry.

10   A    Oh, I'm not aware of any specific mandate.

11   Q    Do you know whether or not there are any

12         gender dysphoria experts or people that

13         specialize in it that work for the BOP?

14              MR. GARDNER:      Objection.  Vague and

15         compound.

16   A    Should I go --

17   Q    Do you want me to divide that question up for

18         you?

19   A    Yes, could you please divide it up for me?

20   Q    Certainly.  Are you aware of anybody who is a

21         gender dysphoria expert who works for the

22         Bureau of Prisons?

23              MR. GARDNER:      Objection.  Vague.

24   A    I -- yes.

25   Q    And who are those people?

```
 1   A    There are individuals in the central office
 2        location specifically working with the
 3        division's special populations that are
 4        available as consultants or they are there in
 5        the role of subject matter experts.
 6   Q    Are you aware of any consultants that were
 7        asked to help out in Kellie's case?
 8   A    I recall that we -- psychology services may
 9        have reached out or had consultation with
10        individuals from that branch, but I don't
11        recall the specifics of it.
12   Q    If such a person did review her case would you
13        expect to see that in her particular medical
14        records, administrative records?
15             MR. GARDNER:     Objection.  Calls for
16        speculation.
17   A    Can you put that in maybe other terms --
18   Q    Certainly.
19   A    -- for me?
20   Q    Did you ever see anything in writing that a
21        gender dysphoria expert reviewed Kellie's
22        case?
23   A    Ed, can you clarify further essentially where
24        that writing -- you know, records in her
25        psychology or medical record?
```

1    Q      Yes.
2    A      So I don't recall -- yeah, I don't recall
3           anything in her records.
4    Q      And again, you can only testify to what you
5           can observe, remember, relate.  You can't
6           testify to things that you don't remember.
7                  Has the BOP -- has the BOP relied upon
8           any of these or any expert in gender dysphoria
9           in this particular case, that you're aware of?
10                 MR. GARDNER:      Objection.  Lack of
11          foundation.
12   A      The institution forwarded requests related to
13          gender-affirming surgery to the Transgender
14          Executive Committee.
15   Q      Do the defendants require any gender dysphoria
16          experience, knowledge or otherwise of any
17          staff or contractor responsible for creating a
18          treatment plan for Kellie?
19   A      Essentially the same answer I provided before
20          regarding that; yes, in that the Bureau
21          expects that clinicians have adhered to
22          professional standards, exercise clinical
23          expertise or competence in their delivery of
24          services, which in this case includes writing,
25          drafting updating treatment plans.

```
 1   Q    If a gender dysphoria expert did review
 2        Kellie's case where would that particular
 3        written review show up in her medical or
 4        administrative file?
 5             MR. GARDNER:     Objection.  Lack of
 6        foundation.
 7   A    I -- I don't know.
 8   Q    Have you ever seen any gender dysphoria expert
 9        writing in her file, that you recall?
10   A    Are you referring to individuals from the
11        Transgender Executive Committee?
12   Q    Yes.
13   A    I have not seen any documentation to that
14        effect in her medical or psychology record.
15   Q    Are you aware that her current hormonal level
16        on June 15, 2021 was 252?
17   A    No.
18             MR. GARDNER:     Objection.  Beyond
19        the scope of the Rule 30(b)(6).
20   Q    I have no further --
21   A    No.
22   Q    Thank you, Doctor.  I don't have any further
23        questions of you at this time.  And I want to
24        thank you for coming today and taking time out
25        of your busy day.
```

```
 1              MR. GARDNER:      I've got a few
 2        questions for you, Dr. Clifford.
 3                    REDIRECT EXAMINATION
 4    By Mr. Gardner:
 5    Q    I want to ask you, with respect to Exhibit 1
 6        entitled the medical management of transgender
 7        inmates from December 2016, is that a document
 8        you were familiar with before this deposition?
 9    A    Yes.
10    Q    Is it a document that you routinely use in
11        your practice?
12    A    In that it is a resource and I am
13        knowledgeable of it and should apply that in
14        day-to-day practice, yes.
15    Q    I want to turn to page 19.  It is Section 12,
16        the gender-affirming aka sex reassignment
17        surgery section that Mr. Icove had asked you
18        about.  And one of the criteria is listed as
19        full-time real life experience in their
20        preferred gender.  And you testified to
21        Mr. Icove, and I think I'm quoting here
22        directly, that there is a lot imbedded in that
23        statement.  What did you mean by that?
24    A    That the words full-time real life experience
25        carry with it a fully lived continuous
```

```
 1          experience of life in the preferred gender
 2          role from which they were not assigned at
 3          birth.  And it involves all the various
 4          aspects of living in that role on a day-to-day
 5          basis, interacting with people, understanding
 6          during that continuous year as much as
 7          possible the full impact of what that means to
 8          take on the other role.
 9   Q      In your judgment can that be done as a
10          transgender female living in a male
11          institution?
12                  MR. ICOVE:        Objection.  You can
13          answer.
14   A      No.
15   Q      Why not?
16                  MR. ICOVE:        Again, continuing
17          objection.
18   A      I do not believe that that can be -- that that
19          element can be fulfilled in a male facility
20          because of the inherent limitations associated
21          with the environment and the -- I'm sorry my
22          screen kind of just took on a different form.
23          Can you hear me?
24   Q      Perfectly.
25                  MR. ICOVE:        Yes.
```

```
 1   A      I'm good.  I'm back again.  That despite the

 2          individual's ability at a male facility to

 3          obtain commissary items or laundry items

 4          associated with their preferred gender and

 5          present themselves as that in a male facility,

 6          they are still at a male facility and there is

 7          -- there is -- I do not believe that they can

 8          fully experience maybe the fullest social

 9          adjustment that taking on the female role

10          would entail, and that, in my opinion, that

11          can only be realized in an environment where

12          there -- such as a female facility in and

13          around other female inmates, in and around an

14          overall environment which is dedicated to

15          female inmates versus a male facility which is

16          not dedicated to female inmates.

17   Q     Why is that social adjustment important for

18          performing permanent anatomical surgery?

19               MR. ICOVE:          Objection.  Go ahead

20          and answer to the best of your knowledge.

21   A     In my clinical opinion the social adjustment

22          is almost more -- it's so challenging; in some

23          cases it's even more challenging than

24          adjustment to the physical modifications that

25          would come with gender-reaffirming surgery.
```

