UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| TONY FISHER, aka KELLIE REHANNA, | ) ) ) CASE NO.: 4:19-CV-1169 |
| Plaintiff, | ) ) ) JUDGE SARA LIOI |
| vs. | ) ) |
| FEDERAL BUREAU OF PRISONS, *et al.,* | ) NOTICE OF FILING THE DEPOSITON ) OF JANE BARNES ) ) ) |
| Defendants. | |

Plaintiff, Tony Fisher, aka Kellie Rehanna, by and through counsel, hereby notifies this

Court and Defendants that the deposition of Jane Barnes that was taken on July 30, 2021

(attached hereto) has been filed in this case.

Respectfully submitted,

*/s/Edward A. Icove*
Edward A. Icove (0019646)
Icove Legal Group, Ltd.
Terminal Tower, Ste. 3220
50 Public Square
Phone (216) 802-0000; Fax (216) 802-0002
ed@icovelegal.com
Attorney for Plaintiff Tony Fisher,
aka Kellie Rehanna

## CERTIFICATE OF SERVICE

On August 27, 2021, this document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this through the Court's system.

*/s/ Edward A. Icove*
Edward A. Icove

1

```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF OHIO
                              EASTERN DIVISION

                                - - -
```

1

2

3

4  Tony Fisher, aka            )     **ORIGINAL**
   Kellie Rehanna,             )
5                              )
                 Plaintiff,    )
6                              )
           vs.                 )     Case No. 4:19CV1169
7                              )     Sara Lioi, J.
   Federal Bureau of           )
8  Prisons, et al.,            )
                               )
9                Defendants.   )

10                              - - -

11        Deposition of Jane Barnes, a witness herein,

12   called on behalf of the plaintiff for oral

13   examination, pursuant to the Federal Rules of Civil

14   Procedure, taken before Karen A. Toth, Notary Public

15   in and for the State of Ohio, pursuant to notice,

16   via Zoom, on Friday, July 30, 2021, commencing at

17   9:24 a.m.

18                              - - -

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2   On behalf of the Plaintiff:

 3           Ed Icove, Esq.
             Icove Legal Group LTD
 4           Terminal Tower
             500 Public Square, Suite 3320
 5           Cleveland, Ohio 44113
             216-802-0000
 6

 7   On behalf of the Defendants:

 8           Gary Feldon, Esq.
             Joshua Gardner, Esq.
 9           United States Department of Justice
             Civil Division, Federal Programs Branch
10           1100 L Street NW
             Room 11502
11           Washington, D.C. 20005
             202-305-7583
12

13                        - - -

14   Also present:

15           Kellie Rehanna

16                        - - -

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX
 2    WITNESS:                           CROSS
 3    Jane Barnes
 4         by Mr. Icove                       4
 5                          - - -
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1                     JANE BARNES
 2   Of lawful age, being first duly sworn, as
 3   hereinafter certified, was examined and testified as
 4   follows:
 5                  CROSS-EXAMINATION
 6   By Mr. Icove:
 7   Q     Good morning, Ms. Barnes.  My name is Ed Icove
 8         and I represent Kellie Fisher, also known as
 9         Kellie Rehanna, who for the purposes of this
10         deposition I will be referring to as Kellie.
11         And this is in her case against the BOP and
12         the Federal Correction Institution Elkton, in
13         Case Number 19CV1169, which is presently
14         pending in the Northern District of Ohio,
15         Eastern Division.  Today's date is July 30,
16         2021.
17               Have you ever testified before by
18         deposition or in court?
19   A     No.
20   Q     Let me give you a little background.  Your
21         testimony today, as you know, is under oath.
22         So it's the same as if you were in court
23         except there isn't any judge present.  And
24         your counsel may object to a question for the
25         purposes of this deposition, and since there
```

