UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| TONY FISHER, aka KELLIE REHANNA, | ) ) ) | CASE NO.: 4:19-CV-1169 |
|  | ) |  |
| Plaintiff, | ) | JUDGE SARA LIOI |
|  | ) |  |
| vs. | ) ) | NOTICE OF FILING THE DEPOSITON |
| FEDERAL BUREAU OF PRISONS, *et al.,* | ) ) ) | OF ELIZABETE STAHL, D.O. |
|  | ) |  |
| Defendants. |  |  |

Plaintiff, Tony Fisher, aka Kellie Rehanna, by and through counsel, hereby notifies this

Court and Defendants that the deposition of Elizabete Stahl, D.O. that was taken on July 21,

2021 (attached hereto) has been filed in this case.

Respectfully submitted,

*/s/Edward A. Icove*
Edward A. Icove (0019646)
Icove Legal Group, Ltd.
Terminal Tower, Ste. 3220
50 Public Square
Phone (216) 802-0000; Fax (216) 802-0002
ed@icovelegal.com
Attorney for Plaintiff Tony Fisher,
aka Kellie Rehanna

## <u>CERTIFICATE OF SERVICE</u>

On August 27, 2021, this document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this through the Court's system.

*/s/ Edward A. Icove*
Edward A. Icove

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION

3                        - - -

4    Tony Fisher, aka          )
     Kellie Rehanna,           )
5                              )
                Plaintiff,     )
6                              )
        vs.                    )   Case No. 4:19CV1169
7                              )   Sara Lioi, J.
     Federal Bureau of         )
8    Prisons, et al.,          )
                               )
9               Defendants.    )

10                       - - -
```

ORIGINAL

11          Deposition of Elizabeth Stahl, M.D., a witness

12    herein, called on behalf of the plaintiff for oral

13    examination, pursuant to the Federal Rules of Civil

14    Procedure, taken before Karen A. Toth, Notary Public

15    in and for the State of Ohio, via Zoom, on

16    Wednesday, July 21, 2021, commencing at 9:01 a.m.

```
17                       - - -
```

2

```
 1   APPEARANCES:

 2   On behalf of the Plaintiff:

 3           Ed Icove, Esq.
             Icove Legal Group LTD
 4           Terminal Tower
             500 Public Square, Suite 3320
 5           Cleveland, Ohio 44113
             216-802-0000
 6

 7   On behalf of the Defendants:

 8           Joshua Gardner, Esq.
             United States Department of Justice
 9           Civil Division, Federal Programs Branch
             1100 L Street NW
10           Room 11502
             Washington, D.C. 20005
11           202-305-7583

12

13   Also present:

14           Kellie Rehanna

15                        - - -

16

17

18

19

20

21

22

23

24

25
```



```
1                        INDEX

2    WITNESS:                              CROSS

3    Elizabeth Stahl

4         by Mr. Icove                       4

5                         - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          MR. ICOVE:          Josh, will you

2      stipulate for the record that the court

3      reporter can swear in the doctor by Zoom?

4          MR. GARDNER:     Yes.

5          ELIZABETH STAHL, M.D.

6  Of lawful age, being first duly sworn, as

7  hereinafter certified, was examined and testified as

8  follows:

9                  CROSS-EXAMINATION

10  By Mr. Icove:

11  Q    Good morning, Doctor.  My name is Ed Icove and

12      I represent Tony Fisher, aka Kellie Rehanna,

13      who I will be referring to as Kellie.

14          Obviously based upon your preference

15      you can refer to her any way that you'd like.

16          Today's deposition is being taken

17      pursuant to agreement of counsel.  And you are

18      designated to testify, as you note, on Items 3

19      through 7 of the Amended Rule 30(b)(6) Notice

20      which was filed on July the 14th in the case

21      Tony Fisher versus Federal Bureau of Prisons,

22      et al., case number 4:19CV1169 in the United

23      States District Court, Northern District of

24      Ohio, Eastern Division.

25          We are going to cover those topics

```
 1        first and after those topics have been covered
 2        I will just ask you a few more questions.
 3             Have you ever had your deposition taken
 4        before?
 5   A    Yes.
 6   Q    So you understand the basic ground rules.  If
 7        you don't understand something you can ask me
 8        to rephrase it.  Although this is formal and
 9        we're doing it under oath, it's more like a
10        conversation just so that we can get
11        information from you and find out information
12        that you can give to us that will enlighten us
13        on this case.
14   A    I understand.
15   Q    So if you have a problem with a question of
16        mine please feel free to ask me to rephrase
17        it?
18   A    Thank you.  I will.
19   Q    Okay.  Just as a little bit of a background
20        because I don't have any on you in writing,
21        what is your position at the Bureau of
22        Prisons?
23   A    I am the incoming medical director.  And I say
24        incoming because there is a period of
25        transition.  The outgoing medical director is
```

```
 1            still on duty until August 27th.
 2    Q     And that's Dr. Allen?
 3    A     That is correct.
 4    Q     And it's your understanding, that you're
 5            taking his place for today's deposition?
 6                MR. GARDNER:       Objection.  I'm not
 7            exactly sure what you're referring to.  We've
 8            designated Dr. Stahl as a 30(b)(6) designee.
 9                MR. ICOVE:         Okay.  That's fine.
10                Well, we'll get into the nitty-gritty,
11            but that's fine.
12    Q     So what is your current position?
13    A     I'm the current medical director for the
14            Bureau of Prisons.
15    Q     Is that for the entire United States?
16    A     Yes.
17    Q     How long have you had that position?
18    A     March 2nd of 2021.
19    Q     And before that what was your position?
20    A     I was a clinical director at FCC Allenwood in
21            Pennsylvania.
22    Q     How long were you there?
23    A     From August of 2009 until I reported to D.C.
24            on March 2nd.
25    Q     Before that did you hold any other positions
```

1    at BOP?

2  A  No.

3  Q  Where did you work?

4  A  Before then I was actually a resident.  I was

5     in resident training, physician resident

6     training at Geisinger Medical Center in

7     central PA.

8  Q  How long were you there?

9  A  I was there four years.

10  Q  Could you briefly give me a couple sentences

11     on your educational background and your board

12     certifications?

13  A  Sure.  I graduated high school in Portugal.  I

14     then did a GED here in Rhode Island.  I have a

15     Bachelor's Degree in nursing.  Graduated from

16     nursing school at Rhode Island College in

17     1998.

18        I decided to then go to medical school,

19     so in 2001 I went to medical school.  I

20     graduated in '05 from University of New

21     England College of Osteopathic Medicine.

22        In July of '05 --

23  Q  Can we take a quick break here for a second.

24     The marshal is on the line for Tony or Kellie.

25        (Discussion off the record.)

```
 1              MR. ICOVE:      Thank you, Josh, for
 2         your understanding.
 3    Q    I think I just asked you a little bit about
 4         your educational background and what, if any,
 5         board certifications you have.
 6    A    Yes.  So I think I had finished with my
 7         medical school graduation which was in June of
 8         '05.  I then completed a four year residency
 9         training in combined internal medicine and
10         pediatrics at Geisinger Medical Center in
11         Danville, PA.  And I am boarded by the
12         American Board of Internal Medicine.
13    Q    I'm sorry, I didn't hear that last statement.
14    A    I am certified by the American Board of
15         Internal Medicine.
16    Q    Thank you.
17              Do you consider yourself to be a gender
18         dysphoria specialist?
19    A    No.
20    Q    Have you ever treated Kellie?
21    A    I never was a direct provider to the patient,
22         no.
23    Q    And it's also fair to say that you've never
24         met her personally?
25    A    Yes, that's correct.
```

9

1  Q    And the first time you've met is on this Zoom

2       which she's now listening to; is that fair?

3  A    Yes.

4  Q    Are you a member of the TEC?

5  A    No.

6  Q    Were you ever a member of the TEC?

7  A    When the TEC was first formulated, which I am

8       sorry, I don't remember those dates, I was

9       asked to review a couple of patient charts in

10      regard to their hormone levels, but that was

11      very early on.  And no, I was never a formal

12      member of the TEC.

13 Q    Besides reviewing hormone levels did you do

14      anything else for the TEC?

15 A    No.

16 Q    So let's go through the items that are listed.

17      Did you get a copy of those items?

18 A    Yes, I did.

19 Q    So let's look at number 3.  Can you answer

20      that particular question for us, please?

21 A    Just for my benefit, because I did have an

22      earlier version and then an amended version,

23      it's --

24 Q    I can read it to you.  Why don't I do that.

25 A    He just gave me the amended, so that's great.

1  Q    Okay.  Good.

2  A    But to get my head in a good frame it is

3       actually good to read it out loud, so I will

4       do that.  "Do the Defendants require any

5       gender dysphoria experience, knowledge or

6       otherwise of any clinician or contractor that

7       treats inmate with gender dysphoria where

8       Plaintiff is housed?"

9            So, Mr. Icove, how I would answer that

10      is the Federal Bureau of Prisons as an agency

11      expects every single institution in the nation

12      to be able to provide gender-affirming

13      treatment.  And by and large gender-affirming

14      treatment is provided by primary care

15      providers both in the community and now in the

16      Federal Bureau of Prisons.

17           With that in mind, the Bureau has

18      participate, has shared continuous medical

19      education programs for all of their providers

20      to different -- many courses that have been

21      done at the national level.

22           We also provide -- there is a

23      committee, a working committee, a support

24      committee that is called the Transgender

25      Clinical Care Team which is composed of a

```
 1          couple of physicians, a psychologist,
 2          pharmacist, social workers who are a support
 3          group for line providers at the institutional
 4          level.
 5               So the answer -- does the Bureau
 6          require?  The answer to that question is we do
 7          not have the requirement, or it's not written
 8          in policy or any regulatory body that I am
 9          aware that someone gets a specific
10          certification in gender dysphoria; however we
11          are all expected -- all institutions are able
12          to have the means to provide gender-affirming
13          care.
14     Q    And as you indicated there is no specific
15          documentation for that particular requirement;
16          is that fair?
17     A    Yes.  And maybe the only exception to that
18          would be for people who have had a special
19          interest in this area of medicine, who have
20          gone outside of the Bureau to participate in
21          multiple continuous medical education courses.
22               I have done that.  So I have my
23          certificate of completion on having attended
24          multiple of those courses through UCFF, WPATH,
25          Harvard University, et cetera.
```

1   Q    As you indicated, it's my understanding that

2         that particular completion of those particular

3         courses is strictly voluntary based upon the

4         particular doctor involved?

