UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TONY FISHER, aka KELLIE REHANNA, | ) ) ) CASE NO.: 4:19-CV-1169 |
| Plaintiff, | ) ) JUDGE SARA LIOI |
| vs. | ) ) ) NOTICE OF FILING THE DEPOSITON |
| FEDERAL BUREAU OF PRISONS, *et al.,* | ) OF JENNA EPPLIN ) ) ) |
| Defendants. | |

Plaintiff, Tony Fisher, aka Kellie Rehanna, by and through counsel, hereby notifies this

Court and Defendants that the deposition of Jenna Epplin that was taken on July 23, 2021

(attached hereto) has been filed in this case.

Respectfully submitted,

*/s/Edward A. Icove*
Edward A. Icove (0019646)
Icove Legal Group, Ltd.
Terminal Tower, Ste. 3220
50 Public Square
Phone (216) 802-0000; Fax (216) 802-0002
ed@icovelegal.com
Attorney for Plaintiff Tony Fisher,
aka Kellie Rehanna

## CERTIFICATE OF SERVICE

On August 27, 2021, this document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this through the Court's system.

*/s/ Edward A. Icove*
Edward A. Icove

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION

 3                        - - -

 4   Tony Fisher, aka        )
     Kellie Rehanna,         )
 5                           )
                Plaintiff,   )
 6                           )
           vs.               )    Case No. 4:19CV1169
 7                           )    Sara Lioi, J.
     Federal Bureau of       )
 8   Prisons, et al.,        )
                             )
 9              Defendants.  )

10                        - - -

11        Deposition of Jennifer Eplin, a witness

12   herein, called on behalf of the plaintiff for oral

13   examination, pursuant to the Federal Rules of Civil

14   Procedure, taken before Karen A. Toth, Notary Public

15   in and for the State of Ohio, via Zoom, on Friday,

16   July 23, 2021, commencing at 9:33 a.m.

17                        - - -

18

19

20

21

22

23

24

25
```

ORIGINAL

```
 1   APPEARANCES:

 2   On behalf of the Plaintiff:

 3           Ed Icove, Esq.
             Icove Legal Group LTD
 4           Terminal Tower
             500 Public Square, Suite 3320
 5           Cleveland, Ohio 44113
             216-802-0000
 6

 7   On behalf of the Defendants:

 8           Gary Feldon, Esq.
             Joshua Gardner, Esq.
 9           United States Department of Justice
             Civil Division, Federal Programs Branch
10           1100 L Street NW
             Room 11502
11           Washington, D.C. 20005
             202-305-7583
12

13                       -  -  -

14   Also present:

15           Kellie Rehanna

16                       -  -  -

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX
 2   WITNESS:              DIRECT   CROSS     REDIRECT
 3   Jennifer Eplin
 4       By Mr. Icove         4                  49
 5       By Mr. Feldon              46
 6                        - - -
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

JENNIFER EPLIN

1  Of lawful age, being first duly sworn, as

2  hereinafter certified, was examined and testified as

3  follows:

4              MR. ICOVE:          Gary, will you

5          stipulate that the deponent can be sworn in

6          over Zoom?

7              MR. FELDON:          Yes.

8              MR. ICOVE:          Thank you very much.

9                  CROSS-EXAMINATION

10 By Mr. Icove:

11 Q   Good morning, Doctor.  Thank you for taking

12         the time to visit with us today.  I'm going to

13         ask you a series of questions.  My name is Ed

14         Icove and I represent Tony Fisher, aka Kellie

15         Rehanna, who I will be referring to as Kellie

16         in her case against the BOP and Federal

17         Correctional Institution Elkton.

18             You were designated to testify as to a

19         couple items and to testify regarding your

20         Rule 30(b)(6) notice that you're designated to

21         be an expert in this case.  And in the -- and

22         that is indicated in the Rule 26(a)(2)(C)

23         disclosures.

24             I may not have said that correctly but

1    basically you've been designated by the

2    government and also pursuant to being

3    designated as an expert.  Have you ever been

4    deposed before?

5  A    No.  And for the record I am not a doctor.

6  Q    Oh, I'm sorry.

7  A    That's all right.

8  Q    I gave you that promotion.  I'm sorry.  Your

9    qualifications are set forth in Exhibit 6; is

10    that correct?

11  A    Yes.

12  Q    Okay.  Are those paragraphs -- there is three

13    paragraphs there, and are those paragraphs

14    true, to the best of your knowledge and

15    belief?

16  A    Yes.

17  Q    Have you ever had to testify in court before?

18  A    Yes.

19  Q    What type of -- was it on behalf of the

20    government in a case regarding gender

21    dysphoria?

22  A    No.

23  Q    Was it -- if you can just tell me what type of

24    case it was, just for the record, or cases.

25  A    It was on behalf of the government.  It was an

```
 1        administrative remedy Bivens hearing, I
 2        believe.
 3   Q    Okay.  And that was a criminal proceeding?
 4   A    I don't think so.
 5   Q    Okay.  It was just an administrative appeal
 6        from the government's decision on an issue?
 7             MR. FELDON:        Objection.  Misstates
 8        prior testimony.
 9   Q    I'm sorry.  It's really not that important,
10        but do you remember what kind of case it was
11        besides what you've explained to me, because I
12        don't understand.
13   A    It was an administrative remedy hearing when
14        an inmate had exhausted an administrative
15        remedy process.
16   Q    Okay.  So in that respect it's similar to this
17        type of a case?
18   A    It was on behalf of the government, yes.
19   Q    One of the things is that you are under oath
20        but all the formalities of being in court
21        don't apply because no judge is present.
22        Accordingly, Gary may object to a question or
23        a series of questions and those will be later
24        determined as to whether or not they are valid
25        objections.  But even if he does object you
```

1      understand you still must answer the question

2      to the best of your ability unless he tells

3      you not to answer the question, which is

4      always a possibility.  Is that fair?

5  A   Yes.

6  Q   In responding to Items 1 and 2 of the

7      26(a)(2)(C) disclosures and the -- what

8      documents did you review to be able to testify

9      today?

10 A   The Transgender Executive Council agenda, the

11     WPATH standards of care, any emails that I had

12     in regard to Inmate Fisher, and any documents

13     that were provided as exhibits.

14 Q   So just for the record, if you could, could

15     you identify by exhibit number what documents

16     you looked at?

17 A   4, 5, 6 and 7.

18 Q   In regards to 5, I made a mistake and didn't

19     include a few pages of the WPATH.  Did you get

20     the updated ones from Gary by any chance?

21         MR. FELDON:        We have a full copy

22     of the WPATH here.

23         MR. ICOVE:         Oh, good.  That's

24     even better.  Thank you very much.

25 Q   He's always one step ahead of me, so thanks.

8

```
 1              Did you review the medical management
 2         of transgender inmates?
 3    A    In the WPATH standards?
 4    Q    You reviewed the WPATH standards, but my
 5         question is there is a document called medical
 6         management of transgender inmates, it's dated
 7         December 2016.  Did you review that?
 8    A    I specifically reviewed the applicability of
 9         the standards of care to people living in
10         institutional environments.
11    Q    Okay.  That's great.  Did you also look at the
12         transgender offender's manual, it's dated May
13         11 of 2018?
14    A    Our program statement?
15    Q    I think that's what it is, yes.
16    A    Yes.
17    Q    Okay.  Great.  In regards to Exhibit 5 which
18         we'll call the WPATH, is that considered to be
19         a gold standard on the issue of
20         gender-affirming surgery and treatment in an
21         institutional setting?
22              MR. FELDON:        Object to the form.
23         Counsel, the term gold standard is vague.  You
24         can answer.
25    Q    Have you ever heard those words used in
```

```
 1          regards to the WPATH?
 2     A    No.
 3     Q    Okay.  Is it considered to be the standard
 4          that the BOP uses on the issue of
 5          gender-affirming treatment and surgery in an
 6          instructional setting?
 7     A    No.
 8     Q    What weight, if any, do you believe the WPATH
 9          has regarding the issue of gender-affirming
10          surgery and treatment in an institutional
11          setting?
12     A    It's a document that we use for information,
13          but it's not a requirement in the BOP.
14     Q    Is that your understanding; it's not a
15          requirement?
16     A    Yes.
17     Q    Are there any documents that support your
18          understanding that the WPATH is not
19          incorporated into the BOP's rules and
20          regulations?
21     A    I don't understand your question.
22     Q    Right.  I'll go again.  Are you referring to
23          any document that would indicate that the
24          WPATH is not incorporated into the BOP as
25          rules and regulations?
```

| | | |
|---|---|---|
| 1 | A | To my knowledge there is no reference of WPATH |
| 2 | | in any BOP policy or procedure. |
| 3 | Q | Thank you. |
| 4 | | Would you look at Exhibit 7, please, if |
| 5 | | you would.  And this is one of the documents |
| 6 | | that were provided to you.  Did you have a |
| 7 | | chance to peruse this particular document? |
| 8 | A | Yes. |
| 9 | Q | And, in general, do these documents accurately |
| 10 | | reflect some of the documents that you either |
| 11 | | sent or received regarding Kellie's treatment |
| 12 | | and review for gender-affirming surgery? |
| 13 | A | They're a part of a review by the Transgender |
| 14 | | Executive Council. |
| 15 | Q | Are you on that council? |
| 16 | A | Yes. |
| 17 | Q | And do they accurately reflect some of the |
| 18 | | documents that were presented to the council? |
| 19 | A | Yes. |
| 20 | Q | To save time, could you just go through these |
| 21 | | with us -- and the numbers are in the -- there |
| 22 | | is Bates stamp numbers which are the numbers |
| 23 | | in the right-hand corner -- and explain to us |
| 24 | | what these documents are and how they relate |
| 25 | | to Kellie's treatment and review? |

```
 1              MR. FELDON:           Objection.  That's a
 2       very compound question.
 3   Q   Do you understand the question?  If you don't
 4       I can rephrase it.  That's not a problem.
 5              That's another ground rule.  If you
 6       don't understand it.  Your attorney doesn't
 7       understand it because it was compound because
 8       it had more than one factor in it.  Do you
 9       have a problem with it?
10   A   Can you rephrase now?
11   Q   Oh, yeah, certainly.  Can you briefly go
12       through these documents so that I can
13       understand them?
14   A   Yes.
15   Q   Okay.
16   A   2655 is an email from FCI Elkton's warden's
17       box, the email box to me dated March 24, 2021
18       with an attachment.
19              2656 is a memo from the warden at FCI
20       Elkton referring Inmate Fisher's request for
21       gender reassignment surgery to the Transgender
22       Executive Council.
23              2657 is an email from myself to the
24       Elkton warden's box with a cc to Paul
25       Clifford.  I'm sorry, that's from the Elkton
```

```
 1        warden to myself.  "Please see attached
 2        regarding Inmate Fisher."  I think these --
 3        are these out of order, the date order?
 4   Q    They may be.  They are in order by the numbers
 5        on the bottom.
 6   A    Okay.
 7   Q    I'm sorry.  So they may be out of date order.
 8        The answer is yes.
 9   A    2657 is dated April 20, '21 from the Elkton
10        warden to myself and Paul Clifford.  It says,
11        "Please see attached regarding Inmate Fisher."
12        It is a new memo from Elkton to myself, the
13        Transgender Executive Council, referring the
14        inmate, based upon the inmate's request for
15        gender-affirming surgery.
16              "Given the inmate's request for
17        surgery, the memo also serves as a review for
18        a lesser security or gender-affirming
19        transfer."  That's 2658.
20              2659 is a continuation of that memo.
21              2660 is an email from myself dated
22        April 22, 2021 forwarding that email I
23        believe, or that -- forwarding 2661, which is
24        the memo, 2661 and 2662 --
25   Q    And -- I'm sorry, go ahead.
```

