## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| TONY FISHER, aka KELLIE REHANNA, | ) ) ) | CASE NO.: 4:19CV1169 |
| Plaintiff, | ) ) ) | JUDGE SARA LIOI |
| vs. | ) ) | |
| FEDERAL BUREAU OF PRISONS, *et al,* | ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants recognize that Plaintiff's gender dysphoria is a serious medical condition that requires attention. Nevertheless, the undisputed material facts demonstrate that Defendants have consistently attended to Plaintiff's medical needs. Consequently, pursuant to Federal Rule of Civil Procedure 56, Defendants Federal Bureau of Prisons ("BOP") and Federal Correctional Institution Elkton (collectively "Defendants"), by and through their undersigned counsel, hereby move for summary judgment.

## INTRODUCTION

Plaintiff has two claims remaining in this case. First, Plaintiff alleges that the previous warden's failure to provide her an exemption to BOP's pat-search policy, which would permit her to be searched only by female BOP employees, violates the Eighth Amendment. Second, Plaintiff claims that BOP's failure to provide her with gender-affirming surgery violates the Eighth Amendment. Neither of these claims have merit.

With respect to Plaintiff's request for a pat-search exemption, it is undisputed that, on May 17, 2021, the current warden approved Plaintiff's request for same-sex pat-searches. Accordingly, Plaintiff will be pat-searched only by female staff members unless the warden finds that Plaintiff has

violated institution rules concerning contraband or if exigent circumstances exist. Given that Plaintiff has received the precise pat-search exemption she sought, her claim is moot, and summary judgment on this claim is warranted.

Plaintiff's claim for gender-affirming surgery is equally flawed. Rather than exhibit deliberate indifference, the undisputed facts reflect that Defendants carefully considered Plaintiff's medical needs and have taken appropriate actions to address those needs. As the Court previously recognized in granting in part and denying in part the Defendants' motion to dismiss, it is undisputed that Plaintiff is receiving treatment for her gender dysphoria. It also is undisputed that, while some of Plaintiff's medical professionals thought gender-affirming surgery may be warranted, BOP's Chief Medical Officer concluded that Plaintiff was not yet ready. In particular, Defendants' considered judgment is that Plaintiff should be housed in a women's prison for 12 months before being considered for surgery, a judgment that is consistent with both BOP policy and the prevailing standards of care. Defendants also reasonably concluded that, unlike other transgender women whom BOP has transferred to women's facilities, Plaintiff is not yet eligible for such a transfer. Plaintiff is ineligible because she has not yet reached stable target hormone levels and because safety and security concerns require that Plaintiff—a sex offender—first receive recommended psychological treatment, including sex offender treatment. To date, Plaintiff has not agreed to participate in such treatment. The bar to Plaintiff's continued transition to her identified gender comes from Plaintiff herself.

Plaintiff nevertheless contends that BOP has a blanket ban on gender-affirming surgery. The record contradicts that contention. As BOP's Chief Medical Officer acknowledges, and as reflected in BOP's policy manuals, gender-affirming surgery can be medically necessary and is considered on a case-by-case basis. Although no inmate has received gender-affirming surgery at this juncture, it is not the result of a blanket ban. Rather, it reflects the medical and penological challenges inherent in providing irreversible anatomic surgery in sex-segregated prisons and the BOP's considered, step-

wise approach to the medical care of those with gender dysphoria. Plaintiff cannot establish an Eighth Amendment claim based on the undisputed facts, and Defendants are therefore entitled to summary judgment as a matter of law.

## BACKGROUND AND MATERIAL FACTS

### I. BOP POLICIES CONCERNING TRANSGENDER INMATES

#### A. BOP's General Policies Concerning Transgender Inmates

BOP has promulgated several program documents that govern the placement and provision of care to transgender inmates. These include the Transgender Offender Manual ("Manual"), which provides guidance concerning the identification, tracking, and provision of services to the transgender inmate population, Ex. A (Manual), and the Medical Management of Transgender Inmates Guidance, which "provides recommendations for the medical management and treatment of transgender federal inmates," Ex. B (Medical Management of Transgender Inmates) ("Medical Management Guidance").

BOP addresses the needs of transgender inmates through a process including a review by an inter-disciplinary group of subject matter experts. Ex. A. For example, the Transgender Executive Council ("TEC") is comprised of staff members from BOP's Health Services Division, the Women and Special Populations Branch, Psychology Services, the Correctional Programs Division, and the Designation and Sentencing Computation Center ("DSCC") and is responsible for offering "advice and guidance on unique measures related to treatment and management needs of transgender inmates." *Id.* at 4.

