# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

TONY FISHER,                                    )        CASE NO. 4:19-cv-1169
                                                )
                                                )        JUDGE SARA LIOI
                    PLAINTIFF,                   )
                                                )
vs.                                             )        MEMORANDUM OPINION
                                                )        AND ORDER
FEDERAL BUREAU OF PRISONS, et al.,              )
                                                )
                                                )
                    DEFENDANTS.                  )

This matter is before the Court on the cross motions of plaintiff Tony Fisher ("Fisher") (Doc. No. 67) and defendants Federal Bureau of Prisons ("BOP") and Elkton Federal Correctional Institution ("Elkton") (collectively, "defendants")[1] (Doc. No. 68) for summary judgment pursuant to Fed. R. Civ. P. 56. Defendants opposed Fisher's motion (Doc. No. 75), to which Fisher replied (Doc. No. 80). Fisher opposed defendants' motion (Doc. No. 74), to which defendants replied (Doc. No. 81). Subsequently, Fisher filed a notice of additional authority[2] (Doc. No. 83) and a second notice of additional authority[3] (Doc. No. 85) in support of her motion for partial summary

---

[1] All other defendants were dismissed when the Court granted their Rule 12 motion. *See Fisher v. Fed. Bureau of Prisons*, 484 F. Supp. 3d 521 (N.D. Ohio 2020).

[2] Without elaboration, Fisher cites *Iglesias v. Fed. Bureau of Prisons*, No. 19-cv-415, 2021 WL 6112790 (S.D. Ill. Dec. 27, 2021). In *Iglesias*, the Court granted plaintiff injunctive relief concerning her request for Sex Reassignment Surgery ("SRS"), ordering, in part, that the appropriate committee at the BOP consider plaintiff's request for SRS and, if SRS is recommended, immediately refer the recommendation to the BOP's medical director to determine if plaintiff is suitable for SRS. *Id.* at *27. If the BOP committee did not recommend SRS, the BOP was to immediately notify the court stating the reasons for that decision. This case is before the Court in a different procedural posture and the facts of *Iglesias* are different than the instant action. For example, the court in *Iglesias* found that plaintiff's Gender Dysphoria ("GD") did not improve with hormone treatment and she continued to threaten self-castration and suicide. *See id.* at *22.

[3] Without elaboration, Fisher cites a show-cause order filed in *Iglesias*, in which the district court ordered the BOP to show-cause why it should not be sanctioned for failure to follow the court's preliminary injunction order.

judgment and in opposition to defendants' motion for summary judgment, to which defendants responded[4] (Doc. No. 86).[5]

For the reasons that follow, Fisher's motion for partial summary judgment is denied, and defendants' motion for summary judgment is granted.

## I.      Background

### A.  Factual

The general background of this case and allegations in Fisher's complaint (Doc. No. 1) are detailed in the Court's memorandum opinion and order resolving defendants' motion to dismiss, with which familiarity is assumed and summarized here. *Fisher v. Fed. Bureau of Prisons*, 484 F. Supp. 3d 521 (N.D. Ohio 2020). A more detailed discussion will be provided as necessary and appropriate in the context of the Court's analysis of the cross motions for summary judgment.

The basic underlying facts relevant to the disposition of the parties' summary judgment motions are undisputed. On May 22, 2013, Fisher was sentenced to 195 months in prison for coercion, enticement, and the production of child pornography. In connection with Fisher's imprisonment, the sentencing court recommended that Fisher participate in a sex offender treatment program ("SOT"). (*See* Doc. No. 68-9 at 2–3.) The sentencing court also imposed a term

---

[4] Defendants contend in their response that Fisher "has not identified any factual or legal representations in *Iglesias* that bear on this case, nor are Defendants aware of any," and argue that Fisher's "filing is nothing more than an attempt to smear Defendants in the eyes of the Court with irrelevant concerns about conduct in another case and thus should not affect the outcome of any issue currently pending before this Court." (Doc. No. 86 at 2 (Page number references are to consecutive page numbers assigned to each individual document by the Court's electronic filing system, a practice recently adopted by the Court.).)

[5] The public docket in *Iglesias* reflects that the district court entered a modified preliminary injunction order and that the case is presently stayed through January 3, 2023.  *See* Doc. Nos. 269 and 271 in S.D. Ill. Case No. 19-cv-415, *Iglesias v. Fed. Bureau of Prisons*.

of ten years supervised release and the requirement (among others) that Fisher participate in SOT and register in the state she[6] resides as a sex offender. (*See id.* at 4–5.)

In connection with her May 2013 sentence, Fisher was ultimately incarcerated at Elkton, a prison for male inmates. There is no dispute that on July 7, 2015, Fisher was diagnosed by the Elkton medical staff with Gender Dysphoria ("GD"). After her diagnosis, Fisher made various requests for treatments and accommodations for her GD, including female clothing and grooming products, electrolysis hair removal, hormone therapy, sex-reassignment surgery ("SRS"),[7] and pat-down searches by female officers. Some of her requests were approved and some were not. *See Fisher,* 484 F. Supp. 3d at 528–30. As to the requests that were not approved, Fisher brought the instant action against Elkton doctors, prison officials, and the BOP. In her complaint, Fisher alleges that by denying certain requests for treatment and accommodation for her GD, the defendants were deliberately indifferent to a serious medical need in violation of the Eighth Amendment. *See id.*

It is also undisputed that the BOP has promulgated various policies, manuals, and rules related to the treatment and clinical care of transgender inmates, including the Transgender Offender Manual. (Doc. No. 68-1.) The Transgender Offender Manual details BOP policies concerning transgender inmates, including staff training and responsibilities, initial designations and intake screening, housing and programming assignments, hormone therapy, medical treatment, mental health services, pat-down searches and exceptions, visual searches and exceptions, clothing and commissary items, and a transgender inmate's reentry needs.

---

[6] Fisher was born anatomically male but identifies as a woman and goes by the name Kellie Rehanna. (Doc. No. 1 at 4 fn.1.) Both parties refer to Fisher with feminine pronouns in their briefs. Accordingly, the Court will refer to Fisher using female pronouns. *See Murray v. United States Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at *1 n.1 (6th Cir. Jan. 28, 1997) (adopting a biologically male plaintiff's usage of "the feminine pronoun to refer to herself").

[7] SRS is also variously referred to as gender-confirmation surgery ("GCS") and gender-affirming surgery ("GAS").

There is no dispute that the BOP has also published clinical guidance for the Medical Management of Transgender Inmates (Doc. No. 68-2) and established the Transgender Clinical Care Team ("TCCT"), which is "[a] multidisciplinary group of BOP personnel with [transgender] subject matter expertise" that "provides assistance to institution staff and develops clinical treatment recommendations for the BOP [transgender] population[,]" and the Transgender Executive Council ("TEC"), which is "[a] group of BOP management personnel who mitigate executive level non-clinical issues[,] ... [and] provides oversight to the BOP TCCT." (*Id*. at 5.)

The Women and Special Populations Branch[8] of the BOP is the BOP's "primary source and point of contact on classification, management, and intervention programs and practices for transgender inmates in Bureau custody." (Doc. No. 68-1 at 6.) The BOP's Health Services Division oversees all medical and psychiatric programs as they apply to transgender inmates, and the Psychology Services Branch oversees all psychological and mental health programs as they apply to transgender inmates and provides "advice and guidance on identification and evaluation of transgender inmates, and mak[es] recommendations for treatment of transgender inmates and/or inmates with GD." (*Id*. at 6–7.)

Several BOP policies and procedures reference the World Professional Association for Transgender Health ("WPATH") which has published Standards of Care ("SOC") for the health of transsexual, transgender, and gender-nonconforming people. (Doc. No. 68-6.) The BOP considers the WPATH SOC to be informational, but not strictly binding, with respect to its

---

[8] Jenna Epplin ("Epplin") is the National Policy and Program Coordinator of the Women and Special Populations Branch.

decision making concerning the treatment of transgender inmates. (*See* Doc. No. 68-5 at 3 (Epplin Dep.).)