1          Social ramifications, adjustments being so

2          widespread, some more overt, some more subtle,

3          but very impactful in terms of taking on the

4          other gender, in terms of having that person

5          develop the fully informed experience of what

6          that is like to interact with people, to

7          present themselves within society and look at

8          societal response to them.  And I just -- in

9          my clinical opinion we want individuals to

10         fully experience that before they go through,

11         as I mentioned before, essentially

12         irreversible surgery.  We want to make sure

13         that that person has a fully informed

14         experience.

15    Q    Dr. Clifford, Mr. Icove had asked you whether

16         or not this Section 12 of the clinical manual

17         for transgender inmates speaks to a

18         requirement that a transgender female live in

19         a female facility.  My question for you is

20         slightly different.

21              Based on your personal knowledge do you

22         know whether the Bureau of Prisons interprets

23         the full-time real life experience described

24         in Section 12 as requiring living in a prison

25         consistent with one's target gender identity?

```
 1              MR. ICOVE:          Objection.
 2   A    Yes, I believe that that is the agency's
 3        interpretation of that.
 4              MR. GARDNER:        Thank you.  I have no
 5        further questions.
 6              MR. ICOVE:          Just one.
 7                   RECROSS-EXAMINATION
 8   By Mr. Icove:
 9   Q    Have you seen any documents that support the
10        finding that -- or your opinion that it's the
11        agency's interpretation that an inmate must be
12        in a female facility in order to fulfill that
13        particular requirement of real life
14        experience?
15   A    Can you clarify?
16   Q    Right, I can -- let me just restate.
17              In regards to the last question that
18        was asked by Mr. Gardner, are you aware of any
19        documents that support that interpretation?
20   A    Can you please -- I'm just trying to answer
21        the question fully and accurately.
22        Documentation in terms of?  You know, if you
23        can clarify what type of documentation.
24   Q    Any kind of documentation that supports that
25        particular interpretation of the agency, the
```

```
1          definition of real life experience?
2    A     I don't -- yeah, I -- I don't recall anything
3          specific, to my knowledge at this point
4          related to that.
5    Q     Thank you very much.  I don't have any further
6          questions.
7                 MR. GARDNER:      We're done.
8            (Deposition concluded at 10:32 p.m.)
9                   (Signature not waived.)
10                        - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    SIGNATURE PAGE

 2   Case Name:     Tony Fisher, etc. vs. Federal Bureau
                     of Prisons, et al.
 3

 4   Case Number:  4:19CV1169

 5   Deponent:      Paul Clifford, M.D.

 6   Date:          Thursday, July 29, 2021

 7

 8   To the Reporter:

 9        I have read the entire transcript of my

10   Deposition taken in the captioned matter or the same

11   has been read to me.  I request that the following

12   changes be entered upon the record for the reasons

13   indicated.

14        I have signed my name to the Errata Sheet and

15   the appropriate Certificate and authorize you to

16   attach both to the original transcript.

17

18

19   _____
     Paul Clifford, M.D.
20
          Subscribed and sworn to before me this
21
     _____day of _____, 2021.
22

23

24   _____
                              Notary Public
25   My commission expires:_____.
```

36

```
1   I have read the foregoing transcript from page 1

2   through page 34 and note the following corrections:

3   PAGE-LINE      REQUESTED CHANGE      REASON FOR CHANGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Paul Clifford, M.D.          [Date]
```

```
 1   State of Ohio,          )
                             )  SS:  CERTIFICATE
 2   County of Cuyahoga,     )

 3        I, Karen A. Toth, Notary Public in and for the

 4   State of Ohio, duly commissioned and qualified, do

 5   hereby certify that the within named witness,

 6   Paul Clifford, M.D., was by me first duly sworn to

 7   testify the truth, the whole truth, and nothing but

 8   the truth in the cause aforesaid; that the testimony

 9   then given by him was by me reduced to

10   stenotypy/computer in the presence of said witness,

11   afterward transcribed, and that the foregoing is a

12   true and correct transcript of the testimony so

13   given by him as aforesaid.

14        I do further certify that this deposition was

15   taken at the time and place in the foregoing caption

16   specified and was completed without adjournment

17        I do further certify that I am not a relative,

18   counsel, or attorney of either party, or otherwise

19   interested in the event of this action.

20        IN WITNESS WHEREOF, I have hereunto set my

21   hand and affixed my seal of office at Cleveland,

22   Ohio on this 9th day of August, 2021.

23        _____

24        Karen A. Toth, Notary Public in
          and for the State of Ohio.
25        My Commission expires May 6, 2023.
```

FINCUN-MANCINI -- THE COURT REPORTERS
(216)696-2272

Case: 4:19-cv-01169-SL  Doc #: 59  Filed:  08/27/21  40 of 46.  PageID #: 1001
Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.
Paul Clifford, M.D.
July 29, 2021