```
 1          is no judge any objection will have to be
 2          considered, if necessary, by the court at a
 3          later date.
 4   A      Should I go on to answer?
 5   Q      Well, is that okay?  Do you understand that?
 6   A      Yes.
 7               MR. FELDON:        Unless I instruct you
 8          not to answer you'll go ahead and answer.
 9          Yes.
10   Q      Right.  I was just getting to that.  If
11          counsel objects you still must answer the
12          question to the best of your ability, unless
13          he instructs you not to answer.
14   A      Okay.
15   Q      And the only things he would instruct you not
16          to answer would be matters of privilege, which
17          we're not going to ask you any questions as to
18          privileged communication.  Is that fair?
19   A      Yes.
20   Q      Are you still working at Elkton?
21   A      In a different role.  I actually retired and
22          then came back as a Civil Service employee.
23   Q      And when did you come back?
24   A      September of 2019.
25   Q      And did you have an opportunity to work with
```

|    |   |   |
|----|---|---|
| 1  |   | Kellie? |
| 2  | A | Since I've been back or previously? |
| 3  | Q | Previously.  I'm sorry. |
| 4  | A | Yes.  Previously. |
| 5  | Q | In what capacity was that? |
| 6  | A | I was the health service administration. |
| 7  | Q | And how long did you hold that position? |
| 8  | A | From 2013 to 2019. |
| 9  | Q | And could you give us a little background as |
| 10 |   | to your education? |
| 11 | A | Sure.  I have -- I'm a physician assistant by |
| 12 |   | trade.  Obviously high school, college |
| 13 |   | graduate, Master's in my family physician |
| 14 |   | assistant studies, prior Air Force, and then I |
| 15 |   | did a lateral service transfer to the Public |
| 16 |   | Health Service and then came here to FCI |
| 17 |   | Elkton. |
| 18 | Q | How long were you in the Air Force? |
| 19 | A | Ten years. |
| 20 | Q | Did you get any specific  -- by the way, thank |
| 21 |   | you for your service. |
| 22 | A | Thank you. |
| 23 | Q | Did you get any specific training in the Air |
| 24 |   | Force regarding medical issues? |
| 25 | A | In what capacity? |

```
 1   Q     Yeah.  Well, let me just -- let me just back
 2         up.  Did you deal with people at a hospital or
 3         a clinic when you were in the Air Force or did
 4         you have some other --
 5   A     Yes.  I was a medic and then I got accepted
 6         into PA school.  And then I was in school for
 7         several years and then I was a PA.  And then
 8         that was for four years and then I transferred
 9         here into the Public Health Service.
10   Q     And where did you get your PA at?
11   A     Through the University of Nebraska Med School
12         with the military.
13   Q     Is there a certification for that particular
14         position?
15   A     For health service administrator, no.
16   Q     What about PA?
17   A     That's what I was hired back as, is a
18         certified PA.
19   Q     Got you.
20   A     But that's not what my role was as the
21         administrator.
22   Q     Got you.  Thank you.
23   A     I'm strictly -- strictly an administrator.
24   Q     So as the administrator you don't have any
25         relationship with any of the inmates regarding
```

8

```
 1        medical aspects of a case?
 2   A    No.  I'm kind of -- I was more like a liaison,
 3        so to speak.  You know, I have patients who
 4        were having concerns, I would address those
 5        concerns, ensure proper care was given, those
 6        kind of things.  Scheduling.
 7   Q    Even though you're Civil Service and you have
 8        those protections are you aware that your
 9        testimony today is considered to be protective
10        activity under federal law?
11            MR. FELDON:        Objection.  Calls for
12        a legal conclusion.  The witness can answer if
13        she knows.
14   A    As a Public Health Service officer generally
15        I'm protected with that.  And that was in a
16        different role than where I'm at now as well.
17   Q    Right.  Are you aware that federal law over
18        and above that considers your testimony and
19        participation in this case to be protected
20        activity?
21            MR. FELDON:        Objection.  Lacks
22        foundation and calls for a legal conclusion.
23        You can answer if you know.
24   Q    If you don't know -- you can only testify as
25        to what you can observe, remember and relate
```