5   A    That is correct.  And it's certainly the

6         standard.  We don't require or dictate what

7         kind of education physicians get in regard to

8         heart disease or diabetes.  There are a number

9         of other diagnoses.  So we do depend on the

10        self awareness of the providers to seek out

11        those opportunities, even though we do provide

12        a fair amount, including a clinical guidance

13        document that pertains directly to

14        gender-affirming treatment.

15   Q    Okay.  Are you aware whether or not the gender

16        dysphoria specialist has ever reviewed

17        Kellie's case?

18   A    I did, in preparation for today, review in

19        fair amount of detail.  I can't say that I

20        looked at every single document.  I did not

21        find an endocrinologist consultation, if

22        that's the question.

23   Q    Yes, that is.  Yes.  No endocrinologist or

24        someone who is a specialist in gender

25        dysphoria; is that fair?

| | | |
|---|---|---|
| 1 | A | That is correct. |
| 2 | Q | Okay.  You mentioned documents that you |
| 3 | | reviewed.  Do you recall -- and obviously I'm |
| 4 | | not going to hold you specifically to any one |
| 5 | | particular document, but do you recall what |
| 6 | | documents you reviewed?  I assumed you |
| 7 | | reviewed a lot of stuff, but go ahead. |
| 8 | A | I'm sorry, I didn't understand the question. |
| 9 | Q | Yeah.  That was a little convoluted.  I |
| 10 | | apologize. |
| 11 | | In preparing for responses to items 3 |
| 12 | | through 7 what documents did you review? |
| 13 | A | I reviewed the medical record of the patient. |
| 14 | | I reviewed the WPATH, few pertinent items of |
| 15 | | the WPATH Version 7, and then the legal |
| 16 | | documents that Josh sent me. |
| 17 | Q | Okay.  Before we talk about legal documents, |
| 18 | | if they are legal documents from Josh to you |
| 19 | | about the case they may or may not be |
| 20 | | privileged.  Just go ahead and identify them |
| 21 | | for the record. |
| 22 | | What I'm concerned about is I don't |
| 23 | | want you to give me anything that is |
| 24 | | privileged on any advice or consult you had |
| 25 | | with Josh. |

| | |
|---|---|
| 1 | MR. GARDNER:      I appreciate that, |
| 2 | Ed.  I think to reframe the question to make |
| 3 | it easier for Dr. Stahl, Dr. Stahl did any of |
| 4 | the legal documents I shared with you form a |
| 5 | basis for your answering the 30(b)(6) topics? |
| 6 | THE WITNESS:      The only documents I |
| 7 | understand were forwarded from your office, |
| 8 | and they were introducing to affidavits that I |
| 9 | had to just be prepared to speak to during the |
| 10 | course of this deposition. |
| 11 Q | Okay.  Which affidavits were those; do you |
| 12 | recall? |
| 13 A | So there is a clinical guidance -- I can list |
| 14 | them. |
| 15 | MR. GARDNER:      Just to be clear, I |
| 16 | think she's referring to the four documents |
| 17 | you had sent us. |
| 18 | MR. ICOVE:      The declarations you |
| 19 | sent me? |
| 20 | MR. GARDNER:      No, no.  So the four |
| 21 | documents you had sent the court reporter and |
| 22 | cc'd me on. |
| 23 | MR. ICOVE:      Okay.  Good. |
| 24 | MR. GARDNER:      That's in the binder. |
| 25 | That's what Dr. Stahl is referring to. |

| | | |
|---|---|---|
| 1 | | MR. ICOVE:          Okay.  Great. |
| 2 | Q | So those particular documents, and those are |
| 3 | | Exhibits 1 through 4? |
| 4 | A | Yes. |
| 5 | Q | You looked at those.  Okay.  Great.  Any other |
| 6 | | documents that you can think of? |
| 7 | A | I can't think of any right now. |
| 8 | Q | Okay.  Good.  If you do just let me know. |
| 9 | A | Okay. |
| 10 | Q | Was Kellie sent out to any outside gender |
| 11 | | dysphoria specialists in regards to her |
| 12 | | particular case? |
| 13 | A | I did not see -- |
| 14 | | MR. GARDNER:       Objection. |
| 15 | Q | No, go ahead. |
| 16 | A | No, I did not -- I saw that she had a |
| 17 | | urologist appointment at one point.  I did not |
| 18 | | see an endocrinology consultation in her |
| 19 | | chart. |
| 20 | Q | Okay.  Let's go on to Question No. 4.  Yeah, |
| 21 | | why don't you go ahead and read it. |
| 22 | A | Question No. 4.  The question is:  "Do |
| 23 | | Defendants require any gender dysphoria |
| 24 | | experience, knowledge or otherwise of any |
| 25 | | staff or contractor responsible for creating |

1      treatment plans for the Plaintiff?"

2               And again, Question 3 partially

3      answered this question in that the answer is

4      that the primary care provider who is a

5      licensed independent medical provider, the

6      physician, is ultimately in charge of all

7      treatment plans for every patient over any

8      diagnosis.  So even if the plaintiff, the

9      patient had gone out to secure and

10     endocrinology appointment, in the end it's

11     still the primary care provider who is the

12     lead, the pilot physician, if you will, in

13     developing a treatment plan.

14              So the same would apply again.  The BOP

15     does provide CME education courses, has a CME

16     budget and allows physicians and advanced

17     practice providers to participate in outside

18     courses in gender specific courses, but there

19     is nothing regulatory in policy that dictates

20     any specific type of certification for these

21     patients to receive care.  And, in fact, in my

22     opinion that would really preclude treatment

23     if certifications were required.

24  Q   Thank you very much for your explanation which

25     I understand.

1      So based upon what you've told me, is

2      it fair to say that neither Exhibit 1 nor

3      Exhibit 2 that you were provided provide any

4      requirements that are listed under Item Number

5      4?

6           MR. GARDNER:      Objection.  Vague.

7   A   Repeat the question.

8   Q   Yeah.  You had previously testified that there

9      weren't any specific documents that made these

10     requirements when we talked about 3, and I'm

11     just confirming that those requirements are

12     not contained -- or any requirements are

13     contained in Exhibit 1 or Exhibit 2?

14  A   I'm going to --

15          MR. GARDNER:      Objection.  Vague.

16          Ed, I think to be clear, when you say

17     requirements, can you just be specific what

18     requirement we're talking about so the Doctor

19     can gave you a clear answer?

20          MR. ICOVE:        Exactly.

21  Q   Is there anything specific in Exhibit 1 or

22     Exhibit 2 which relate to the requirements

23     under Item Number 4?

24          MR. GARDNER:      Same objection.

25  A   Can I ask a question?

| | | |
|---|---|---|
| 1 | Q | Yeah, please. |
| 2 | A | I'm wondering, are you asking is there any |
| 3 | | requirement for an endocrinologist |
| 4 | | consultation in either Affidavit 1 or 2?  Is |
| 5 | | that the question?  Whether our own policy or |
| 6 | | clinical guidance manual require a provider to |
| 7 | | involve an endocrinologist in the care of a |
| 8 | | trans patient; is that the question? |
| 9 | Q | Yes, it is.  And you're referring to those |
| 10 | | documents as affidavits.  They are just |
| 11 | | exhibits. |
| 12 | A | Okay.  Exhibit 1.  Sorry. |
| 13 | Q | That's fine.  That's fine.  A rose by any name |
| 14 | | smells sweet.  That's fine.  I was just having |
| 15 | | you confirm it with those particular |
| 16 | | documents, because I couldn't see anything in |
| 17 | | there that had any of those requirements.  I |
| 18 | | just wanted you to confirm that I'm not |
| 19 | | missing something. |
| 20 | A | Yes, you are correct. |
| 21 | Q | Okay.  Good. |
| 22 | | From a review of Kellie's medical |
| 23 | | chart -- let's go to Number 5. |
| 24 | A | "What specialists have been consulted with |
| 25 | | regard to Plaintiff's care?" |

19

| | | |
|---|---|---|
| 1 | Q | Correct. |
| 2 | A | And the only consulting that -- again, I might |
| 3 | | have missed.  The only consultant that I know |
| 4 | | for a fact she did see for hematology workup |
| 5 | | was a urologist.  It ended up being a negative |
| 6 | | workup. |
| 7 | | I did not see any other specialist |
| 8 | | consultant, but I again did not do an entire |
| 9 | | document review of the medical chart. |
| 10 | Q | Based upon the review you did, it fair to say |
| 11 | | that you didn't see any other referrals for an |
| 12 | | epidemiologist or a dysphoria specialist; is |
| 13 | | that fair to say? |
| 14 | A | The -- so dysphoria specialists are an |
| 15 | | umbrella term that usually refer to |
| 16 | | psychologists.  And she did have a fair amount |
| 17 | | of interaction to have mental health issues. |
| 18 | | According to the record there is a history of |
| 19 | | significant anxiety.  And so she did have a |
| 20 | | fair amount of mental health work that was |
| 21 | | obvious in the chart. |
| 22 | | But again, if you are referring to an |
| 23 | | endocrinologist, I did not see a referral to |
| 24 | | an endocrinologist. |
| 25 | Q | Okay.  Can you look at Question No. 6, please? |

1  A    The Question No.6.  "Why did Defendants inform

2       J. Barnes of the information contained in her

3       clinical note dated January 19, 2018?"

4            I did go to the chart, to the medical

5       record to review that particular entry, and I

6       don't have -- so --

7            THE WITNESS:     Do we have that?

8            MR. GARDNER:     Yes.

9  Q    Did you see Exhibit 3?

10  A    If it's okay, I'd like the review it again.

11  Q    Please do.  Please do.  Take your time.  I'm

12       not in any hurry.

13  A    So the note in question here says the

14       following:  "Discussed case with Region over

15       last several months as well as Chief Medical

16       Officer who confirmed there is no sex

17       reassignment surgeries being done at this time

18       and it is still considered an elective medical

19       procedure rather than medical necessity."