13

| | | |
|---|---|---|
| 1 | A | To Shannon Robbins, the section chief of the |
| 2 | | designation and sentencing computation center |
| 3 | | in Grand Prairie, Texas that sits on the |
| 4 | | Transgender Executive Council.  A copy of that |
| 5 | | memo for her review prior to the next TEC. |
| 6 | Q | Let me ask you a quick question about this: |
| 7 | | The cover email that you sent, that's 2660, |
| 8 | | you indicated here, "She's done everything we |
| 9 | | have asked of her."  What did -- what did -- |
| 10 | | to the best of your recollection, what did the |
| 11 | | government ask of her and what did she do that |
| 12 | | you're referring to? |
| 13 | A | Prior to the Transgender Executive Council |
| 14 | | meetings biweekly I do a preliminary review, |
| 15 | | and to my recollection it appeared she had |
| 16 | | clear conduct, hormone levels.  Just a quick |
| 17 | | review.  I wanted the correctional program |
| 18 | | staff to look at her for appropriateness for a |
| 19 | | transfer to a possible female institution. |
| 20 | Q | So what do you consider to be everything that |
| 21 | | you asked her -- that her -- she hasn't had |
| 22 | | any problems, her hormone levels were okay |
| 23 | | and what else?  Were there anything else that |
| 24 | | you asked her to do? |
| 25 | A | Institutional conduct.  It was just a quick |

```
 1        review so that all of the staff would have
 2        time to look at it before we got to the formal
 3        Transgender Executive Council where we had the
 4        multi-disciplinary meeting.
 5   Q    And it's fair to say that Kellie over the
 6        years has been reviewed by the TEC on four or
 7        five occasions, that you're aware of?
 8   A    I don't specifically recall.
 9   Q    Do you remember the most recent one?
10   A    Yes.
11   Q    And was that date May the 17th of 2021?
12   A    I don't recall.
13   Q    Okay.  Do you recall it was in May?
14   A    No, I don't recall the specific month.
15   Q    Do you recall what the disposition was?
16   A    We recommended further mental health treatment
17        and programming.
18   Q    And specifically what type of mental health
19        treatment, what type of program?
20   A    Sex offender treatment.
21   Q    And why did you do that?
22   A    I believe the council recommended that in part
23        because of a judicial recommendation and under
24        the lens of safety for both Inmate Fisher and
25        other inmates prior to transfer to a female
```

```
 1          facility due to her sex offense.
 2   Q      To the best of your knowledge, has she ever
 3          had any discipline problems or health and
 4          safety problems at Elkton?
 5   A      Not that I recall.
 6   Q      And for the record, Elkton is a male facility?
 7   A      Yes.
 8   Q      And what additional mental health treatment
 9          did the TEC recommend?
10   A      Sex offender treatment.
11   Q      Was that the only requirement that was
12          recommended?
13   A      To the best of my recollection it was sex --
14          or mental health treatment and programming.
15   Q      Do you know what her hormone levels were like
16          on May the 17th of 2021?
17   A      I don't recall.
18   Q      Are you aware that on June 15th of 2021 her
19          estrogen level was 252?
20   A      No.
21   Q      So it's fair to say you don't review her
22          particular file on a regular basis, you only
23          review it when it comes before the TEC?
24               MR. FELDON:        Object to the form.
25   Q      Did you look at her particular file before
```

| | | |
|---|---|---|
| 1 | | today? |
| 2 | A | What do you mean by file? |
| 3 | Q | Her medical, psychological and administrative |
| 4 | | file. |
| 5 | A | I can review some of the documents as far as |
| 6 | | the medical.  I'm not a medical professional. |
| 7 | | So no, if we're referring to the hormones, no, |
| 8 | | I don't specifically look at the hormones.  We |
| 9 | | have a member of the TEC that looks at |
| 10 | | hormones. |
| 11 | Q | Right.  And who is that? |
| 12 | A | Don Lewis. |
| 13 | Q | Did Don Lewis indicate to you, if you recall, |
| 14 | | that her hormone levels were okay in May of |
| 15 | | 2021? |
| 16 | A | I don't specifically recall. |
| 17 | Q | We'll call them HRTs; is that okay? |
| 18 | A | I believe it's hormone therapy, not |
| 19 | | replacement therapy. |
| 20 | Q | Okay.  We'll call it hormone therapy.  Okay. |
| 21 | | Hormone therapy is a factor that would |
| 22 | | be something that would be weighed in |
| 23 | | determining whether or not there is gender |
| 24 | | surgery? |
| 25 | A | Yes. |

```
1   Q   And Exhibit 5, if I may, if you look at that
2       particular document, I think it's on page 60
3       of Exhibit 5, and the question is, is it fair
4       to say that WPATH provides that stabilization
5       of hormones levels is not a criteria for
6       gender surgery, at least according to the
7       WPATH; is that correct?
8   A   Page 60 wasn't in my Exhibit 5 so I'm
9       referencing -- I had to pull out the
10      standards or the WPATH.  Can you please repeat
11      your question?
12  Q   Oh, yes, certainly.  I'm sorry.  It was my
13      mistake.
14              Is it fair to say that the standard of
15      care of the WPATH provides that hormone
16      therapy is not criteria for gender surgery?
17          MR. FELDON:          Objection.  The
18      document speaks for itself.
19  A   Do I still -- do you want me to read the
20      document?
21  Q   No, I just want you to answer the question.
22          MR. FELDON:          It doesn't need an
23      answer.
24  Q   Yeah.  My recollection, it's on page 60.
25  A   The document states 12 months or 12 continuous
```

| | | |
|---|---|---|
| 1 | | months of hormone therapy. |
| 2 | Q | And what page is that, page 60? |
| 3 | A | Yes. |
| 4 | Q | Okay.  Is that particular factor taken into |
| 5 | | consideration by the TEC; if you know? |
| 6 | A | The TEC considers hormone levels. |
| 7 | Q | How much weight is given to hormone levels? |
| 8 | A | Each inmate is an individualized assessment. |
| 9 | Q | So that's done on a case-by-case basis? |
| 10 | A | Yes. |
| 11 | Q | So there is no threshold or area which would |
| 12 | | be considered to be sufficient for genital |
| 13 | | surgery? |
| 14 | A | One of our medical experts that sits on the |
| 15 | | TEC would weigh into that factor.  I'm not a |
| 16 | | medical expert so I don't know what the |
| 17 | | numbers would be for what they would weigh in |
| 18 | | on that aspect of it. |
| 19 | Q | Well, just based upon -- and I understand that |
| 20 | | and I appreciate that.  But how much of a |
| 21 | | factor do you believe hormone therapy is in |
| 22 | | regards to making a determination as to |
| 23 | | genital surgery? |
| 24 | A | The inmate should show stability in hormones |
| 25 | | and have taken them for at least a year to two |

| | | |
|---|---|---|
| 1 | | years continuously. |
| 2 | Q | Are you aware of the fact that Kellie has |
| 3 | | taken hormones for approximately six years? |
| 4 | A | I don't know a year. |
| 5 | Q | Well, let's put it like this:  Are you aware |
| 6 | | of the fact that she has taken hormones for at |
| 7 | | least one year? |
| 8 | A | Can I refer back to the memo from -- or to the |
| 9 | | TEC? |
| 10 | Q | Of course.  Yeah, you can refer to any |
| 11 | | document you prefer. |
| 12 | A | Yes. |
| 13 | Q | On Sections 67 to 68 of the WPATH there is -- |
| 14 | | I want you to look at that, if you would |
| 15 | | please.  And my question is why hasn't that |
| 16 | | particular section in -- the Roman numeral is |
| 17 | | XIV.  Can you -- do you know why that |
| 18 | | particular section hasn't been extended or |
| 19 | | incorporated into Kellie's treatment plan? |
| 20 | A | Can you rephrase that question? |
| 21 | Q | Yeah, certainly.  I'm referring to the |
| 22 | | applicability of the standards of care for |
| 23 | | people living in institutional environments, |
| 24 | | and Section XIV starts on page 67. |
| 25 | | My question to you is do you know why |

```
 1           this particular section has or has not been
 2           extended or incorporated into Kellie's
 3           treatment plan?
 4   A       I don't know that it's not.
 5   Q       Based on your recollection today, do you
 6           believe it has been?
 7   A       We use this document as an informational tool.
 8           She has an individualized treatment plan.  I
 9           don't know if there is -- I don't know how to
10           answer that, if there is a specific part.
11                  Every inmate's treatment plan is
12           different, especially in a correctional
13           environment.
14   Q       So I don't want to put words in your mouth,
15           but based -- as we sit here today you believe
16           that part of it has been extended or
17           incorporated into her treatment plan?
18                  MR. FELDON:         Objection.  Misstates
19           the witness's testimony.
20   Q       I can restate it if you're having a problem.
21                  My question simply is do you know what
22           parts of this particular standard of care has
23           been incorporated in Kellie's treatment plan,
24           just based on your personal knowledge?
25                  You can only testify as to what you can
```

21

```
 1          observe, remember and relate to us today.  I
 2          don't want you to guess, your attorneys
 3          doesn't want you to guess, but I do need, if
 4          you can tell me, the answer to that question.
 5    A     I don't know how to answer that because there
 6          is so many different -- I mean, can you please
 7          rephrase it?  I don't know how to answer that.
 8          I mean, she's provided mental health
 9          treatment, she's provided medical treatments,
10          she's provided hormone therapy, she's provided
11          reasonable accommodations, she's providing
12          housing and shower.
13               We use this as a guide.  We reference
14          this.  It's just not a requirement.
15    Q     I understand.  Thank you very much.  We'll go
16          on to the next question.
17               Does the BOP require all female sex
18          offenders to complete court recommended sex
19          offender treatment before housing them in a
20          female institution?
21    A     Can you repeat that?
22    Q     Oh, certainly.  Yeah.
23               Does the BOP require that all female
24          sex offenders must complete court recommended
25          sex offender treatment before being housed in
```

1    a female -- excuse me.  Let me restate it.

2    Strike that.

3         Does the BOP require all female sex

4    offenders to complete court recommended sex

5    offender treatment before housing them in a

6    female institution?

7  A  No.

8  Q  Is Kellie, to your knowledge, as we sit here

9    today, the only one who fits that particular

10   criteria?

11        MR. FELDON:        Objection.  Vague.

12  A  No.

13  Q  And let's look at Exhibit 4, page 2, if you

14   would please.

15  A  Okay.

16  Q  And it says, "The court makes the following

17   recommendations to the Bureau of Prisons."

18   And just drop down and it says, "The defendant

19   participate in a sex offender treatment

20   program."  Is that what you're referring to

21   when you indicated that the TEC wanted that to

22   be done in order for her to obtain the genital

23   surgery?

24  A  No.

25  Q  And where did the requirements -- did you

```
 1        interpret this at all to have any weight in
 2        terms of what the TEC recommended?
 3    A   Yes.
 4    Q   And was that what the TEC was referring to in
 5        regards to the most recent recommendation that
 6        you told me about?
 7    A   We were referring to the program, not the
 8        judicial recommendation.  The jurisdictional
 9        recommendation supports our TEC recommendation
10        but it's not the only reason.
11    Q   What were the other reasons?
12    A   Under a lens of safety prior to transfer to a
13        female institution the multi-disciplinary
14        committee believes that she needs to
15        participate in the sex offender treatment.
16        That's just supported by the jurisdictional
17        recommendation.
18    Q   That particular treatment, is it fair to say
19        that sexual offender treatment could be
20        completed in a supervised release?
21    A   I have no knowledge of that.
22    Q   So is it your understanding that as far as the
23        TEC is concerned the sexual offender treatment
24        program is necessary before Kellie could go to
25        a female facility?
```

```
 1   A    Yes.
 2   Q    And if you could, I'm having a little
 3        difficulty.  Can you show me where that's
 4        written down or do you know where that's
 5        written down?  Is it in the TEC records?  Is
 6        it in anything that I've given you?
 7   A    I believe it's in the TEC agenda.  I don't
 8        have that in front of me today.
 9   Q    And that would be in the TE -- is that the TEC
10        agenda that you were referring to that we were
11        talking about May 17, 2021?  Is that the
12        agenda you were talking about?
13   A    I don't know.  I don't have it in front of me.
14        I don't know the date specifically.
15   Q    Okay.  But it was in May?
16   A    I don't recall.
17   Q    If it says, "Question for team:
18        Gender-affirming transfer request;" does that
19        cover what you're talking about?
20             MR. FELDON:        Counsel, if you want
21        to refer her to a document, that might be the
22        easier approach.
23             MR. ICOVE:         Yeah.  I would love
24        to do that but I'm looking at something that
25        says attorney's eyes only and I didn't want to
```

```
 1            include those in the documents.  Obviously
 2            they would have to be filed under seal.  But I
 3            just wanted to get some idea from her because
 4            I was confused.
 5                 MR. FELDON:       Okay.  Can you repeat
 6            the question then?
 7                 MR. ICOVE:        Oh, certainly.  Thank
 8            you.
 9   Q   Was the topic that you recall in May of 2021
10            and the question for the team gender-affirming
11            transfer request?  If you don't recall, you
12            don't recall. I mean, you can't expect to
13            remember everything.
14   A   Does he have a copy of the TEC?
15   Q   What does that have -- Wait.  Let's back up
16            here a second.
17   A   I don't know what you're referring to.
18   Q   Okay.  I'm referring to -- I'm referring to
19            the inmate case summary.  And on her inmate
20            case summary it says, "Question for team:
21            Gender-affirming transfer request;" does that
22            appear to be accurate, to the best of your
23            knowledge?
24   A   I don't know if I don't have the document in
25            front of me.  I mean yes, that's what it would
```

1    say hypothetically if we were reviewing an
2    inmate for a gender-affirming transfer, but I
3    don't have the specific documents so I don't
4    know.