The Women and Special Populations Branch ("WSPB") is BOP's "primary source and point of contact on classification, management, and intervention programs and practices for transgender inmates in [BOP's] custody." *Id.* at 3. Among other responsibilities, the WSPB ensures that BOP offers

appropriate services to transgender inmates, develops and implements staff training on transgender issues, and develops and monitors monthly reports on the transgender inmate population and institutional programs. *Id.*

BOP's Health Services Division is responsible for the oversight of all medical and psychiatric activities for transgender inmates. *Id.* The Medical Director of the Health Services Division provides guidance on "the most current research-driven clinical medical and psychiatric care of transgender inmates" to staff members. *Id.* The Psychology Services Branch oversees all psychological mental health programs and services concerning transgender inmates, including the provision of advice and guidance on the identification and evaluation of transgender inmates, and making recommendations for the treatment needs of transgender inmates. *Id.* at 3-4.

**B.  BOP's Guidance Concerning Gender-Affirming Surgery**

As discussed above, BOP's Medical Management Guidance provides clinical guidance for the treatment of transgender inmates. Ex. B. BOP's Medical Management Guidance recognizes a step-wise approach to the medical and mental health management of transgender inmates and references the World Professional Association for Transgender Health ("WPATH") guidelines "for further consideration" by practitioners. Ex. B at 10, 11 (referring to the WPATH guidelines for hormone therapy). The Medical Management Guidance expressly recognizes that "gender-affirming surgery may be appropriate for some and is considered on a case-by-case basis." Ex. *Id.* at 19; .Ex. C (Pl.'s Am. Resp. to Defs.' First Set of Reqs. For Admissions & Rogs.), RFA No. 18. Pursuant to the Medical Management Guidance, "[i]n addition to the eligibility and readiness criteria for hormone therapy, general criteria for consideration of surgery include at least 12 months of successful use of hormone therapy, participation in psychotherapy as clinically indicated, full-time real life experience in their preferred gender, and consolidation of gender identity." Ex. B at 19. BOP has concluded that the

"full-time real life experience" of living in one's targeted gender can best be achieved by living in a facility consistent with one's gender identity. Ex. D (Clifford Depo.) at 32:21-33:3. This policy is in accord with medical experts' experience that "the fullest social adjustment that taking on the female role would entail . . . can only be realized in an environment . . . [where the patient will be] around other female inmates, [and] in . . . an overall environment which is dedicated to female inmates versus a male facility[,] which is not dedicated to female inmates." *Id.* at 31:8-31:16.

Although BOP does not view the WPATH standards of care ("SOC") as binding, it does consider them informative guidance. Ex. E (Epplin Depo.) at 9:3-9:16. The WPATH SOC are not a one-size-fits all set of binding standards. Indeed, by their own terms, the WPATH SOC are "flexible clinical guidelines" and recognize that "the criteria put forth in this document for hormone therapy and surgical treatments for gender dysphoria are clinical guidelines; individual health professional and programs may modify them." Ex. F (WPATH SOC) at 2. The WPATH SOC further recognize that "[c]linical departures from the SOC may come about because of a patient's unique anatomic, social, or psychological situation; an experienced health professional's evolving method of handling a common situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm reduction strategies." *Id.*

With respect to gender-affirming surgery, the SOC recognizes that genital surgery "is often the last and most considered step in the treatment process for gender dysphoria." *Id.* at 54. WPATH has outlined six criteria for vaginoplasty in male-to-female patients:

1.  Persistent, well documented gender dysphoria;

2.  Capacity to make a fully informed decision and to consent for treatment;

3.  Age of majority in a given country;

4.  If significant medical or mental health concerns are present, they must be well controlled;

5.   12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones).

6.   12 continuous months of living in a gender role that is congruent with their gender identity.

*Id.* at 60.

"[B]ased on expert clinical consensus," the WPATH SOC require transgender individuals to live 12 continuous months in a gender role congruent with their gender identity because "this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery." *Id.* at 61. As the WPATH SOC notes, the "duration of 12 months allows for a range of different life experiences and events that may occur throughout the year (*e.g.*, family events, holidays, vacations, season-specific work or school experiences)." *Id.*

BOP has not concluded that any inmates in its custody who have requested surgery met all the requirements for gender-affirming surgery at the time of their request. Ex. G (Defs.' Resp. to Pl.'s Req. for Admissions), No. 14. There are a number of reasons for this. Common examples include: "co-existing medical or mental health conditions [that] need to be reasonably controlled"; "12 continuous months of hormone levels that are at goal"; "patients who are often noncompliant with treatment" (for example, by "forget[ting] to pick up their meds [or] stop[ping] taking them without telling anyone"); being unable to live in "a female institution for 12 continuous months without running into trouble, [and] security issues." Ex. H (Stahl Depo.) at 30:3-31:10.