### B.  Procedural

All defendants moved to dismiss Fisher's complaint under Fed. R. Civ. P. 12. The Court dismissed all defendants except for the BOP and Elkton. *Fisher*, 484 F.Supp.3d at 531–32. The Court also granted defendants' Rule 12(b)(6) motion as to all Fisher's Eighth Amendment claims except for two, those concerning allegations regarding: (1) pat-down searches by female officers and staff; and (2) the denial of her requests for SRS on the grounds that the BOP has a de facto blanket ban on such surgery. *See id.* at 538–44.

After denying defendants' motion to dismiss these two claims, the Court granted Fisher's motion for appointment of counsel and published a case management plan and trial order establishing dates and deadlines for discovery, dispositive motions, and trial. (*See* Doc. Nos. 34, 41.) After discovery, both sides filed motions for summary judgment pursuant to Fed. R. Civ. P. 56. Fisher moves for partial summary judgment as to liability with respect to her SRS claim.[9] Defendants move for summary judgment on both of Fisher's remaining claims.

## II.      Applicable Law

### A.  Fed. R. Civ. P. 56 Standard of Review

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is

---

[9] Fisher does not seek summary judgment on her claim regarding pat-down searches.

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. *Id.*

In order to obtain summary judgment, the moving party must provide evidence to the court that demonstrates the absence of a genuine dispute as to any material fact. Once the moving party meets this initial burden, the opposing party must come forward with specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Anderson*, 477 U.S. at 250. The nonmoving party may oppose a summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex*, 477 U.S. at 324. The Court must view all facts and evidence, and inferences that may be reasonably drawn therefrom, in favor of the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).

General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Summary judgment requires that a plaintiff present more than a scintilla of evidence to demonstrate each element of a prima facie case." *Garza v. Norfolk S. Ry. Co.*, 536 F. App'x 517, 519 (6th Cir. 2013) (citing *Van Gorder v. Grand Trunk W. R.R.*, 509 F.3d 265, 268 (6th Cir. 2007)). "'The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989) (*quoting Anderson*, 477 U.S. at 252).

The district court's review on summary judgment is a threshold inquiry to determine whether there is the need for a trial due to genuine factual issues that must be resolved by a finder of fact because those issues may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52; *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003).

Summary judgment is required:

> against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing of an essential element of [his] case with respect to which [he] has the burden of proof.

*Celotex,* 477 U.S. at 322–23 (internal quotation marks and citation omitted).

The typical summary judgment standard of review "poses unique issues" when cross motions for summary judgment are filed. *B.F. Goodrich Co. v. U.S. Filter Corp*., 245 F.3d 587, 592 (6th Cir. 2001). In such case, the district court must evaluate each party's motion on its own merits, drawing all reasonable inferences against the moving party. *Id.* (citation omitted). If it is possible to draw inferences in either direction, then both motions for summary judgment should be denied. *Id.* at 592–93. The making of contradictory claims on summary judgment does not mean that if one is rejected the other must be accepted. *Id.*

**B. Eighth Amendment—Deliberate Indifference**

As discussed in the Court's memorandum opinion denying defendants' motion to dismiss two of Fisher's claims, those claims are based upon allegations that defendants violated the Eighth Amendment. To show that "conditions of confinement constitute 'cruel and unusual punishment' prohibited by the Eighth Amendment," a plaintiff must satisfy a two-step framework, which includes an objective and subjective component. *Reilly v. Vadlamudi*, 680 F.3d 617, 623–24 (6th Cir. 2012) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991); *Blackmore v. Kalamazoo Cty.,* 390 F.3d 890, 895 (6th Cir. 2004)).

The objective component requires the plaintiff to show that the alleged deprivation was "sufficiently serious[.]" *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). To show that the denial of medical care has violated the Eighth Amendment, the plaintiff must "establish the existence of a sufficiently serious medical need." *Reilly*, 680 F.3d at 623–24 (internal quotation omitted). The objective component is not at issue here because the parties do not dispute that Fisher has been diagnosed with GD or that GD is recognized by the Sixth Circuit as a serious medical condition. *Fisher*, 484 F. Supp. 3d at 540 ("The Sixth Circuit has recognized GD as a serious medical condition and, as such, 'a complete refusal by prison officials to provide [an inmate] with any treatment at all would state an Eighth Amendment claim for deliberate indifference to medical needs.'") (quoting *Murray*, 1997 WL 34677, at *3).

The subjective component requires the plaintiff to demonstrate that the defendants were deliberately indifferent to the prisoner's needs. *Wilson,* 501 U.S. at 297–302. The deliberate indifference standard is very high. To demonstrate deliberate indifference, "a plaintiff must show that the official: (1) subjectively knew of a risk to the inmate's health [or safety], (2) drew the

inference that a substantial risk of harm to the inmate existed, and (3) consciously disregarded that risk." *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010) (citations omitted); *see Cardinal v. Metrish,* 564 F.3d 794, 802 (6th Cir. 2009). "A prison official acts with deliberate indifference when 'he acts with criminal recklessness,' a state of mind that requires that the official act with conscious disregard of a substantial risk of serious harm." *Parra-Soto v. Campbell*, 73 F. App'x 86, 87 (6th Cir. 2003) (quoting *Farmer,* 511 U.S. at 837).

### III.    Discussion

#### A.  Fisher's SRS claim

As discussed earlier, the Court denied defendants' motion to dismiss Fisher's Eighth Amendment claims that (1) the BOP has a blanket policy against providing SRS to GD patients, and (2) the BOP declined to approve Fisher's request for SRS based upon such a policy. *See Fisher,* 484 F. Supp. 3d at 543.[10] Both sides seek summary judgment on Fisher's SRS claim.[11]

#### 1.  De facto policy against SRS

Fisher contends that the BOP is deliberately indifferent to treating her GD by failing to approve her request for SRS because of a de facto ban on surgical treatment for GD.[12] But Fisher

---

[10] "[A]t [the motion to dismiss] stage, it is improper for the Court to determine whether BOP does, in fact, have an alleged blanket (or de facto) policy against providing SRS to inmates with GD. Nor is it proper for the Court to determine whether the BOP denied Fisher's SRS requests based on such a policy."

[11] Fisher claims that SRS is medically necessary to treat her GD. In order to rule on the parties' motions regarding SRS, however, the Court need not resolve the issue of medical necessity.

[12] As discussed in the Court's ruling on defendants' motion to dismiss, the Sixth Circuit has not determined if a blanket ban by a prison of SRS treatment for GD violates the Eighth Amendment. Other circuits considering the issue are divided. Those that find a policy banning SRS as a treatment for GD may be unconstitutional reason that such a ban would conflict with the requirement that constitutionally sufficient medical care must be individualized based upon a particular prisoner's serious medical needs. *See Fisher,* 484 F. Supp. 3d at 542–43 (citing cases and quoting *Kosilek v. Spencer*, 774 F. 3d 73, 91 (1st Cir. 2014); *cf. Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019) (A blanket ban on SRS does not violate the Eighth Amendment because "there is no consensus in the medical community about the necessity and efficacy of sex reassignment surgery as a treatment for gender dysphoria.").

has not advanced evidence of a de facto ban from which a jury could reasonably find in her favor

on that issue, nor has she raised a genuine dispute of material fact to rebut the evidence advanced

by defendants that the BOP does not have a de facto ban on SRS.

As an initial matter, there is no dispute that the BOP's written policies provide for the

surgical treatment of GD on a case-by-case basis, and the BOP's chief medical officer corroborates

this policy.[13] The BOP's "Medical Management of Transgender Inmates—Clinical Guidance"

provides:

> Although individuals may live successfully as transgender persons without surgery, gender-affirming surgery may be appropriate for some and is considered on a case-by-case basis.
>
> **CRITERIA:** In addition to the eligibility and readiness criteria for hormone therapy, general criteria for consideration of surgery include at least 12 months of successful use of hormone therapy, participation in psychotherapy as clinically indicated, full-time real life experience in their preferred gender, and consolidation of gender identity. The inmate must request consideration for and demonstrate via informed consent a practical understanding of gender-affirming surgery including, but not limited to, permanence, potential complications, and short and long-term treatment plans.
>
> Requests for surgery are submitted to the **BOP TCCT** for initial review and recommendation to the Medical Director, who is the approving authority. Each referral should include comprehensive medical and mental health summaries, a comprehensive psychosocial assessment (preferably by a licensed clinical social worker), and a criminal history and institutional adjustment report.