## A

**abide (1)**
9:13
**ability (2)**
5:1;31:2
**able (3)**
11:16;20:13;21:1
**absolutely (2)**
16:25;17:10
**abuse (1)**
5:14
**accurately (2)**
11:17;33:21
**across (1)**
10:12
**actively (1)**
13:5
**actual (1)**
19:22
**actually (2)**
15:25;16:5
**addressed (1)**
14:15
**adhered (1)**
27:21
**adherence (1)**
24:24
**adjustment (4)**
31:9,17,21,24
**adjustments (2)**
14:1;32:1
**administer (1)**
4:3
**administrative (3)**
7:8;26:14;28:4
**adopting (1)**
23:1
**again (9)**
5:15;7:2,13;9:1;
18:21;20:25;27:4;
30:16;31:1
**against (1)**
4:16
**age (1)**
4:6
**agency (1)**
33:25
**agency's (3)**
13:20;33:2,11
**agreement (2)**
21:8,10
**ahead (2)**
15:13;31:19
**aka (1)**
29:16
**allowed (1)**
16:18
**allowing (1)**
13:12
**almost (3)**
18:10;21:7;31:22

**along (1)**
24:8
**although (1)**
21:17
**anatomical (1)**
31:18
**and/or (1)**
14:24
**apologize (2)**
15:7,10
**apply (1)**
29:13
**appreciate (1)**
23:8
**appropriately (1)**
16:16
**approximate (2)**
6:22;21:19
**approximately (3)**
5:13,15,16
**approximates (1)**
14:6
**approximation (1)**
9:2
**area (1)**
24:19
**around (2)**
31:13,13
**arrived (1)**
6:25
**aspects (4)**
14:2;15:1;23:3;
30:4
**assess (1)**
23:23
**assigned (2)**
23:4;30:2
**associated (3)**
6:12;30:20;31:4
**assume (1)**
16:23
**attempting (1)**
14:24
**attorney (1)**
9:24
**available (3)**
12:25;13:4;26:4
**aware (17)**
8:18;20:10:9;11:3,
5;12:5,22,24;16:8;
17:15;20:12;25:10,
20;26:6;27:9;28:15;
33:18

## B

**back (2)**
10:4;31:1
**background (1)**
5:4
**based (4)**
12:4,7;16:5;32:21
**basically (2)**

15:18;24:14
**basis (2)**
5:21;30:5
**became (1)**
5:16
**behavioral (1)**
8:24
**best (4)**
5:1;10:16,19;31:20
**Beyond (9)**
9:20;11:6,12;13:8;
15:2;16:12;17:19;
18:18;28:18
**birth (2)**
23:5;30:3
**bit (1)**
8:14
**board (1)**
5:18
**BOP (13)**
4:16;5:5,9;9:19;
10:8;11:8,18,21;
17:15;23:14;25:13;
27:7,7
**branch (1)**
26:10
**briefly (3)**
5:3;7:4;18:9
**Bureau (9)**
5:12;12:19;13:2,
19;14:14;25:8,22;
27:20;32:22
**busy (1)**
28:25

## C

**call (1)**
24:1
**Calls (1)**
26:15
**can (36)**
4:2;5:3;6:5;9:9,10,
22;11:13,15,19;
14:17;16:16,20;17:6,
9;18:3;19:18,24;
22:17,21;23:24,24;
26:17,23;27:4,5;30:9,
12,18,19,23;31:7,11;
33:15,16,20,23
**capacities (3)**
6:24;7:3,5
**capacity (4)**
9:3;13:18;21:13;
23:7
**care (3)**
7:7,14,16
**carry (1)**
29:25
**cascaded (1)**
10:24
**case (12)**
4:16,16;7:24;9:6;

13:17;15:21;26:7,12,
22;27:9,24;28:2
**cases (1)**
31:23
**central (2)**
12:11;26:1
**certain (5)**
8:19;21:6;24:19,
19,20
**Certainly (5)**
11:18;21:10;22:20;
25:20;26:18
**certified (2)**
4:7;5:18
**challenging (2)**
31:22,23
**chart (1)**
6:17
**chief (1)**
5:16
**child (2)**
15:19;16:2
**clarification (2)**
5:22;6:5
**clarify (7)**
7:2;20:18;22:17;
23:24;26:23;33:15,
23
**clear (1)**
16:22
**CLIFFORD (8)**
4:5;9:22;11:14;
16:23;17:5;18:19;
29:2;32:15
**clinical (10)**
5:10;13:16;23:17;
24:2,4,18;27:22;
31:21;32:9,16
**clinically (2)**
13:22;20:3;24:25
**clinician (4)**
23:23;24:2,15,25
**clinicians (2)**
23:21;27:21
**clinician's (2)**
24:5,23
**combination (2)**
24:5,21
**coming (1)**
28:24
**comment (1)**
19:17
**commissary (1)**
31:3
**Committee (2)**
27:14;28:11
**competence (2)**
24:18;27:23
**competent (1)**
25:1
**complete (7)**
11:11,24;16:9;
17:16;19:9;22:2;

23:11
**completed (3)**
18:7,14;19:8
**completing (1)**
19:10
**completion (1)**
11:25
**component (2)**
12:12;24:17
**components (1)**
25:4
**composition (1)**
24:5
**compound (1)**
25:15
**concerned (2)**
8:2,6
**concluded (1)**
34:8
**concur (2)**
13:19;14:13
**condition (2)**
23:23;24:21
**confer (2)**
16:16,18
**consent (3)**
21:3,6,8
**consider (1)**
11:22
**consideration (3)**
12:2,9;14:16
**considered (5)**
4:23;11:9;12:3,14;
15:21
**consistent (2)**
23:21;32:25
**consolidation (4)**
20:8,16,20,24
**consult (3)**
16:24,25;17:10
**consultants (2)**
26:4,6
**consultation (2)**
24:8;26:9
**contact (3)**
15:6,14,16
**contact-related (1)**
15:22
**contacts (2)**
7:8;21:18
**continuing (6)**
5:20;18:17;19:13;
24:16;25:2;30:16
**continuous (2)**
29:25;30:6
**contractor (2)**
23:18;27:17
**Conversations (1)**
12:8
**conveyed (1)**
8:11
**convicted (1)**
14:21