```
 1          to us, and if you don't know, you don't know.
 2          That's a fair response if you don't.
 3   A      I would say I don't know 100 percent.
 4   Q      You are aware, however, that neither the
 5          government nor anyone else can retaliate
 6          against you for testifying or participating in
 7          this case in any manner?
 8               MR. FELDON:        Same objection.
 9   A      Agree.  Yes.
10   Q      Could you briefly state to us the involvement
11          you had with Kellie regarding her treatment
12          plan and her treatment?
13   A      Her treatment plan obviously would fall along
14          the lines with the provider and the physician
15          and basically following the guidelines we
16          have.  And my role with her was mainly to see
17          which direction do we go next, so to speak,
18          each time she got to another level.
19   Q      Was she cooperative with you while you were
20          treating her?
21   A      Yes.
22   Q      And were you supportive of her request for
23          gender-affirming surgery?
24               MR. FELDON:        Objection.  Vague as
25          to the word supportive.
```

10

| | | |
|---|---|---|
| 1 | Q | You need to answer the question.  I'm sorry, |
| 2 | | Ms. Barnes. |
| 3 | A | Okay.  As far as supportive, yes, finding the |
| 4 | | information I needed to pursue that request |
| 5 | | for her. |
| 6 | Q | Were you involved in any decisions of her care |
| 7 | | as it relates to her gender-affirming surgery? |
| 8 | A | No. |
| 9 | Q | How long did you work approximately with |
| 10 | | Kellie? |
| 11 | A | From the time that she would have arrived |
| 12 | | until my retirement.  And she still is here in |
| 13 | | the institution, I just have not had |
| 14 | | one-on-one visits or anything with her.  I've |
| 15 | | seen her but that's it. |
| 16 | Q | So if I let you know that she was in the |
| 17 | | institution in 2015, is it fair to say that |
| 18 | | you treated her for approximately four years? |
| 19 | | MR. FELDON:        Objection.  Lacks |
| 20 | | foundation, also just vague.  Can you restate? |
| 21 | | MR. ICOVE:        She didn't have a |
| 22 | | problem with it.  I know you did, Gary, and |
| 23 | | that's fine. |
| 24 | Q | Ms. Barnes, do you have a problem with that |
| 25 | | question? |

11

| | | |
|---|---|---|
| 1 | A | Well, I didn't treat her. |
| 2 | Q | Okay. |
| 3 | A | I was never a provider for her, I was strictly |
| 4 | | an administrator. |
| 5 | Q | Okay.  And so you didn't give her any -- you |
| 6 | | were involved with her treatment plan |
| 7 | | solely -- |
| 8 | A | Yes. |
| 9 | Q | -- solely as a -- more of a |
| 10 | | counselor/administrator role? |
| 11 | A | Not even as a counselor but more of a |
| 12 | | coordinator of care. |
| 13 | | Once the providers would come to a |
| 14 | | decision -- I mean, it's in general for |
| 15 | | anyone -- a decision and then you go through |
| 16 | | the guidelines, and if we need additional |
| 17 | | direction from there that's where I would come |
| 18 | | in. |
| 19 | Q | Got you.  Have you had an opportunity to look |
| 20 | | at any documents prior to your testimony |
| 21 | | today? |
| 22 | A | I was sent two exhibits. |
| 23 | Q | And why don't we look at Exhibit 3, if you |
| 24 | | would please. |
| 25 | A | Okay. |

12

| | | |
|---|---|---|