20            So my position, this note was written

21       on January 19, 2018.  And this does not

22       reflect at all the position of the Federal

23       Bureau of Prisons as an agency in general.

24       And so I don't have a great explanation as to

25       why this entry was made, but we have been

```
 1          provided gender-affirming specific treatment

 2          for many years now and have presented national

 3          conferences encouraging gender-affirming

 4          treatment.

 5               I actually had the opportunity to speak

 6          with the chief medical officer who was

 7          Dr. Allen who I share an office with at this

 8          time, to see if he recalls a conversation with

 9          Ms. Barnes, who is the author of this clinical

10          note, and he does not remember a conversation

11          with Ms. Barnes in this regard and confirmed

12          that at the time as the medical director he

13          has always encouraged and educated staff to

14          provide appropriate community standard

15          gender-affirming therapy.

16    Q     So as I look this over, it's fair to say that

17          I should talk to Ms. Barnes about this

18          particular matter?  That would be fair to say,

19          correct?

20    A     That would.

21    Q     Thank you for talking to Dr. Allen about it.

22               Is there anything else that he informed

23          you about as far as this entry was concerned?

24    A     No.  I mean, I asked him a very directed

25          question about this particular entry.
```

| | | |
|---|---|---|
| 1 | Q | Did he confirm -- is it true that there were |
| 2 | | no sex reassignment surgeries being done in |
| 3 | | January of 2018? |
| 4 | A | So to this date I am not aware that a |
| 5 | | gender-affirming procedure has been completed; |
| 6 | | however, that has never been my policy.  So |
| 7 | | just because it hasn't been done yet it just |
| 8 | | -- there are a number of factors why that |
| 9 | | might be the case.  But it's never been the |
| 10 | | Bureau's policy to be against gender-affirming |
| 11 | | hormone treatment and/or gender-affirming |
| 12 | | surgery. |
| 13 | Q | In regards to this response that you've given |
| 14 | | me, which I greatly appreciate it, is this |
| 15 | | particular response documented in any BOP |
| 16 | | manual or other document? |
| 17 | | MR. GARDNER:      Objection.  Vague. |
| 18 | | Ed, just to be clear, what are you asking? |
| 19 | | MR. ICOVE:      Well, I don't know if |
| 20 | | she had a problem with it, but I'm more than |
| 21 | | happy to -- |
| 22 | Q | Doctor, did you understand my question? |
| 23 | A | No, I didn't. |
| 24 | Q | Okay.  Well, I'll rephrase it.  Thank you. |
| 25 | | You indicated that from talking to |

```
 1          Dr. Allen and from your knowledge, the fact
 2          that there were no sex reassignment surgeries
 3          being done as of January of '18 is incorrect;
 4          is that what you told me?
 5   A      No.
 6                 MR. GARDNER:        Objection.
 7          Mischaracterizes the witness's testimony.
 8   Q      What did you tell me?
 9   A      I told you that I asked Dr. Allen if he
10          recalled a conversation with Ms. Barnes where
11          he might have given her the impression that
12          gender-affirming surgery was not medically
13          necessary.  This is a double negative
14          sentence.
15                 But essentially, in essence, he denied
16          ever giving any person in the field the
17          impression that gender-affirming surgery was
18          not medically necessary.
19   Q      So it BOP's position that gender-affirming
20          surgery can be a medical necessity?
21   A      It can, certainly.  So all aspects of
22          gender-affirming treatments are individualized
23          and we know that only a small portion of trans
24          or gender nonconforming patients end up
25          needing surgery, but we do recognize that in
```

```
 1              those cases it can be medically necessary.
 2              Absolutely.
 3   Q    And that's done -- and I don't mean to put
 4        words in your mouth, but that's done on a
 5        case-by-case basis?
 6   A    Yes.
 7   Q    And that particular policy is contained in one
 8        of the exhibits I gave you; is that fair to
 9        say?
10   A    Yes.
11   Q    Okay.  Just for the record, could you identify
12        where that's at?
13   A    Did you --
14   Q    I think it's page 19.  Is that the page you
15        got?  Page 19 of Exhibit 1.  I'm just trying
16        to keep things moving.
17   A    Yes.  Yes.
18   Q    That's all.  Okay.
19              That's the first sentence of that
20        particular paragraph?
21   A    That's correct.  Which states, "Although
22        individuals may live successfully as
23        transgender persons without surgery,
24        gender-affirming surgery may be appropriate
25        for some and is considered on a case-by-case
```

```
 1          basis," yes.
 2    Q     And I just have one other question about this
 3          particular note that I'm confused on.
 4    A     Okay.
 5    Q     To the best of your knowledge, in January of
 6          2018 had there been any sexual reassignment
 7          surgeries done?
 8    A     Not to my knowledge.
 9    Q     And as of today you're not aware of any; is
10          that fair to say?
11    A     Yes.
12    Q     So BOP considers gender-affirming surgery to
13          be elective; is that fair?
14    A     No.
15    Q     It's not elective?  It can be necessary in a
16          case-by-case basis, right?
17    A     That is correct.
18    Q     Okay.  Thank you.
19               I'm sorry for this but I need to make
20          sure that I understand your testimony.  Thank
21          you.
22               Let's go to Number 7, if we could
23          please.
24    A     Number 7, "Why requests for gender-affirming
25          surgery have not been ripe for consideration
```

```
 1          and approval over the past ten years;" is that
 2          the question?
 3    Q     Yes.   Thank you.
 4    A     So from what I understand we have been trying
 5          to follow the WPATH criteria.  And while the
 6          WPATH specifically references the expectation
 7          that gender-affirming therapy is provided at
 8          all institutions, there have been patients who
 9          just have not been able to meet all of the
10          WPATH criteria.
11                So from what I understand we have not
12          had -- and using your terminology -- a patient
13          who has been ripe for the gender-affirming
14          therapy.  I am not aware of any case who has
15          been submitted to the medical director's
16          office for review of a gender-affirming
17          procedure to this date.
18    Q     And that determination would be by the medical
19          director based upon the evaluation done by the
20          TEC?
21    A     So the medical director would have final
22          clinical authority over the decision to pursue
23          gender-affirming surgery by policy because
24          it's considered an extraordinary type of
25          surgery.  So very similar to a solid organ
```

1    transplant, which is considered a medical

2    necessary treatment.  But because it's

3    considered medically extraordinary it would be

4    routed through and finally reviewed and

5    approved by the Office of the Medical

6    Director.

7  Q  How do you define extraordinary for the

8    purposes of severe physical impairments?

9  A  I have to review that.  I'd have to refer the

10   policy to answer that.

11 Q  Okay.  That's fine.  Is there a policy off the

12   top of your head that you can think of or --

13 A  I know it's in the patient care program

14   statement for the Federal Bureau of Prisons.

15   I would have to research the exact section

16   that pertains to this language.

17 Q  Okay.  Well, if you could do that and give it

18   to your counsel at your earliest convenience,

19   that would be great.

20       Is there any other document that you're

21   referring to to determine whether or not

22   something is an extraordinary mental or

23   physical disability?

24       MR. GARDNER:       Objection.  Misstates

25   the witness's previous testimony.

```
 1   Q    Are there any other documents that you're
 2        aware of that relate to what is determined to
 3        be extraordinary medical/mental disorder?
 4             MR. GARDNER:        Objection.
 5        Mischaracterizes the witness's previous
 6        testimony.
 7   Q    Do you understand my question?  Your attorney
 8        is allowed to make objections during this
 9        particular proceeding.  He's not entitled to
10        make speaking objections, but I really don't
11        care because you're a professional and he's a
12        professional and I'm a professional.  But the
13        rules provide he's not allowed to tip you off
14        as to what to say or what not to say.
15             Can you answer the question, or do you
16        need me to rephrase it?
17   A    The part of the question that is confusing is
18        when you are adding extraordinary mental
19        disorder.  I don't know what that means.  So
20        we have policy that --
21   Q    Let's drop off -- excuse me.  I don't mean to
22        cut you off.  Let's drop off the mental
23        disorder, let's just talk about the physical
24        disorder.
25   A    Can you rephrase?
```

```
 1   Q    How does the BOP determine an extraordinary
 2        medical --
 3   A    Procedure.
 4   Q    Exactly.
 5   A    Yes.  So we do have -- I'm only aware of one
 6        policy where that is covered and it is under
 7        our patient care program statement which we
 8        will provide.
 9   Q    Okay.  Thank you so much.  That's very
10        helpful.
11   A    Uh-huh.
12   Q    Now, we talked about Question 7, and I wanted
13        to know if you recall off the top of your head
14        what research are you aware of that support a
15        determination that gender-affirming surgery is
16        not ripe over the last ten years?
17   A    Can you rephrase the question?
18   Q    Yeah.  What reasons were you -- what reasons
19        do you know, from what you've read and from
20        what you've reviewed in your position that
21        you're aware of that supported a determination
22        that for over the last ten years
23        gender-affirming surgery has not been ripe for
24        consideration or approval?
25   A    Okay.  So there has been a number of factors
```

1    that have been challenging for most patients

2    to be considered meeting all the requirements

3    of WPATH.  One, if there are co-existing

4    medical or mental health conditions they need

5    to be reasonably controlled before a surgeon

6    will pursue gender-affirming surgery; 12

7    continuous months of hormone levels that are

8    at goal, to meet the patient's goals.  So when

9    it's a trans they usually would need to be at

10   12 continuous months of at goal hormone

11   levels.  That can sometimes be a problem for

12   some patients who are often noncompliant with

13   treatment, forget to pick up their meds,

14   sometimes they hoard their meds and stop

15   taking them without telling anyone.  So that's

16   a challenge.

17        Being able to provide a

18   gender-affirming experience in a opposite

19   institution -- so for a trans female to be

20   able to be located, transferred to a female

21   institution for 12 continuous months without

22   running into trouble, security issues with

23   other prisons I know has been a challenge at

24   times.

25        Those are probably the main factors I

1    would suspect that have contributed to not

2    being able to meet all of the WPATH criteria.

3         And lastly maybe my -- another thought

4    is that surgeons require letters of support

5    for these procedures; one from a mental health

6    worker and one from a medical provider.  And

7    so if there are noncompliance issues between

8    the patient or if there is distrust issues

9    between the treatment modality, if you will,

10   that also will lead to further pause.

11        And again I will bring up the medical

12   transplant of solid organs.  While everyone

13   agrees that at the end of your liver's lifetime

14   that you would only live if you get a liver,

15   that certainly is something that we recognize

16   as necessary, but it doesn't mean that

17   everyone is actually going to get that liver.

18        So while we recognize the medical

19   necessity we certainly recognize that it does

20   not entitle someone for that procedure.

21        So I know that was a long winded

22   answer.

23 Q   No, it was very informative and I appreciate

24   it because you answered a lot of the questions

25   that I have.

| | | |
|---|---|---|
| 1 | | Are you aware of any other reasons |
| 2 | | besides the ones you've indicated? |
| 3 | A | Those are -- I'm sure there are many other |
| 4 | | reasons.  And again, because we make |
| 5 | | individualized decisions and every case is |
| 6 | | different from the next, but those would |
| 7 | | probably be the top three or four categories |
| 8 | | of major co-existing factors that go into this |
| 9 | | decision. |
| 10 | Q | Are those particular factors from any source |
| 11 | | that you're aware of, or is this one that the |
| 12 | | department has put together itself? |
| 13 | | MR. GARDNER:        Objection.   Vague. |
| 14 | Q | Did you understand the question? |
| 15 | A | No, I didn't.  It was a little vague.  If you |
| 16 | | could just narrow down or rephrase it and I'll |
| 17 | | be able to answer. |
| 18 | Q | Do these particular criteria -- and you've |
| 19 | | mentioned four or five of them; are those from |
| 20 | | any particular document; for example, the |
| 21 | | WPATH?  Are they from the factors of the WPATH |
| 22 | | or are they something that the Bureau has put |
| 23 | | together? |
| 24 | A | Those factors are the criteria that I was |
| 25 | | going over that has been particularly |

1      challenging for in-prison federal inmates to

2      meet towards those specified by WPATH.