5  Q  Right.  Is it possible that that particular
6    requirement -- strike that.

7        Are there any other reviews of Tony
8    Fisher that you recall by the TEC, since
9    you're on that panel?

10 A  We -- just the reviews -- I mean just the
11   reviews that are on the TEC agenda.

12 Q  Right.  There is one here for a pat down.
13   Does the TEC weigh in on that?

14 A  Yes.

15 Q  Do you recall if the TEC granted it?

16 A  I believe the issue was resolved prior to the
17   TEC meeting.

18 Q  Were you part of the resolution of it?

19 A  I had spoken with the Bureau attorney and the
20   institutional executive assistant about it.

21 Q  Let's just back up a second.  There is a thing
22   called privilege.  When you talk to an
23   attorney, things that you talk about I don't
24   want to know about because we as attorneys
25   don't ask questions regarding privilege and we

```
 1        respect that because attorney-client privilege
 2        is like priest-parishioner privilege.  But you
 3        learned about it through other sources; is
 4        that fair to say?
 5   A    No, I learned about it from the Bureau
 6        attorney.
 7   Q    Okay.  Do you know anybody else that
 8        participated?
 9   A    In that determination of?
10   Q    Of granting the exception for a pat down?
11   A    It was resolved before it formally came to the
12        TEC so I can only speculate the institution
13        staff.
14   Q    Well, it shows up on the docket.  So is it
15        fair to say that that was withdrawn by the TEC
16        before consideration?
17   A    The issue had been resolved once we got to the
18        TEC.
19   Q    So the issue was moot as far as you were
20        concerned, it didn't have to be resolved?
21   A    Yes.
22   Q    Are there any gender dysphoria specialists
23        assigned to Elkton?
24   A    What do you mean by gender dysphoria
25        specialists?
```

28

| | | |
|---|---|---|
| 1 | Q | Doctors or psychologists that specialize in |
| 2 | | gender dysphoria impairments. |
| 3 | A | I don't know the specialties of the medical or |
| 4 | | the psychology staff. |
| 5 | Q | Right.  Are you aware of how many male to |
| 6 | | female transgender inmates have been |
| 7 | | transferred from a male institution to a |
| 8 | | female institution during your tenure? |
| 9 | A | Approximately five. |
| 10 | Q | Were you involved in those? |
| 11 | A | Yes. |
| 12 | Q | Do you remember why those particular |
| 13 | | individuals were able to be transferred from a |
| 14 | | male to a female institution? |
| 15 | A | Not specifically.  Each inmate was |
| 16 | | individually assessed by the Transgender |
| 17 | | Executive Council. |
| 18 | Q | Were any of those five, to the best of your |
| 19 | | recollection, proponents of gender-reaffirming |
| 20 | | surgery and that was the reason why they were |
| 21 | | transferred? |
| 22 | | MR. FELDON:        Objection.  Vague as |
| 23 | | to the term proponents. |
| 24 | A | Can you rephrase?  I don't know what you mean. |
| 25 | Q | That's fine.  Your attorney didn't either. |

29

```
 1        And -- were those transfers done in
 2        conjunction with the male getting
 3        gender-affirming surgery?
 4   A    I don't specifically remember.  Each
 5        individual case is different.
 6   Q    Do you recall whether any were?
 7   A    Yes.
 8   Q    And how many of those five individuals were
 9        granted genitalia surgery; if you know?
10   A    No surgeries have been approved or denied at
11        this time.
12   Q    So these particular inmates were transferred
13        from a male to a female institution.  What
14        were the various reasons that were given?  I
15        need you to help me.
16   A    The inmates would have been transferred in the
17        process of their gender affirmation.
18   Q    Okay.  And what do you believe that means?
19        Can you explain that to me?
20   A    As they transition, that was the next step in
21        their transition process.
22   Q    Right.  But that gender affirmation didn't
23        necessarily include surgery; is that fair to
24        say?
25   A    I don't remember each specific inmate.
```

```
 1    Q    Okay.  So as we sit here today, and obviously
 2         you can only testify to what you remember,
 3         were there any of those five individuals who
 4         received genitalia surgery?
 5    A    No surgeries have been approved or denied.
 6    Q    And what do you mean when you say no surgeries
 7         have been denied?
 8    A    At this point we have not referred any inmates
 9         for consideration for surgery.
10    Q    Who is we?
11    A    The Transgender Executive Council.
12    Q    And the transgender -- the TEC also didn't
13         recommend any either, did they?
14    A    No.
15    Q    I'm almost done.  I just got a couple other
16         questions.
17              On your particular disclosures as an
18         expert 3B says that you're expected to testify
19         about the BOP's reasoning for concluding the
20         plaintiff is not suitable for gender-affirming
21         surgery at this juncture.  So let me just ask
22         you a leading question.
23              Is it your understanding that she has
24         not been approved for gender-affirming surgery
25         because she did not complete the sexual
```

| | | |
|---|---|---|
| 1 | | offenders treatment program? |
| 2 | A | I think -- when you're talking about a human |
| 3 | | being it's more than just one thing, it's |
| 4 | | multi-layered.  She hasn't lived as a female |
| 5 | | in a female environment; she hasn't completed |
| 6 | | the recommended programming so that we can |
| 7 | | move her to a female institution. |
| 8 | Q | And you got to help me.  Are there any other |
| 9 | | factors besides those that you're aware of as |
| 10 | | we sit here today? |
| 11 | A | I think for Inmate Fisher we need to see the |
| 12 | | stability, the programming and the movement to |
| 13 | | the female facility to live as a female -- |
| 14 | Q | Right. |
| 15 | A | -- prior to the TEC recommending her. |
| 16 | Q | That's number one.  And number two is that -- |
| 17 | | is regarding programming to move her to a |
| 18 | | female institution, correct? |
| 19 | A | Can you rephrase or repeat that? |
| 20 | Q | Yeah.  You gave me two particular reasons, and |
| 21 | | one was that she hasn't lived as a female in a |
| 22 | | female environment; and the second one is that |
| 23 | | she hasn't completed the programs necessary to |
| 24 | | move her to the institution, to a female |
| 25 | | institution? |

1  A   Yes.

2  Q   Are you aware of any other factors?

3  A   Not to my knowledge.

4  Q   Two questions regarding the first factor, that

5      she hasn't lived as a female in a female

6      institution.  Is it fair to say that she's

7      lived as a female at Elkton?

8  A   I don't think that's a yes or no.

9  Q   Okay.  Well --

10 A   When you're in an institutional environment

11     there is just so many other faucets to it --

12     facets, I'm sorry.

13 Q   Well, has she put herself out as a female

14     since she's been at Elkton?

15 A   To the best of my knowledge, yes.

16 Q   And think this through with me for a second.

17     If she's put herself out as a female in a male

18     institution isn't it more difficult to do that

19     rather than to put yourself out as a female in

20     a female institution?

21     MR. FELDON:        I'm going to object.

22     We're straying a little far from either this

23     witness's experience and expertise or from the

24     two 30(b)(6) topics that she's been designated

25     for.  I'm going to instruct her not to answer

        that.

                MR. ICOVE:        I would ask the court
        reporter to certify that particular question.
Q       And the programming that you're referring to
        in respond to 3B for concluding that plaintiff
        is not suitable for gender-affirming surgery
        at this juncture, and the programming is the
        one we've talked about; is that correct; the
        sexual offender treatment programming?
A       Yes.
Q       Is there any documentation that you're aware
        of regarding the first factor that you gave us
        that Kellie hasn't lived in a female
        institution as a female?  Is there any
        documentation that is in the BOP regulations,
        rules that says that that's a requirement to
        be transferred to a female institution?
A       No.  The transgender offender manual
        references that we look at a variety of
        aspects when we designate inmates.
Q       Right.  And let's look at -- I mean, is that
        -- I have the transgender offender manual in
        front of me.  It's Plaintiff's Exhibit 2.  And
        can you show me where the requirement of
        living as a female in a female institution is

```
 1        required?
 2              MR. FELDON:        Counsel --
 3    A   I don't have a copy of it.
 4    Q   Okay.  That's fine.  But you believe it's in
 5        that particular manual?
 6    A   It doesn't specifically say that, it just says
 7        that we look at a variety.  I mean, I can pull
 8        -- do you want me to pull it up?
 9    Q   Yeah, if you can.  It would be helpful.  I'm
10        almost done.
11    A   I don't have a signal.
12              MR. FELDON:        Counsel, I'm going to
13        have somebody run and print this out.  It's
14        Exhibit 2 you said?
15              MR. ICOVE:        Yes.  Thank you very
16        much.  Why don't I go ahead and ask her the
17        rest of my questions so that we can get this
18        done.
19              MR. FELDON:        Sure.
20    Q   You're familiar with the female facilities
21        that the BOP has in Ohio?
22    A   I don't specifically -- I can't think of the
23        name of the female facility in Ohio, no.
24    Q   Right.  Are you aware that there may not be
25        any facilities in Ohio or there is one or two
```

```
 1              and you just can't recall the names?
 2    A    I know Elkton.  I can't think of another
 3         facility we have off the top of my head.
 4    Q    So Elkton does have a female facility as well
 5         as a male facility?
 6    A    No.  I thought you were just referring to a
 7         facility.
 8    Q    Right.  I'm sorry.  That's my fault.
 9              What female facilities does the BOP
10         have in Ohio; if you recall?
11    A    None that I can recall.  But we have over 120
12         facilities so I may be forgetting one.
13    Q    Right.  That's fine.  And what female
14         facilities does the BOP have within like 500
15         miles of Columbus?  Are you aware of any?
16         That obviously would include a number of
17         different states.
18    A    Within 500 miles.  I don't know.  I mean,
19         Chicago has a female cadre, Greenville, Pekin,
20         Danbury, Connecticut; Philadelphia, Lexington,
21         Kentucky.  I mean, we have like approximately
22         20 female facilities.
23    Q    What female facilities does the BOP have in
24         Ohio for sexual treatment programs?
25    A    I can't think of a female facility that we
```

1       have in Ohio.  I could be mistaken though.  I

2       don't have a list of BOP facilities in front

3       of me.

4   Q   No, that's fine.  And, again, within 500 miles

5       of Columbus, what female facilities does the

6       BOP have for a sexual treatment program?

7   A   I don't know where -- I don't know.

8   Q   Okay.  That's fine.  You can only recall --

9       you can only testify to what you can remember

10      and relate to us today.  No one expects you to

11      do otherwise.

12              There was a note in Exhibit 4 -- never

13      mind.  Strike that.

14              Is it your understanding that Kellie

15      was recommended by the TEC to go to Devens,

16      Massachusetts to complete the sexual offender

17      treatment program?

18  A   I believe so.

19  Q   Did you ever talk with her or do you know

20      anybody that talked to her about that

21      particular matter?