### C.  BOP's Policies Concerning the Placement of Transgender Inmates

The placement of transgender inmates is governed by BOP's Manual. Ex. A. Pursuant to the Manual, Unit Management staff will twice-yearly review a transgender inmate's housing unit status and will consider, "on a case-by-case basis[,] that the inmate's placement does not jeopardize the

inmate's health and safety and does not present management or security concerns." *Id.* at 6-7. The Manual expressly provides that the Warden may make a recommendation to the TEC to transfer a transgender inmate based on an inmate's identified gender, and that the TEC will make the following assessments concerning the recommendation:

- The TEC will use biological sex as the initial determination for designation;

- The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, re-designation to another facility of the same sex, etc.;

- The TEC will also consider other factors specific to the transgender inmate, such as behavioral history, overall demeanor, program participation, and likely interactions with other inmates; and

- The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (*e.g.*, considering inmates with histories of trauma, privacy concerns, etc.)

*Id.* at 7. In applying this policy, BOP has housed several transgender women in women's facilities. Ex. G, No. 15.

### D. BOP's Policies Concerning Pat-Searches

The Manual also provides guidance for providing same-gender pat-searches. The Manual provides that "inmates will be pat-searched in accordance with the gender of the institution, or housing assignment, in which they are assigned," but that transgender inmates may request an exception. Ex. A at 11. The Manual provides that a pat-search exception may be reversed by the Warden "if [the inmate is] found to have violated institution rules concerning contraband" and that staff member may pat-down search any inmate in "exigent circumstances." *Id.*[1]

---

[1] The Prison Rape Elimination Act regulations, 28 C.F.R. § 115.5, defines "exigent circumstances" as "any set of temporary or unforeseen circumstances that require immediate action in order to combat

## II.     PLAINTIFF'S TREATMENT BY BOP

Plaintiff is a transgender female inmate currently in the custody of the Federal Bureau of Prisons at Federal Corrections Institution-Elkton ("Elkton"). On May 22, 2013, Plaintiff was sentenced for a total term of 195 months for coercion and enticement, as well as production of child pornography. Ex. I (Sentencing Court Order). The sentencing court recommended to the Federal Bureau of Prisons that Plaintiff, among other things, participate in a sex offender treatment program. *Id.* The sentencing court further ordered that Plaintiff register as a sex offender upon supervised release from prison. *Id.*

Plaintiff was formally diagnosed with gender dysphoria by the Elkton medical staff on July 7, 2015. Ex. C, RFA No. 1. Plaintiff also suffers from Post-Traumatic Stress Disorder. Ex. J (Mar. 19, 2021 Memo from Williams). Plaintiff began hormone therapy at Elkton in October 2015. Ex. C, RFA No. 2). Plaintiff currently is receiving medical treatment, psychotherapy and hormone therapy for her gender dysphoria. *Id.*, RFA Nos. 3-5. Plaintiff also has been provided female undergarments, make-up and other female accessories from the commissary, and wears her hair in a traditionally female style. Ex. K (Apr. 19, 2021 Memo from Williams). In addition, Plaintiff has received an exception to the Federal Bureau of Prison's pat-search policy and is subject to pat-searches only by female correctional officers. Ex. L (May 17, 2021 Memo.)

Beginning in 2018, and continuing to this day, Plaintiff's has experienced dangerously elevated levels of Estradiol, an artificial estrogen supplement. Ex. C, RFA No. 6. For example, in August 2018, Plaintiff's Estradiol level peaked at 519.3 pg/ml. *Id.*, RFA No. 7. In December 2018, Plaintiff's Estradiol level was 715 pg/ml. *Id.*, RFA No. 8. In December 2020, Plaintiff's lab results indicated an Estradiol level of 551 pg/ml. Ex. J. Plaintiff's hormone levels were unstable and consistently above

---

a treat to the security or institutional order of a facility." *See also* BOP Program Statement 5521.06 at 3.

the maximum acceptable range for a premenopausal adult female of 200 pg/ml. Ex. C, RFA Nos. 9-11.