(Doc. No. 68-2 at 23 (emphasis in original).)

But Fisher points to evidence in the record which she argues shows that, notwithstanding

its written policy, the BOP has a de facto ban on SRS or at least raises a genuine issue of material

fact on that issue.

---

[13] Dr. Elizabeth Stahl ("Stahl") testified at her deposition that, as provided by BOP policy, SRS may be appropriate to treat some transgender inmates and that determination is made on a case-by-case basis. (*See* Doc. No. 63 at 25–26 (Stahl Dep.).)

### a. The BOP's characterization of SRS as elective

First, Fisher points to a clinical encounter note regarding Fisher's SRS request prepared by BOP nurse practitioner Jane Barnes ("Barnes") on January 19, 2018, who wrote: "Discussed case with Region over last several months as well as Chief Medical Officer who confirmed there are no sex reassignment surgeries being done at this time as it is still considered an 'elective medical procedure,' rather than medical necessity." (*See* Doc. No. 65-3; Doc. No. 67 at 19 (citing Doc. No. 65-3).) Thus, Fisher reasons that even in cases such as hers where her treating psychologist, Dr. Bethanie Cavalier ("Cavalier"), believes SRS is "emotionally a medical necessity" for Fisher (*see* Doc. No. 57 at 15 (Cavalier Dep.)), the BOP's characterization of SRS as an elective procedure amounts to a de facto ban.

In response, the BOP points to Barnes' deposition where she explains that in the manner in which the BOP defines "categories of care," "elective" means "not an absolute medical emergency at that time" and there is time for regional or central BOP to review recommendations for surgery. Barnes testified that other examples of surgeries defined as elective by the BOP are gall bladder surgery, knee or hip replacement, thyroid, and hernia surgery. "Medically necessary" surgeries, on the other hand, are acute and immediately life threatening and cannot wait—such as bypass surgery which "needs done two minutes ago"—and the decision concerning surgery is not made by the BOP at the regional or central level, but by the institution. (*See* Doc. No. 68-19 at 3–5 (Barnes Dep.).)

Barnes' testimony concerning the difference between "elective" and "medically necessary" surgery is consistent with the BOP's program statement number 6031.04 concerning inmate care. The program statement distinguishes the categories of medically necessary conditions (which are

acute or emergent conditions such as heart attack and stroke) from medically acceptable but "[n]ot [a]lways [n]ecessary" procedures, "which are considered elective procedures," such as joint replacement and knee repair. (*See* Doc. No. 68-20 at 6–7.) The BOP's distinction between acute conditions and "elective" conditions is consistent with the BOP's explanation to Fisher that the need for SRS is not a condition that is immediate and acute and emergent and "fall[s] under the Medically Acceptable-Not Always Necessary Category. Medical conditions in this category are those that may improve or enhance quality of life but are not necessary to sustain life or function." (*See* Doc. No. 68-13 at 5.) Indeed, even WPATH does not consider gender-affirming surgery to be always necessary to treat GD and identifies "hormones and surgery [as] just two of many options available to assist people with achieving comfort with self and identity." (Doc. No. 68-6 at 12 (WPATH SOC); *see also id.* at 15–16.[14])

Construing the facts presented in the record in a light most favorable to Fisher, the BOP's categorization of SRS as "elective" is an insufficient basis upon which a jury could reasonably find that the BOP has a de facto policy against SRS or raise a genuine issue of material fact as to that issue.

### b.  The BOP's characterization of SRS as extraordinary

Fisher further points to the deposition of Stahl in support of her claim of a de facto ban because the BOP considers SRS to be an "extraordinary" medical procedure. (Doc. No. 67 at 19

---

[14] "As the field matured, health professionals recognized that while many individuals need both hormone therapy and surgery to alleviate their gender dysphoria, others need only one of these treatment options and some need neither (Bockting & Goldberg, 2006; Bockting, 2008; Lev, 2004). Often with the help of psychotherapy, some individuals integrate their trans- or cross-gender feelings into the gender role they were assigned at birth and do not feel the need to feminize or masculinize their body. For others, changes in gender role and expression are sufficient to alleviate gender dysphoria. Some patients may need hormones, a possible change in gender role, but not surgery; others may need a change in gender role along with surgery, but not hormones. In other words, treatment for gender dysphoria has become more individualized."

(citing Doc. No. 63 at 28–29).) The BOP's patient care program policy defines the "extraordinary" category of care as medical interventions that "affect the life of another individual, such as organ transplantation, or are considered investigational in nature." (Doc. No. 68-20 at 8.) "Extraordinary" medical procedures require the Medical Director's review or approval and notification of the Regional Director. (*Id.*)

Fisher takes issue with any characterization by the BOP that SRS is investigational. (*See* Doc. No. 67 at 20 (citing *Edmo v. Corizon, Inc.*, 935 F.3d 757, 770 (9th Cir. 2019) ("[SRS] is safe, effective, and medically necessary in appropriate circumstances.").) But even if SRS is safe and effective in certain circumstances, as WPATH recognizes, there is no uniform agreement among relevant professionals regarding safety and efficacy in all circumstances. (*See e.g.* Doc. No. 68-6 at 62 (WPATH SOC) ("In ordinary surgical practice, pathological tissues are removed to restore disturbed functions, or alterations are made to body features to improve a patient's self-image. Some people, including some health professionals, object on ethical grounds to surgery as a treatment for gender dysphoria, because these conditions are thought not to apply. It is important that health professionals caring for patients with gender dysphoria feel comfortable about altering anatomically normal structures.").) *See also Gibson v. Collier*, 920 F.3d 212, 216 (5th Cir. 2019) ("[I]t is indisputable that the necessity and efficacy of sex reassignment surgery is a matter of significant disagreement within the medical community. As the First Circuit has noted—and counsel here does not dispute—respected medical experts fiercely question whether sex reassignment surgery, rather than counseling and hormone therapy, is the best treatment for gender dysphoria.") (citing *Kosilek v. Spencer*, 774 F.3d 63, 76–78, 87 (1st Cir. 2014) (surveying conflicting testimony concerning medical efficacy and necessity of sex reassignment surgery)),

13

*cert. denied,* 140 S. Ct. 653, 205 L. Ed. 2d 384 (2019).

Thus, to the extent that SRS is designated by the BOP as extraordinary, or even considered investigational, this evidence merely reflects the lack of agreement among medical professionals and is an insufficient basis upon which a jury could reasonably find that such a designation constitutes a de facto ban on SRS rather than simply requiring additional layers of approval within the BOP; it does not raise a genuine issue of material fact on that issue.

### c.  Lack of SRS

Further in support of her argument on summary judgment that the BOP has a de facto ban on SRS, Fisher points out that between 2017 and 2020, the BOP's transgender inmate population has ranged from 497 to 1,062 inmates, and since 2016, approximately 50 transgender inmates have requested SRS. But over the last ten years, not a single transgender inmate has been approved for SRS. (Doc. No. 67 at 20 (citing Doc. Nos. 67-3 (Defendants' response to plaintiff's request for admissions) and 67-4 (Defendants' response to plaintiff's second request for admissions).)

The BOP does not dispute that no surgeries have taken place during this period of time, but responds that the lack of SRS is not due to a de facto ban but because there were no inmate requests for gender-affirming surgery that were "ripe for consideration" during that time period. (Doc. No. 68-14 ¶¶ 4–6 (Defendants' response to plaintiff's request for interrogatories).) In support, defendants point to the deposition of Stahl, who testified that it is "challenging" for transgender patients to satisfy all of the WPATH requirements for surgery because of coexisting medical and mental health conditions that must be "reasonably controlled" prior to surgery, difficulty in achieving twelve continuous months of "at goal" hormone levels which can be difficult for some because of medication non-compliance and, in order to "provide a gender-affirming experience in

14

a[n] opposite institution – … a trans female to be able to be located, transferred to a female institution for 12 continuous months without running into trouble, security issues with other prisons I know has been a challenge at times."[15] (Doc. No. 68-8 at 4 (Stahl Dep.).) In response, Fisher does not advance any evidence that the transgender inmates requesting SRS during the time period in question actually satisfied the WPATH requirements and were "ripe for consideration" for surgery by the BOP.