Case: 4:19-cv-01169-SL  Doc #: 59  Filed: 08/27/21  41 of 46.  PageID #: 1002

Tony Fisher, aka Kellie Rehanna vs.                                    Paul Clifford, M.D.
Federal Bureau of Prisons, et al.                                          July 29, 2021

**cooperative (1)**
8:2
**coordinator (1)**
5:14
**Correction (2)**
4:17;23:15
**correctional (1)**
14:10
**correctly (2)**
6:3;24:14
**counsel (3)**
4:20,25;16:17
**couple (2)**
8:15;18:10
**course (1)**
4:4
**court (4)**
4:2,19,23;14:21
**creating (1)**
27:17
**credentials (1)**
25:5
**criminal (1)**
14:21
**criteria (8)**
18:9,12,15;19:5,8,
19;23:10;29:18
**criterion (1)**
19:16
**CROSS-EXAMINATION (1)**
4:11
**curious (1)**
6:6
**current (2)**
7:1;28:15
**currently (1)**
13:5

**D**

**day (2)**
9:8;28:25
**day-to-day (2)**
29:14;30:4
**December (1)**
29:7
**decision (2)**
14:20;20:24
**decisions (1)**
7:23
**dedicated (2)**
31:14,16
**defendants (1)**
27:15
**defined (2)**
15:14,17
**definition (2)**
15:25;34:1
**degree (5)**
5:10;8:18;20:12,
21,25
**delivering (1)**
24:3

**delivery (1)**
27:23
**demonstrated (1)**
21:3
**department (1)**
7:12
**depending (1)**
25:3
**deposition (3)**
6:9;29:8;34:8
**described (1)**
32:23
**designated (1)**
18:20
**desk (1)**
10:12
**despite (2)**
15:24;31:1
**develop (1)**
32:5
**Devens (2)**
11:10,23
**different (1)**
30:22;32:20
**direct (4)**
7:6,16;15:15;22:17
**direction (1)**
12:8
**directly (1)**
29:22
**discussed (1)**
21:18
**divide (2)**
25:17,19
**division's (1)**
26:3
**divulging (1)**
17:7
**Doctor (6)**
4:13;9:9;15:11,23;
16:14;28:22
**doctoral (1)**
5:10
**document (3)**
16:8;29:7,10
**documentation (4)**
28:13;33:22,23,24
**documents (7)**
6:8,10,12;12:5;
17:14;33:9,19
**done (4)**
12:16;18:10;30:9;
34:7
**down (2)**
24:4,21
**Dr (7)**
9:22;11:14;16:23;
17:5;18:19;29:2;
32:15
**drafting (1)**
27:25
**drug (1)**
5:14

**duly (1)**
4:6
**during (3)**
9:7;16:19;30:6
**dysphoria (11)**
23:16,19;24:16;
25:7,12,21;26:21;
27:8,15;28:1,8

**E**

**Ed (3)**
4:13;19:2;26:23
**education (6)**
5:20;24:6,15,16;
25:3,7
**educational (3)**
5:4,6,8
**effect (1)**
28:14
**effort (1)**
14:7
**either (2)**
11:15;14:23
**element (1)**
30:19
**Elkton (10)**
4:17;5:12;6:3,20,
25;8:17,21;20:7;
23:15,19
**else (1)**
9:13
**email (1)**
15:8
**employment (2)**
5:4,9
**enough (2)**
25:1,1
**ensure (1)**
24:25
**ensuring (1)**
22:23
**entail (1)**
31:10
**entitled (1)**
29:6
**environment (4)**
14:11;30:21;31:11,
14
**essentially (10)**
8:24;9:7;13:15;
24:1,1,4;25:5;26:23;
27:19;32:11
**ethical (1)**
24:24
**even (1)**
31:23
**exact (3)**
7:20;15:2;21:16
**EXAMINATION (1)**
29:3
**examined (1)**
4:7

**example (1)**
12:16
**except (2)**
4:19;9:13
**exclusive (1)**
20:20
**excuse (2)**
16:1;22:3
**Executive (2)**
27:14;28:11
**exercise (1)**
27:22
**exhibit (3)**
6:13;17:22;29:5
**expect (2)**
9:12;26:13
**expectation (1)**
13:15
**expectations (1)**
23:2
**expects (2)**
23:20;27:21
**experience (20)**
13:24;20:7,14,22;
21:1;22:19,25;23:16;
24:6;27:16;29:19,24;
30:1;31:8;32:5,10,14,
23;33:14;34:1
**experiences (1)**
24:7
**expert (6)**
25:1,21;26:21;
27:8;28:1,8
**expertise (4)**
24:2,4,18;27:23
**experts (2)**
25:12;26:5
**explain (3)**
7:4;8:22;23:7
**explicit (1)**
25:6

**F**

**facilitating (1)**
7:9
**facility (19)**
7:11;12:3,13;
13:24;14:4,8,17;
16:11;17:18;20:15;
22:4;30:19;31:2,5,6,
12,15;32:19;33:12
**facts (1)**
14:19
**fair (8)**
7:21;8:16;12:15;
15:4,4,24;19:25;20:6
**falls (1)**
17:11
**familiar (2)**
6:10;29:8
**FCI (1)**
5:12