| 1 | Q | And then we'll look at the other exhibit |
| 2 | | shortly. |
| 3 | A | Okay. |
| 4 | Q | Can you identify Exhibit 3, please? |
| 5 | A | It's an administrative note I wrote on January |
| 6 | | 19th of 2018. |
| 7 | Q | Was this note prepared in the course of |
| 8 | | regular conducted business at Elkton? |
| 9 | A | Yes, during normal duty hours. |
| 10 | Q | And likewise, was it kept in the ordinary |
| 11 | | course of regular conducted business at |
| 12 | | Elkton? |
| 13 | | MR. FELDON:        Objection to the fact |
| 14 | | that term is being used in its technical |
| 15 | | sense, calls for a legal conclusion.  If you |
| 16 | | know the answer, you can answer. |
| 17 | Q | Do you want me to -- |
| 18 | A | Yes, this is a normal administrative note |
| 19 | | explaining where we are on the treatment of |
| 20 | | the patient. |
| 21 | Q | And it's kept in the ordinary regular course |
| 22 | | of business at Elkton? |
| 23 | | MR. FELDON:        Same objection. |
| 24 | A | And I would still agree, it's an |
| 25 | | administrative note from the administrator. |

1    Q    Was this note a regular practice of your

2        position at Elkton?

3        MR. FELDON:       Objection.   Vague.

4    A    I would agree that I'm not sure what you mean.

5    Q    Okay.   I know your attorney didn't.   I'm more

6        than happy.

7          Your attorney is making objections for

8        the record.   He's really not allowed to make

9        speaking objections, so just because he says

10       something doesn't mean that you should

11       necessarily follow what he says, because the

12       conversation is between you and me.   He's not

13       sitting there as a mushroom or a toad or

14       anything, but -- so I'll just restate it.

15         Was this note a regular practice of

16       your position at Elkton as an administrator?

17       MR. FELDON:      Same objection.

18    A    As I said previously, yes, this is an

19       administrative note as an administrator, yes.

20       It is not an uncommon note that I would write.

21    Q    Do you recall who at region you discussed

22       Kellie's case with?

23       MR. FELDON:       Objection.   Lacks

24       foundation.

25    A    No, I do not.

14

| | | |
|---|---|---|
| 1 | Q | Do you recall the substance of the discussion? |
| 2 | A | As an administrator I talk many times with |
| 3 | | regional staff on numerous occasions in |
| 4 | | generalizations.  So I don't even have a |
| 5 | | specific conversation or even a specific |
| 6 | | person. |
| 7 | | The information based on this note was |
| 8 | | because Kellie continually said she knew of |
| 9 | | other inmates that were actually already |
| 10 | | undergoing that surgery.  And I was trying to |
| 11 | | find out is that true, because she didn't feel |
| 12 | | that I was being honest with her. |
| 13 | Q | Right.  So did -- |
| 14 | A | So -- |
| 15 | Q | I'm sorry.  Go ahead. |
| 16 | A | So I was just trying to gather information |
| 17 | | based on what Kellie was trying to tell me |
| 18 | | what was the case and do we go further, is it |
| 19 | | being done, where do we go from here. |
| 20 | Q | Right.  And she was being cooperative with you |
| 21 | | during this process? |
| 22 | A | Yes. |
| 23 | Q | Did region confirm that there were no sexual |
| 24 | | reassignment surgeries being done at that |
| 25 | | time? |