3  Q    Good.  So let's quickly go through those so

4      far as what you've reviewed for Kellie.

5            It's fair to say that she has had a

6      consistent well documented --

7            MR. GARDNER:      Objection.

8  Q    -- gender dysphoria?

9            MR. ICOVE:       I'm sorry.  I wasn't

10     done with the question.

11           MR. GARDNER:      I'm sorry.  I thought

12     you were, Ed.

13           MR. ICOVE:       That's okay.  By the

14     way, Josh, just so you know, I will stipulate

15     for the record that you are not going to waive

16     any objection that you make during the

17     deposition.

18           MR. GARDNER:      I appreciate that.

19           MR. ICOVE:       I do that with all

20     counsel.

21           MR. GARDNER:      I appreciate that.

22     But we do object.  Beyond the scope of the

23     30(b)(6) deposition.

24           You can answer to the extent of your

25     knowledge.

| | | |
|---|---|---|
| 1 | A | Sorry.  So what is the question? |
| 2 | Q | You know what, I'm sorry, I don't need |
| 3 | | necessarily to ask you.  I don't need to ask |
| 4 | | these of you, I can ask these of somebody |
| 5 | | else. |
| 6 | | MR. GARDNER:      Ed, I was just going |
| 7 | | to say -- |
| 8 | | MR. ICOVE:       I'm not going to |
| 9 | | quibble with you guys.  There are plenty of |
| 10 | | people that I can ask this of, but it's just |
| 11 | | the thought that she was probably the best |
| 12 | | person. |
| 13 | | MR. GARDNER:      Just as a reminder, |
| 14 | | this isn't a speaking objection but just for |
| 15 | | your edification we are making Dr. Eplin |
| 16 | | available to answer exactly those types of |
| 17 | | questions. |
| 18 | | MR. ICOVE:       Great.  Thank you. |
| 19 | | I was going to ask her about that |
| 20 | | particular line of questioning.  Thank you. |
| 21 | Q | Is it your understanding that Kellie's |
| 22 | | diagnosis includes gender dysphoria, panic |
| 23 | | attack disorder and depression? |
| 24 | | MR. GARDNER:      Objection.  Beyond |
| 25 | | the scope of the Rule 30(b)(6) deposition. |

1     Again, I'm just making an objection.

2          MR. ICOVE:          I'll tell you what,

3     let's do this:  At the end of the 30(b)(6)

4     categories I will go ahead and ask the

5     questions and we'll do it that way, which we

6     had talked about before.  Okay.  I'm sorry.

7  Q  You indicated that you have reviewed Kellie's

8     record.  Did you look at the record that had

9     the most recent estrogen level?  It was dated

10    June 15, 2021.

11 A  Yes, I did.

12 Q  And what was that particular level?

13 A  Her hormone levels were at goal.  For a total

14    testosterone it should be less than 55, and

15    for an estradiol level it should be around

16    200.

17 Q  So if there were more comparable levels in

18    this range she would be at goal; is that fair

19    to say?

20 A  Any time that her total testosterone is less

21    than 55 and that his estradiol level is around

22    200 she will be considered to have female

23    level hormones, taking into consideration that

24    a native female will have levels anywhere

25    between the 80 to 200, sometimes 300 level.

1           So we do understand that with fluctuation of

2           levels in a native female might be slightly

3           different than we expect for gender-affirming

4           therapy, which is why the American

5           Endocrinology and the experts in this field

6           believe that a level of estradiol around 200

7           is considered at goal.

8 Q     Okay.  So now I'm going to ask you a few other

9           questions that aren't specifically -- although

10          I think they are reasonably connection to your

11          testimony.  We'll start there.  It will only

12          take a minute or two.

13                Is it fair to say that Kellie has been

14          diagnosed with gender dysphoria, panic attack

15          disorder and depression?

16 A     So I did not go into any detail over the

17          mental health record.  I do know from

18          reviewing the medical portion of her medical

19          record that panic attacks, anxiety in general,

20          depression were mentioned.  Yes, she has had a

21          validated gender dysphoria diagnosis for quite

22          some time.

23 Q     And based upon your review of the records and

24          your position, is it your opinion within a

25          reasonable degree of medical certainty that

1    her gender dysphoria is a serious medical

2    need?

3    MR. GARDNER:    I'm sorry, Ed, you

4    dropped off there.

5    MR. ICOVE:    Karen, you want to

6    read that back?

7    (Question read.)

8    MR. GARDNER:    Objection.  Beyond

9    the scope of the Rule 30(b)(6).  Also

10    objection, lack of foundation.

11    MR. ICOVE:    And for the record, I

12    indicated these questions are in addition to

13    the 30(b)(6).  And my understanding, based on

14    our conversation is I get a half hour to do

15    these.  So let's finish it up and get it done.

16    MR. GARDNER:    Ed, that's not

17    consistent with our understanding.  We put

18    Dr. Stahl up as a 30(b)(6) designee only.  You

19    did not seek to take Dr. Stahl's deposition in

20    an individual capacity.  I'm only going to

21    give you a little bit of latitude if you have

22    a few questions for her.  Let's be clear this

23    is not per agreement at all.

24    MR. ICOVE:    Okay.  Well, I'll be

25    more careful next time we make agreements.

|   |   |   |
|---|---|---|
| 1 |   | Our agreement was that any of the 30(b)(6) |
| 2 |   | people that I wanted to testify to other |
| 3 |   | issues, they would count as a separate half an |
| 4 |   | hour deposition.  And I'm sorry that we don't |
| 5 |   | agree on that, but let's not waste any more |
| 6 |   | time, okay? |
| 7 |   | MR. GARDNER:    That's fine. |
| 8 | Q | What is your position regarding why the |
| 9 |   | gender-affirming surgery hasn't been completed |
| 10 |   | for Kellie? |
| 11 |   | MR. GARDNER:    Objection.  Beyond |
| 12 |   | the scope of the Rule 30(b)(6) deposition. |
| 13 |   | MR. ICOVE:    I'll stipulate to |
| 14 |   | your continuing objection on those bases.  You |
| 15 |   | can object every time you want to, but just as |
| 16 |   | I indicated, I preserve those.  And all these |
| 17 |   | questions are going to be subject to the same |
| 18 |   | objection. |
| 19 |   | MR. GARDNER:    I understand. |
| 20 | Q | Okay.  Could you answer the question please if |
| 21 |   | you can? |
| 22 | A | Rephrase the question please. |
| 23 | Q | I will. |
| 24 |   | Is it your understanding that Kellie |
| 25 |   | was turned down for the surgery because she |

1    didn't complete the requirements of her
2    ability to be successfully transitioned to a
3    female facility?
4  A  Yeah, I actually cannot answer that question
5    at all.
6  Q  That's fine.
7  A  Yeah.  I don't have the knowledge of -- you
8    know, I don't have enough knowledge of her
9    medical care and all of the factors that weigh
10    into her treatment plan to answer that
11    question.
12  Q  Right.  And in answering the questions
13    regarding people that have had surgery for
14    serious medical conditions, and putting aside
15    gender surgery, in the last five years or so
16    what serious medical impairments were referred
17    out for surgery for these inmates, just off
18    the top of your head?
19        MR. GARDNER:        Objection.  Lack of
20    foundation.  Overbroad.
21        THE WITNESS:        I don't know what
22    he's asking.
23  A  I'm sorry I don't even know -- I don't know
24    the question.  I don't understand the
25    question.

1   Q    That's fine.  I'm asking you, regardless of

2        what your attorney says, and, you know, he's

3        really not allowed to tell you or give you any

4        hint as to whether you should object or not

5        object to something if you don't understand

6        it.  You're supposed to have a conversation

7        with me.  So let's -- I only got a couple more

8        questions.

9             Are you aware of any other inmates that

10       had been treated for serious medical

11       impairments outside of the prison system?  We

12       talked briefly about it and we mentioned --

13       you mentioned -- I just wanted to follow-up.

14  A    You mean any -- of course.  Any serious

15       medical conditions whose needs cannot be met

16       at an outpatient clinic are referred out to

17       medical hospitals and specialty centers.

18  Q    Okay.  And can you give me examples of those

19       types of serious medical impairments?

20       Obviously it wouldn't be all inclusive, but

21       just off the top of your head.

22  A    It could be a number of things.  End stage

23       kidney disease, cancer, referrals for cell

24       organ transplants.  I mean, the list is huge.

25       Severe head trauma, and to include gender-

1    affirming treatment, if there are co-existing

2    medical conditions that would flag the patient

3    for high risk such as pre-existing cancer or

4    even blood clotting disorders.  There could be

5    a number of complicating co-existing serious

6    conditions in a gender nonbinary patient who

7    would require comanagement by a subspecialist.

8  Q    I don't have any further questions of you.

9    You're entitled to -- I want to thank you very

10    much for coming today and telling us what you

11    know.  You're entitled to review the

12    deposition for any corrections, or you can

13    waive your signature.  That's up to you and

14    your attorney.

15        MR. GARDNER:     The witness will

16    reserve the write to read and sign.

17        MR. ICOVE:     Thank you.  Let's go

18    off the record.

19        (Deposition concluded at 10:06 a.m.)

20        (Signature not waived.)

21        - - -

22

23

24

25

42

1          SIGNATURE PAGE

2  Case Name:      Tony Fisher, etc., vs. Federal Bureau of
                   Prisons, et al.
3

4  Case Number:   4:19CV1169

5  Deponent:      Elizabeth Stahl, M.D.

6  Date:          Friday July 23, 2021

7

8  To the Reporter:

9          I have read the entire transcript of my

10 Deposition taken in the captioned matter or the same

11 has been read to me.  I request that the following

12 changes be entered upon the record for the reasons

13 indicated.

14         I have signed my name to the Errata Sheet and the

15 appropriate Certificate and authorize you to attach

16 both to the original transcript.

17

18

19

20                         Elizabeth Stahl, M.D.

21         Subscribed and sworn to before me this

22 _____day of _____, 2025.