22  A   I believe her psychology staff did.

23  Q   And do you know in particular who that would

24      be?  Would it be one of her treating sources?

25  A   I don't know specifically what psychologist

```
1          spoke with her.
2   Q      Now on Exhibit 4, I referred to what the court
3          order is as far as the sexual treatment
4          program is concerned, it's fair to say that
5          the courts -- and I know that this was a
6          separate requirement from the TEC, but is it
7          fair to say that the court's reference to that
8          she participate in the sexual offender
9          treatment program, that it doesn't designate
10         that that has to be done while being
11         incarcerated, does it?
12             MR. FELDON:        Objection.  The
13         document speaks for itself.  This witness
14         would have to speculate as to what the judge
15         meant.  You can answer if you can.
16  Q      Go ahead and answer.  Just read it.  I'm
17         talking about the plain meaning of what the
18         judge said.  "The court makes the following
19         recommendations to the Bureau of Prisons.  The
20         defendant participate in the sexual offender
21         treatment program."
22  A      Historically the recommendations made to the
23         Bureau of Prisons are programs that we
24         recommend to the inmates while they are
25         incarcerated with the BOP prior to release.
```

```
1   Q    Thank you.
2             And it's fair to say that that sexual
3        offender treatment program could be done under
4        supervised release without being incarcerated?
5   A    I don't know.
6   Q    Let's go off the record for a second.
7             (Discussion off the record.)
8             MR. ICOVE:         Okay.  Great.
9             Karen, can you read that question again
10       for the record and so that it's coupled with
11       Ms. Eplin's testimony.
12            THE NOTARY:     "Question: Can you show
13       me where the requirement of living as a female
14       in a female institution is required?"
15  A    Page 7, Paragraph 7 begins with, "In
16       considering such recommendations the TEC will
17       apply all criteria of Section 5."
18            And then it's bullets 3 and 4.  "The
19       TEC will also consider factors specific to the
20       transgender inmate, such as behavioral
21       history, overall demeanor, program
22       participation and the likely interactions with
23       other inmates."
24            And then Bullet 4, "The TEC will
25       consider whether placement would threaten the
```

```
1         management, security of the institution and/or
2         pose a risk to other inmates in the
3         institution, considering inmates with history
4         of trauma, privacy concerns, et cetera."
5    Q    And while -- let me just ask you.  This is a
6         change that was made and it was highlighted
7         and it apparently was made in January --
8         excuse me, in May of 2018; is that correct?
9    A    I believe so.  Mine's not highlighted.
10   Q    Okay.  is it blackened or grayed?
11   A    No.
12   Q    Okay.  So changes to this particular offender
13        manual are made periodically?
14   A    Yes.
15   Q    Does the TEC make those?
16   A    We review for changes and then recommendations
17        are made.
18   Q    Right.  You make recommendations to the
19        director of the Federal Bureau of Prisons and
20        he or she approves it or makes changes or goes
21        over that with you?
22   A    Yes.
23   Q    Okay.  So it's ultimately up to the director
24        of Federal Bureau of Prisons, correct?
25   A    He's the signature authority, yes.
```

| | | |
|---|---|---|
| 1 | Q | Is Mark Inch, I-n-c-h, currently the director |
| 2 | | of the Federal Bureau of Prisons? |
| 3 | A | No. |
| 4 | Q | Do you know who is? |
| 5 | A | Michael Carvajal. |
| 6 | Q | Do you know how to spell his last name? |
| 7 | A | C-a-r-v-a-j-a-l. |
| 8 | Q | I'm glad you could spell that.  Thank you very |
| 9 | | much. |
| 10 | | In regards to those two bullet points, |
| 11 | | the seconds to last one, it's fair to say that |
| 12 | | you're not aware of any adverse interaction |
| 13 | | with other inmates at the Elkton facility as |
| 14 | | far as Kellie is concerned? |
| 15 | A | No. |
| 16 | Q | Are you aware of any incident where she |
| 17 | | threatened either management or security at |
| 18 | | Elkton or posed a risk to other inmates at |
| 19 | | Elkton? |
| 20 | | MR. FELDON:        Object to the form. |
| 21 | | Compound. |
| 22 | A | She could pose a risk to other inmates with |
| 23 | | her past predatory behavior with the sex |
| 24 | | offense. |
| 25 | Q | Okay.  So let me break this up.  Your attorney |

```
 1            -- it's a compound question because I read the
 2            whole thing, but are you aware of any threats
 3            to management and security of the institution
 4            that Kellie posed during her tenure at Elkton?
 5    A       We have to look at her offense behavior.  So
 6            to answer that, it is not a yes or no because
 7            we're talking about a person again.
 8    Q       Exactly.  Let's do this, put aside her
 9            offense.
10    A       I can't.
11    Q       Yeah, well I'm asking you to for this
12            question.  Are you aware of anything else
13            besides the offense that she was involved with
14            when she was in prison, any incidents while
15            she was incarcerated with management or
16            security of the institution that she
17            threatened anybody or caused any physical harm
18            to anyone in that category?
19               MR. FELDON:         I'm going to object
20            to the question.
21    A       No, I'm not aware of any specific incidents.
22    Q       And again, are you aware of any incidents that
23            Kellie had with other inmates at the
24            institution, that being Elkton, where she
25            posed a risk of harm to those particular
```

42

1      inmates?

2  A   To other male inmates, no.

3            MR. ICOVE:      Let's go off the

4      record for a second.  I think I'm done.  I

5      want to thank you very much for coming today,

6      but I just want to go through my notes real

7      quickly again.  And I don't want to stay on

8      the record to do it.  It will only take me a

9      minute.

10           (Discussion off the record.)

11           MR. ICOVE:      Karen, let the record

12     reflect that counsel discussed the certified

13     question and we've come to a resolution, as we

14     have in the past regarding many issues in this

15     case, and I would like you, if you would, to

16     reread the certified question so that it can

17     be answered and this deposition can be

18     concluded.

19           MR. FELDON:      And before we

20     conclude the deposition we are going to want

21     that two minute break to discuss our response.

22           MR. ICOVE:      To discuss the

23     response.  That's fine.

24           Gary, I know that you looked at the

25     local rules, and it indicates that while a

1       question is pending counsel for the deponent

2       and the deponent must not confer except for

3       the purpose of deciding whether to assert

4       privilege.

5               MR. FELDON:        Yes.

6               MR. ICOVE:         Is that what you

7       are --

8               MR. FELDON:        We're happy to let

9       her answer the question before taking a break.

10      We wanted to take a quick break and see if

11      there was anything that we wanted to ask on a

12      brief cross before we closed the depo.

13              MR. ICOVE:         Oh, okay.  No, that's

14      fine.

15              MR. FELDON:        She can answer the

16      question before the break.

17              MR. ICOVE:         Go ahead.  I'm sorry.

18              THE NOTARY:        "Question: And think

19      this through with me for a second.  If she's

20      put herself out as a female in a male

21      institution isn't it more difficult to do that

22      rather than to put yourself out as a female in

23      a female institution?"

24              MR. FELDON:        So I'll lodge a

25      speculation objection, but go ahead and

```
 1        answer.
 2             MR. ICOVE:          Thank you.
 3   A    I don't know.  We've had inmates that we've
 4        transferred to female institutions that were
 5        biologically male and then they've asked to go
 6        back to male institutions.  We've -- I mean,
 7        each individual is different.  I don't know.
 8        I don't think that that's something that I can
 9        say for her.
10   Q    And it's fair to say that you're telling us
11        today that you can't answer that question in
12        regards to others, or just in general?
13   A    If I'm understanding the question correctly, I
14        mean, I don't know for a transperson how that
15        is to transition in the correctional
16        environment.
17   Q    My question is in general, regardless of
18        whether it's Kellie or not.  If a person who's
19        a male puts herself out to be female in a male
20        institution, isn't that in and of itself
21        pretty difficult to do for that person?
22             MR. FELDON:          Objection.
23        Speculation.  You can answer.
24   A    It would be difficult in either institution I
25        can assume.
```

```
 1   Q    I don't want you to assume anything.  I mean,
 2        if you don't know that's fine.  But if I'm
 3        correct, you know, say yes; if I'm not correct
 4        say no.  And if you're going to assume say I
 5        don't know.
 6   A    I don't know.
 7   Q    Okay.  I don't want to put you on the spot.
 8        Okay.
 9              Thank you.  That's the end of those
10        questions.
11              MR. ICOVE:         Thank you, Gary.
12              MR. FELDON:        Thank you.  So if we
13        can hold the depo for just a minute or two
14        while we talk at this end, I may have one or
15        two follow-up questions that shouldn't take
16        long.
17              MR. ICOVE:         Certainly.  Let's go
18        off the record.
19                   (Short recess.)
20              CROSS-EXAMINATION
21   By Mr. Feldon:
22   Q    So since I'm not on camera, this is Gary
23        Feldon, counsel for the defendants.  I'm going
24        to ask just a few follow-up questions, if
25        that's okay with you, Ms. Eplin?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Okay.  We talked before about the relationship |
| 3 | | between the WPATH standards and the BOP |
| 4 | | policy.  Is it your understanding -- |
| 5 | | MR. ICOVE:     Can't hear you. |
| 6 | | MR. FELDON:    Is that better? |
| 7 | | MR. ICOVE:     Yeah, that's better. |
| 8 | | The mike isn't picking up.  Now it is, yes. |
| 9 | | Thank you. |
| 10 | | MR. FELDON:    I'm leaning in a |
| 11 | | little bit so it should be louder. |
| 12 | | MR. ICOVE:     Good. |
| 13 | Q | The WPATH standard -- I'm going to represent |
| 14 | | the WPATH standards talk about living a real |
| 15 | | world experience.  And does BOP also, when |
| 16 | | making decisions about placing transgender |
| 17 | | inmates, take into account whether they can |
| 18 | | live a real world experience in their |
| 19 | | identified gender? |
| 20 | A | Yes. |
| 21 | Q | Okay.  And how is it that BOP interprets that |
| 22 | | requirement? |
| 23 | A | By transferring the inmate into the female |
| 24 | | facility.  Part of that is that we want the |
| 25 | | inmate to have that experience with the |

```
 1           gender-affirming transfer so that they can see
 2           is this something that they want to do.  We
 3           want a good outcome for them before we make a
 4           life changing surgery, a surgery that we can't
 5           come back from.  As I just stated, but I don't
 6           think I formulated it well, we've had inmates
 7           that we transferred before to gender-affirming
 8           facilities that have been requested to go back
 9           to the biological sex facility.
10                So we do that gender-affirming surgery
11           to ensure that we have the best possible
12           outcome for the inmates.
13      Q    And if you did have an inmate who
14           hypothetically have gender-affirming surgery
15           prior to being transferred back to a male
16           facility, would that create any concerns for
17           BOP?
18      A    Yes.
19                MR. ICOVE:          Objection.
20                MR. FELDON:         What grounds?
21                MR. ICOVE:          Objection.  That's
22           all.  Go ahead.
23                MR. FELDON:         Okay.
24      Q    Yeah, if you had an individual with that
25           gender-affirming surgery and for whatever
```

1      reason had to be transferred back to a male

2      facility, what concerns, if any, would that

3      raise for BOP?

4              MR. ICOVE:          Objection.

5  A   That we would have questions on what would be

6      the proper placement for the inmate, mental

7      health treatment for the inmate, the

8      healthcare for the -- the lifelong concerns

9      for the inmate.  How have -- have we done

10     damage by doing this without the inmate's best

11     interest; have we provided every opportunity

12     before this.

13 Q   And would there be any safety or security

14     concerns about that transfer?

15             MR. ICOVE:          Objection.

16 A   Yes.

17             MR. FELDON:         What would the

18     grounds of the objection be?

19             MR. ICOVE:          Objection.  For the

20     record, I don't need to state grounds for the

21     objection.  All I need to do is make the

22     obligation according to Local Rule 30.1, and

23     that's the way that we do it in the Northern

24     District.  It makes things go quicker.

25 Q   All right.  And, Ms. Eplin, to the best of