Consistent with BOP's medical guidance, BOP medical officials last evaluated Plaintiff for gender-affirming surgery in May 2021. Ex. C, RFA No. 13. BOP's Chief Medical Officer determined that Plaintiff was ineligible for gender-affirming surgery at the time of the evaluation. Ex. C, RFA No. 14. Plaintiff did not meet all of the requirements for gender-affirming surgery outlined in the WPATH SOC and BOP's Clinical Guidance Publication for the Medical Management of Transgender Inmates ("Clinical Guidance"). Ex. G, RFA Nos. 1-2. In particular, BOP's Chief Medical Officer determined that Plaintiff was not currently a suitable candidate for gender-affirming surgery for three reasons: (1) Plaintiff had not yet reached the maximum benefit from hormone therapy; (2) Plaintiff's hormone levels were unstable; and (3) Plaintiff was not at that time eligible for transfer to a female prison. Ex. C, RFA No. 15. BOP's judgment is that placement in a women's facility is the most appropriate way for a transgender female to live a real life experience in the inmate's gender identity. Ex. M (Administrative remedy 954868). Ultimately, BOP considered Plaintiff's request for gender-affirming surgery and recommended, among other things, that Plaintiff continue hormone therapy to maximize hormone levels. C, RFA No. 19.

Pursuant to the Manual, BOP has transferred some transgender female inmates to women's facilities. Ex. G, No. 15. Consistent with the recommendation of Plaintiff's sentencing court and given Plaintiff's conviction for serious sex offenses, the TEC applied the factors identified in the Manual with respect to Plaintiff and recommended that Plaintiff participate in Sex Offender Treatment before she is considered for a transfer to a female facility. Ex. N (Defs.' Resp. to Pl.'s Rogs.) No. 1; Ex. I; Ex. O (May 3, 2021 email from Epplin to Warden); Ex. E at 14:15-15:10.

On May 17, 2021, the current warden at Elkton approved Plaintiff's request for same-sex pat-searches. Ex. N, No. 9; Ex. L. Accordingly, Plaintiff will be pat-searched by female staff members unless the warden of Plaintiff's correctional institution finds that Plaintiff has violated institution rules

concerning contraband or if exigent circumstances exist. Ex. P (Defs.' Reps. to 2d RFAs), No. 4. Elkton staff will conduct all pat-searches of Plaintiff consistent with policy, including Program Statement 5200.04, the Manual, and Program Statement 5521.06, Searches of Housing Units, Inmates, and Inmate Work Areas. Ex. N, No. 9.

### III.    PROCEDURAL HISTORY

Plaintiff filed her *pro se* complaint on May 21, 2019, raising a number of claims. ECF No. 1. Defendants filed their motion to dismiss the complaint, which the Court granted in part and denied in part. ECF No. 31. With respect to Plaintiff's claims concerning pat-down searches, the Court dismissed her claim that an Elkton staff member conducted a pat-search in a discriminatory manner. *Fisher v. Fed. Bureau of Prisons*, 484 F. Supp. 3d 521, 539 (N.D. Ohio 2020). The Court found that Plaintiff "met the minimum pleading standards to survive defendants' motion to dismiss" as to her claim related to the former warden's denial of her requests for a pat-search exemption and allowed that claim to proceed. *Id.*

With respect to Plaintiff's claim concerning gender-affirming surgery, the Court held that "[t]here is no dispute that Fisher is receiving medical treatment—hormone therapy and psychotherapy—for her" gender dysphoria. *Id.* at 541. The Court further explained that "Fisher's own record proves that she has been evaluated for [gender-affirming surgery]" and, although "several of Fisher's treating medical professionals apparently thought that [gender-affirming surgery] was necessary, the BOP's Chief Medical Officer and [Transgender Clinical Care Team] determined that it was not." *Id.* at 542. The Court concluded that "[i]f Fisher's complaint only alleged disagreements between medical professionals as to the medical necessity of [gender-affirming surgery] to treat her [gender dysphoria], it would be difficult to find that FCI-Elkton was deliberately indifferent to Fisher's serious medical need." *Id.* The Court nevertheless liberally interpreted Plaintiff's *pro se* complaint to allege that Plaintiff was denied gender-affirming surgery on "an alleged unofficial BOP blanket policy against providing [gender-affirming surgery] to inmates with [gender dysphoria]." *Id.* The Court

concluded that, at the motion to dismiss stage, it was "improper for the Court to determine whether BOP does, in fact, have an alleged blanket (or *de facto*) policy against proving [gender-affirming surgery] to inmates with" gender dysphoria or "whether the BOP denied Fisher's [gender-affirming surgery] request based on such a policy." *Id.* at 543.

Defendants answered the complaint, ECF No. 35, and the parties then engaged in discovery. Plaintiff did not identify any expert witnesses to support her claims and took a Federal Rule of Civil Procedure 30(b)(6) deposition as well as deposing four current or former BOP employees. ECF No. 55, 56.