Fisher also cites to an internal complaint she filed concerning the denial of her request for SRS in which she states that nurse practitioner Lori Hunter ("Hunter") explained the request was denied because the BOP was not yet doing SRS because "they can't find a doctor to perform the surgery or personnel for after care even though SRS [i]s part of the BOP Clinical Guidelines for the treatment of transgender inmates." (*See* Doc. No. 68-22 at 2.) While this answer may be unsatisfactory to Fisher, she does not offer any evidence that doctors and after-care personal were actually available to perform for SRS and after care at that time so as to create a genuine issue of material fact concerning a de facto ban on SRS.

In summary, in opposition to defendants' evidence regarding the lack of SRS over the time period in question, Fisher has not advanced evidence from which a reasonable jury could conclude that the lack of SRS surgery during the time period in question constitutes a de facto BOP policy against SRS or raises a genuine dispute of material fact on that issue.

---

[15] Though challenging, it is apparently not impossible for a transgender inmate to meet the criteria for surgery as the TEC has recently recommended SRS for a transgender female inmate who has been housed in a female prison for at least 12 months. (*See* Doc. No. 75-3 ¶ 5 (Epplin Decl.).)

### d. *Norsworthy v. Beard*

Fisher points to *Norsworthy v. Beard* in support of her argument that the BOP has a de facto policy against SRS. *Norsworthy v. Beard*, 87 F. Supp. 3d 1164 (D.C. Cal. 2015). But Fisher's reliance on *Norsworthy* is misplaced because of numerous factual distinctions from the instant action.

In *Norsworthy*, the district court granted a preliminary injunction ordering the California Department of Corrections to provide plaintiff with adequate medical care for her GD because, among other reasons, the court found that plaintiff was likely to succeed on the merits of her claim that the California Department of Corrections had a ban on SRS. *See id.* at 1190. In support of her argument that she was denied SRS based on a de facto ban, Norsworthy maintained that her case for SRS was evaluated by an individual who "had attended a training at which [participants were] instructed . . . that SRS should never be provided to incarcerated patients." *Id.* Fisher has presented no such instruction or similar evidence here.[16]

Moreover, the California Department of Corrections' guidelines for treating transgender inmates does not mention SRS as a treatment option. *Id.* at 1191. That is not the case here where the BOP's transgender treatment manual specifically identifies SRS as a treatment option. (*See* Doc. No. 68-2 at 23.)

---

[16] And to the contrary, defendants offer the deposition of Stahl who testified that gender affirming surgery may be medically necessary for an individual patient because all aspects of gender affirming treatments are individualized and, while only a small portion of trans patients require surgery, determinations regarding surgery are made on a case-by-case basis. (Doc. No. 63 at 24–26 (Stahl Dep.) ("So to this date I am not aware that a gender-affirming procedure has been completed; however, that has never been my policy. So just because it hasn't been done yet it just – there are a number of factors why that might be the case. But it's never been the Bureau's policy to be against gender-affirming hormone treatment and/or gender-affirming surgery.").)

In addition, California prison officials implied that SRS would not be appropriate for Norsworthy because she has not had an opportunity to live *outside* prison in a gender role congruent with her gender identity, which the district court found to be inconsistent with the WPATH SOC's "explicit rejection of the idea that SRS should be denied to a patient on the basis that she lives in an institutional environment." *Norsworthy,* 87 F. Supp. 3d at 1190. The BOP has not applied any such unachievable criteria to Fisher's request that amounts to a denial of SRS because she lives in an institutional environment. Indeed, in order to be eligible for consideration of SRS the BOP requires the achievable criteria that transgender female inmates live in a female prison prior to surgery so to experience prison life in a gender role congruent with their gender identity.

In conclusion, the allegations in Fisher's complaint on the issue of a de facto ban on SRS were sufficient to survive a motion to dismiss. But in order to prevail on her motion or survive the defendants' motion for summary judgment on this issue, Fisher must either advance facts which demonstrate an absence of a genuine dispute of material fact with respect to her claim of a de facto SRS ban and that she is entitled to judgment as a matter of law, or, in response to the evidence advanced by defendants in support of their motion, at least put forth evidence that creates a genuine dispute of material fact that must be considered by a jury. Fisher has done neither. At most, Fisher has advanced a scintilla of evidence to rebut the evidence advanced by defendants that the BOP does not have a de facto ban on SRS, and a scintilla of evidence is insufficient to create a genuine dispute of fact from which a jury could return a verdict for either party. *See Garza,* 536 F. App'x at 519; *Street*, 886 F.2d at 1477.

17

Accordingly, defendants are entitled to summary judgment on Fisher's SRS claim that the BOP has an alleged de facto policy against SRS, as well as Fisher's claim that defendants' failure to approve her request for SRS was based upon such a ban. Moreover, as discussed below, the BOP has determined that Fisher is not suitable for SRS at this time for reasons unrelated to those offered by Fisher as evidence of a de facto ban, and that determination does not constitute deliberate indifference in violation of the Eighth Amendment.

**2. Defendants' determination that Fisher is not suitable for SRS at this time**

As an initial matter, multiple claims by Fisher of deliberate indifference in violation of the Eighth Amendment concerning the defendants' treatment of Fisher's GD were considered and rejected by the Court in ruling on defendants' motion to dismiss, and the only treatment claims that survived are related to SRS.[17] For the reasons more fully discussed below, defendants are entitled to summary judgment on Fisher's Eighth Amendment claim concerning SRS. In summary, though, this is so because there is no genuine dispute of material fact that defendants' determination that Fisher is not yet a suitable candidate for surgery because (1) she has not lived as a woman in a female prison prior to surgery, and (2) she has not completed SOT that is prerequisite to residing in a female prison, does not constitute deliberate indifference to her mental and emotional suffering resulting from the continued presence of her male genitals and/or is grounded in legitimate penological safety and security interests entitled to deference by this Court.

---

[17] Fisher's arguments on summary judgment that defendants' failure to approve her request for SRS constitutes deliberate indifference under the Eighth Amendment are wide ranging, and she contends almost as an aside that the BOP's deliberate indifference is grounded in a de facto policy against SRS: "While not necessary to prove deliberate indifference, the evidence also proves that the BOP has a de facto ban on providing [SRS] to prisoners, which violates the Eight Amendment." (Doc. No. 67 at 19.) Indeed, defendants contend that it appears that Fisher abandoned her claim that the BOP has a policy against SRS. (*See* Doc. No. 81 at 7 (citing Fisher's motion for summary judgment and opposition to defendants' motion).)

### a. Summary of defendants' treatment of Fisher's GD

To begin, it is useful to summarize the GD treatment defendants have provided Fisher to this point. There is no dispute that defendants have provided Fisher with hormone therapy and psychotherapy to treat her GD and with other accommodations such as female garments, feminine self-care and grooming products, and have permitted Fisher to wear her hair and present as a woman at Elkton. (*See* Doc. No. 68-11.) Hormone therapy has helped Fisher's GD: "I am 'hormonally confirmed,' meaning that I have hormone levels and secondary sex-characteristics of an adult female. The hormone medication has helped to some extent and has resulted in breast growth, body fat redistribution, and changes in my skin consistency." (Doc. No 67-1 ¶ 5 (Fisher Decl.).) But Fisher contends that she continues to suffer from anxiety and depression related to her gender incongruence and struggles with thoughts of self-castration which she has shared with her therapists. (*See id.* ¶¶ 4–7; *see also* Doc. No. 57 at 11–12 (Cavalier Dep.).) Fisher argues that that only SRS can address her mental and emotional suffering and that defendants' failure to approve her requests for SRS constitutes deliberate indifference under the Eighth Amendment.