**February (1)**
9:16
**Federal (4)**
4:17;5:12;13:2;
23:15
**feel (1)**
17:7
**felt (1)**
23:6
**female (27)**
9:3;11:9,22;12:2,
13;13:18,24,25;14:6,
8,16;16:10;17:17;
21:23;22:4,7,13;
23:12;30:10;31:9,12,
13,15,16;32:18,19;
33:12
**few (1)**
29:1
**field (2)**
15:14,17
**file (2)**
28:4,9
**finding (1)**
33:10
**fine (3)**
7:21;9:9;19:15
**first (5)**
4:6;8:15;10:16,19;
19:10
**Fisher (1)**
4:14
**follows (1)**
4:8
**form (1)**
30:22
**forward (1)**
21:3
**forwarded (3)**
6:14;10:25;27:12
**foundation (4)**
16:4;19:14;27:11;
28:6
**frame (1)**
10:22
**frames (1)**
7:20
**free (1)**
17:7
**front (1)**
9:7
**fulfill (2)**
13:22;33:12
**fulfilled (1)**
30:19
**full (3)**
21:8;23:1;30:7
**fullest (1)**
31:8
**full-time (6)**
20:6,21;22:19;
29:19,24;32:23
**fully (11)**

Case: 4:19-cv-01169-SL  Doc #: 59  Filed: 08/27/21  42 of 46.  PageID #: 1003
Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

Paul Clifford, M.D.
July 29, 2021

13:12,17,24;20:23;
22:25;29:25;31:8;
32:5,10,13;33:21
**further (7)**
11:7;23:24;26:23;
28:20,22;33:5;34:5

## G

**GARDNER (26)**
4:4,9;9:20;11:12;
13:8;16:3,12,17,22;
17:5,19;18:16;19:2,
12;20:10;25:14,23;
26:15;27:10;28:5,18;
29:1,4;33:4,18;34:7
**gender (22)**
20:8,9,14,16;
22:20;23:3,16,18;
24:16;25:6,12,21;
26:21;27:8,15;28:1,
8;29:20;30:1;31:4;
32:4,25
**gender-affirming (12)**
9:18;10:7,11;11:2,
4;13:14;14:5;21:4,
15;22:8;27:13;29:16
**gender-reaffirming (1)**
31:25
**generally (1)**
14:23
**given (1)**
22:25
**Good (3)**
4:13;9:11;31:1
**group (1)**
24:20

## H

**hands-on (1)**
15:16
**health (1)**
19:22
**hear (5)**
15:8,9;16:14;17:3;
30:23
**heard (1)**
15:7
**help (1)**
26:7
**hereinafter (1)**
4:7
**history (4)**
5:4,6,8,9
**hold (2)**
5:10,23
**hormonal (3)**
19:20,23;28:15

## I

**ICOVE (16)**

**4:1,12,13;18:21;**
19:4,15;29:17,21;
30:12,16,25;31:19;
32:15;33:1,6,8
**identify (1)**
20:9
**identity (2)**
20:16;32:25
**imbedded (2)**
22:22;29:22
**impact (1)**
30:7
**impactful (1)**
32:3
**implies (1)**
21:6
**important (1)**
31:17
**incarcerated (3)**
12:20;13:5,23
**include (2)**
6:11;7:11
**includes (1)**
27:24
**indicate (1)**
21:12
**indicated (3)**
20:3;21:5,10
**indicates (1)**
22:1
**indication (1)**
21:5
**individual (9)**
12:10;13:12,13,16,
23;14:7,8,12;15:17
**individually (1)**
19:6
**individuals (9)**
6:15;7:14;12:20;
13:4;24:20;26:1,10;
28:10;32:9
**individual's (1)**
31:2
**information (2)**
17:3,4
**informed (4)**
20:23,23;32:5,13
**inherent (1)**
30:20
**initially (1)**
5:13
**initiated (2)**
10:21,23
**inmate (3)**
21:22;22:1;33:11
**inmates (7)**
22:12;23:18;29:7;
31:13,15,16;32:17
**Insofar (2)**
8:1,5
**insomuch (1)**
19:21
**Institute (1)**

**4:17**
**institution (9)**
10:10;11:1;21:23;
22:8,13;23:12,15;
27:12;30:11
**interact (1)**
32:6
**interacting (1)**
30:5
**interaction (2)**
8:1,5
**interactions (3)**
8:9,25;9:2
**interpretation (4)**
33:3,11,19,25
**interprets (1)**
32:22
**intervention (1)**
10:24
**into (2)**
10:24;16:10
**involved (5)**
7:6,7,22;14:23;
21:14
**involves (1)**
30:3
**irreversible (2)**
13:15;32:12
**items (2)**
31:3,3

## J

**job (1)**
9:11
**Josh (1)**
4:1
**judge (3)**
4:20,22;10:1
**judgment (1)**
30:9
**June (3)**
5:13,15;28:16
**juvenile (1)**
16:6

## K

**Karen (1)**
4:10
**Kellie (13)**
4:14,15;6:19;8:2,6,
17;10:21;11:4;15:25;
16:5,9;18:14;27:18
**Kellie's (10)**
6:17;7:24;9:17;
11:9,19,22;19:7;26:7,
21;28:2
**kind (8)**
13:20;14:1;15:15,
15;21:6;23:6;30:22;
33:24
**knowledge (12)**

**7:13;8:23;11:7;**
16:5,7;18:13;21:17;
23:17;27:16;31:20;
32:21;34:3
**knowledgeable (1)**
29:13
**known (1)**
4:14

## L

**Lack (4)**
16:3;19:13;27:10;
28:5
**last (1)**
33:17
**lastly (1)**
20:15
**later (3)**
4:24;8:14;10:4
**laundry (1)**
31:3
**lawful (1)**
4:6
**least (7)**
8:19;10:9;11:5;
13:17;19:19;21:12;
23:6
**legal (1)**
5:20
**level (3)**
20:24;21:7;28:15
**levels (1)**
21:6
**license (1)**
5:23
**licensed (1)**
5:23
**life (12)**
20:7,13,13,22;
21:1;22:19;29:19,24;
30:1;32:23;33:13;
34:1
**limitations (1)**
30:20
**lines (1)**
24:8
**listed (2)**
23:9;29:18
**literally (1)**
15:16
**little (1)**
8:14
**live (5)**
8:21;13:16;20:13;
21:1;32:18
**lived (2)**
8:17;29:25
**living (4)**
20:21;30:4,10;
32:24
**location (1)**
26:2