```
 1  A    I don't believe I had the full conclusion that
 2       there had not been at that particular time
 3       until I actually got some feedback from
 4       central office.  And that is what the note is
 5       about.
 6  Q    Okay.  And you'll have to enlighten me.  What
 7       is central officer?
 8  A    We have a regional office over the northeast
 9       region and then central office is over the
10       entire Bureau of Prisons.  So when we do any
11       kind of a medical elective type procedure
12       generally that requires a higher level of
13       approval.  And those are my -- that would be
14       my chain of command.
15  Q    Right.  So I'm looking at this note and it
16       says that there was confirmation that there
17       was no sex reassignment surgeries being done
18       at this time.  That was based upon
19       communications you had with central?
20  A    Correct.  Well, both.  Between -- several
21       discussions over several months as well as
22       central office, yes.
23  Q    So those discussions would be with region as
24       well as central?
25  A    Correct.
```

| | | |
|---|---|---|
| 1 | Q | And would central or did central and region |
| 2 | | inform you that at this time or the time that |
| 3 | | you wrote the note that gender-affirming |
| 4 | | surgery was an elective medical procedure |
| 5 | | rather than a medical necessity? |
| 6 | A | Yes, that is why I wrote the note. |
| 7 | Q | And so it's fair to say that your reference to |
| 8 | | the chief medical officer, how does that come |
| 9 | | into play in this particular note; if you |
| 10 | | recall? |
| 11 | A | That would be the central office staff. |
| 12 | Q | So your reference to the chief medical officer |
| 13 | | wasn't the chief medical officer at that time, |
| 14 | | it was the chief medical officer at the |
| 15 | | central staff? |
| 16 | A | The chief medical officer position or whoever |
| 17 | | was acting at the time.  Many people.  If |
| 18 | | someone is on vacation you have someone |
| 19 | | acting.  I mean, it's not -- I don't recall |
| 20 | | this specific conversation or even |
| 21 | | specifically who I spoke with, because, again, |
| 22 | | as my role is an administrator it was not |
| 23 | | uncommon for me to talk to various folks |
| 24 | | regionally or at central office about numerous |
| 25 | | different inmates, not just -- I mean, and |

17

| | | |
|---|---|---|
| 1 | | when I called it was never specifically about |
| 2 | | Kellie, it was generalizations on direction of |
| 3 | | sex reassignment surgery and treatment for |
| 4 | | transgenders. |
| 5 | | So, yeah, the chief medical officer was |
| 6 | | the position of the person I spoke with, but I |
| 7 | | don't recall who that would have been, |
| 8 | | honestly. |
| 9 | Q | And that was at either region or central? |
| 10 | A | Chief medical officer is a central office |
| 11 | | position. |
| 12 | Q | Okay.  Well, are we -- we're not referring to |
| 13 | | the chief medical officer at Elkton, are we? |
| 14 | A | No.  No, this is for -- these decisions are |
| 15 | | above FCI Elkton. |
| 16 | Q | So the information from this note was not |
| 17 | | obtained in any way from Dr. Allen; is that |
| 18 | | fair? |
| 19 | A | Doctor who? |
| 20 | Q | Dr. Allen? |
| 21 | A | He held that position, but I don't know if it |
| 22 | | would have been him directly or an acting at |
| 23 | | the time. |
| 24 | Q | So you don't recall specifically talking with |
| 25 | | him? |