23

24                         Notary Public

25 My commission expires:_____.

43

```
 1        I have read the foregoing transcript from page 1
 2   through page 41  and note the following corrections:
 3   PAGE-LINE      REQUESTED CHANGE           REASON FOR CHANGE
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   _____       _____
     Elizabeth Stahl, M.D.           Date
```

```
1   State of Ohio,          )
                            )  SS:   CERTIFICATE
2   County of Cuyahoga,     )

3          I, Karen A. Toth, Notary Public in and for the
4   State of Ohio, duly commissioned and qualified, do
5   hereby certify that the within named witness,
6   Elizabeth Stahl, was by me first duly sworn to
7   testify the truth, the whole truth, and nothing but
8   the truth in the cause aforesaid; that the testimony
9   then given by her was by me reduced to
10  stenotypy/computer in the presence of said witness,
11  afterward transcribed, and that the foregoing is a
12  true and correct transcript of the testimony so
13  given by her as aforesaid.

14         I do further certify that this deposition was
15  taken at the time and place in the foregoing caption
16  specified and was completed without adjournment

17         I do further certify that I am not a relative,
18  counsel, or attorney of either party, or otherwise
19  interested in the event of this action.

20         IN WITNESS WHEREOF, I have hereunto set my
21  hand and affixed my seal of office at Cleveland,
22  Ohio on this 5th day of August, 2021.

23

24         Karen A. Toth, Notary Public in
           and for the State of Ohio.
25         My Commission expires May 6, 2023
```

FINCUN-MANCINI -- THE COURT REPORTERS

(216)696-2272

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

Elizabeth Stahl, M.D.
July 21, 2021

## A

ability (1)
39:2
able (7)
10:12;11:11;26:9;
30:17,20;31:2;32:17
Absolutely (1)
24:2
According (1)
19:18
actually (5)
7:4;10:3;21:5;31:17;
39:4
adding (1)
28:18
addition (1)
37:12
advanced (1)
16:16
advice (1)
13:24
Affidavit (1)
18:4
affidavits (3)
14:8,11;18:10
affirming (1)
41:1
again (9)
16:2,14;19:2,8,22;
20:10;31:11;32:4;35:1
against (1)
22:10
age (1)
4:6
agency (2)
10:10;20:23
agree (1)
38:5
agreement (3)
4:17;37:23;38:1
agreements (1)
37:25
agrees (1)
31:13
ahead (5)
13:7,20;15:15,21;
35:4
aka (1)
4:12
al (1)
4:22
Allen (5)
6:2;21:7,21;23:1,9
Allenwood (1)
6:20
allowed (3)
28:8,13;40:3
allows (1)
16:16
Although (1)
5:8;24:21;36:9

always (1)
21:13
Amended (3)
4:19;9:22,25
American (3)
8:12,14;36:4
amount (4)
12:12,19;19:16,20
and/or (1)
22:11
answered (2)
16:3;31:24
anxiety (2)
19:19;36:19
apologize (1)
13:10
apply (1)
16:14
appointment (2)
15:17;16:10
appreciate (5)
14:1;22:14;31:23;
33:18,21
appropriate (2)
21:14;24:24
approval (2)
26:1;29:24
approved (1)
27:5
area (1)
11:19
around (3)
35:15,21;36:6
aside (1)
39:14
aspects (1)
23:21
assumed (1)
13:6
attack (2)
34:23;36:14
attacks (1)
36:19
attended (1)
11:23
attorney (3)
28:7;40:2;41:14
August (2)
6:1,23
author (1)
21:9
authority (1)
26:22
available (1)
34:16
aware (12)
11:9;12:15;22:4;
25:9;26:14;28:2;29:5,
14,21;32:1,11;40:9
awareness (1)
12:10

## B

Bachelor's (1)
7:15
back (1)
37:6
background (3)
5:19;7:11;8:4
Barnes (5)
20:2;21:9,11,17;
23:10
based (7)
4:14;12:3;17:1;
19:10;26:19;36:23;
37:13
bases (1)
38:14
basic (1)
5:6
basis (4)
14:5;24:5;25:1,16
benefit (1)
9:21
Besides (2)
9:13;32:2
best (2)
25:5;34:11
Beyond (4)
33:22;34:24;37:8;
38:11
binder (1)
14:24
bit (3)
5:19;8:3;37:21
blood (1)
41:4
board (4)
7:11;8:5,12,14
boarded (1)
8:11
body (1)
11:8
BOP (5)
7:1;16:14;22:15;
25:12;29:1
BOP's (1)
23:19
both (1)
10:15
break (1)
7:23
briefly (2)
7:10;40:12
bring (1)
31:11
budget (1)
16:16
Bureau (11)
4:21;5:21;6:14;
10:10,16,17;11:5,20;
20:23;27:14;32:22
Bureau's (1)

22:10

## C

called (1)
10:24
can (30)
4:3,15;5:7,10,12;
7:23;9:19,24;14:13;
15:6;17:17,19,25;
19:25;23:20,21;24:1;
25:15;27:12;28:15,25;
29:17;30:11;33:24;
34:4,10;38:15,21;
40:18;41:12
cancer (2)
40:23;41:3
capacity (1)
37:20
care (12)
10:14,25;11:13;16:4,
11,21;18:7,25;27:13;
28:11;29:7;39:9
careful (1)
37:25
case (10)
4:20,22;5:13;12:17;
13:19;15:12;20:14;
22:9;26:14;32:5
case-by-case (3)
24:5,25;25:16
cases (1)
24:1
categories (2)
32:7;35:4
cc'd (1)
14:22
cell (1)
40:23
Center (2)
7:6;8:10
centers (1)
40:17
central (1)
7:7
certainly (4)
12:5;23:21;31:15,19
certainty (1)
36:25
certificate (1)
11:23
certification (2)
11:10;16:20
certifications (3)
7:12;8:5;16:23
certified (2)
4:7;8:14
cetera (1)
11:25
challenge (2)
30:16,23
challenging (2)
30:1;33:1

charge (1)
16:6
chart (5)
15:19;18:23;19:9,21;
20:4
charts (1)
9:9
Chief (2)
20:15;21:6
clear (5)
14:15;17:16,19;
22:18;37:22
clinic (1)
40:16
clinical (8)
6:20;10:25;12:12;
14:13;18:6;20:3;21:9;
26:22
clinician (1)
10:6
clotting (1)
41:4
CME (2)
16:15,15
co-existing (4)
30:3;32:8;41:1,5
College (2)
7:16,21
comanagement (1)
41:7
combined (1)
8:9
coming (1)
41:10
committee (3)
10:23,23,24
community (2)
10:15;21:14
comparable (1)
35:17
complete (1)
39:1
completed (3)
8:8;22:5;38:9
completion (1)
11:23;12:2
complicating (1)
41:5
composed (1)
10:25
concerned (2)
13:22;21:23
concluded (1)
41:19
conditions (5)
30:4;39:14;40:15;
41:2,6
conferences (1)
21:3
confirm (3)
18:15,18;22:1
confirmed (2)
20:16;21:11

Elizabeth Stahl, M.D.
July 21, 2021

Case: 4:19-cv-01169-SL   Doc #: 63   Filed: 08/27/21   48 of 54.   PageID #: 1145

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

**confirming (1)**
17:11
**confused (1)**
25:3
**confusing (1)**
28:17
**connection (1)**
36:10
**consider (1)**
8:17
**consideration (3)**
25:25;29:24;35:23
**considered (8)**
20:18;24:25;26:24;
27:1,3;30:2;35:22;36:7
**considers (1)**
25:12
**consistent (2)**
33:6;37:17
**consult (1)**
13:24
**consultant (2)**
19:3,8
**consultation (3)**
12:21;15:18;18:4
**consulted (1)**
18:24
**consulting (1)**
19:2
**contained (4)**
17:12,13;20:2;24:7
**continuing (1)**
38:14
**continuous (5)**
10:18;11:21;30:7,10,
21
**contractor (2)**
10:6;15:25
**contributed (1)**
31:1
**controlled (1)**
30:5
**convenience (1)**
27:18
**conversation (6)**
5:10;21:8,10;23:10;
37:14;40:6
**convoluted (1)**
13:9
**copy (1)**
9:17
**corrections (1)**
41:12
**counsel (3)**
4:17;27:18;33:20
**count (1)**
38:3
**couple (4)**
7:10;9:9;11:1;40:7
**course (2)**
14:10;40:14
**courses (7)**
10:20;11:21,24;12:3;

**16:15,18,18**
**court (3)**
4:2,23;14:21
**cover (1)**
4:25
**covered (2)**
5:1;29:6
**creating (1)**
15:25
**criteria (5)**
26:5,10;31:2;32:18,
24
**CROSS-EXAMINATION (1)**
4:9
**current (2)**
6:12,13
**cut (1)**
28:22

## D

**Danville (1)**
8:11
**date (2)**
22:4;26:17
**dated (2)**
20:3;35:9
**dates (1)**
9:8
**DC (1)**
6:23
**decided (1)**
7:18
**decision (2)**
26:22;32:9
**decisions (1)**
32:5
**declarations (1)**
14:18
**Defendants (3)**
10:4;15:23;20:1
**define (1)**
27:7
**Degree (2)**
7:15;36:25
**denied (1)**
23:15
**department (1)**
32:12
**depend (1)**
12:9
**deposition (12)**
4:16;5:3;6:5;14:10;
33:17,23;34:25;37:19;
38:4,12;41:12,19
**depression (3)**
34:23;36:15,20
**designated (2)**
4:18;6:8
**designee (2)**
6:8;37:18
**detail (2)**
12:19;36:16

**determination (3)**
26:18;29:15,21
**determine (2)**
27:21;29:1
**determined (1)**
28:2
**developing (1)**
16:13
**diabetes (1)**
12:8
**diagnosed (1)**
36:14
**diagnoses (1)**
12:9
**diagnosis (3)**
16:8;34:22;36:21
**dictate (1)**
12:6
**dictates (1)**
16:19
**different (3)**
10:20;32:6;36:3
**direct (1)**
8:21
**directed (1)**
21:24
**directly (1)**
12:13
**director (8)**
5:23,25;6:13,20;
21:12;26:19,21;27:6
**director's (1)**
26:15
**disability (1)**
27:23
**Discussed (1)**
20:14
**Discussion (1)**
7:25
**disease (2)**
12:8;40:23
**disorder (6)**
28:3,19,23,24;34:23;
36:15
**disorders (1)**
41:4
**District (2)**
4:23,23
**distrust (1)**
31:8
**Division (1)**
4:24
**doctor (5)**
4:3,11;12:4;17:18;
22:22
**document (7)**
12:13,20;13:5;19:9;
22:16;27:20;32:20
**documentation (1)**
11:15
**documented (2)**
22:15;33:6
**documents (16)**