```
 1        your knowledge -- I'm sorry.  My recollection
 2        is you said there were approximately five
 3        inmates who had been transferred from male to
 4        female facilities because of their transgender
 5        status; is that accurate?
 6   A    During my tenure I think was his question.
 7   Q    Okay.  Roughly five inmates during your
 8        tenure.  And to your recollection, were any of
 9        those inmates sex offenders who refused to
10        complete sex offender treatment programs?
11             MR. ICOVE:        Objection.
12   A    No.
13             MR. FELDON:       That's all for me.
14             MR. ICOVE:        I got one follow-up.
15        Thank you, Gary.
16             REDIRECT EXAMINATION
17   By Mr. Icove:
18   Q    The first question that he asked you was BOP's
19        policy separate and apart from WPATH.  Is that
20        particular policy memorialized or in any
21        particular document?
22   A    Can you repeat or rephrase that?  I'm
23        confused.
24   Q    Do you recall the first question Gary asked
25        you?
```

| | | |
|---|---|---|
| 1 | A | No.  Can you repeat it please? |
| 2 | Q | I'll have the court reporter read it so there |
| 3 | | isn't any questions. |
| 4 | | MR. ICOVE:    Karen, would you be |
| 5 | | kind, enough?  Thank you. |
| 6 | | THE NOTARY:    "The WPATH standard -- |
| 7 | | I'm going to represent the WPATH standards |
| 8 | | talk about living a real world experience. |
| 9 | | And does BOP also, when making decisions about |
| 10 | | placing transgender inmates, take into account |
| 11 | | whether they can live a real world experience |
| 12 | | in their identified gender? |
| 13 | Q | And my question to you is is there any place |
| 14 | | in the BOP policies, procedures or regulations |
| 15 | | that codifies that particular policy? |
| 16 | A | No. |
| 17 | Q | Okay.  I don't have any further questions. |
| 18 | | Ms. Eplin, thank you so much for taking |
| 19 | | time out of the day to come today and answer |
| 20 | | questions.  And your attorney will instruct |
| 21 | | you on whether or not you're going to waive |
| 22 | | signature. |
| 23 | | MR. FELDON:    We will read and |
| 24 | | sign. |
| 25 | | (Deposition concluded at 10:55 a.m.) |

```
 1                    SIGNATURE PAGE

 2   Case Name:    Tony Fisher, etc. vs. Federal Bureau
                   of Prisons, et al.
 3

 4   Case Number:  4:19CV1169

 5   Deponent:     Jennifer Eplin

 6   Date:         Friday, July 23, 2021

 7

 8   To the Reporter:

 9        I have read the entire transcript of my

10   Deposition taken in the captioned matter or the same

11   has been read to me.  I request that the following

12   changes be entered upon the record for the reasons

13   indicated.

14        I have signed my name to the Errata Sheet and

15   the appropriate Certificate and authorize you to

16   attach both to the original transcript.

17

18

19
                              _____
20                            Jennifer Eplin

21        Subscribed and sworn to before me this

22   _____day of _____, 2021.

23
                              _____
24                            Notary Public

25   My commission expires:_____.
```



```
 1    I have read the foregoing transcript from page 1
 2    through page 50 and note the following corrections:
 3    PAGE-LINE      REQUESTED CHANGE      REASON FOR CHANGE
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25    Jennifer Eplin _____     _____
                                         Date
```

```
 1  State of Ohio,          )
                            )  SS:   CERTIFICATE
 2  County of Cuyahoga,     )

 3        I, Karen A. Toth, Notary Public in and for the

 4  State of Ohio, duly commissioned and qualified, do

 5  hereby certify that the within named witness,

 6  Jennifer Eplin, was by me first duly sworn to

 7  testify the truth, the whole truth, and nothing but

 8  the truth in the cause aforesaid; that the testimony

 9  then given by her was by me reduced to

10  stenotypy/computer in the presence of said witness,

11  afterward transcribed, and that the foregoing is a

12  true and correct transcript of the testimony so

13  given by her as aforesaid.

14        I do further certify that this deposition was

15  taken at the time and place in the foregoing caption

16  specified and was completed without adjournment

17        I do further certify that I am not a relative,

18  counsel, or attorney of either party, or otherwise

19  interested in the event of this action.