## STANDARD OF REVIEW

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Briner v. City of Ontario*, 370 Fed. Appx. 682, 699 (6th Cir. 2010) (quotation and citation omitted). A party is entitled to summary judgment where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where, as here, the parties have cross-moved for summary judgment, each party bears the burden of establishing that no genuine issue of fact exists and that the party is entitled to a judgment as a matter of law. *Ferron v. Subscriberbase Holdings, Inc.*, No. 2:08-cv-760, 2010 WL 4809324, *2 (S.D. Ohio Nov. 16, 2010). "In reviewing cross-motions for summary judgment, courts should 'evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party.'" *Id.* (quoting *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994)).

## ARGUMENT

## I.   PLAINTIFF'S CLAIM FOR SAME-GENDER PAT-SEARCHES IS MOOT.

Plaintiff alleges that Defendants have violated the Eighth Amendment when the previous warden at Elkton denied her request for a pat-search exception that would have permitted pat-searches

by female corrections officers. ECF No. 1 at 88. As relief, Plaintiff seeks an injunction requiring the current warden to grant her exception request. *Id.* However, on May 17, 2021, the current warden granted Plaintiff's request to be pat-searched only by female staff. Ex. L. Furthermore, consistent with Section 12 of the Manual, Plaintiff will be pat-searched by female staff members unless the warden of Plaintiff's correctional institution finds that Plaintiff has violated institution rules concerning contraband or if exigent circumstances exist. Ex. P, No. 4. Under these circumstances, Plaintiff's claim concerning the denial of a same-sex pat-search exception is moot.

There would be no merit to any argument that this claim is subject to the "voluntary cessation" exception to mootness. As the Sixth Circuit has held, "[a]lthough the bar is high for when voluntary cessation by a private party will moot a claim, the burden in showing mootness is lower when it is the government that has voluntarily ceased its conduct." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019). "'[C]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties' and . . . '[the government's] self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine." *Id.* (quoting *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012)); *Hanrahan v. Mohr*, 905 F.3d 947, 961 (6th Cir. 2018) (holding that challenge to prison media policies not subject to voluntary cessation where, among other things, "defendants have represented that new policies will remain in place."); *Jones v. Caruso*, 421 F. App'x 550, 551 (6th Cir. 2011) (inmate's request for injunctive relief concerning prison's smoking policy was moot when prison banned smoking inside the prison because "nothing remains to be enjoined or declared improper.") (quotation omitted); *Putnam v. Montgomery Cnty. Sheriff's Dep't*, No. 3:12-0132, 2012 WL 6645314, *3 (M.D. Tenn. Dec. 20, 2012) (inmates' challenge to prison's mail policies moot where prison officials discontinued policies and reinstated previous policies because "the Court can no longer provide the requested relief.").

Here, Defendants have unequivocally represented their intention to maintain same-sex pat-searches for Plaintiff subject to the reasonable caveat that such an exception may be rescinded if the warden of Plaintiff's correctional institution finds that Plaintiff has violated institution rules concerning contraband or if exigent circumstances exist. Ex. P, No. 4. There is no evidence that this decision to provide Plaintiff with same-gender pat-searches was made in bad faith, and "nothing remains to be enjoined or declared improper." *Jones*, 421 Fed. Appx. at 551. For these reasons, summary judgment in favor of Defendants is warranted.

## II.  PLAINTIFF CANNOT ESTABLISH AN EIGHTH AMENDMENT VIOLATION FOR GENDER-AFFIRMING SURGERY.

To succeed on her claims that BOP's conclusion that Plaintiff was not yet suitable for gender-affirming surgery violates the Eighth Amendment, Plaintiff must meet both an objective and subjective prong. *Berkshire v. Beauvais*, 928 F.3d 520, 535 (6th Cir. 2019). The objective prong requires that Plaintiff show she has a "sufficiently serious medical need." *Id.* (quotation omitted), which "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Rather, the objective prong requires a showing that "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id.* Second, Plaintiff must show that "prison officials are deliberately indifferent to inmate health or safety." *Berkshire*, 928 F.3d at 535 (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)).

Deliberate indifference imposes a high hurdle, requiring "something approaching a total unconcern for the [inmate's] welfare in the face of serious risk, or a conscious, culpable refusal to prevent harm." *Slone v. Lincoln Cnty.*, 242 F. Supp. 3d 579 (E.D. Ky. 2017) (quoting *Duane v. Lane*, 959

F.2d 673, 677 (7th Cir. 1992)). More generally, prison officials' conduct is judged based on "the constraints facing the *official*," and managing a prison requires officials to balance competing interests. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (emphasis in original).