In support of her deliberate indifference claim, Fisher points to the WPATH criteria for surgery and her therapist's recommendation that SRS is an emotional necessity (Doc. No. 57 at 15 (Cavalier Dep.).) Fisher argues that she has satisfied all the WPATH criteria for surgery and that defendants' failure to approve her for SRS is based upon non-medical reasons in violation of the Eighth Amendment. (*See* Doc. No. 67 at 15–19.)

The WPATH SOC criteria for surgery are as follows:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to [give] consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled;

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals;

6. 12 continuous months of living in a gender role that is congruent with their gender identity.

(Doc. No. 68-6 at 67.)

The BOP considers the WPATH to be informational, but not strictly binding, with respect to its decision making concerning the treatment of transgender inmates. (*See* Doc. No. 68-5 at 3 (Epplin Dep.).) That said, the BOP's clinical guidance for the Medical Management of Transgender Inmates addresses similar criteria for gender-affirming surgery:

> In addition to the eligibility and readiness criteria for hormone therapy, general criteria for consideration of surgery include at least 12 months of successful use of hormone therapy, participation in psychotherapy as clinically indicated, full-time real life experience in their preferred gender, and consolidation of gender identity. … [R]eferral for [surgery] should include comprehensive medical and mental health summaries, a comprehensive psychosocial assessment … and a criminal history and institutional adjustment report.

(Doc. No. 68-2 at 23.)

### b. Fisher's mental and emotional distress

Fisher claims that defendants are deliberately indifferent to her mental and emotional suffering by failing to approve SRS to treat her GD. The mental and emotional distress she experiences is "mostly focused on her male genitalia" which causes her to feel "constant disgust, depression, and distress," and she struggles every day with thoughts of self-castration. (Doc. No. 67 at 11; Doc. No. 67-1 ¶ 4 (Fisher Decl.).) Fisher does not dispute that defendants provide her with counseling and medication to address her anxiety and depression. (Doc. No. 67-1 ¶ 7 ("I have

been prescribed medication to help me deal with my continued distress, depression, anxiety, and panic attacks and I have always taken that medication.").) Fisher's treating psychologist describes her mental health as well-controlled. (Doc. No. 57 at 12 (Cavalier Dep.).)

After receiving Fisher's declaration in support of her summary judgment motion, the BOP conducted a suicide risk assessment. (Doc. No. 75-1.) The suicide assessment acknowledges that Fisher's gender incongruence has caused her "clinically significant" distress and anxiety, for which Fisher has been provided psychotherapy and prescribed medications. But Fisher "denied any history of suicidal behavior" (*Id*. at 2) and "adamantly denied suicidal or self-harming ideation" (*Id*. at 3). At the assessment, Fisher stated that she has had thoughts of self-castration "since I was a kid" and denied a history of suicidal behavior and suicidal ideation or an intent or plan to commit suicide. According to the assessment, Fisher's "urges to remove her male genitalia are not motivated by intent to harm herself or intent to die, but a desire to no longer have male genitals. She reported that she will eventually have her male genitalia removed via surgery, she is just not sure when that will occur." (*Id*. at 2–3.) Fisher states that she does not desire to die by suicide. (Doc. No. 67-1 ¶ 5 (Fisher Decl.) ("I cannot stand to come into contact with my male genitalia. I am afraid that one day I will not be able to stop myself and I will cut my genitals off. The main reason I don't do this is because I am afraid I could bleed to death, although there are many days when I think that dying is better than living like this.").) And Fisher has identified multiple coping skills to manage thoughts of self-castration and when such thoughts increase in severity, she contacts Psychology Services for help. (Doc. No. 75-1 at 3.) Moreover, Fisher acknowledges that her mental health issues are not entirely caused by a lack of SRS and may not be entirely relieved by that procedure: "I know that some of my mental health symptoms relate to my history of sexual

assaults in prison [before she was transferred to Elkton], but I also know that my daily experiences of depression and anxiety also relate in large part to my gender dysphoria." (Doc. No. 67-1 ¶ 7 (Fisher Decl.).)

The suicide risk assessment performed by the BOP rated the "Overall Acute Suicide Risk" for Fisher as "Low" and her "Overall Chronic Suicide Risk" as "Absent." (Doc. No. 75-1 at 4.) And in claiming that she satisfies all the WPATH criteria to be eligible for surgery, one of which is: "If significant medical or mental health concerns are present, they must be well controlled" (*see* Doc. No. 68-6 at 67 (WPATH SOC)), Fisher corroborates the BOP's conclusions and ratings from the risk assessment.

The undisputed record indicates that defendants have not consciously disregarded a serious risk of substantial harm to Fisher with respect to her mental and emotional health; rather, they have provided her treatment with both medication and therapy which has "well-controlled" her anxiety and depression. With respect to risk of suicide, the BOP's assessment does not reflect "a strong likelihood" that Fisher may harm herself due to the presence of her male genitalia. *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 601 (6th Cir. 2020) (In order to establish deliberate indifference concerning a risk of suicide, "'it is not enough to establish that an official may have acted with deliberate indifference to some *possibility* of suicide, or even a *likelihood* of suicide; the test is a *strong likelihood* of suicide.'") (emphasis in original) (quoting *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 336 (6th Cir. 2013)).

But Fisher argues that the BOP should be providing her with surgery, not medication and psychotherapy, to address the mental and emotional distress resulting from her GD: "What the BOP does not seem to understand, though, is that I may not even need those medications if I had

the surgery I need." (Doc. No. 67-1 ¶ 7 (Fisher Decl.).) But Fisher's disagreement with the manner of defendants' treatment of her mental and emotional health concerning GD does not constitute deliberate indifference. *See Westlake v. Lucas,* 537 F.2d 857, 860 n.5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018) ("An inmate's disagreement with the testing and treatment he has received ... does not rise to the level of an Eighth Amendment violation. Nor does a desire for additional or different treatment ... suffice to support an Eighth Amendment claim.") (internal quotations marks and citations omitted).

Thus, to the extent that Fisher experiences mental and emotional distress because defendants have not yet approved SRS surgery, she has not advanced evidence raising a genuine issue of material fact that defendants have acted with deliberate indifference to a substantial risk of serious harm to Fisher with respect to treatment of her GD and related mental and emotional health issues.

### c. Suitability for SRS

While Fisher's treating psychologist believes that surgery is necessary to treat the emotional distress caused by her GD, the BOP has determined that Fisher is not yet a suitable candidate for SRS under WPATH and the BOP's clinical guidance for the medical management of transgender inmates for two reasons: (1) concerns regarding Fisher's hormone levels, and (2) she was not yet eligible for transfer to a female prison. (Doc. No. 69-1 RFA 15; *see also* Doc. No. 68-10 (Memorandum for TEC dated March 19, 2021 from Warden Elkton noting elevated estradiol levels and resulting reduction in estrogen dose).) The Court need not address the parties' dispute

23

regarding Fisher's hormone level because, viewing the facts in a light most favorable to Fisher and regardless of hormone levels, there is no genuine dispute of material fact that Fisher is not a suitable candidate for SRS surgery because she is not yet eligible for transfer to a female prison.

### Real life gender-congruent experience in a female prison

Both WPATH SOC and the BOP criteria for SRS identify the importance of living in a gender role congruent with gender identity prior to SRS surgery, though each is phrased somewhat differently. The WPATH SOC criteria requires an individual to experience "12 continuous months of living in a gender role that is congruent with their gender identity." The WPATH SOC elaborates that this criterion "is based on expert clinical consensus that this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery. … [T]he social aspects of changing one's gender role are usually challenging—often more so than the physical aspects. Changing gender role can have profound personal and social consequences, and the decision to do so should include an awareness of what the … challenges are likely to be, so that people can function successfully in their gender role." (Doc. No. 68-6 at 67–68 (WPATH SOC).)