**lodge (1)**
19:13
**long (1)**
25:2
**look (4)**
12:12;14:9;17:22;
32:7
**looked (1)**
14:14
**looking (1)**
17:23
**lot (2)**
22:22;29:22

## M

**main (2)**
24:9,11
**making (2)**
9:24;18:17
**male (9)**
14:4,4;20:14;
30:10,19;31:2,5,6,15
**management (2)**
6:14;29:6
**managing (1)**
14:10
**mandate (2)**
25:6,10
**manner (3)**
13:22;15:16;23:20
**manual (2)**
24:12;32:16
**Massachusetts (2)**
11:10,23
**matter (1)**
26:5
**may (9)**
4:20;8:15;9:25,25;
15:8;21:17;23:23;
25:3;26:8
**maybe (2)**
26:17;31:8
**MD (1)**
4:5
**mean (3)**
18:4;22:18;29:23
**means (1)**
30:7
**medical (6)**
6:14;26:13,25;
28:3,14;29:6
**mental (1)**
19:21
**mention (1)**
22:12
**mentioned (4)**
11:5;22:18;24:22;
32:11
**mentions (1)**
21:22;23:10
**met (1)**
19:18

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

Paul Clifford, M.D.
July 29, 2021

middle (1)
    16:19
minor (2)
    14:25;15:6
minute (1)
    17:22
Misstates (1)
    20:10
modifications (1)
    31:24
months (1)
    19:19
more (8)
    7:7;8:8;18:10;
    23:14;31:22,23;32:2,
    2
morning (1)
    4:13
most (1)
    15:15
much (4)
    7:19;13:25;30:6;
    34:5
must (6)
    4:24,25;21:22;
    22:1;23:10;33:11
mutually (1)
    20:19

**N**

name (1)
    4:13
necessary (3)
    4:23;6:6;9:25
need (7)
    10:2;12:1,12;
    16:23;18:5,24;23:6
needed (1)
    22:7
needs (2)
    13:23;14:14
nor (1)
    22:17
note (1)
    4:24
notifications (1)
    15:8

**O**

oath (1)
    4:3
object (2)
    4:21,25
objection (21)
    4:22;9:20;10:2;
    11:12;13:8;16:3,12;
    18:18,23;19:13;
    20:10;25:14,23;
    26:15;27:10;28:5,18;
    30:12,17;31:19;33:1
objections (1)

9:24
observations (1)
    8:24
observe (2)
    9:10;27:5
observed (2)
    8:25;9:1
obtain (2)
    22:8;31:3
occur (1)
    12:2
off (2)
    9:17;16:25
offender (16)
    8:10;11:11,24;
    12:1,15,18,24;13:2;
    14:15,20;16:1,9;
    17:16,16;22:2;23:11
offense (4)
    14:13;15:5,14,22
offered (2)
    12:19,22
office (2)
    12:11;26:1
Ohio (2)
    5:24;6:3
one (8)
    9:23;10:9,18;11:6;
    19:11;20:5;29:18;
    33:6
one's (1)
    32:25
ongoing (1)
    25:2
only (7)
    9:9;12:19;13:4;
    14:6;19:24;27:4;
    31:11
opinion (6)
    20:19,21;31:10,21;
    32:9;33:10
opportunity (2)
    6:16;22:25
order (7)
    13:21;16:10;17:17;
    20:22;22:3;23:11;
    33:12
originally (1)
    23:4
otherwise (2)
    23:17;27:16
out (4)
    16:20;26:7,9;28:24
outlines (1)
    24:10
over (3)
    7:17;18:3;21:19
overall (4)
    10:22;13:20;24:11;
    31:14
oversight (1)
    7:11
overt (3)

15:15;22:18;32:2

**P**

page (4)
    17:23,25;18:1;
    29:15
part (3)
    5:7;24:23;25:3
participated (1)
    20:2
particular (18)
    8:13;9:14;10:2;
    12:4;13:7;14:20;
    15:5,25;18:22;19:8,
    25;21:21,25;26:13;
    27:9;28:2;33:13,25
patient (3)
    7:6;10:23;22:24
PAUL (1)
    4:5
Pennsylvania (2)
    5:25;6:1
people (6)
    12:22,25;25:12,25;
    30:5;32:6
Perfectly (1)
    30:24
perform (1)
    13:7
performing (1)
    31:18
period (4)
    6:22;7:15;8:19,20
permanent (1)
    31:18
person (7)
    20:22;22:7,24;
    23:10;26:12;32:4,13
personal (4)
    8:1,5;21:16;32:21
person's (1)
    25:4
physical (1)
    31:24
physically (1)
    16:6
pictures (2)
    14:24,25
place (1)
    14:17
plainly (1)
    21:9
plan (2)
    7:23;27:18
plans (1)
    27:25
please (2)
    25:19;33:20
pm (1)
    34:8
point (2)
    19:25;34:3

points (1)
    20:19
populations (1)
    26:3
pornographic (1)
    15:1
pornography (1)
    15:20
portions (1)
    9:8
position (1)
    6:20
possible (2)
    13:25;30:7
practical (1)
    21:13
practice (4)
    24:19;25:1;29:11,
    14
preferred (6)
    20:8,14;22:20;
    29:20;30:1;31:4
preparation (1)
    6:8
present (4)
    4:20,22;31:5;32:7
presented (1)
    9:3
previous (1)
    20:11
prison (3)
    11:10,23;32:24
Prisons (6)
    5:12;12:19;13:19;
    25:8,22;32:22
Prisons' (1)
    13:2
privilege (3)
    16:24;17:7,12
privileged (3)
    17:2,4,10
procedures (2)
    7:9,10
process (1)
    19:9
professional (6)
    19:22;21:13;23:22,
    25;24:7;27:22
program (15)
    5:14;6:11,12;8:10,
    14;11:11;12:1,18,19;
    13:3;14:16;24:9,9,11,
    13
programming (1)
    12:25
provide (4)
    5:3;6:5,19;23:21
provided (3)
    6:24;7:15;27:19
provider (1)
    19:22
provides (1)
    22:12

provision (1)
    22:11
provisional (1)
    7:3
proximity (1)
    15:18
psychological (1)
    24:3
psychologist (1)
    5:16
psychology (11)
    5:11,18,23;6:11;
    7:12;21:19;24:10,12;
    26:8,25;28:14
psychotherapy (1)
    20:2
purposes (1)
    5:22
pursuit (1)
    10:23
put (2)
    21:9;26:17