```
1   A    No.  I mean, I had many conversations over the
2        years but I don't recall specifically about
3        this conversation.  And he had many actings as
4        well.
5   Q    And why would you need acting chief medical
6        officers?
7   A    If there is a concern or a problem somewhere.
8        So business goes on every day.  Just as if my
9        clinical director is not here I have an acting
10       physician who is the clinical director.
11              As the administrator, if I wasn't here
12       I had an acting administrator to make sure my
13       role and my duties were completed that day.
14       That's a general, I don't want to say
15       requirement, but an expectation.
16              If you're between positions, if someone
17       is on vacation or out on emergency leave.  You
18       know, you have no idea.
19  Q    Thank you very much.  So there is always
20       somebody there to -- if you're on vacation or
21       doing something else to step in your shoes?
22  A    Correct.
23  Q    Let's look briefly at Exhibit 9, if you would
24       please.
25  A    Okay.
```

1   Q     Can you please go through this particular --

2         it's three pages I think.  Can you go through

3         these documents with us so that we know what

4         they are and how they were generated?

5   A     You said three documents?  I only brought the

6         top sheet because I thought it was -- when I

7         printed it it showed the top sheet and has a

8         back sheet that says rendering attachment, and

9         then the same note from Exhibit 3.

10   Q     Okay.

11   A     That's all I have.

12   Q     So you have two pages.  Well, that's all there

13         are.  There are three documents.  You just

14         described the three documents.  And if you

15         look at the corner it says Fisher 002651,

16         Fisher 002652, and Fisher 002653.  Are those

17         the documents?

18   A     I have one and two but I did not bring the

19         third because I thought it was a repeat of

20         Exhibit 3.  It looked exactly the same to me.

21         MR. ICOVE:  Okay.  Gary, for the

22         record without handing her that document

23         again, would you stipulate it's the same

24         document as Exhibit 3?

25         MR. FELDON:  Yeah.  I'm looking at

|    |   |                                                    |
|----|---|----------------------------------------------------|
| 1  |   | it now, and it appears to be the same document      |
| 2  |   | as Exhibit 3.                                       |
| 3  | A | Okay.  I did not bring that.                        |
| 4  | Q | For the record, your counsel and I are going        |
| 5  |   | to agree that 002653 is the same as Exhibit 3.      |
| 6  | A | Okay.                                               |
| 7  | Q | And based upon your recollection you believe        |
| 8  |   | that's correct, isn't it?                           |
| 9  | A | Yes.                                                |
| 10 | Q | And let's look at your cover sheet or your          |
| 11 |   | cover email, which is the first page.  Can you      |
| 12 |   | describe why you sent that and what was going       |
| 13 |   | on?                                                 |
| 14 |   | MR. FELDON:          Objection.   Compound          |
| 15 |   | question.  Vague.                                   |
| 16 | Q | Did you send that document on or about              |
| 17 |   | February 12th of 2018 to John Dunlop, Lori          |
| 18 |   | Hunter and Shelly Kennedy?                          |
| 19 | A | Yes.                                               |
| 20 | Q | Does that appear to be an authentic copy of        |
| 21 |   | that document?                                      |
| 22 | A | Yes.                                               |
| 23 | Q | And page 2 and page 3 also are authentic, to       |
| 24 |   | the best of your knowledge and belief?             |
| 25 | A | I don't know what page 2 is.                        |

| | | |
|---|---|---|
| 1 | Q | Okay.  It says rendering attachment.  I don't |
| 2 | | know what that is either. |
| 3 | A | Yeah, I have no idea. |
| 4 | Q | Okay. |
| 5 | A | That may be the search for IT to find the |
| 6 | | email. |
| 7 | Q | Okay. |
| 8 | A | But I have no idea.  I've never seen that |
| 9 | | before. |
| 10 | Q | I hadn't either, that's why I asked. |
| 11 | | So Exhibit 3, which is the third page |
| 12 | | of this document, is the attachment that goes |
| 13 | | with this particular email; is that fair to |
| 14 | | say? |
| 15 | A | Yes. |
| 16 | Q | And can you go through that particular email |
| 17 | | and explain to me what was going on, what this |
| 18 | | back and forth was about? |
| 19 | | MR. FELDON:        Objection.  Vague. |
| 20 | Q | Go ahead. |
| 21 | A | I was contacted by the region to -- regarding |
| 22 | | Kellie's BP10 and the direction of where to go |
| 23 | | with that.  And so that was me merely sending |
| 24 | | an email to our clinical director, Dr. Dunlop. |
| 25 | | Lori Hunter at the time was an acting |

1    assistant health service administrator, as

2    well as Shelly Kennedy, she's our IOP but she

3    was also an acting administrator because I was

4    down a couple positions.  So they were

5    assisting both part time in that role.

6         And the email was to let them know we

7    needed to talk the following day and

8    determine, you know, as far as submitting

9    Kellie for the sex reassignment surgery and

10   which direction we would go with that.

11   Q   And what is BP10, for my knowledge?

12   A   It is an inmate's ability to what they -- what

13   we call file or argue against perhaps, like as

14   far as medically going, maybe their medical

15   care.  If it's a diet.  You know, I mean, it

16   could be a variety of things.  Whatever they

17   are not happy about.

18   Q   Do you recall what it was about here?

19   A   I'm assuming -- I don't -- I never had the 10,

20   but I'm assuming it's the sex reassignment

21   surgery.

22   Q   Are those your notes there where it says,

23   "Ok... Well got called on this gem by region;"

24   Is that -- are those your notes there?

25   A   Yes.

| | | |
|---|---|---|
| 1 | Q | And that goes all the way down and it says, |
| 2 | | "Then, submit a packet to the Transgender |
| 3 | | Committee"? |
| 4 | A | Correct. |
| 5 | Q | That whole section you wrote. |
| 6 | | So can you review -- it says, "Gonna |
| 7 | | have to review this case and do one of the |
| 8 | | following." Can you explain what the two |
| 9 | | options were? |
| 10 | A | For any kind of consultation for surgeries |
| 11 | | generally we submit those for electronic |
| 12 | | medical records, and that goes through a |
| 13 | | utilization review committee for approval, |
| 14 | | disapproval, a referral to the regional staff. |
| 15 | | So that was one option. And the decisions -- |
| 16 | | like if it's an immediate life-threatening |
| 17 | | acute -- things that cannot wait, the |
| 18 | | institution has the decision to make that. If |
| 19 | | it's considered elective in any sort, meaning |
| 20 | | potential gall bladder, I need a hip |
| 21 | | replacement, knee replacement, a hernia; those |
| 22 | | -- you know, those are all considered elective |
| 23 | | surgeries and those would go to the regional |
| 24 | | level for approval. |
| 25 | Q | So if I -- |

24