**13:2,6,12,16,17,18;
14:4,6,16,21;15:2,6;
17:9;18:10,16;28:1**
**done (12)**
10:21;11:22;20:17;
22:2,7;23:3;24:3,4;
25:7;26:19;33:10;
37:15
**double (1)**
23:13
**down (2)**
32:16;38:25
**Dr (12)**
6:2,8;14:3,3,25;21:7,
21;23:1,9;34:15;37:18,
19
**drop (2)**
28:21,22
**dropped (1)**
37:4
**duly (1)**
4:6
**during (3)**
14:9;28:8;33:16
**duty (1)**
6:1
**dysphoria (15)**
8:18;10:5,7;11:10;
12:16,25;15:11,23;
19:12,14;33:8;34:22;
36:14,21;37:1

## E

**earlier (1)**
9:22
**earliest (1)**
27:18
**early (1)**
9:11
**easier (1)**
14:3
**Eastern (1)**
4:24
**Ed (8)**
4:11;14:2;17:16;
22:18;33:12;34:6;37:3,
16
**edification (1)**
34:15
**educated (1)**
21:13
**education (4)**
10:19;11:21;12:7;
16:15
**educational (2)**
7:11;8:4
**either (1)**
18:4
**elective (3)**
20:18;25:13,15
**ELIZABETH (1)**
4:5

**else (3)**
9:14;21:22;34:5
**encouraged (1)**
21:13
**encouraging (1)**
21:3
**end (5)**
16:10;23:24;31:13;
35:3;40:22
**ended (1)**
19:5
**endocrinologist (6)**
12:21,23;18:3,7;
19:23,24
**endocrinology (3)**
15:18;16:10;36:5
**England (1)**
7:21
**enlighten (1)**
5:12
**enough (1)**
39:8
**entire (2)**
6:15;19:8
**entitle (1)**
31:20
**entitled (3)**
28:9;41:9,11
**entry (4)**
20:5,25;21:23,25
**epidemiologist (1)**
19:12
**Eplin (1)**
34:15
**essence (1)**
23:15
**essentially (1)**
23:15
**estradiol (3)**
35:15,21;36:6
**estrogen (1)**
35:9
**et (2)**
4:22;11:25
**evaluation (1)**
26:19
**even (4)**
12:11;16:8;39:23;
41:4
**everyone (2)**
31:12,17
**exact (1)**
27:15
**exactly (4)**
6:7;17:20;29:4;
34:16
**examined (1)**
4:7
**example (1)**
32:20
**examples (1)**
40:18
**exception (1)**

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

Elizabeth Stahl, M.D.
July 21, 2021

11:17
excuse (1)
    28:21
Exhibit (9)
    17:2,3,13,13,21,22;
    18:12;20:9;24:15
Exhibits (3)
    15:3;18:11;24:8
expect (1)
    36:3
expectation (1)
    26:6
expected (1)
    11:11
expects (1)
    10:11
experience (3)
    10:5;15:24;30:18
experts (1)
    36:5
explanation (2)
    16:24;20:24
extent (1)
    33:24
extraordinary (7)
    26:24;27:3,7,22;
    28:3,18;29:1

**F**

facility (1)
    39:3
fact (3)
    16:21;19:4;23:1
factors (8)
    22:8;29:25;30:25;
    32:8,10,21,24;39:9
fair (19)
    8:23;9:2;11:16;
    12:12,19,25;17:2;
    19:10,13,16,20;21:16,
    18;24:8;25:10,13;33:5;
    35:18;36:13
far (2)
    21:23;33:4
FCC (1)
    6:20
Federal (6)
    4:21;10:10,16;20:22;
    27:14;33:1
feel (1)
    5:16
female (6)
    30:19,20;35:22,24;
    36:2;39:3
few (4)
    5:2;13:14;36:8;
    37:22
field (2)
    23:16;36:5
filed (1)
    4:20
final (1)

26:21
finally (1)
    27:4
find (2)
    5:11;12:21
fine (9)
    6:9,11;18:13,13,14;
    27:11;38:7;39:6;40:1
finish (1)
    37:15
finished (1)
    8:6
first (5)
    4:6;5:1;9:1,7;24:19
Fisher (2)
    4:12,21
five (2)
    32:19;39:15
flag (1)
    41:2
fluctuation (1)
    36:1
follow (1)
    26:5
following (1)
    20:14
follows (1)
    4:8
follow-up (1)
    40:13
forget (1)
    30:13
form (1)
    14:4
formal (2)
    5:8;9:11
formulated (1)
    9:7
forwarded (1)
    14:7
foundation (2)
    37:10;39:20
four (6)
    7:9;8:8;14:16,20;
    32:7,19
frame (1)
    10:2
free (1)
    5:16
further (2)
    31:10;41:8

**G**

GARDNER (31)
    4:4;6:6;14:1,15,20,
    24;15:14;17:6,15,24;
    20:8;22:17;23:6;27:24;
    28:4;32:13;33:7,11,18,
    21;34:6,13,24;37:3,8,
    16;38:7,11,19;39:19;
    41:15
gave (3)

9:25;17:19;24:8
GED (1)
    7:14
Geisinger (2)
    7:6;8:10
gender (17)
    8:17;10:5,7;11:10;
    12:15,24;15:10,23;
    16:18;23:24;33:8;
    34:22;36:14,21;37:1;
    39:15;41:6
gender- (1)
    40:25
gender-affirming (27)
    10:12,13;11:12;
    12:14;21:1,3,15;22:5,
    10,11;23:12,17,19,22;
    24:24;25:12,24;26:7,
    13,16,23;29:15,23;
    30:6,18;36:3;38:9
general (2)
    20:23;36:19
gets (1)
    11:9
given (2)
    22:13;23:11
giving (1)
    23:16
goal (5)
    30:8,10;35:13,18;
    36:7
goals (1)
    30:8
Good (8)
    4:11;10:1,2,3;14:23;
    15:8;18:21;33:3
graduated (3)
    7:13,15,20
graduation (1)
    8:7
great (6)
    9:25;15:1,5;20:24;
    27:19;34:18
greatly (1)
    22:14
ground (1)
    5:6
group (1)
    11:3
guidance (3)
    12:12;14:13;18:6
guys (1)
    34:9

**H**

half (2)
    37:14;38:3
happy (1)
    22:21
Harvard (1)
    11:25
head (6)

10:2;27:12;29:13;
    39:18;40:21,25
health (5)
    19:17,20;30:4;31:5;
    36:17
hear (1)
    8:13
heart (1)
    12:8
helpful (1)
    29:10
hematology (1)
    19:4
hereinafter (1)
    4:7
high (2)
    7:13;41:3
hint (1)
    40:4
history (1)
    19:18
hoard (1)
    30:14
hold (2)
    6:25;13:4
hormone (6)
    9:10,13;22:11;30:7,
    10;35:13
hormones (1)
    35:23
hospitals (1)
    40:17
hour (2)
    37:14;38:4
housed (1)
    10:8
huge (1)
    40:24
hurry (1)
    20:12

**I**

ICOVE (22)
    4:1,10,11;6:9;8:1;
    10:9;14:18,23;15:1;
    17:20;22:19;33:9,13,
    19;34:8,18;35:2;37:5,
    11,24;38:13;41:17
identify (2)
    13:20;24:11
impairments (4)
    27:8;39:16;40:11,19
impression (2)
    23:11,17
include (1)
    40:25
includes (1)
    34:22
including (1)
    12:12
inclusive (1)
    40:20

incoming (2)
    5:23,24
incorrect (1)
    23:3
independent (1)
    16:5
indicated (7)
    11:14;12:1;22:25;
    32:2;35:7;37:12;38:16
individual (1)
    37:20
individualized (2)
    23:22;32:5
individuals (1)
    24:22
inform (1)
    20:1
information (3)
    5:11,11;20:2
informative (1)
    31:23
informed (1)
    21:22
inmate (1)
    10:7
inmates (3)
    33:1;39:17;40:9
in-prison (1)
    33:1
institution (3)
    10:11;30:19,21
institutional (1)
    11:3
institutions (2)
    11:11;26:8
interaction (1)
    19:17
interest (1)
    11:19
internal (3)
    8:9,12,15
into (6)
    6:10;30:22;32:8;
    35:23;36:16;39:10
introducing (1)
    14:8
involve (1)
    18:7
involved (1)
    12:4
Island (2)
    7:14,16
issues (5)
    19:17;30:22;31:7,8;
    38:3
Item (2)
    17:4,23
Items (5)
    4:18;9:16,17;13:11,
    14

**J**

Elizabeth Stahl, M.D.
July 21, 2021

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

**January (5)**
20:3,21;22:3;23:3;
25:5
**Josh (6)**
4:1;8:1;13:16,18,25;
33:14
**July (2)**
4:20;7:22
**June (2)**
8:7;35:10

## K

**Karen (1)**
37:5
**keep (1)**
24:16
**Kellie (9)**
4:12,13;7:24;8:20;
15:10;33:4;36:13;
38:10,24
**Kellie's (4)**
12:17;18:22;34:21;
35:7
**kidney (1)**
40:23
**kind (1)**
12:7
**knowledge (8)**
10:5;15:24;23:1;
25:5,8;33:25;39:7,8

## L

**lack (2)**
37:10;39:19
**language (1)**
27:16
**large (1)**
10:13
**last (5)**
8:13;20:15;29:16,22;
39:15
**lastly (1)**
31:3
**latitude (1)**
37:21
**lawful (1)**
4:6
**lead (2)**
16:12;31:10
**legal (4)**
13:15,17,18;14:4
**less (2)**
35:14,20
**letters (1)**
31:4
**level (9)**
10:21;11:4;35:9,12,
15,21,23,25;36:6
**levels (8)**
9:10,13;30:7,11;
35:13,17,24;36:2

**licensed (1)**
16:5
**lifetime (1)**
31:13
**line (3)**
7:24;11:3;34:20
**list (1)**
14:13;40:24
**listed (2)**
9:16;17:4
**listening (1)**
9:2
**little (5)**
5:19;8:3;13:9;32:15;
37:21
**live (2)**
24:22;31:14
**liver (2)**
31:14,17
**liver's (1)**
31:13
**located (1)**
30:20
**long (4)**
6:17,22;7:8;31:21
**look (4)**
9:19;19:25;21:16;
35:8
**looked (2)**
12:20;15:5
**lot (2)**
13:7;31:24
**loud (1)**
10:3