20        IN WITNESS WHEREOF, I have hereunto set my

21  hand and affixed my seal of office at Cleveland,

22  Ohio on this 5th day of August, 2021.

23

24        Karen A. Toth, Notary Public in
          and for the State of Ohio.
25        My Commission expires May 6, 2023
```

FINCUN-MANCINI -- THE COURT REPORTERS

(216)696-2272

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

Jennifer Eplin
July 23, 2021

**A**

ability (1)
  7:2
able (2)
  7:8;28:13
accommodations (1)
  21:11
according (2)
  17:6;48:22
Accordingly (1)
  6:22
account (2)
  46:17;50:10
accurate (2)
  25:22;49:5
accurately (2)
  10:9,17
additional (1)
  15:8
administrative (5)
  6:1,5,13,14;16:3
adverse (1)
  40:12
affirmation (2)
  29:17,22
again (6)
  9:22;36:4;38:9;41:7,
  22;42:7
against (1)
  4:17
age (1)
  4:2
agenda (5)
  7:10;24:7,10,12;
  26:11
ahead (7)
  7:25;12:25;34:16;
  37:16;43:17,25;47:22
aka (1)
  4:15
almost (2)
  30:15;34:10
always (2)
  7:4,25
and/or (1)
  39:1
answered (1)
  42:17
apart (1)
  49:19
apparently (1)
  39:7
appeal (1)
  6:5
appear (1)
  25:22
appeared (1)
  13:15
applicability (2)
  8:8;19:22
apply (2)

  6:21;38:17
appreciate (1)
  18:20
approach (1)
  24:22
appropriateness (1)
  13:18
approved (3)
  29:10;30:5,24
approves (1)
  39:20
approximately (4)
  19:3;28:9;35:21;
  49:2
April (2)
  12:9,22
area (1)
  18:11
aside (1)
  41:8
aspect (1)
  18:18
aspects (1)
  33:20
assert (1)
  43:3
assessed (1)
  28:16
assessment (1)
  18:8
assigned (1)
  27:23
assistant (1)
  26:20
assume (3)
  44:25;45:1,4
attached (2)
  12:1,11
attachment (1)
  11:18
attorney (7)
  11:6;26:19,23;27:6;
  28:25;40:25;50:20
attorney-client (1)
  27:1
attorneys (2)
  21:2;26:24
attorney's (1)
  24:25
authority (1)
  39:25
aware (16)
  14:7;15:18;19:2,5;
  28:5;31:9;32:2;33:11;
  34:24;35:15;40:12,16;
  41:2,12,21,22

**B**

back (8)
  19:8;25:15;26:21;
  44:6;47:5,8,15;48:1
based (2)

  12:14;18:19;20:5,15,
  24
basically (1)
  5:1
basis (2)
  15:22;18:9
Bates (1)
  10:22
begins (1)
  38:15
behalf (3)
  5:19,25;6:18
behavior (2)
  40:23;41:5
behavioral (1)
  38:20
belief (1)
  5:15
believes (1)
  23:14
besides (3)
  6:11;31:9;41:13
best (11)
  5:14;7:2;13:10;15:2,
  13;25:22;28:18;32:15;
  47:11;48:10,25
better (3)
  7:24;46:6,7
biological (1)
  47:9
biologically (1)
  44:5
bit (1)
  46:11
Bivens (1)
  6:1
biweekly (1)
  13:14
blackened (1)
  39:10
BOP (23)
  4:17;9:4,13,24;10:2;
  21:17,23;22:3;33:15;
  34:21;35:9,14,23;36:2,
  6;37:25;46:3,15,21;
  47:17;48:3;50:9,14
BOP's (3)
  9:19;30:19;49:18
both (1)
  14:24
bottom (1)
  12:5
box (3)
  11:17,17,24
break (5)
  40:25;42:21;43:9,10,
  16
brief (1)
  43:12
briefly (1)
  11:11
Bullet (2)
  38:24;40:10

bullets (1)
  38:18
Bureau (8)
  22:17;26:19;27:5;
  37:19,23;39:19,24;
  40:2

**C**

cadre (1)
  35:19
call (3)
  8:18;16:17,20
called (2)
  8:5;26:22
came (1)
  27:11
camera (1)
  45:22
can (51)
  4:6;5:23;8:24;11:4,
  10,11,12;16:5;17:10;
  19:8,10,17,20;20:20,
  25,25;21:4,6,21;24:3;
  25:5;27:12;28:24;
  29:19;30:2;31:6,19;
  33:24;34:7,9,17;35:11;
  36:8,9,9;37:15,15;38:9,
  12;42:16,17;43:15;
  44:8,23,25;45:13;
  46:17;47:1;49:22;50:1,
  11
care (5)
  7:11;8:9;17:15;
  19:22;20:22
Carvajal (1)
  40:5
C-a-r-v-a-j-a-l (1)
  40:7
case (10)
  4:17,22;5:20,24;
  6:10,17;25:19,20;29:5;
  42:15
case-by-case (1)
  18:9
cases (1)
  5:24
category (1)
  41:18
caused (1)
  41:17
cc (1)
  11:24
center (1)
  13:2
certainly (6)
  11:11;17:12;19:21;
  21:22;25:7;45:17
certified (3)
  4:3;42:12,16
certify (1)
  33:3
cetera (1)

  39:4
chance (2)
  7:20;10:7
change (1)
  39:6
changes (3)
  39:12,16,20
changing (1)
  47:4
Chicago (1)
  35:19
chief (1)
  13:1
clear (1)
  13:16
Clifford (2)
  11:25;12:10
closed (1)
  43:12
codifies (1)
  50:15
Columbus (2)
  35:15;36:5
coming (1)
  42:5
committee (1)
  23:14
complete (6)
  21:18,24;22:4;30:25;
  36:16;49:10
completed (3)
  23:20;31:5,23
compound (4)
  11:2,7;40:21;41:1
computation (1)
  13:2
concerned (4)
  23:23;27:20;37:4;
  40:14
concerns (5)
  39:4;47:16;48:2,8,14
conclude (1)
  42:20
concluded (2)
  42:18;50:25
concluding (2)
  30:19;33:5
conduct (2)
  13:16,25
confer (1)
  43:2
confused (2)
  25:4;49:23
conjunction (1)
  29:2
Connecticut (1)
  35:20
consider (3)
  13:20;38:19,25
consideration (3)
  18:5;27:16;30:9
considered (3)
  8:18;9:3;18:12

Jennifer Eplin
July 23, 2021

Case: 4:19-cv-01169-SL   Doc #: 64   Filed: 08/27/21   57 of 63   PageID #: 1208

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al,

considering (2)
  38:16;39:3
considers (1)
  18:6
continuation (1)
  12:20
continuous (1)
  17:25
continuously (1)
  19:1
copy (4)
  7:21;13:4;25:14;
  34:3
corner (1)
  10:23
Correctional (4)
  4:18;13:17;20:12;
  44:15
correctly (2)
  4:25;44:13
Council (12)
  7:10;10:14,15,18;
  11:22;12:13;13:4,13;
  14:3,22;28:17;30:11
Counsel (7)
  8:23;24:20;34:2,12;
  42:12;43:1;45:23
couple (2)
  4:20;30:15
coupled (1)
  38:10
course (1)
  19:10
court (10)
  5:17;6:20;21:18,24;
  22:4,16;33:2;37:2,18;
  50:2
courts (1)
  37:5
court's (1)
  37:7
cover (2)
  13:7;24:19
create (1)
  47:16
criminal (1)
  6:3
criteria (4)
  17:5,16;22:10;38:17
cross (1)
  43:12
CROSS-EXAMINATION (2)
  4:10;45:20
currently (1)
  40:1

D

damage (1)
  48:10
Danbury (1)
  35:20
date (4)

12:3,7;14:11;24:14
dated (5)
  8:6,12;11:17;12:9,21
day (1)
  50:19
December (1)
  8:7
deciding (1)
  43:3
decision (1)
  6:6
decisions (2)
  46:16;50:9
defendant (1)
  22:18;37:20
defendants (1)
  45:23
demeanor (1)
  38:21
denied (3)
  29:10;30:5,7
depo (2)
  43:12;45:13
deponent (3)
  4:6;43:1,2
deposed (1)
  5:4
deposition (3)
  42:17,20;50:25
designate (2)
  33:20;37:9
designated (5)
  4:19,21;5:1,3;32:24
designation (1)
  13:2
determination (2)
  18:22;27:9
determined (1)
  6:24
determining (1)
  16:23
Devens (1)
  36:15
different (5)
  20:12;21:6;29:5;
  35:17;44:7
difficult (4)
  32:18;43:21;44:21,
  24
difficulty (1)
  24:3
director (3)
  39:19,23;40:1
discipline (1)
  15:3
disclosures (3)
  4:24;7:7;30:17
discuss (2)
  42:21,22
discussed (1)
  42:12
Discussion (2)
  38:7;42:10

disposition (1)
  14:15
District (1)
  48:24
docket (1)
  27:14
Doctor (2)
  4:12;5:5
Doctors (1)
  28:1
document (14)
  8:5;9:12,23;10:7;
  17:2,18,20,25;19:11;
  20:7;24:21;25:24;
  37:13;49:21
documentation (2)
  33:11,15
documents (13)
  7:8,12,15;9:17;10:5,
  9,10,18,24;11:12;16:5;
  25:1;26:3
Don (2)
  16:12,13
done (11)
  13:8;18:9;22:22;
  29:1;30:15;34:10,18;
  37:10;38:3;42:4;48:9
down (5)
  22:18;24:4,5;26:12;
  27:10
drop (1)
  22:18
due (1)
  15:1
duly (1)
  4:2
during (4)
  28:8;41:4;49:6,7
dysphoria (4)
  5:21;27:22,24;28:2

E

easier (1)
  24:22
Ed (1)
  4:14
either (6)
  10:10;28:25;30:13;
  32:22;40:17;44:24
Elkton (18)
  4:18;11:20,24,25;
  12:9,12;15:4,6;27:23;
  32:7,14;35:2,4;40:13,
  18,19;41:4,24
Elkton's (1)
  11:16
else (4)
  13:23,23;27:7;41:12
email (6)
  11:16,17,23;12:21,
  22;13:7
emails (1)

7:11
end (2)
  45:9,14
enough (1)
  50:5
ensure (1)
  47:11
environment (5)
  20:13;31:5,22;32:10;
  44:16
environments (2)
  8:10;19:23
EPLIN (4)
  4:1;45:25;48:25;
  50:18
Eplin's (1)
  38:11
especially (1)
  20:12
estrogen (1)
  15:19
et (1)
  39:4
even (2)
  6:25;7:24
Exactly (1)
  41:8
EXAMINATION (1)
  49:16
examined (1)
  4:3
except (1)
  43:2
exception (1)
  27:10
excuse (2)
  22:1;39:8
Executive (10)
  7:10;10:14;11:22;
  12:13;13:4,13;14:3;
  26:20;28:17;30:11
exhausted (1)
  6:14
Exhibit (12)
  5:9;7:15;8:17;10:4;
  17:1,3,8;22:13;33:23;
  34:14;36:12;37:2
exhibits (1)
  7:13
expect (1)
  25:12
expected (1)
  30:18
expects (1)
  36:10
experience (6)
  32:23;46:15,18,25;
  50:8,11
expert (4)
  4:22;5:3;18:16;
  30:18
expertise (1)
  32:23

experts (1)
  18:14
explain (2)
  10:23;29:19
explained (1)
  6:11
extended (3)
  19:18;20:2,16
eyes (1)
  24:25

F

facets (1)
  32:12
facilities (11)
  34:20,25;35:9,12,14,
  22,23;36:2,5;47:8;49:4
facility (15)
  15:1,6;23:25;31:13;
  34:23;35:3,4,5,7,25;
  40:13;46:24;47:9,16;
  48:2
fact (2)
  19:2,6
factor (7)
  11:8;16:21;18:4,15,
  21;32:4;33:12
factors (3)
  31:9;32:2;38:19
fair (15)
  7:4;14:5;15:21;17:3,
  14;23:18;27:4,15;
  29:23;32:6;37:4,7;
  38:2;40:11;44:10
familiar (1)
  34:20
far (6)
  16:5;23:22;27:19;
  32:22;37:3;40:14
faucets (1)
  32:11
fault (1)
  35:8
FCI (2)
  11:16,19
Federal (4)
  4:17;39:19,24;40:2
FELDON (36)
  4:8;6:7;7:21;8:22;
  11:1;15:24;17:17,22;
  20:18;22:11;24:20;
  25:5;28:22;32:21;34:2,
  12,19;37:12;40:20;
  41:19;42:19;43:5,8,15,
  24;44:22;45:12,21,23;
  46:6,10;47:20,23;
  48:17;49:13;50:23
female (54)
  13:19;14:25;21:17,
  20,23;22:1,3,6;23:13,
  25;28:6,8,14;29:13;
  31:4,5,7,13,13,18,21,

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

Jennifer Eplin
July 23, 2021

22,24;32:5,5,7,13,17,
19,20;33:13,14,17,25,
25;34:20,23;35:4,9,13,
19,22,23,25;36:5;
38:13,14;43:20,22,23;
44:4,19;46:23;49:4
**few (2)**
7:19;45:24
**file (4)**
15:22,25;16:2,4
**filed (1)**
25:2
**fine (8)**
28:25;34:4;35:13;
36:4,8;42:23;43:14;
45:2
**first (5)**
4:2;32:4;33:12;
49:18,24
**Fisher (7)**
4:15;7:12;12:2,11;
14:24;26:8;31:11
**Fisher's (1)**
11:20
**fits (1)**
22:9
**five (7)**
14:7;28:9,18;29:8;
30:3;49:2,7
**following (2)**
22:16;37:18
**follows (1)**
4:4
**follow-up (3)**
45:15,24;49:14
**forgetting (1)**
35:12
**form (3)**
8:22;15:24;40:20
**formal (1)**
14:2
**formalities (1)**
6:20
**formally (1)**
27:11
**formulated (1)**
47:6
**forth (1)**
5:9
**forwarding (2)**
12:22,23
**four (1)**
14:6
**front (5)**
24:8,13;25:25;33:23;
36:2
**full (1)**
7:21
**further (2)**
14:16;50:17

**G**

**Gary (8)**
4:5;6:22;7:20;42:24;
45:11,22;49:15,24
**gave (3)**
5:8;31:20;33:12
**gender (12)**
5:20;11:21;16:23;
17:6,16;27:22,24;28:2;
29:17,22;46:19;50:12
**gender-affirming (19)**
8:20;9:5,9;10:12;
12:15,18;24:18;25:10,
21;26:2;29:3;30:20,24;
33:6;47:1,7,10,14,25
**gender-reaffirming (1)**
28:19
**general (3)**
10:9;44:12,17
**genital (3)**
18:12,23;22:22
**genitalia (2)**
29:9;30:4
**Given (4)**
12:16;18:7;24:6;
29:14
**glad (1)**
40:8
**goes (1)**
39:20
**gold (2)**
8:19,23
**Good (4)**
4:12;7:23;46:12;