Establishing that Defendants were deliberately indifferent to Plaintiff's serious medical needs requires more than showing a mere difference of opinion regarding the appropriate medical care she has received or mere speculation about the medical care she might yet receive. *Estelle v. Gamble*, 429 U.S. 97, 104-05, 107 (1976). "Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference." *Brown v. Wilson*, No. 3:13CV599, 2015 WL 3885984, *5 (E.D. Va. Jun. 23, 2015) (citing *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)); *Fisher*, 484 F. Supp. 3d at 541 (explaining that "cases involving dueling medical experts will typically not support an Eighth Amendment claim"). Allegations that are akin to run-of-the-mill medical malpractice claims are insufficient to maintain a viable Eighth Amendment claim. *Estelle*, 429 U.S. at 104; *Farmer*, 511 U.S. at 835. Courts are reluctant to second-guess medical judgments when prisoners, like Plaintiff, have received medical attention and subsequently dispute the adequacy of that medical care. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Instead, to establish an Eighth Amendment claim, Plaintiff must establish that she was subject to cruel and unusual punishment because Defendants were so deliberately indifferent to her serious medical needs as to unnecessarily and wantonly inflict pain. *Estelle*, 429 U.S. at 104.

The Supreme Court repeatedly has affirmed that the Eighth Amendment does not authorize courts to superintend prison officials' decisions about how to balance competing interests within the constraints of the prison setting. *See, e.g.*, *Helling*, 509 U.S. at 37. Prison officials act with deliberative indifference in violation of the Eighth Amendment only if they "know[] of and disregard[] an excessive risk to inmate health or safety," a standard that "incorporates due regard for [officials'] unenviable

task of keeping dangerous [individuals] in safe custody under humane conditions." *Farmer*, 511 U.S. at 837, 838, 845 (quotation marks omitted). For this reason, "[w]hen evaluating medical care and deliberate indifference, security considerations inherent in the functioning of a penological institution must be given significant weight." *Kosilek v. Spencer*, 774 F.3d 63, 83 (1st Cir. 2014) (citation omitted). Accordingly, "even a denial of care may not amount to an Eighth Amendment violation if that decision is based in legitimate concerns regarding prison safety and institutional security." *Id.* (citations omitted).

"Correctional administrators must have 'substantial discretion to devise reasonable solutions to the problems they face,'" and courts must give "considerable deference . . . to the judgment of prison administrators" about how to balance competing objectives. *Mays v. Dart*, 974 F.3d 810, 820-21 (7th Cir. 2020) (quoting *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012)); *see also Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011). "A prison medical professional faces liability only if his course of treatment is 'such a substantial departure from accepted professional judgment, practice, or standards[] as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (citations omitted). Courts therefore must use "caution" in issuing injunctions in the prison context and may not "enmesh[]" themselves "in the minutiae of prison operations." *Farmer*, 511 U.S. at 846-47.

In addition, courts have recognized that "prisons aren't obligated to provide every requested treatment once medical care begins." *Campbell*, 936 F.3d at 548. Rather, "[d]eciding whether to provide additional medical interventions—especially when the inmate's preferred course of treatment poses considerable challenges to prison administration—is not the same as deciding to provide no treatment at all." *Id.* at 549. Indeed, "[s]urgery is 'the last and the most considered step in the treatment process [for gender dysphoria],' and not all gender-dysphoric patients are surgical candidates." *Id.* at 539 (citing

WPATH standards). Accordingly, the federal courts of appeal have held that the denial of gender-affirming surgery does not violate the Eighth Amendment when surgery is not medically necessary, an inmate receives other forms of treatment, such as hormone therapy, and an individualized determination is made that additional medical care is unwarranted. *See Lamb v. Norwood*, 899 F.3d 1159, 1163 (10th Cir. 2018) (prison officials not deliberately indifferent when they provided inmate counseling and hormone treatment for gender dysphoria and prison doctor stated that gender-affirming surgery was unnecessary); *Kosilek v. Spencer*, 774 F.3d 63, 90-91 (1st Cir. 2014) (*en banc*) (holding that a prison's decision not to provide gender affirming surgery did not violate the Eighth Amendment where the prison provided other treatment options and the inmate simply disagreed with the prison's medical decisions); *Wittkowski v. Levine*, 382 F. Supp. 3d 107, 115 (D. Mass. 2019) (applying *Kosilek* and rejecting claim for gender affirming surgery).