The BOP also requires female transgender inmates to experience "full-time real life experience in their preferred gender" prior to gender-affirming surgery. (Doc. No. 68-2 at 23.) Chief psychologist Dr. Paul Clifford ("Clifford") explains that in a prison setting, where institutions are segregated by gender, the BOP has determined that this criterion is best fulfilled by living in a facility consistent with one's gender identity in order to "fully experience the full ramifications of adopting the role ultimately, all the social roles, expectations and other aspects of being the other gender [from] which they were originally assigned at birth." (Doc. No. 59 at 24–

24

25 (Clifford Dep.); *see also id.* at 32–33 (Dr. Clifford explains that in a prison setting a transgender female inmate can only experience the full social adjustment of a female role in a female, rather than male, institution that is dedicated to female inmates.).) And, like WPATH, Dr. Clifford recognizes that the social aspects of changing gender roles may be more challenging than the physical aspects: "I do not believe that [a transgender female] can fully experience [at a male facility] the fullest social adjustment that taking on the female role would entail . . . such as a female facility in and around other female inmates. . . . In my clinical opinion, the social adjustment is almost more – it's so challenging; in some cases it's even more challenging than adjustment to the physical modifications that would come with gender-reaffirming surgery" and that experience cannot be achieved as a transgender female living in a male institution. (*Id.* at 32–33.)

In the BOP's determination, a "real life" experience for a female transgender inmate in her preferred gender in a prison setting includes living in a female facility so that the inmate can experience if this "is something they want to do. We want a good outcome for them before we make a life changing surgery, a surgery that we can't come back from. … [W]e've had inmates that we transferred before to gender-affirming facilities that have … requested to go back to the biological sex facility."[18] (Doc. No. 64 at 49 (Epplin Dep.).) Defendants maintain that the WPATH SOC's real life experience requirement as applied by the BOP is not inconsistent with WPATH's criteria for SRS, recognizing that the WPATH SOC are intended to be "flexible" and "departures from the SOC may come about because of a patient's unique anatomic, social, or psychological

---

[18] The BOP has transferred approximately five transgender females from a male to a female facility as part of their gender-affirming process, and some have asked to be transferred back to male institutions.  (*See* Doc. No. 64 at 30-31, 46 (Epplin Dep.).)

situation … or the need for specific harm-reduction strategies." (*See* Doc. No. 68-6 at 9 (WPATH SOC).)

That said, no BOP policy or procedure specifically provides that the real life gender-congruent experience criterion must be achieved by living in a female prison facility. (Doc. No. 59 at 24–25[19] (Clifford Dep.).) And Fisher argues that the BOP's position that she must reside in a female prison in order to obtain a real life gender-congruent experience has been contrived for litigation.[20] But that contention is contradicted by the April 4, 2019 BOP's response to her request for gender affirming surgery, which she attached to her complaint. (Doc. No. 1-7 at 80.[21]) Nevertheless, Fisher argues that she has fulfilled that SRS prerequisite of real life experience in her preferred gender because she has, without dispute, presented and lived as a woman at Elkton for more than 12 months and there is no need for her to live in a female prison to satisfy that criteria.

Beyond argument and disagreement, however, Fisher has not advanced any material evidence challenging defendants' interpretation of the WPATH SOC's pre-SRS requirement in a prison setting. Moreover, to the extent that any such expert or medical or other material evidence

---

[19] "There is nothing direct nor overt regarding that. I mean, as I mentioned before, the full-time real life experience in the preferred gender, that is – certainly has to be thoughtfully – how can I say, that there is a lot imbedded within that small statement in terms of ensuring that the person, that the patient really is ultimately given the opportunity to fully experience the full ramifications of adopting the role ultimately, all the social roles, expectations and other aspects of being the other gender for which they originally were assigned at birth."

[20] Fisher filed her complaint on May 21, 2019.

[21] "Gender-affirming surgery is considered after real life experience in your preferred gender. Therefore, you were reviewed for transfer to a female facility. Based on BOP Program Statement 5200.04, Transgender Offender Manual, several factors were considered to determine whether your current placement is appropriate, including your health and safety, your behavioral history, overall demeanor, and likely interactions with other inmates; whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution; and whether there has been significant progress towards transition as demonstrated by your medical and mental health history. After consideration and review, it was determined that your current designated facility is appropriate."

were offered that simply constitute a disagreement with the opinion of defendants' doctors that a real life gender-congruent experience in a prison setting requires residence in a female prison, such evidence, alone, is insufficient to establish an Eight Amendment violation. *Kosilek*, 774 F.3d at 88 ("Prudent medical professionals, however, do reasonably differ in their opinions regarding the requirements of a real life experience—and this reasonable difference in medical opinions is sufficient to defeat Kosilek's argument.") (citations omitted); *see also Mann v. Cook*, No. 3:16-cv-537, 2017 WL 4052377, at *4 (E.D. Tenn. Sept. 13, 2017) ("[A] disagreement between doctors is not a matter of concern under Eighth Amendment.") (citing *Wilhelm v. Rotman*, 680 F.3d 1113, 1123 (9th Cir. 2012) (noting that one doctor's difference of opinion with another doctor's opinion is "insufficient to establish deliberate indifference")).

Moreover, and perhaps more importantly, the defendants' requirement that transgender female inmates live in a female prison prior to SRS is not grounded only in the opinion of their doctors and desire for "a good outcome" for the inmate, but in safety and security concerns that are unique to prison settings. In defendants' experience, and as discussed above, not all female transgender inmates are able to successfully reside in a female prison and, because of safety and security issues, social adjustment issues, or the inmate's own preference, transfer back to a male prison. (*See* Doc. No. 64 at 49 (Epplin Dep.); Doc. No. 68-8 at 4 (Stahl Dep.).) Fisher has advanced no evidence creating a genuine dispute of material fact that female transgender inmates are not always able to successfully reside in a female prison and were transferred back to a prison with inmates of their biological gender. If a female transgender inmate were to undergo SRS prior to attempting residence in a female prison then prove unable to reside in a female facility, residence in a male facility would raise safety and security concerns for that inmate. *Kosilek,* 774 F.3d at 93

("Recognizing that reasonable concerns would arise regarding a post-operative, male-to-female transsexual being housed with male prisoners takes no great stretch of the imagination.") (citing *Farmer,* 511 U.S. at 848–49 (summarizing evidence that a prison's refusal to provide segregated housing to a pre-operative male-to-female transsexual could pose significant security concerns)). (*See also* Doc. No. 64 at 49–50 (Epplin Dep.).)

The balance of safety, security, and health decisions by prison officials "'are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'" *Bell v. Wolfish*, 441 U.S. 520, 541, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)). Here, Fisher has advanced no evidence that defendants have exaggerated their response concerning safety and security with respect to their determination that a real life gender-congruent experience in a prison setting prior to SRS requires residence in a female prison.

An inmate's rights under the Eighth Amendment are not absolute. *Whitley v. Albers*, 475 U.S. 312, 320, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) (prison officials may consider legitimate penological interests even in the context of the Eighth Amendment); *Kosilek*, 774 F.3d at 83 ("[E]ven a denial of care may not amount to an Eighth Amendment violation if that decision is based in legitimate concerns regarding prisoner safety and institutional security.") (citation omitted). Here defendants' balance of safety, security, and health concerns concerning their requirement of a gender-congruent experience in a female prison before a female transgender inmate undergoes SRS is within the realm of reason even if that requirement were to impose some

28

limitations on Fisher's constitutional rights. *See Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987) (prison regulation that impinges on inmates' constitutional rights is valid if reasonably related to legitimate penological interests); *Kosilek*, 774 F.3d at 83 ("When evaluating medical care and deliberate indifference, security considerations inherent in the functioning of the penological institution must be given significant weight.") (citation omitted). Thus, defendants are entitled to deference by this Court with respect to their determination that a real life gender-congruent experience for a female transgender inmate requires residence in a female prison, and defendants are entitled to summary judgment on that issue. *Bell*, 441 U.S. at 547 ("[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); *see also Kosilek*, 774 F.3d at 92 ("As long as prison administrators make judgments balancing security and health concerns that are within the realm of reason and made in good faith, their decisions do not amount to a violation of the Eighth Amendment.") (internal quotation marks and citation omitted).

### *Sex offender treatment before transfer to female prison*

A similar analysis applies to the parties' evidence and arguments regarding the BOP's determination that Fisher first complete SOT in order to be eligible for transfer to a female prison for her gender-congruent experience in prison as the next step for consideration of suitability for SRS. Fisher is a convicted sex offender. The sentencing judge recommended SOT while Fisher is incarcerated and required it for supervised release. (Doc. No. 68-9 at 3, 5.)