**Q**

quoting (1)
    29:21

**R**

ramifications (2)
    23:1;32:1
rationale (1)
    13:11
reached (1)
    26:9
read (6)
    4:10;18:3,6;19:16,
    17,18
reading (1)
    18:7
real (8)
    20:7,22;22:19;
    29:19,24;32:23;
    33:13;34:1
realized (1)
    31:11
really (4)
    13:14;14:6;21:7;
    22:24
reassignment (1)
    29:16
recall (20)
    6:3,22;7:16,17,19;
    9:16;10:5,6,13;12:7,
    10;14:23;15:2;21:16;
    26:8,11;27:2,2;28:9;
    34:2
recent (1)
    8:8
recollecting (1)
    10:18
recollection (2)

Case: 4:19-cv-01169-SL  Doc #: 59  Filed:  08/27/21  44 of 46.  PageID #: 1005
Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

Paul Clifford, M.D.
July 29, 2021

10:17,19
**recommendation (1)**
  13:6
**recommending (1)**
  8:9
**reconsider (1)**
  11:19
**record (8)**
  4:10;9:24;17:1;
  18:6,17,22;26:25;
  28:14
**records (4)**
  26:14,14,24;27:3
**RECROSS-EXAMINATION (1)**
  33:7
**REDIRECT (1)**
  29:3
**referring (2)**
  4:15;28:10
**regarding (8)**
  6:14;10:10;11:1;
  12:8,11;22:18;24:15;
  27:20
**regards (1)**
  33:17
**regular (1)**
  5:21
**Rehanna (1)**
  4:15
**relate (2)**
  9:10;27:5
**related (6)**
  6:12;7:9,23;14:13;
  27:12;34:4
**release (3)**
  12:17,23;13:1
**relevant (1)**
  13:22
**relied (1)**
  27:7
**remember (4)**
  9:10;10:14;27:5,6
**remotely (1)**
  15:20
**reporter (1)**
  4:2
**represent (1)**
  4:14
**request (9)**
  9:17;10:6,9,11,16,
  20,25;12:9;23:16
**requested (1)**
  8:7
**requests (2)**
  11:3;27:12
**require (2)**
  17:15;27:15
**requirement (2)**
  32:18;33:13
**requires (1)**
  16:8
**requiring (1)**
  32:24

**resource (1)**
  29:12
**respect (2)**
  16:24;29:5
**response (1)**
  32:8
**responsible (1)**
  27:17
**restate (3)**
  11:15;17:13;33:16
**review (5)**
  6:8,16;26:12;28:1,
  3
**reviewed (2)**
  6:10;26:21
**Right (3)**
  17:2;19:24;33:16
**role (8)**
  13:25;14:3;23:1;
  26:5;30:2,4,8;31:9
**roles (1)**
  23:2
**routinely (1)**
  29:10
**rule (4)**
  9:14;10:1;13:9;
  28:19

**S**

**same (4)**
  4:18;15:18;23:20;
  27:19
**saying (1)**
  25:2
**scope (7)**
  9:21;11:13;13:9;
  16:13;17:19;18:18;
  28:19
**screen (1)**
  30:22
**second (1)**
  5:7
**Section (7)**
  18:4;21:21;22:1;
  29:15,17;32:16,24
**seeking (2)**
  13:13;14:5
**sent (3)**
  9:18;10:7,10
**series (1)**
  8:8
**services (10)**
  6:11,19,24;7:3;
  23:21;24:3,10,12;
  26:8;27:24
**sex (11)**
  8:10;11:11,24;
  12:1,15,18,24;13:2;
  14:15,20;29:16
**sexual (5)**
  16:9;17:15,16;
  22:2;23:11

**sexually (1)**
  14:12
**show (1)**
  28:3
**sign (1)**
  4:10
**Signature (1)**
  34:9
**signed (1)**
  9:17
**six (2)**
  7:18;21:19
**slightly (1)**
  32:20
**small (1)**
  22:22
**social (6)**
  14:1;23:2;31:8,17,
  21;32:1
**societal (1)**
  32:8
**society (1)**
  32:7
**someone (3)**
  9:6;12:10;15:19
**sorry (5)**
  5:8;16:14;19:2;
  25:9;30:21
**sort (1)**
  17:6
**span (1)**
  7:17
**speak (1)**
  23:25
**speaking (1)**
  13:3
**speaks (1)**
  32:17
**special (1)**
  26:3
**specialize (1)**
  25:13
**specific (4)**
  14:9;21:16;25:10;
  34:3
**specifically (2)**
  17:23;26:2
**specifics (2)**
  15:3;26:11
**speculation (1)**
  26:16
**staff (1)**
  27:17
**standards (5)**
  13:16;23:22,25;
  24:24;27:22
**start (1)**
  19:10
**started (1)**
  5:14
**State (1)**
  5:24
**statement (6)**