```
 1   A     And then --
 2   Q     Go ahead, I'm sorry.
 3   A     Finally, when it says, "Then, submit a packet
 4         up to the Transgender Committee," because with
 5         the Transgender Committee they actually have a
 6         packet that goes through the warden that is
 7         sent up requesting and listing all the various
 8         reasons.  You know, at what point the patient
 9         -- because it's much more than just medical,
10         you know, the patient's met all the various
11         criteria.  And that's what -- we had to decide
12         which way we were going to go with it.
13   Q     And do you recall what was done in this
14         particular case?
15   A     When I looked at the charts the next day
16         Ms. Hunter had done a consultation for -- in
17         the electronical medical records for the sex
18         reassignment surgery.
19   Q     Was that part of the packet that was submitted
20         to region?
21   A      No.  Well, I mean it's an electronic medical
22         record so that automatically goes up through
23         to the regional medical director or whoever is
24         acting in that role.
25   Q     What is in the packet; if you know?
```

```
 1   A      It's not a packet -- that doesn't -- that's
 2          just a consultation in -- BEMR is considered
 3          our electric medical records, it's the Bureau
 4          of Electronic -- so in BEMR if we click refer
 5          it's an automatic referral notification to
 6          that in box.  It's not a packet.
 7                  The last sentence there is talking
 8          about a packet that actually is submitted from
 9          here at Elkton by the warden's areas, by the
10          warden and executive staff to the Transgender
11          Committee.  It's not even in the electronic
12          medical records.
13   Q      And do you know what the packet consisted of
14          in Kellie's case?
15   A      No.  Because what we did was the referral in
16          BEMR and then waited until we had further
17          direction.  So there wasn't a packet at that
18          time until maybe possibly later.  I'm not
19          sure.
20   Q      But based on your testimony today you didn't
21          submit that packet, that would be done through
22          the warden's office?
23   A      Correct.
24   Q      And Melissa Fisher, is she part of the region?
25   A      Yes.  She worked at the region at the time.
```

| | | |
|---|---|---|
| 1 | Q | And, so her comment, "Can you tell me if |
| 2 | | surgery was submit to the BOP TCCT for |
| 3 | | review," that email that you sent was a |
| 4 | | response to her inquiry? |
| 5 | A | Yes. |
| 6 | Q | Are you familiar with hormone confirmation for |
| 7 | | those who want gender-affirming surgery? |
| 8 | A | I'm not sure what you mean by hormone |
| 9 | | confirmation. |
| 10 | Q | Okay.  Do you know what hormonally confirmed |
| 11 | | means? |
| 12 | A | Medically that's not a term we use so I'm not |
| 13 | | sure. |
| 14 | Q | Okay.  Well, let me ask it in a different way. |
| 15 | | Thank you. |
| 16 | | When you were working with Kellie did |
| 17 | | she have the hormones and secondary |
| 18 | | characteristics of an adult female? |
| 19 | A | Yes.  Well, I should say she was taking |
| 20 | | hormones and had various characteristics. |
| 21 | Q | Okay.  And what characteristics were those, |
| 22 | | that you recall? |
| 23 | A | She pulls her hair up in a ponytail often, |
| 24 | | wears makeup, eye liner, would wear a bra. |
| 25 | | Those kind of things. |

```
 1   Q    If Kellie is denied gender-affirming surgery
 2        or it's further delayed how do you feel this
 3        will affect her?
 4             MR. FELDON:        Objection.  Calls for
 5        speculation.
 6   A    I would agree that would be total speculation
 7        because I have no idea.  I'm not in a position
 8        to make that kind of a decision or comment.
 9   Q    Did you sign off on the gender-affirming
10        surgery request for Kellie that was sent to
11        the BOP in approximately April of 2018?
12   A    I'm not -- I was -- the agency is not on the
13        -- there is not a place for me to sign, or I'm
14        not part of that -- the trail of who is
15        required to sign on that.
16   Q    Did you support her request for
17        gender-affirming surgery?
18   A    Yes, that's why things were submitted.
19   Q    Do you believe that gender-affirming surgery
20        is a medical necessity for Kellie?
21             MR. FELDON:        Objection.  Calls for
22        -- well, objection to form.  You can answer.
23   Q    Why or why not is fine.
24   A    Basically I still consider it elective,
25        because just as I said previously, elective
```