## M

**main (1)**
30:25
**major (1)**
32:8
**making (2)**
34:15;35:1
**manual (2)**
18:6;22:16
**many (3)**
10:20;21:2;32:3
**March (2)**
6:18,24
**marshal (1)**
7:24
**matter (1)**
21:18
**may (4)**
13:19,19;24:22,24
**maybe (2)**
11:17;31:3
**MD (1)**
4:5
**mean (6)**
21:24;24:3;28:21;
31:16;40:14,24
**means (2)**

**11:12;28:19**
**medical (43)**
5:23,25;6:13;7:6,18,
19;8:7,10;10:18;11:21;
13:13;16:5;18:22;19:9;
20:4,15,18,19;21:6,12;
23:20;26:15,18,21;
27:1,5;29:2;30:4;31:6,
11,18;36:18,18,25;
37:1;39:9,14,16;40:10,
15,17,19;41:2
**medical/mental (1)**
28:3
**medically (4)**
23:12,18;24:1;27:3
**Medicine (5)**
7:21;8:9,12,15;11:19
**meds (2)**
30:13,14
**meet (4)**
26:9;30:8;31:2;33:2
**meeting (1)**
30:2
**member (3)**
9:4,6,12
**mental (8)**
19:17,20;27:22;
28:18,22;30:4;31:5;
36:17
**mentioned (5)**
13:2;32:19;36:20;
40:12,13
**met (3)**
8:24;9:1;40:15
**might (4)**
19:2;22:9;23:11;
36:2
**mind (1)**
10:17
**mine (1)**
5:16
**minute (1)**
36:12
**Mischaracterizes (2)**
23:7;28:5
**missed (1)**
19:3
**missing (1)**
18:19
**Misstates (1)**
27:24
**modality (1)**
31:9
**months (4)**
20:15;30:7,10,21
**more (7)**
5:2,9;22:20;35:17;
37:25;38:5;40:7
**morning (1)**
4:11
**most (2)**
30:1;35:9
**mouth (1)**

**24:4**
**moving (1)**
24:16
**much (3)**
16:24;29:9;41:10
**multiple (2)**
11:21,24

## N

**name (2)**
4:11;18:13
**narrow (1)**
32:16
**nation (1)**
10:11
**national (2)**
10:21;21:2
**native (2)**
35:24;36:2
**necessarily (1)**
34:3
**necessary (6)**
23:13,18;24:1;25:15;
27:2;31:16
**necessity (3)**
20:19;23:20;30:19
**need (7)**
25:19;28:16;30:4,9;
34:2,3;37:2
**needing (1)**
23:25
**needs (1)**
40:15
**negative (2)**
19:5;23:13
**neither (1)**
17:2
**New (1)**
7:20
**next (2)**
32:6;37:25
**nitty-gritty (1)**
6:10
**No6 (1)**
20:1
**nonbinary (1)**
41:6
**noncompliance (1)**
31:7
**noncompliant (1)**
30:12
**nonconforming (1)**
23:24
**nor (1)**
17:2
**Northern (1)**
4:23
**note (6)**
4:18;20:3,13,20;
21:10;25:3
**Notice (1)**
4:19

**number (12)**
4:22;9:19;12:8;17:4,
23;18:23;22:8;25:22,
24;29:25;40:22;41:5
**nursing (2)**
7:15,16

## O

**oath (1)**
5:9
**object (4)**
33:22;38:15;40:4,5
**Objection (21)**
6:6;15:14;17:6,15,
24;22:17;23:6;27:24;
28:4;32:13;33:7,16;
34:14,24;35:1;37:8,10;
38:11,14,18;39:19
**objections (2)**
28:8,10
**obvious (1)**
19:21
**Obviously (3)**
4:14;13:3;40:20
**off (11)**
7:25;27:11;28:13,21,
22,22;29:13;37:4;
39:17;40:21;41:18
**office (4)**
14:7;21:7;26:16;
27:5
**Officer (2)**
20:16;21:6
**often (1)**
30:12
**Ohio (1)**
4:24
**one (9)**
13:4;15:17;24:7;
25:2;29:5;30:3;31:5,6;
32:11
**ones (1)**
32:2
**only (11)**
11:17;14:6;19:2,3;
23:23;29:5;31:14;
36:11;37:18,20;40:7
**opinion (2)**
16:22;36:24
**opportunities (1)**
12:11
**opportunity (1)**
21:5
**opposite (1)**
30:18
**organ (2)**
26:25;40:24
**organs (1)**
31:12
**Osteopathic (1)**
7:21
**otherwise (2)**

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

Elizabeth Stahl, M.D.
July 21, 2021

10:6;15:24
**out (7)**
    5:11;10:3;12:10;
    15:10;16:9;39:17;
    40:16
**outgoing (1)**
    5:25
**outpatient (1)**
    40:16
**outside (4)**
    11:20;15:10;16:17;
    40:11
**over (9)**
    16:7;20:14;21:16;
    26:1,22;29:16,22;
    32:25;36:16
**Overbroad (1)**
    39:20
**own (1)**
    18:5

**P**

**PA (2)**
    7:7;8:11
**page (3)**
    24:14,14,15
**panic (3)**
    34:22;36:14,19
**paragraph (1)**
    24:20
**part (1)**
    28:17
**partially (1)**
    16:2
**participate (3)**
    10:18;11:20;16:17
**particular (22)**
    9:20;11:15;12:2,2,4;
    13:5;15:2,12;18:15;
    20:5;21:18,25;22:15;
    24:7,20;25:3;28:9;
    32:10,18,20;34:20;
    35:12
**particularly (1)**
    32:25
**past (1)**
    26:1
**patient (12)**
    8:21;9:9;13:13;16:7,
    9;18:8;26:12;27:13;
    29:7;31:8;41:2,6
**patients (5)**
    16:21;23:24;26:8;
    30:1,12
**patient's (1)**
    30:8
**pause (1)**
    31:10
**pediatrics (1)**
    8:10
**Pennsylvania (1)**
    6:21

**people (4)**
    11:18;34:10;38:2;
    39:13
**per (1)**
    37:23
**period (1)**
    5:24
**person (2)**
    23:16;34:12
**personally (1)**
    8:24
**persons (1)**
    24:23
**pertains (2)**
    12:13;27:16
**pertinent (1)**
    13:14
**pharmacist (1)**
    11:2
**physical (3)**
    27:8,23;28:23
**physician (3)**
    7:5;16:6,12
**physicians (3)**
    11:1;12:7;16:16
**pick (1)**
    30:13
**pilot (1)**
    16:12
**place (1)**
    6:5
**Plaintiff (3)**
    10:8;16:1,8
**Plaintiff's (1)**
    18:25
**plan (2)**
    16:13;39:10
**plans (2)**
    16:1,7
**please (9)**
    5:16;9:20;18:1;
    19:25;20:11,11;25:23;
    38:20,22
**plenty (1)**
    34:9
**point (1)**
    15:17
**policy (11)**
    11:8;16:19;18:5;
    22:6,10;24:7;26:23;
    27:10,11;28:20;29:6
**portion (2)**
    23:23;36:18
**Portugal (1)**
    7:13
**position (10)**
    5:21;6:12,17,19;
    20:20,22;23:19;29:20;
    36:24;38:8
**positions (1)**
    6:25
**practice (1)**
    16:17

**preclude (1)**
    16:22
**pre-existing (1)**
    41:3
**preference (1)**
    4:14
**preparation (1)**
    12:18
**prepared (1)**
    14:9
**preparing (1)**
    13:11
**presented (1)**
    21:2
**preserve (1)**
    38:16
**previous (2)**
    27:25;28:5
**previously (1)**
    17:8
**primary (3)**
    10:14;16:4,11
**prison (1)**
    40:11
**Prisons (8)**
    4:21;5:22;6:14;
    10:10,16;20:23;27:14;
    30:23
**privileged (2)**
    13:20,24
**probably (3)**
    30:25;32:7;34:11
**problem (3)**
    5:15;22:20;30:11
**procedure (5)**
    20:19;22:5;26:17;
    29:3;31:20
**procedures (1)**
    31:5
**proceeding (1)**
    28:9
**professional (3)**
    28:11,12,12
**program (2)**
    27:13;29:7
**programs (1)**
    10:19
**provide (10)**
    10:12,22;11:12;
    12:11;16:15;17:3;
    21:14;28:13;29:8;
    30:17
**provided (4)**
    10:14;17:3;21:1;
    26:7
**provider (6)**
    8:21;16:4,5,11;18:6;
    31:6
**providers (5)**
    10:15,19;11:3;12:10;
    16:17
**psychologist (1)**
    11:1

**psychologists (1)**
    19:16
**purposes (1)**
    27:8
**pursuant (1)**
    4:17
**pursue (2)**
    26:22;30:6
**put (4)**
    24:3;32:12,22;37:17
**putting (1)**
    39:14

**Q**

**quibble (1)**
    34:9
**quick (1)**
    7:23
**quickly (1)**
    33:3
**quite (1)**
    36:21

**R**

**range (1)**
    35:18
**rather (1)**
    20:19
**read (7)**
    9:24;10:3;15:21;
    29:19;37:6,7;41:16
**really (3)**
    16:22;28:10;40:3
**reasonable (1)**
    36:25
**reasonably (2)**
    30:5;36:10
**reasons (4)**
    29:18,18;32:1,4
**reassignment (4)**
    20:17;22:2;23:2;
    25:6
**recall (4)**
    13:3,5;14:12;29:13
**recalled (1)**
    23:10
**recalls (1)**
    21:8
**receive (1)**
    16:21
**recent (1)**
    35:9
**recognize (4)**
    23:25;31:15,18,19
**record (14)**
    4:2;7:25;13:13,21;
    19:18;20:5;24:11;
    33:15;35:8,8;36:17,19;
    37:11;41:18
**records (1)**
    36:23

**refer (3)**
    4:15;19:15;27:9
**references (1)**
    26:6
**referral (1)**
    19:23
**referrals (2)**
    19:11;40:23
**referred (2)**
    39:16;40:16
**referring (7)**
    4:13;6:7;14:16,25;
    18:9;19:22;27:21
**reflect (1)**
    20:22
**reframe (1)**
    14:2
**regard (4)**
    9:10;12:7;18:25;
    21:11
**regarding (2)**
    38:8;39:13
**regardless (1)**
    40:1
**regards (2)**
    15:11;22:13
**Region (1)**
    20:14
**regulatory (2)**
    11:8;16:19
**Rehanna (1)**
    4:12
**relate (2)**
    17:22;28:2
**remember (2)**
    9:8;21:10
**reminder (1)**
    34:13
**Repeat (1)**
    17:7
**rephrase (8)**
    5:8,16;22:24;28:16,
    25;29:17;32:16;38:22
**reported (1)**
    6:23
**reporter (2)**
    4:3;14:21
**represent (1)**
    4:12
**requests (1)**
    25:24
**require (7)**
    10:4;11:6;12:6;
    15:23;18:6;31:4;41:7
**required (1)**
    16:23
**requirement (4)**
    11:7,15;17:18;18:3
**requirements (9)**
    17:4,10,11,12,17,22;
    18:17;30:2;39:1
**research (2)**
    27:15;29:14