47:3
**government (5)**
5:2,20,25;6:18;13:11
**government's (1)**
6:6
**Grand (1)**
13:3
**granted (2)**
26:15;29:9
**granting (1)**
27:10
**grayed (1)**
39:10
**great (3)**
8:11,17;38:8
**Greenville (1)**
35:19
**ground (1)**
11:5
**grounds (3)**
47:20;48:18,20
**guess (2)**
21:2,3
**guide (1)**
21:13

**H**

**happy (1)**
43:8

**harm (2)**
41:17,25
**head (1)**
35:3
**health (7)**
14:16,18;15:3,8,14;
21:8;48:7
**healthcare (1)**
48:8
**hear (1)**
46:5
**heard (1)**
8:25
**hearing (2)**
6:1,13
**help (2)**
29:15;31:8
**helpful (1)**
34:9
**hereinafter (1)**
4:3
**herself (4)**
32:13,17;43:20;
44:19
**highlighted (2)**
39:6,9
**Historically (1)**
37:22
**history (2)**
38:21;39:3
**hold (1)**
45:13
**hormone (13)**
13:16,22;15:15;
16:14,18,20,21;17:15;
18:1,6,7,21;21:10
**hormones (7)**
16:7,8,10;17:5;
18:24;19:3,6
**housed (1)**
21:25
**housing (3)**
21:12,19;22:5
**HRTs (1)**
16:17
**human (1)**
31:2
**hypothetically (2)**
26:1;47:14

**I**

**ICOVE (31)**
4:5,9,11,15;7:23;
24:23;25:7;33:2;34:15;
38:8;42:3,11,22;43:6,
13,17;44:2;45:11,17;
46:5,7,12;47:19,21;
48:4,15,19;49:11,14,
17;50:4
**idea (1)**
25:3
**identified (2)**

46:19;50:12
**identify (1)**
7:15
**impairments (1)**
28:2
**important (1)**
6:9
**incarcerated (4)**
37:11,25;38:4;41:15
**Inch (1)**
40:1
**I-n-c-h (1)**
40:1
**incident (1)**
40:16
**incidents (3)**
41:14,21,22
**include (4)**
7:19;25:1;29:23;
35:16
**incorporated (6)**
9:19,24;19:19;20:2,
17,23
**indicate (2)**
9:23;16:13
**indicated (3)**
4:23;13:8;22:21
**indicates (1)**
42:25
**individual (3)**
29:5;44:7;47:24
**individualized (2)**
18:8;20:8
**individually (1)**
28:16
**individuals (3)**
28:13;29:8;30:3
**information (1)**
9:12
**informational (1)**
20:7
**inmate (22)**
6:14;7:12;11:20;
12:2,11,14;14:24;18:8,
24;25:19,19;26:2;
28:15;29:25;31:11;
38:20;46:23,25;47:13;
48:6,7,9
**inmates (26)**
8:2,6;14:25;28:6;
29:12,16;30:8;33:20;
37:24;38:23;39:2,3;
40:13,18,22;41:23;
42:1,2;44:3;46:17;
47:6,12;49:3,7,9;50:10
**inmate's (4)**
12:14,16;20:11;
48:10
**Institution (30)**
4:18;13:19;21:20;
22:6;23:13;27:12;28:7,
8,14;29:13;31:7,18,24,
25;32:6,18,20;33:14,

17,25;38:14;39:1,3;
41:3,16,24;43:21,23;
44:20,24
**institutional (7)**
8:10,21;9:10;13:25;
19:23;26:20;32:10
**institutions (2)**
44:4,6
**instruct (1)**
32:25;50:20
**instructional (1)**
9:6
**interaction (1)**
40:12
**interactions (1)**
38:22
**interest (1)**
48:11
**interpret (1)**
23:1
**interprets (1)**
46:21
**into (10)**
9:19,24;18:4,15;
19:19;20:2,17;46:17,
23;50:10
**involved (2)**
28:10;41:13
**issue (7)**
6:6;8:19;9:4,9;
26:16;27:17,19
**issues (1)**
42:14
**items (2)**
4:20;7:6

**J**

**January (1)**
39:7
**JENNIFER (1)**
4:1
**judge (3)**
6:21;37:14,18
**judicial (1)**
14:23;23:8
**juncture (2)**
30:21;33:7
**June (1)**
15:18
**jurisdictional (2)**
23:8,16

**K**

**Karen (3)**
38:9;42:11;50:4
**Kellie (12)**
4:15,16;14:5;19:2;
22:8;23:24;33:13;
36:14;40:14;41:4,23;
44:18
**Kellie's (5)**

Jennifer Eplin
July 23, 2021

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

10:11,25;19:19;20:2,
23
**Kentucky (1)**
35:21
**kind (2)**
6:10;50:5
**knowledge (10)**
5:14;10:1;15:2;
20:24;22:8;23:21;
25:23;32:3,15;49:1

**L**

**last (2)**
40:6,11
**later (1)**
6:23
**lawful (1)**
4:2
**leading (1)**
30:22
**leaning (1)**
46:10
**learned (2)**
27:3,5
**least (3)**
17:6;18:25;19:7
**lens (2)**
14:24;23:12
**lesser (1)**
12:18
**level (1)**
15:19
**levels (7)**
13:16,22;15:15;
16:14;17:5;18:6,7
**Lewis (2)**
16:12,13
**Lexington (1)**
35:20
**life (1)**
47:4
**lifelong (1)**
48:8
**likely (1)**
38:22
**list (1)**
36:2
**little (3)**
24:2;32:22;46:11
**live (3)**
31:13;46:18;50:11
**lived (5)**
31:4,21;32:5,7;33:13
**living (6)**
8:9;19:23;33:25;
38:13;46:14;50:8
**local (2)**
42:25;48:22
**lodge (1)**
43:24
**long (1)**
45:16

**look (13)**
8:11;10:4;13:18;
14:2;15:25;16:8;17:1;
19:14;22:13;33:19,21;
34:7;41:5
**looked (2)**
7:16;42:24
**looking (1)**
24:24
**looks (1)**
16:9
**louder (1)**
46:11
**love (1)**
24:23

**M**

**makes (4)**
22:16;37:18;39:20;
48:24
**making (3)**
18:22;46:16;50:9
**male (17)**
15:6;28:5,7,14;29:2,
13;32:17;35:5;42:2;
43:20;44:5,6,19,19;
47:15;48:1;49:3
**management (6)**
8:1,6;39:1;40:17;
41:3,15
**manual (5)**
8:12;33:18,22;34:5;
39:13
**many (5)**
21:6;28:5;29:8;
32:11;42:14
**March (1)**
11:17
**Mark (1)**
40:1
**Massachusetts (1)**
36:16
**matter (1)**
36:21
**may (17)**
4:25;6:22;8:12;12:4,
7;14:11,13;15:16;
16:14;17:1;24:11,15;
25:9;34:24;35:12;39:8;
45:14
**mean (16)**
16:2;21:6,8;25:12,
25;26:10;27:24;28:24;
30:6;33:21;34:7;35:18,
21;44:6,14;45:1
**meaning (1)**
37:17
**means (1)**
29:18
**meant (1)**
37:15
**medical (9)**

8:1,5;16:3,6,6;18:14,
16;21:9;28:3
**meeting (2)**
14:4;26:17
**meetings (1)**
13:14
**member (1)**
16:9
**memo (7)**
11:19;12:12,17,20,
24;13:5;19:8
**memorialized (1)**
49:20
**mental (6)**
14:16,18;15:8,14;
21:8;48:6
**Michael (1)**
40:5
**might (1)**
24:21
**mike (1)**
46:8
**miles (3)**
35:15,18;36:4
**mind (1)**
36:13
**Mine's (1)**
39:9
**minute (3)**
42:9,21;45:13
**Misstates (2)**
6:7;20:18
**mistake (2)**
7:18;17:13
**mistaken (1)**
36:1
**month (1)**
14:14
**months (2)**
17:25;18:1
**moot (1)**
27:19
**more (4)**
11:8;31:3;32:18;
43:21
**morning (1)**
4:12
**most (2)**
14:9;23:5
**mouth (1)**
20:14
**move (3)**
31:7,17,24
**movement (1)**
31:12
**much (9)**
4:9;7:24;18:7,20;
21:15;34:16;40:9;42:5;
50:18
**multi-disciplinary (2)**
14:4;23:13
**multi-layered (1)**
31:4

**must (3)**
7:1;21:24;43:2
**myself (5)**
11:23;12:1,10,12,21

**N**

**name (3)**
4:14;34:23;40:6
**names (1)**
35:1
**necessarily (1)**
29:23
**necessary (2)**
23:24;31:23
**need (6)**
17:22;21:3;29:15;
31:11;48:20,21
**needs (1)**
23:14
**new (1)**
12:12
**next (3)**
13:5;21:16;29:20
**None (1)**
35:11
**Northern (1)**
48:23
**NOTARY (3)**
38:12;43:18;50:6
**note (1)**
36:12
**notes (1)**
42:6
**notice (1)**
4:21
**number (4)**
7:15;31:16,16;35:16
**numbers (5)**
10:21,22,22;12:4;
18:17
**numeral (1)**
19:16

**O**

**oath (1)**
6:19
**object (7)**
6:22,25;8:22;15:24;
32:21;40:20;41:19
**Objection (17)**
6:7;11:1;17:17;
20:18;22:11;28:22;
37:12;43:25;44:22;
47:19,21;48:4,15,18,
19,21;49:11
**objections (1)**
6:25
**obligation (1)**
48:22
**observe (1)**
21:1

**obtain (1)**
22:22
**Obviously (3)**
25:1;30:1;35:16
**occasions (1)**
14:7
**off (6)**
35:3;38:6,7;42:3,10;
45:18
**offender (18)**
14:20;15:10;21:19,
25;22:5,19;23:15,19,
23;33:9,18,22;36:16;
37:8,20;38:3;39:12;
49:10
**offenders (5)**
21:18,24;22:4;31:1;
49:9
**offender's (1)**
8:12
**offense (5)**
15:1;40:24;41:5,9,13
**Ohio (5)**
34:21,23,25;35:10,
24;36:1
**once (1)**
27:17
**One (21)**
6:19;7:25;10:5;11:8;
14:9;18:14;19:7;22:9;
26:12;31:3,16,21,22;
33:8;34:25;35:12;
36:10,24;40:11;45:14;
49:14
**ones (1)**
7:20
**only (11)**
15:11,22;20:25;22:9;
23:10;24:25;27:12;
30:2;36:8,9;42:8
**opportunity (1)**
48:11
**order (6)**
12:3,3,4,7;22:22;
37:3
**others (1)**
44:12
**otherwise (1)**
36:11
**out (11)**
12:3,7;17:9;32:13,
17,19;34:13;43:20,22;
44:19;50:19
**outcome (2)**
47:3,12
**over (4)**
4:7;14:5;35:11;
39:21
**overall (1)**
38:21

**P**

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

Jennifer Eplin
July 23, 2021

**page (8)**
17:2,8,24;18:2,2;
19:24;22:13;38:15
**pages (1)**
7:19
**panel (1)**
26:9
**Paragraph (1)**
38:15
**paragraphs (3)**
5:12,13,13
**part (6)**
10:13;14:22;20:10,
16;26:18;46:24
**participate (4)**
22:19;23:15;37:8,20
**participated (1)**
27:8
**participation (1)**
38:22
**particular (25)**
10:7;15:22,25;17:2;
18:4;19:16,18;20:1,22;
22:9;23:18;26:5;28:12;
29:12;30:17;31:20;
33:3;34:5;36:21,23;
39:12;41:25;49:20,21;
50:15
**parts (1)**
20:22
**past (2)**
40:23;42:14
**pat (2)**
26:12;27:10
**Paul (2)**
11:24;12:10
**Pekin (1)**
35:19
**pending (1)**
43:1
**people (2)**
8:9;19:23
**periodically (1)**
39:13
**person (3)**
41:7;44:18,21
**personal (1)**
20:24
**peruse (1)**
10:7
**Philadelphia (1)**
35:20
**physical (1)**
41:17
**picking (1)**
46:8
**place (1)**
50:13
**placement (2)**
38:25;48:6
**placing (2)**
46:16;50:10
**plain (1)**

37:17
**plaintiff (2)**
30:20;33:5
**Plaintiff's (1)**
33:23
**plan (6)**
19:19;20:3,8,11,17,
23
**please (8)**
10:4;12:1,11;17:10;
19:15;21:6;22:14;50:1
**point (1)**
30:8
**points (1)**
40:10
**policies (1)**
50:14
**policy (5)**
10:2;46:4;49:19,20;
50:15
**pose (2)**
39:2;40:22
**posed (3)**
40:18;41:4,25
**possibility (1)**
7:4
**possible (3)**
13:19;26:5;47:11
**Prairie (1)**
13:3
**predatory (1)**
40:23
**prefer (1)**
19:11
**preliminary (1)**
13:14
**present (1)**
6:21
**presented (1)**
10:18
**pretty (1)**
44:21
**priest-parishioner (1)**
27:2
**print (1)**
34:13
**prior (9)**
6:8;13:5,13;14:25;
23:12;26:16;31:15;
37:25;47:15
**prison (1)**
41:14
**Prisons (6)**
22:17;37:19,23;
39:19,24;40:2
**privacy (1)**
39:4
**privilege (5)**
26:22,25;27:1,2;43:4
**problem (3)**
11:4,9;20:20
**problems (3)**
13:22;15:3,4

**procedure (1)**
10:2
**procedures (1)**
50:14
**proceeding (1)**
6:3
**process (3)**
6:15;29:17,21
**professional (1)**
16:6
**program (14)**
8:14;13:17;14:19;
22:20;23:7,24;31:1;
36:6,17;37:4,9,21;38:3,
21
**programming (8)**
14:17;15:14;31:6,12,
17;33:4,7,9
**programs (4)**
31:23;35:24;37:23;
49:10
**promotion (1)**
5:8
**proper (1)**
48:6
**proponents (2)**
28:19,23
**provided (7)**
7:13;10:6;21:8,9,10,
10;48:11
**provides (2)**
17:4,15
**providing (1)**
21:11
**psychological (1)**
16:3
**psychologist (1)**
36:25
**psychologists (1)**
28:1
**psychology (2)**
28:4;36:22
**pull (3)**
17:9;34:7,8
**purpose (1)**
43:3
**pursuant (1)**
5:2
**put (9)**
19:5;20:14;32:13,17,
19;41:8;43:20,22;45:7
**puts (1)**
44:19

**qualifications (1)**
5:9
**quick (4)**
13:6,16,25;43:10
**quicker (1)**
48:24
**quickly (1)**

42:7

**R**

**raise (1)**
48:3
**rather (2)**
32:19;43:22
**read (6)**
17:19;37:16;38:9;
41:1;50:2,23
**real (5)**
42:6;46:14,18;50:8,
11
**really (1)**
6:9
**reason (3)**
23:10;28:20;48:1
**reasonable (1)**
21:11
**reasoning (1)**
30:19
**reasons (3)**
23:11;29:14;31:20
**reassignment (1)**
11:21
**recall (21)**
14:8,12,13,14,15;