Here, it is undisputed that Plaintiff has received medical care for her gender dysphoria, *Fisher*, 484 F. Supp. 3d at 541 ("There is no dispute that Fisher is receiving medical treatment—hormone therapy and psychotherapy—for her [gender dysphoria]."), and that Defendants concluded that Plaintiff did not meet all of the requirements for gender-affirming surgery outlined in the WPATH SOC and BOP's Clinical Guidance. Ex. G, RFA ¶¶ 1-2. More specifically, BOP's Chief Medical Officer reached the medical judgment that Plaintiff was not yet suitable for gender-affirming surgery for three reasons: (1) she had not yet reached the maximum benefit of hormone therapy; (2) her hormone levels were unstable; and (3) she was not yet eligible for transfer to a female facility. Ex. C, RFA ¶ 15. BOP's Transgender Clinical Care Team also considered Plaintiff's request for gender-affirming surgery and recommended, among other things, that Plaintiff continue hormone therapy to maximize hormone levels. *Id.*, RFA ¶ 19.

BOP's judgment is that hormone stability is a necessary prerequisite for placement in a female facility which, as discussed below, is a necessary prerequisite for consideration for gender-affirming surgery. Ex. H at 30:6-30:8; Ex. Q (Epplin Declaration) ¶ 9. The TEC views achieving target hormone levels as a first step for transgender women moving to a female facility. *Id.* ¶ 12. When transgender women sustain their target hormone levels, they become more feminine in appearance, lose muscle mass, experience lower libido, and are not able to maintain erections. *Id.* All of these feminizing effects are important for their ability to live in a female institution and for the safety of women who would be their peers. *Id.*

In addition, BOP's judgment is that placement in a female facility is a prerequisite for consideration of irreversible anatomical surgery for several reasons. Ex. D (Clifford Depo.) at 22:11-23:7. First, BOP's considered judgment is that placement in a female facility is the best way to provide a real-life experience for transgender female inmates. Ex. M; Ex. D at 22:11-23:7, 29:15-31-16. *Kosilek,* 774 F.3d at 88 (explaining that "[p]rudent medical professionals, however, do reasonably differ in their opinions regarding the requirement of a real-life experience—and this reasonable difference in medical opinions is sufficient to defeat [Plaintiff's Eighth Amendment] argument.")

Second, placement in a female facility for 12 months before BOP will consider surgery provides BOP the necessary confidence that an inmate will succeed in a female facility and not be transferred back to a male facility. Ex. H at 30:20-30:22**.** BOP has placed female transgender inmates in female facilities, and some of those inmates request that they be transferred back to male facilities, while some other inmates are transferred back due to behavioral concerns. Ex. E at 44:3-44:6, 47:5-47:9; Ex. H at 30:20-30:22. BOP's reasonable judgment is that it wants to avoid the safety and security concerns of having to place a post-operative anatomical female in a male prison. *Kosilek,* 774 F.3d at 93 ("Recognizing that reasonable concerns would arise regarding a post-operative, male-to-female

[transgender inmate] being housed with male prisoners takes no great stretch of the imagination.")
(citing *Farmer*, 511 U.S. at 848-49).

BOP has concluded that, before Plaintiff can be considered for transfer to a female facility, her hormone levels must stabilize and, consistent with her sentencing court's recommendation, she must complete sex offender treatment. Ex. N , No. 1); Ex. I; Ex. O; Ex. E at 14:15-15:1. BOP's judgment is that safety and security requires that a convicted sex offender like Plaintiff undergo court-recommended sex offender treatment before being placed in in a women's prison. Ex. E at 14:15-15:1, 23:11-24:1. For all these reasons, Plaintiff cannot show that Defendants were deliberately indifferent to her serious medical needs, and summary judgment concerning Plaintiff's Eighth Amendment claim for gender-affirming surgery should be granted in Defendants' favor.

### III. PLAINTIFF'S CLAIM CONCERNING BOP'S POLICIES REGARDING GENDER-AFFIRMING SURGERY LACKS MERIT.

Plaintiff appears to allege that, despite the undisputed record evidence indicating that Defendants conducted an individualized assessment of Plaintiff's suitability for gender-affirming surgery and concluded that Plaintiff was not yet a suitable candidate, the real reason Plaintiff has not received surgery is an unofficial blanket policy prohibiting surgery. The undisputed material facts do not support Plaintiff's contention.