It is true as Fisher argues that the BOP policies do not contain any specific requirement that SOT take place before transfer to a female prison. (*See* Doc. No. 59 at 25 (Clifford Dep.).) However, the BOP has specific criteria for facility assignment of transgender inmates, which involve an individualized assessment of various factors, including: (1) the health and safety of the transgender inmate and mitigation of risk to the transgender offender; (2) behavioral history, overall demeanor, and likely interactions with other inmates; and (3) management and security of the institution and risk to other inmates at the institution, including the inmates' histories of trauma. (*See* Doc. No. 68-1 at 9–10 (housing decisions include consideration of risk to the transgender inmate, program participation of the transgender inmate, likely interactions with other inmates, and whether a placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution).)

In BOP's determination, SOT is required before transfer to a female prison in Fisher's case because of her past predatory behavior and sex offense, "judicial recommendation[,] and under the lens of safety for both Inmate Fisher and other inmates prior to transfer to a female facility." (Doc. No. 64 at 16–17 (Epplin Dep.); *see also id.* at 32–33, 42–44; Doc. No. 68-15 at 2.) It takes no stretch of the imagination to understand that Fisher herself, as well as the female inmates, may face a safety and security risk by Fisher's presence in a female prison, and Fisher has advanced no evidence disputing the BOP's assessment. *See e.g. King v. Edward Banks*, No. 2:10-CV-852, 2012 WL 2891264, at *4 (S.D. Ohio July 13, 2012) ("[I]t is almost always the case that prison officials know that sex offenders, especially those whose crimes involve children, may be targets of assault for just that reason."); *Kosilek*, 774 F.3d at 93 (prison officials expressed significant concerns regarding housing a formerly male inmate with a criminal history of violence against a female

30

domestic partner with a female prison population containing high numbers of domestic violence survivors). The BOP's requirement that Fisher is not suitable to be considered for placement in a female prison until she completes SOT is well within the realm of a reasoned attempt to balance Fisher's path to SRS while at the same time mitigating the risk to Fisher and fellow inmates.

But SOT is not available at Elkton. In order to obtain that training, the TEC recommended that Fisher be transferred to a federal prison in Massachusetts so she could complete SOT. (Doc. No. 64 at 38 (Epplin Dep.); Doc. No. 67-1 ¶¶ 13–15 (Fisher Decl.).) Elkton's chief psychologist attempted to have Fisher sign an agreement to transfer her to the prison in Massachusetts, but Fisher declined because she "does not understand what that has to do with my need for surgery now[,]" and she cannot transfer from Elkton for SOT because (1) she has filed a habeas petition pursuant to 28 U.S.C. § 2255 in her criminal case (2:12-cr-162) and needs to stay in Ohio in case her testimony is required;[22] and (2) she does not appear to be eligible for transfer for SOT because such transfers normally take place 36 months prior to an inmate's release date and Fisher's projected release date is 57 months in the future. (Doc. No. 67-1 ¶¶ 13–15 (Fisher Decl.).)

While Fisher disagrees with the BOP's requirement that she undergo SOT prior to transfer to a female prison, her disagreement with the manner in which the BOP implements its policies regarding inmate housing and treatment for her GD does not constitute an Eighth Amendment violation. Nor has Fisher advanced any material evidence that disputes or creates a genuine issue

---

[22] This issue identified by Fisher appears to be moot. An examination of the public docket for Fisher's criminal case in the United States District Court for the Southern District of Ohio (2:12-cr-162) indicates that on July 7, 2021, the magistrate judge recommended that Fisher's § 2255 habeas petition should be dismissed. Fisher objected to the magistrate judge's report and recommendation on July 21, 2021 and October 12, 2021. On November 16, 2021, the district court overruled Fisher's objections and denied Fisher's § 2255 petition. While the district court denied Fisher's petition, the court did issue a certificate of appealability. However, the docket does not reflect that Fisher appealed the district court's denial of her § 2255 habeas petition.

31

of material fact that the BOP's safety and security concerns regarding housing a convicted sex offender in a female prison are exaggerated or unreasoned.

Defendants' concern for the safety and well-being of female inmates that may be housed with Fisher are reasonably balanced with their concern for Fisher's safety and well-being, and the BOP's requirement that Fisher complete SOT before undergoing a real life gender-congruent experience in a female prison is a measured and reasoned response to valid security concerns.[23] *Kosilek*, 774 F.3d at 93 (The appropriate inquiry in determining deference to a prison official's articulated legitimate penological interest is not whether the court believed that Kosilek could be housed safely, "but whether [prison officials have] a reasoned basis for its stated concerns.").

Accordingly, defendants are entitled to summary judgment on Fisher's Eighth Amendment SRS claim.

---

[23] The facts of this case are analogous to *Kosilek v. Spencer*. In 1992, Kosilek murdered his wife and was convicted and sentenced to life in prison. Kosilek, born anatomically male, was diagnosed with GD. While in prison, the state provided Kosilek with "supportive therapy" and she sued on the ground that this treatment was inadequate medical care under the Eighth Amendment. The state then began providing Kosilek with hormone therapy, mental health treatment, electrolysis, and gender appropriate clothing and personal items. *Kosilek*, 774 F.3d at 70. An outside organization was retained by the state to evaluate Kosilek for SRS and issued a report recommending SRS. The reports emphasized that Kosilek experienced significant distress from the presence of her male genitalia and it was quite likely that she would attempt suicide if not able to change her anatomy. *See id.* at 70–71. The agency's doctors writing report believed that a "real life" experience in a female role was possible in a prison setting and a "key step" prior to SRS but recognized that SRS would "bring up issues of housing and safety[.]" *Id.* at 73. The state considered safety security concerns regarding housing Kosilek post-surgery, including that Kosilek would be a target for assault and victimization in a male prison, that given Kosilek's conviction for the murder her presence may cause inmates in a female prison mental distress, and the possible negative impact of Kolisek's mental health caused by a housing solution that may involve long term isolation. *Id.* at 74. Kosilek sought and received injunctive relief from the district court on the ground that the government's refusal to provide Kosilek with SRS constituted inadequate treatment of, and deliberate indifference to, Kosilek's serious medical need in violation of the Eighth Amendment. The First Circuit reversed and remanded the case for dismissal, finding that Kosilek's current treatment regimen without SRS, and the government's plan to treat her suicidal ideation should it arise, did not constitute deliberate indifference to Kosilek's serious medical need but a "measured response to . . . valid security concerns[.]" *Id.* at 96.

### B. Pat-down search claim

Fisher's second claim surviving defendants' motion to dismiss relates to the issue of pat-down searches. Fisher claims that she suffers from post-traumatic stress disorder ("PTSD") due to a sexual assault at another prison, and that pat-down searches by male officers trigger her PTSD.

The BOP's transgender offender manual (Doc. No. 68-1) provides guidance for same-gender pat-down searches. The manual provides that pat-down searches will be conducted in accordance with the gender of the institution to which the inmate is assigned, but that transgender inmates may request an exception. (*Id.* at 14.)

There is no dispute that Fisher's 2017 request for pat-down searches by female staff was denied by then Warden Merlak ("Merlak"). In this action, filed in 2019, Fisher claims that Merlak's denial violates the Eighth Amendment and she seeks injunctive relief requiring the warden to grant her request to be pat-searched only by female staff. On May 17, 2021, Elkton's current warden, Mark Williams ("Williams"), granted Fisher's request to be pat-searched by female staff. (Doc. No. 68 at 12 (citing Doc. No. 68-12).)

On summary judgment, defendants argue that this claim should be dismissed because Fisher's pat-down search exception request has been granted, rendering her claim for that relief moot. But Fisher contends that her claim is not moot under the voluntary cessation exception to mootness, and the Court should deny defendants' motion because "there are material issues of fact regarding whether Defendants' position was not genuine based upon a totality of circumstances, including the relative ease, timing, and manner by which the exception was granted." (Doc. No. 74 at 14.)