22:23;24:9,10,11,
  13;29:23
**statements (2)**
  6:11,13
**status (3)**
  6:15;7:10;19:7
**steps (1)**
  10:25
**still (2)**
  4:25;31:6
**stipulate (2)**
  4:2;18:22
**strike (1)**
  11:20
**study (1)**
  24:8
**subject (1)**
  26:5
**subtle (1)**
  32:2
**successful (1)**
  19:20
**summary (1)**
  7:21
**supervised (4)**
  12:17,23;13:1;24:7
**support (2)**
  33:9,19
**supports (1)**
  33:24
**Sure (7)**
  5:6;7:6;15:14;
  16:15;18:4;19:1;
  32:12
**surgery (16)**
  9:18;10:7,11;11:2,
  4;13:14;14:6;21:4,
  11,15;22:9;27:13;
  29:17;31:18,25;
  32:12
**surrounding (1)**
  14:19
**sworn (1)**
  4:6

**T**

**talk (1)**
  8:13
**target (1)**
  32:25
**tells (1)**
  5:2
**terms (13)**
  7:8;8:8,9,22;10:22;
  13:1,12;20:15;22:23;
  26:17;32:3,4;33:22
**testified (2)**
  4:7;29:20
**testify (4)**
  9:9;19:24;27:4,6
**testimony (2)**
  4:18;20:11

**therapy (1)**
  19:20;22:2
**thoughtfully (1)**
  22:21
**tied (1)**
  20:20
**times (2)**
  7:6,7
**today (4)**
  4:18;9:11;17:4;
  28:24
**today's (1)**
  6:9
**Tony (1)**
  4:14
**took (1)**
  30:22
**topics (1)**
  18:19
**touch (3)**
  16:1,1,6
**touched (1)**
  20:5
**training (4)**
  22:2;23:11;24:6,23
**transfer (3)**
  11:9,19,22
**transferred (7)**
  12:13;17:17;21:23;
  22:3,7,13;23:12
**transgender (9)**
  6:15;7:10;13:13;
  27:13;28:11;29:6;
  30:10;32:17,18
**transitioned (1)**
  16:10
**treat (1)**
  23:23
**treatment (18)**
  7:22,23;8:10;
  11:11,24;12:1,16,18,
  24;13:3,7;14:15;
  16:9;17:16;19:23;
  23:22;27:18,25
**treats (1)**
  23:18
**trying (2)**
  12:10;33:20
**turn (1)**
  29:15
**two (2)**
  16:21;23:14
**type (1)**
  33:23

**U**

**ultimately (2)**
  22:24;23:2
**umbrella (1)**
  17:11
**uncertain (1)**
  8:11

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

Paul Clifford, M.D.
July 29, 2021

**under (3)**
7:14;12:16;17:11
**unfortunately (1)**
16:18
**unique (1)**
14:10
**unless (1)**
5:1
**up (6)**
6:25;24:14,24;
25:17,19;28:3
**updating (1)**
27:25
**upon (5)**
12:4,7;16:5;25:3;
27:7
**use (2)**
19:20;29:10
**utilize (1)**
24:2

**V**

**Vague (2)**
25:14,23
**vantage (1)**
19:25
**varied (2)**
7:17,19
**varies (1)**
6:24
**various (4)**
7:9;14:2;24:22;
30:3
**varying (2)**
7:3,13
**verbal (1)**
21:5
**verify (1)**
9:5
**versus (2)**
15:19;31:15
**via (1)**
14:15
**victim (1)**
15:19
**views (1)**
15:19
**vouch (1)**
9:5

**W**

**waived (1)**
34:9
**way (2)**
16:2;25:2
**what's (2)**
17:9;19:2
**wherein (1)**
7:12
**widespread (1)**
32:2

**within (3)**
22:22;25:8;32:7
**without (1)**
17:6
**witness (1)**
4:10
**witness's (1)**
20:11
**woman (2)**
8:17,21
**words (1)**
29:24
**work (2)**
16:20;25:13
**working (2)**
5:11;26:2
**works (1)**
25:21
**writing (4)**
26:20,24;27:24;
28:9
**written (2)**
21:7;28:3

**Y**

**year (3)**
10:14;13:17;30:6
**years (4)**
7:18;9:1,4;21:20

**1**

**1 (2)**
17:22;29:5
**10:32 (1)**
34:8
**12 (6)**
18:4;19:19;21:22;
29:15;32:16,24
**15 (1)**
28:16
**19 (3)**
17:23;18:1;29:15
**1999 (2)**
5:13,15

**2**

**2001 (1)**
5:17
**2015 (2)**
6:25;8:16
**2016 (1)**
29:7
**2018 (1)**
9:16
**2021 (1)**
28:16
**252 (1)**
28:16

**3**

**30b6 (7)**
9:21;11:13;13:9;
16:13;17:20;18:19;
28:19

```
1    I have read the foregoing transcript from page 1

2    through page 34 and note the following corrections:

3    PAGE-LINE        REQUESTED CHANGE        REASON FOR CHANGE

4    Tr. 1:11          "M.D." should be "Psy.D."     Transcription
                                                      error
5

6    Tr. 4:5           "M.D." should be "Psy.D."
                                                      Transcription
7                                                     error

8    Tr. 6:24           "varies" should "varied"     Transcription
                                                      error
9

10   Tr. 7:3           "provision" should be         Transcription
                       "provision of"                 error
11

12

13   Tr. 9:7           delete "but"
                                                      Transcription
14                                                    error

15   Tr. 12:13         "transferred" should          Transcription
                       "transfer"                     error
16

17

18   Tr. 35:19         "M.D." should be "Psy.D"      Transcription
                                                      error
19

20   Tr. 36:25          "M.D' should be "Psy.D."     Transcription
                                                      error
21

22    cover sheet        "M.D. should be "Psy.D"     Transcription
                                                      error
23

24   Paul Clifford, Psy.D.         08/26/2021
25   Paul Clifford, M.D.           [Date]
```