```
 1              surgery is a hernia that needs repaired but
 2              it doesn't mean it needs done today.  Knee
 3              replacement, things like that.  Versus you
 4              need bypass and it needs done two minutes ago.
 5                      So anything that is not an absolute
 6              medical emergency at that time is considered
 7              an elective surgery medically speaking.
 8    Q        So if the medical problem didn't require
 9              immediate attention because it was an
10              emergency you would consider it to be
11              elective?
12    A        Correct.  Yeah, same thing if -- I mean, that
13              goes for almost -- a variety of things.
14              Thyroid surgeries.  I mean, if it -- rarely,
15              like would a thyroid surgery becomes a medical
16              necessity today.  And a hernia, if it became
17              incarcerated, then becomes a medical
18              necessity.
19    Q        Do you believe that Kellie would benefit from
20              a gender-affirming surgery?
21                      MR. FELDON:        Objection.  Calls for
22              speculation.
23    A        I don't -- that's kind of out of my scope.
24                      MR. FELDON:        Counsel, I'm going to
25              note it's 10:00 and we actually started this
```

1    witnesses's deposition a little early.  So we

2    have Lori Hunter coming up next.

3         MR. ICOVE:          That's fine.  That

4    was my last question.  Thank you, Gary.

5         MR. FELDON:         No questions for me.

6         MR. ICOVE:          I appreciate it.

7    Okay.

8         We started her -- just for the

9    record -- just for the record, we started hers

10   a little bit late.  I'm not going to quibble

11   over a few minutes one way or the other.

12 Q  Ms. Barnes, this concludes your deposition.

13   And your counsel will instruct you as to

14   whether you'll read the deposition or whether

15   you waive.

16        MR. FELDON:         We'll read and sign.

17        (Deposition concluded at 10:01 a.m.)

18        (Signature not waived.)

19             - - -

20

21

22

23

24

25

1                            SIGNATURE PAGE

2  Case Name:      Tony Fisher, etc. vs. Federal Bureau
                       of Prisons, et al.

3

4  Case Number:  4:19CV1169

5  Deponent:      Jane Barnes

6  Date:          Friday, July 30, 2021

7

8  To the Reporter:

9       I have read the entire transcript of my

10  Deposition taken in the captioned matter or the same

11  has been read to me.  I request that the following

12  changes be entered upon the record for the reasons

13  indicated.

14       I have signed my name to the Errata Sheet and

15  the appropriate Certificate and authorize you to

16  attach both to the original transcript.

17

18

19

20                           Jane Barnes

21       Subscribed and sworn to before me this

22  _____day of _____, 2021.

23

24                           Notary Public

25  My commission expires:_____.

```
 1          I have read the foregoing transcript from page

 2    1  through page 17 and note the following

 3    corrections:

 4    PAGE-LINE        REQUESTED CHANGE        REASON FOR CHANGE

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    _____        _____
      Jane Barnes                        Date
```

1  State of Ohio,           )
                            )  SS:  CERTIFICATE
2  County of Cuyahoga,      )

3      I, Karen A. Toth, Notary Public in and for the

4  State of Ohio, duly commissioned and qualified, do

5  hereby certify that the within named witness,

6  Jane Barnes, was by me first duly sworn to

7  testify the truth, the whole truth, and nothing but

8  the truth in the cause aforesaid; that the testimony

9  then given by her was by me reduced to

10  stenotypy/computer in the presence of said witness,

11  afterward transcribed, and that the foregoing is a

12  true and correct transcript of the testimony so

13  given by her as aforesaid.

14      I do further certify that this deposition was

15  taken at the time and place in the foregoing caption

16  specified and was completed without adjournment

17      I do further certify that I am not a relative,

18  counsel, or attorney of either party, or otherwise

19  interested in the event of this action.

20      IN WITNESS WHEREOF, I have hereunto set my

21  hand and affixed my seal of office at Cleveland,

22  Ohio on this 5th day of August, 2021.

23  *Karen C. Toth*

24  Karen A. Toth, Notary Public in
   and for the State of Ohio.
25  My Commission expires May 6, 2023.

```
1         I have read the foregoing transcript from page

2   1  through page 17 and note the following

3   corrections:

4   PAGE-LINE      REQUESTED CHANGE      REASON FOR CHANGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   /s/ Jane M. Barnes, PA-C          8/5/21

25   _____         _____
        Jane Barnes                    Date
```