**FINCUN-MANCINI -- THE COURT REPORTERS**
(216) 696-2272

(5) out - research

Elizabeth Stahl, M.D.
July 21, 2021

Case: 4:19-cv-01169-SL  Doc #: 63  Filed: 08/27/21  52 of 54.  PageID #: 1149

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

reserve (1)
  41:16
residency (1)
  8:8
resident (3)
  7:4,5,5
response (2)
  22:13,15
responses (1)
  13:11
responsible (1)
  15:25
review (12)
  9:9;12:18;13:12;
  18:22;19:9,10;20:5,10;
  26:16;27:9;36:23;
  41:11
reviewed (10)
  12:16;13:3,6,7,13,
  14;27:4;29:20;33:4;
  35:7
reviewing (2)
  9:13;36:18
Rhode (2)
  7:14,16
right (3)
  15:7;25:16;39:12
ripe (4)
  25:25;26:13;29:16,
  23
risk (1)
  41:3
rose (1)
  18:13
routed (1)
  27:4
Rule (4)
  4:19;34:25;37:9;
  38:12
rules (2)
  5:6;28:13
running (1)
  30:22

## S

same (3)
  16:14;17:24;38:17
saw (1)
  15:16
school (5)
  7:13,16,18,19;8:7
scope (4)
  33:22;34:25;37:9;
  38:12
second (1)
  7:23
section (1)
  27:15
secure (1)
  16:9
security (1)
  30:22

seek (2)
  12:10;37:19
self (1)
  12:10
sent (5)
  13:16;14:17,19,21;
  15:10
sentence (2)
  23:14;24:19
sentences (1)
  7:10
separate (1)
  38:3
serious (7)
  37:1;39:14,16;40:10,
  14,19;41:5
several (1)
  20:15
severe (2)
  27:8;40:25
sex (3)
  20:16;22:2;23:2
sexual (1)
  25:6
share (1)
  21:7
shared (2)
  10:18;14:4
sign (1)
  41:16
signature (2)
  41:13,20
significant (1)
  19:19
similar (1)
  26:25
single (2)
  10:11;12:20
slightly (1)
  36:2
small (1)
  23:23
smells (1)
  18:14
social (1)
  11:2
solid (2)
  26:25;31:12
somebody (1)
  34:4
someone (3)
  11:9;12:24;31:20
sometimes (3)
  30:11,14;35:25
sorry (13)
  8:13;9:8;13:8;18:12;
  25:19;33:9,11;34:1,2;
  35:6;37:3;38:4;39:23
source (1)
  32:10
speak (2)
  14:9;21:5
speaking (2)

28:10;34:14
special (1)
  11:18
specialist (5)
  8:18;12:16,24;19:7,
  12
specialists (3)
  15:11;18:24;19:14
specialty (1)
  40:17
specific (8)
  11:9,14;16:18,20;
  17:9,17,21;21:1
specifically (1)
  13:4;26:6;36:9
specified (1)
  33:2
staff (2)
  15:25;21:13
stage (1)
  40:22
STAHL (6)
  4:5;6:8;14:3,3,25;
  37:18
Stahl's (1)
  37:19
standard (2)
  12:6;21:14
start (1)
  36:11
statement (3)
  8:13;27:14;29:7
States (3)
  4:23;6:15;24:21
still (3)
  6:1;16:11;20:18
stipulate (3)
  4:2;33:14;38:13
stop (1)
  30:14
strictly (1)
  12:3
stuff (1)
  13:7
subject (1)
  38:17
submitted (1)
  26:15
subspecialist (1)
  41:7
successfully (2)
  24:22;39:2
support (4)
  10:23;11:2;29:14;
  31:4
supported (1)
  29:21
supposed (1)
  40:6
sure (4)
  6:7;7:13;25:20;32:3
surgeon (1)
  30:5

surgeons (1)
  31:4
surgeries (4)
  20:17;22:2;23:2;
  25:7
surgery (19)
  22:12;23:12,17,20,
  25;24:23,24;25:12,25;
  26:23,25;29:15,23;
  30:6;38:9,25;39:13,15,
  17
suspect (1)
  31:1
swear (1)
  4:3
sweet (1)
  18:14
sworn (1)
  4:6
system (1)
  40:11

## T

talk (3)
  13:17;21:17;28:23
talked (4)
  17:10;29:12;35:6;
  40:12
talking (3)
  17:18;21:21;22:25
Team (1)
  10:25
TEC (6)
  9:4,6,7,12,14;26:20
telling (2)
  30:15;41:10
ten (3)
  26:1;29:16,22
term (1)
  19:15
terminology (1)
  26:12
testified (2)
  4:7;17:8
testify (2)
  4:18;38:2
testimony (5)
  23:7;25:20;27:25;
  28:6;36:11
testosterone (2)
  35:14,20
therapy (4)
  21:15;26:7,14;36:4
though (1)
  12:11
thought (3)
  31:3;33:11;34:11
three (1)
  32:7
times (1)
  30:24
tip (1)

28:13
today (3)
  12:18;25:9;41:10
Today's (2)
  4:16;6:5
together (2)
  32:12,23
told (3)
  17:1;23:4,9
Tony (3)
  4:12,21;7:24
top (5)
  27:12;29:13;32:7;
  39:18;40:21
topics (3)
  4:25;5:1;14:5
total (2)
  35:13,20
towards (1)
  33:2
training (3)
  7:5,6;8:9
trans (1)
  18:8;23:23;30:9,19
transferred (1)
  30:20
Transgender (2)
  10:24;24:23
transition (1)
  5:25
transitioned (1)
  39:2
transplant (2)
  27:1;31:12
transplants (1)
  40:24
trauma (1)
  40:25
treated (2)
  8:20;40:10
treatment (15)
  10:13,14;12:14;16:1,
  7,13,22;21:1,4;22:11;
  27:2;30:13;31:9;39:10;
  41:1
treatments (1)
  23:22
treats (1)
  10:7
trouble (1)
  30:22
true (1)
  22:1
trying (2)
  24:15;26:4
turned (1)
  38:25
two (1)
  36:12
type (2)
  16:20;26:24
types (2)
  34:16;40:19

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

Elizabeth Stahl, M.D.
July 21, 2021

**U**

UCFF (1)
  11:24
ultimately (1)
  16:6
umbrella (1)
  19:15
under (4)
  5:9;17:4,23;29:6
United (2)
  4:22;6:15
University (2)
  7:20;11:25
up (7)
  19:5;23:24;30:13;
  31:11;37:15,18;41:13
upon (6)
  4:14;12:3;17:1;
  19:10;26:19;36:23
urologist (2)
  15:17;19:5
using (1)
  26:12
usually (2)
  19:15;30:9

**V**

Vague (5)
  17:6,15;22:17;32:13,
  15
validated (1)
  36:21
version (3)
  9:22,22;13:15
versus (1)
  4:21
voluntary (1)
  12:3

**W**

waive (2)
  33:15;41:13
waived (1)
  41:20
waste (1)
  38:5
way (3)
  4:15;33:14;35:5
weigh (1)
  39:9
weren't (1)
  17:9
whose (1)
  40:15
winded (1)
  31:21
within (1)
  36:24
without (3)

24:23;30:15,21
WITNESS (4)
  14:6;20:7;39:21;
  41:15
witness's (3)
  23:7;27:25;28:5
wondering (1)
  18:2
words (1)
  24:4
work (2)
  7:3;19:20
worker (1)
  31:6
workers (1)
  11:2
working (1)
  10:23
workup (2)
  19:4,6
WPATH (11)
  11:24;13:14,15;26:5,
  6,10;30:3;31:2;32:21,
  21;33:2
write (1)
  41:16
writing (1)
  5:20
written (2)
  11:7;20:20

**Y**

year (1)
  8:8
years (6)
  7:9;21:2;26:1;29:16,
  22;39:15

**Z**

Zoom (2)
  4:3;9:1

**0**

05 (3)
  7:20,22;8:8

**1**

1 (7)
  15:3;17:2,13,21;
  18:4,12;24:15
10:06 (1)
  41:19
12 (3)
  30:6,10,21
14th (1)
  4:20
15 (1)
  35:10
18 (1)

23:3
19 (4)
  20:3,21;24:14,15
1998 (1)
  7:17

**2**

2 (4)
  17:3,13,22;18:4
200 (4)
  35:16,22,25;36:6
2001 (1)
  7:19
2009 (1)
  6:23
2018 (4)
  20:3,21;22:3;25:6
2021 (2)
  6:18;35:10
27th (1)
  6:1
2nd (2)
  6:18,24

**3**

3 (6)
  4:18;9:19;13:11;
  16:2;17:10;20:9
300 (1)
  35:25
30b6 (11)
  4:19;6:8;14:5;33:23;
  34:25;35:3;37:9,13,18;
  38:1,12

**4**

4 (5)
  15:3,20,22;17:5,23
4:19CV1169 (1)
  4:22

**5**

5 (1)
  18:23
55 (2)
  35:14,21

**6**

6 (1)
  19:25

**7**

7 (6)
  4:19;13:12,15;25:22,
  24;29:12

**8**

80 (1)
  35:25

**FINCUN-MANCINI — THE COURT REPORTERS**
**(216) 696-2272**

43

```
1        I have read the foregoing transcript from page 1

2   through page 41  and note the following corrections:

3   PAGE-LINE       REQUESTED CHANGE          REASON FOR CHANGE

4    Page 11:24    UCSF, not UCFF            mis-transcribed
5
     Page 19:4     hematuria, not hematology  mis-transcribed
6
     Page 22:6     "by policy", not "my policy" mis-transcribed
7
     Page 30:23    "other prisoners", not     mis-transcribed
8                  "other prisons"

9
     Page 40:24    "solid organ", not         mis-transcribed
10                 "cell organ"

11
     throughout    The witness's first name   error
12                 is Elizabete, not
                   Elizabeth, and she is a
13                 D.O., not an M.D.

14

15

16

17

18

19

20

21

22

23

24

25  _____              _____
    Elizabete Stahl, D.O.                    Date
```

**ELIZABETE STAHL** Digitally signed by ELIZABETE STAHL
Date: 2021.08.09 15:16:43 -04'00'

FINCUN-MANCINI -- THE COURT REPORTERS

(216)696-2272