15:5,17;16:13,16;
24:16;25:9,11,12;26:8,
15;29:6;35:1,10,11;
36:8;49:24
**received (2)**
10:11;30:4
**recent (3)**
14:9;23:5
**recess (1)**
45:19
**recollection (8)**
13:10,15;15:13;
17:24;20:5;28:19;49:1,
8
**recommend (3)**
15:9;30:13;37:24
**recommendation (6)**
14:23;23:5,8,9,9,17
**recommendations (6)**
22:17;37:19,22;
38:16;39:16,18
**recommended (9)**
14:16,22;15:12;
21:18,24;22:4;23:2;
31:6;36:15
**recommending (1)**
31:15
**record (13)**
5:5,24;7:14;15:6;
38:6,7,10;42:4,8,10,11;
45:18;48:20
**records (1)**
24:5
**REDIRECT (1)**
49:16

**refer (3)**
19:8,10;24:21
**reference (3)**
10:1;21:13;37:7
**references (1)**
33:19
**referencing (1)**
17:9
**referred (2)**
30:8;37:2
**referring (16)**
4:16;9:22;11:20;
12:13;13:12;16:7;
19:21;22:20;23:4,7;
24:10;25:17,18,18;
33:4;35:6
**reflect (3)**
10:10,17;42:12
**refused (1)**
49:9
**regard (1)**
7:12
**regarding (11)**
4:20;5:20;9:9;10:11;
12:2,11;26:25;31:17;
32:4;33:12;42:14
**regardless (1)**
44:17
**regards (7)**
7:18;8:17;9:1;18:22;
23:5;40:10;44:12
**regular (1)**
15:22
**regulations (4)**
9:20,25;33:15;50:14
**Rehanna (1)**
4:16
**relate (3)**
10:24;21:1;36:10
**relationship (1)**
46:2
**release (3)**
23:20;37:25;38:4
**remedy (3)**
6:1,13,15
**remember (9)**
6:10;14:9;21:1;
25:13;28:12;29:4,25;
30:2;36:9
**repeat (6)**
17:10;21:21;25:5;
31:19;49:22;50:1
**rephrase (7)**
11:4,10;19:20;21:7;
28:24;31:19;49:22
**replacement (1)**
16:19
**reporter (2)**
33:3;50:2
**represent (3)**
4:15;46:13;50:7
**request (6)**
11:20;12:14,16;

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272**

Jennifer Eplin
July 23, 2021

Case: 4:19-cv-01169-SL   Doc #: 64   Filed: 08/27/21   61 of 63.   PageID #: 1212

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al,

24:18;25:11,21
requested (1)
    47:8
require (3)
    21:17,23;22:3
required (2)
    34:1;38:14
requirement (10)
    9:13,15;15:11;21:14;
    26:6;33:16,24;37:6;
    38:13;46:22
requirements (1)
    22:25
reread (1)
    42:16
resolution (2)
    26:18;42:13
resolved (4)
    26:16;27:11,17,20
respect (2)
    6:16;27:1
respond (1)
    33:5
responding (1)
    7:6
response (2)
    42:21,23
rest (1)
    34:17
restate (2)
    20:20;22:1
review (15)
    7:8;8:1,7;10:12,13,
    25;12:17;13:5,14,17;
    14:1;15:21,23;16:5;
    39:16
reviewed (3)
    8:4,8;14:6
reviewing (1)
    26:1
reviews (3)
    26:7,10,11
right (14)
    5:7;9:22;16:11;26:5,
    12;28:5;29:22;31:14;
    33:21;34:24;35:8,13;
    39:18;48:25
right-hand (1)
    10:23
risk (4)
    39:2;40:18,22;41:25
Robbins (1)
    13:1
Roman (1)
    19:16
Roughly (1)
    49:7
Rule (4)
    4:21,23;11:5;48:22
rules (4)
    9:19,25;33:16;42:25
run (1)
    34:13

**S**

safety (4)
    14:24;15:4;23:12;
    48:13
save (1)
    10:20
seal (1)
    25:2
second (7)
    25:16;26:21;31:22;
    32:16;38:6;42:4;43:19
seconds (1)
    40:11
section (6)
    13:1;19:16,18,24;
    20:1;38:17
Sections (1)
    19:13
security (6)
    12:18;39:1;40:17;
    41:3,16;48:13
sent (2)
    10:11;13:7
sentencing (1)
    13:2
separate (2)
    37:6;49:19
series (2)
    4:14;6:23
serves (1)
    12:17
set (1)
    5:9
setting (3)
    8:21;9:6,11
Sex (16)
    14:20;15:1,10,13;
    21:17,18,24,25;22:3,4,
    19;23:15;40:23;47:9;
    49:9,10
sexual (11)
    23:19,23;30:25;33:9;
    35:24;36:6,16;37:3,8,
    20;38:2
Shannon (1)
    13:1
Short (1)
    45:19
show (4)
    18:24;24:3;33:24;
    38:12
shower (1)
    21:12
shows (1)
    27:14
sign (1)
    50:24
signal (1)
    34:11
signature (2)
    39:25;50:22

similar (1)
    6:16
simply (1)
    20:21
sit (4)
    20:15;22:8;30:1;
    31:10
sits (2)
    13:3;18:14
six (1)
    19:3
somebody (1)
    34:13
sorry (11)
    5:6,8;6:9;11:25;12:7,
    25;17:12;32:12;35:8;
    43:17;49:1
sources (2)
    27:3;36:24
speaks (2)
    17:18;37:13
specialists (2)
    27:22,25
specialize (1)
    28:1
specialties (1)
    28:3
specific (6)
    14:14;20:10;26:3;
    29:25;38:19;41:21
specifically (11)
    8:8;14:8,18;16:8,16;
    24:14;28:15;29:4;34:6,
    22;36:25
speculate (2)
    27:12;37:14
speculation (2)
    43:25;44:23
spell (2)
    40:6,8
spoke (1)
    37:1
spoken (1)
    26:19
spot (1)
    45:7
stability (2)
    18:24;31:12
stabilization (1)
    17:4
staff (5)
    13:18;14:1;27:13;
    28:4;36:22
stamp (1)
    10:22
standard (7)
    8:19,23;9:3;17:14;
    20:22;46:13;50:6
standards (9)
    7:11;8:3,4,9;17:10;
    19:22;46:3,14;50:7
starts (1)
    19:24

state (1)
    48:20
stated (1)
    47:5
statement (1)
    8:14
states (2)
    17:25;35:17
status (1)
    49:5
stay (1)
    42:7
step (2)
    7:25;29:20
still (2)
    7:1;17:19
stipulate (1)
    4:6
straying (1)
    32:22
Strike (3)
    22:2;26:6;36:13
sufficient (1)
    18:12
suitable (2)
    30:20;33:6
summary (2)
    25:19,20
supervised (2)
    23:20;38:4
support (1)
    9:17
supported (1)
    23:16
supports (1)
    23:9
Sure (1)
    34:19
surgeries (3)
    29:10;30:5,6
surgery (27)
    8:20;9:5,10;10:12;
    11:21;12:15,17;16:24;
    17:6,16;18:13,23;
    22:23;28:20;29:3,9,23;
    30:4,9,21,24;33:6;47:4,
    4,10,14,25
sworn (2)
    4:2,6

**T**

talk (6)
    26:22,23;36:19;
    45:14;46:14;50:8
talked (3)
    33:8;36:20;46:2
talking (6)
    24:11,12,19;31:2;
    37:17;41:7
TE (1)
    24:9
team (3)

24:17;25:10,20
TEC (34)
    13:5;14:6;15:9,23;
    16:9;18:5,6,15;19:9;
    22:21;23:2,4,9,23;24:5,
    7,9;25:14;26:8,11,13,
    15,17;27:12,15,18;
    30:12;31:15;36:15;
    37:6;38:16,19,24;
    39:15
telling (1)
    44:10
tells (1)
    7:2
tenure (4)
    28:8;41:4;49:6,8
term (2)
    8:23;28:23
terms (1)
    23:2
testified (1)
    4:3
testify (8)
    4:19,20;5:17;7:8;
    20:25;30:2,18;36:9
testimony (3)
    6:8;20:19;38:11
Texas (1)
    13:3
thanks (1)
    7:25
therapy (8)
    16:18,19,20,21;
    17:16;18:1,21;21:10
though (1)
    36:1
thought (1)
    35:6
threaten (1)
    38:25
threatened (2)
    40:17;41:17
threats (1)
    41:2
three (1)
    5:12
threshold (1)
    18:11
today (14)
    4:13;7:9;16:1;20:5,
    15;21:1;22:9;24:8;
    30:1;31:10;36:10;42:5;
    44:11;50:19
told (1)
    23:6
Tony (2)
    4:15;26:7
tool (1)
    20:7
top (1)
    35:3
topic (1)
    25:9

Case: 4:19-cv-01169-SL  Doc #: 64  Filed: 08/27/21  62 of 63.  PageID #: 1213

Tony Fisher, aka Kellie Rehanna vs.
Federal Bureau of Prisons, et al.

Jennifer Eplin
July 23, 2021

**topics (1)**
    32:24
**transfer (10)**
    12:19;13:19;14:25;
    23:12;24:18;25:11,21;
    26:2;47:1;48:14
**transferred (11)**
    28:7,13,21;29:12,16;
    33:17;44:4;47:7,15;
    48:1;49:3
**transferring (1)**
    46:23
**transfers (1)**
    29:1
**Transgender (20)**
    7:10;8:2,6,12;10:13;
    11:21;12:13;13:4,13;
    14:3;28:6,16;30:11,12;
    33:18,22;38:20;46:16;
    49:4;50:10
**transition (3)**
    29:20,21;44:15
**transperson (1)**
    44:14
**trauma (1)**
    39:4
**treating (1)**
    36:24
**treatment (37)**
    8:20;9:5,10;10:11,
    25;14:16,19,20;15:8,
    10,14;19:19;20:3,8,11,
    17,23;21:9,19,25;22:5,
    19;23:15,18,19,23;
    31:1;33:9;35:24;36:6,
    17;37:3,9,21;38:3;
    48:7;49:10
**treatments (1)**
    21:9
**true (1)**
    5:14
**two (10)**
    18:25;31:16,20;32:4,
    24;34:25;40:10;42:21;
    45:13,15
**type (5)**
    5:19,23;6:17;14:18,
    19

**U**

**ultimately (1)**
    39:23
**under (5)**
    6:19;14:23;23:12;
    25:2;38:3
**unless (1)**
    7:2
**up (7)**
    25:15;26:21;27:14;
    34:8;39:23;40:25;46:8
**updated (1)**
    7:20

**upon (2)**
    12:14;18:19
**use (3)**
    9:12;20:7;21:13
**used (1)**
    8:25
**uses (1)**
    9:4

**V**

**vague (3)**
    8:23;22:11;28:22
**valid (1)**
    6:24
**variety (2)**
    33:19;34:7
**various (1)**
    29:14
**visit (1)**
    4:13

**W**

**Wait (1)**
    25:15
**waive (1)**
    50:21
**warden (3)**
    11:19;12:1,10
**warden's (2)**
    11:16,24
**way (1)**
    48:23
**weigh (3)**
    18:15,17;26:13
**weighed (1)**
    16:22
**weight (3)**
    9:8;18:7;23:1
**whole (1)**
    41:2
**who's (1)**
    44:18
**withdrawn (1)**
    27:15
**within (3)**
    35:14,18;36:4
**without (2)**
    38:4;48:10
**witness (1)**
    37:13
**witness's (2)**
    20:19;32:23
**words (2)**
    8:25;20:14
**world (4)**
    46:15,18;50:8,11
**WPATH (22)**
    7:11,19,22;8:3,4,18;
    9:1,8,18,24;10:1;17:4,
    7,10,15;19:13;46:3,13,
    14;49:19;50:6,7

**written (2)**
    24:4,5

**X**

**XIV (2)**
    19:17,24

**Y**

**year (3)**
    18:25;19:4,7
**years (3)**
    14:6;19:1,3

**Z**

**Zoom (1)**
    4:7

**1**

**1 (1)**
    7:6
**10:55 (1)**
    50:25
**11 (1)**
    8:13
**12 (2)**
    17:25,25
**120 (1)**
    35:11
**15th (1)**
    15:18
**17 (1)**
    24:11
**17th (2)**
    14:11;15:16

**2**

**2 (4)**
    7:6;22:13;33:23;
    34:14
**20 (2)**
    12:9;35:22
**2016 (1)**
    8:7
**2018 (2)**
    8:13;39:8
**2021 (8)**
    11:17;12:22;14:11;
    15:16,18;16:15;24:11;
    25:9
**21 (1)**
    12:9
**22 (1)**
    12:22
**24 (1)**
    11:17
**252 (1)**
    15:19
**2655 (1)**

    11:16
**2656 (1)**
    11:19
**2657 (2)**
    11:23;12:9
**2658 (1)**
    12:19
**2659 (1)**
    12:20
**2660 (2)**
    12:21;13:7
**2661 (2)**
    12:23,24
**2662 (1)**
    12:24
**26a2C (2)**
    4:23;7:7

**3**

**3 (1)**
    38:18
**30.1 (1)**
    48:22
**30b6 (2)**
    4:21;32:24
**3B (2)**
    30:18;33:5

**4**

**4 (6)**
    7:17;22:13;36:12;
    37:2;38:18,24

**5**

**5 (7)**
    7:17,18;8:17;17:1,3,
    8;38:17
**500 (3)**
    35:14,18;36:4

**6**

**6 (2)**
    5:9;7:17
**60 (4)**
    17:2,8,24;18:2
**67 (2)**
    19:13,24
**68 (1)**
    19:13

**7**

**7 (4)**
    7:17;10:4;38:15,15

```
 1   I have read the foregoing transcript from page 1

 2   through page 50 and note the following corrections:

 3   PAGE-LINE       REQUESTED CHANGE       REASON FOR CHANGE

 4  "Eplin" should be "Epplin" throughout
    "Jennifer" should be "Jenna" throughout"
 5  23:8 "jurisdictional" should be "judicial"  mistranscription

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  JENNA EPPLIN Digitally signed by JENNA EPPLIN
                Date: 2021.08.30 11:49:44 -04:00
25  Jenna Eplin                          Date
```