The undisputed evidence reflects that BOP believes that gender-affirming surgery may be medically necessary and that such surgery could be provided once a Plaintiff completes the other steps of the transition process. Ex. H at 26:5-26:10. This is consistent with Defendants' medical guidance on the treatment of transgender individuals, which provides that "gender-affirming surgery may be appropriate for some and is considered on a case-by-case basis." Ex. B at 19. As reflected in BOP's Medical Management Guidance, "[i]n addition to the eligibility and readiness criteria for hormone

therapy, general criteria for consideration of surgery include at least 12 months of successful use of hormone therapy, participation in psychotherapy as clinically indicated, full-time real life experience in their preferred gender, and consolidation of gender identity." *Id.* As Dr. Stahl, the Federal Bureau of Prison's Chief Medical Officer, explained, there are a number of reasons why inmates have yet to satisfy these requirements for eligibility for gender-affirming surgery. These include:  issues that prevent successfully housing the inmate in a facility of their identified gender; poorly controlled medical or mental health conditions other than gender dysphoria; unstable or insufficient hormone levels; and non-compliance with treatment regimens. Ex. H at 30:3-31:10. In short, Defendants do not have a blanket ban on gender-affirming surgery; rather the lack of gender-affirming surgeries reflect the real-world challenges of providing such surgery in a prison environment. *Kosilek*, 774 FF.3d at 90-91 (rejecting inmate's claim of *per se* ban on gender-affirming surgery in part based on the fact that the prison "had disclaimed any attempt to create a blanket policy regarding [gender-affirming surgery."). Indeed, even without the additional challenges of a prison environment, only "an exceedingly small percentage" of transgender individuals "undergo sex-reassignment surgery." *Doe 2 v. Shanahan*, 917 F.3d 694, 735 (D.C. Cir. 2019) (Williams, J., concurring in judgment).

In her complaint, Plaintiff purports to identify documents that reflect an alleged blanket ban on gender-affirming surgeries. None of these documents support such a ban. For example, Plaintiff cites to a clinical note from January 2018 by BOP nurse practitioner Jane Barnes that stated: "Discussed case with Region over last several months as well as Chief Medical Officer who confirmed there are no sex reassignment surgeries being done at this time as it is still considered an 'elective medical procedure,' rather than medical necessity."  Ex. R (Jan. 19, 2018 clinical encounter note). By referring to gender-affirming surgery as "elective," Ms. Barnes meant that it is "not an absolute medical emergency at that time," so there is the opportunity for consideration by regional or central BOP

offices. Ex. T (Barnes Depo.) at 27:24-28:7; *see also id.* at 23:15-23:2; 4. This is in contrast to medical necessities, which are "immediate[,] life-threatening[, and] acute." *Id.* at 23:15-23:17. This is entirely consistent with BOP Program Statement 6031.01, Patient Care, which draws a distinction between medically necessary conditions that are acute or emergent, and medically necessary care that is non-emergent, such as the treatment of cancer and heart disease. Ex. U (BOP Program Statement 6031.01) at 6.

Similarly, Plaintiff cites to her own informal grievance form, where she purports to relay a conversation with a BOP nurse practitioner, Lori Hunter, in November 2017. Ms. Hunter allegedly told Plaintiff that the request for gender-affirming surgery was "denied by a doctor at the regional level" and that "the BOP is not yet doing [gender-affirming surgery] as they can't find a doctor to perform the surgery or personnel for after care even though [gender-affirming surgery] is part of the BOP clinical guidelines for the treatment of transgender inmates." Ex. V. This document does not reflect a blanket-ban on gender-affirming surgery, but rather reflected the reality at the time that BOP could not find an outside doctor who could perform those surgeries. Indeed, Ms. Hunter explained at her deposition that, like Ms. Barnes, when she used the phrase "elective" to refer to gender-affirming surgery she was attempting to draw a distinction between those conditions that required immediate, emergency treatment and other medically-necessary conditions that did not require immediate surgical intervention. Ex. V (Hunter Depo.) at 18:7-18:15.

In short, the undisputed material evidence reflects that BOP considered Plaintiff's request for gender-affirming surgery and reached the judgment that she was not an appropriate candidate at this juncture. The undisputed evidence further refutes Plaintiff's contention that BOP has a *per se* ban on gender-affirming surgery. For these reasons, summary judgment in favor of Defendants is warranted.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter summary judgment in their favor.

September 1, 2021

BRIAN M. BOYNTON
Acting Assistant  Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

_/s/ Joshua E. Gardner_
JOSHUA E. GARDNER
Special Counsel, Federal Programs Branch

GARY D. FELDON
U.S. Department of Justice
1100 L Street, N.W., Rm. 11104
Phone: 202-598-0905
Washington,  D.C. 20530

_Attorneys for Defendants_