The issue of mootness implicates the Court's jurisdiction under the Constitution. Article III, § 2 of the United States Constitution vests federal courts with jurisdiction to address "actual cases and controversies" and "[f]ederal courts are prohibited from rendering decisions that do not affect the rights of the litigants." *Thomas v. City of Memphis, Tennessee*, 996 F.3d 318, 323 (6th Cir. 2021) (quotation marks and citations omitted). "A case becomes moot 'when the issues presented are no longer live or parties lack a legally cognizable interest in the outcome.'" *Id.* at 323–24 (quoting *Cleveland Branch, N.A.A.C.P. v. City of Parma, Ohio*, 263 F.3d 513, 530 (6th Cir. 2001) (further citation omitted)); *see also Powell v. McCormack*, 395 U.S. 486, 496, 89 S. Ct. 1944, 1951, 23 L. Ed. 2d 491 (1969) (A case is moot when the issue presented is no longer "live" or the parties "lack a legally cognizable interest in the outcome."). The burden of demonstrating mootness falls upon the party asserting it. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000).

Here, defendants voluntarily ceased the conduct at issue when the current warden granted Fisher's request for a pat-down search exception. Defendants have committed to the exception, admitting in Fisher's request for admissions that she will be pat-searched only by female staff members "unless the warden of Plaintiff's correctional institution finds that Plaintiff has violated institution rules concerning contraband or if exigent circumstances exist." (*See* Doc. No. 68-16 RFA No. 4.)

"'[A]s a general rule, 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.*, does not make the case moot.'" *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631, 99 S. Ct. 1379, 59 L. Ed. 2d 642 (1979) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632, 73 S. Ct. 894, 97 L. Ed. 1303 (1953)). "Although the bar is

34

high for when voluntary cessation by a private party will moot a claim, the burden in showing mootness is lower when it is the government that has voluntarily ceased its conduct." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019). "[G]overnment action receives this solicitude because courts assume 'that [the government] acts in good faith.'" *Id.* (quoting *Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018) (citation omitted)). That is, courts "presume that the same allegedly wrongful conduct by the government is unlikely to recur." *Id.* (citing *Friends of the Earth*, 528 U.S. at 189).

But Fisher argues that her claim is likely to reoccur because the current warden granted her request in response to litigation. (Doc. No. 74 at 15–17.) It is true that the burden on the party claiming mootness is increased if voluntary cessation is not genuine and occurred in response to litigation. *See Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 342–43 (6th Cir. 2007). But it appears that Fisher's request was reconsidered and granted by the current warden because of a change in circumstance, rather than in response to litigation. Fisher's initial request was denied by Merlak in 2017. This case was filed in 2019. Williams replaced Merlak in late 2018 or early 2019. William's reversal of Merlak's denial did not occur until 2021 when Fisher's request was brought to his attention approximately two years after this action was filed. (*See* Doc. No. 58 at 20–21 (Timothy Smith[24] Dep.).) Elkton's voluntary cessation of its denial of Fisher's pat-down search request appears to be due to the changed circumstance of a new warden and, therefore, supports a conclusion that the cessation is genuine and not likely to reoccur.

This case is similar to *Youngstown Publ'g Co. v. McKelvey*, 189 F. App'x 402 (6th Cir. 2006). In that case, a local publishing company sued the mayor of Youngstown, Ohio, for issuing

---

[24] Timothy Smith is a lieutenant at Elkton.

a policy that city personnel were not to speak with the *Business Journal* after it published articles critical of then Mayor McKelvey. After the litigation was filed, Youngstown's new mayor, Jay Williams, rescinded Mayor McKelvey's policy. The city argued that the litigation was moot. But the plaintiff publishing company argued, among other reasons, that the case was not moot under the voluntary cessation exception. The Sixth Circuit disagreed, finding that current mayor's revocation of former mayor's policy rendered the First Amendment action moot and not subject to voluntary cessation exception where the revocation by current mayor constituted a change of circumstances and there was no indication that the new mayor would return to the "old ways" of the former mayor. *Id.* at 405–06; *see also Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 698 (6th Cir. 2020) (finding First Amendment claim rendered moot when the city amended the sign ordinance where "in spite of the somewhat suspicious timing of the amendment of the Sign Ordinance within days after International Outdoor filed its motion for summary judgment, there is no indication that the City of Troy intends to repeal the amendment").

Fisher further maintains that her claim is not moot because Williams could simply reverse his approval of her pat-down search exception at his discretion. But defendants have documented a commitment that Fisher's pat-down search exception will remain in place unless she violates institution rules concerning contraband or under exigent circumstances. (*See* Doc. No. 68-16 RFA No. 4.) And even unfettered discretion of prison personnel to change a policy is not enough to defeat mootness under the voluntary cessation exception where, as here, the relief Fisher sought was provided due to a change of administrators, the defendants have committed to the change unless there is an occurrence of specific circumstances, and Fisher points to no evidence suggesting the contrary. *See Hanrahan v. Mohr*, 905 F.3d 947, 961 (6th Cir. 2018) (holding that plaintiffs'

36

challenge to prison media policies were moot and not subject to the voluntary cessation exception when, among other reasons, "defendants have represented that the new policies will remain in place."). Moreover, given the "unique complexities of the prison setting[,] [p]rison administrators must be entitled to deference in their ability to implement or cease policies related to the operations of the institutions they oversee and good faith should be attributed to their cessation of challenged policies." *Putnam v. Montgomery Cty. Sheriff's Dep't*, No. 3:12-cv-0132, 2012 WL 6645314, at *4 (M.D. Tenn. Dec. 20, 2012), *report and recommendation adopted,* No. 3:12-cv-0132, 2013 WL 173001 (M.D. Tenn. Jan. 15, 2013); *see also Hanrahan*, 905 F.3d at 962 (finding plaintiff's claim for injunctive relief moot where the change to prison policy provided the relief requested even though the changes to the media policies did not impact the baseline ability of the prison personnel to control media access).

And finally, Williams has granted Fisher the relief she sought in this action with respect to her pat-down search claim. Even though the warden has discretion to modify or reverse the pat-down search exception granted to Fisher, "it is hard to say that granting injunctive or declaratory relief as to [plaintiff] would 'make a difference to the legal interests of the parties' in light of the action the defendants have taken." *Hanrahan*, 905 F.3d at 962 (quoting *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc) (further citation omitted); *Jones v. Caruso*, 421 F. App'x 550, 551 (6th Cir. 2011) ("[N]othing remains to be enjoined or declared improper."); *Putnam*, 2012 WL 6645314, at *4 (recommending dismissing as moot plaintiff's claims challenging jail administrators discontinued mail policies because the court can no longer provide the relief requested). And to the extent that Fisher seeks a ruling regarding the prior warden's conduct or other declaratory relief, "the Supreme Court has admonished that the courts

'are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong.'" *Hanrahan,* 905 F.3d at 962 (quoting *Spencer v. Kemna*, 523 U.S. 1, 18, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998)); *see also id.* ("[W]e have previously found cases seeking declaratory and injunctive relief moot after prisons have changed policies that were challenged in litigation.") (collecting cases).

In this case, Fisher has received the relief requested with respect to her pat-down search claim and, for the reasons discussed above, the Court finds that defendants have carried their burden of establishing that Fisher's Eighth Amendment pat-down search claim is moot. A federal court lacks jurisdiction to review moot issues because, under Article III of the United States Constitution, the exercise of judicial power depends upon the existence of a case or controversy. *Liner v. Jafco, Inc.,* 375 U.S. 301, 306 n.3, 84 S. Ct. 391, 11 L. Ed. 2d 347 (1964). "Mootness is a jurisdictional question because the Court 'is not empowered to decide moot questions or abstract propositions[.]'" *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S. Ct. 402, 30 L. Ed. 2d 413 (1971) (citation omitted). Accordingly, defendants are entitled to summary judgment on Fisher's pat-down search claim.

## IV.   Conclusion

For all the foregoing reasons, Fisher's motion for summary judgment (Doc. No. 67) is denied, and defendants' motion for summary judgment (Doc. No. 68) is granted.

**IT IS SO ORDERED**.

Dated: July 8, 2022

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**